# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

KENNETH EUGENE SMITH,    )
    )
    Plaintiff,    )
    )    Case No. 2:23-cv-00656-RAH
v.    )
    )    CAPITAL CASE
JOHN Q. HAMM, in his official    )
Capacity as Commissioner, Alabama    )    **EXECUTION SCHEDULED FOR**
Department of Corrections, and    )    **JANUARY 25, 2024**
    )
TERRY RAYBON, in his official    )
Capacity as Warden, Holman    )
Correctional Facility,    )
    )
    Defendants.    )

## MOTION FOR PRELIMINARY INJUNCTION TO ENJOIN DEFENDANTS FROM EXECUTING MR. SMITH BY NITROGEN HYPOXIA USING THEIR PROTOCOL

# Table of Contents

PRELIMINARY STATEMENT ................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ..............................................4

LEGAL STANDARD...........................................................................................10

ARGUMENT .......................................................................................................11

I.     MR. SMITH IS LIKELY TO SUCCEED ON THE MERITS OF HIS
       CLAIMS. .................................................................................................11

   A.     Mr. Smith is Likely to Succeed on His Fourteenth Amendment Claim. ....11

      1.     Moving forward with Mr. Smith's second execution by nitrogen
             hypoxia while he has a pending appeal violates his right to equal
             protection. ...........................................................................................12

      2.     Moving forward with Mr. Smith's second execution by nitrogen
             hypoxia to moot discovery obligations violates his right to due
             process..................................................................................................15

   B.     Mr. Smith is Likely to Succeed on His Eighth Amendment Method-Of-
          Execution Claim. ...................................................................................17

      1.     ADOC's nitrogen hypoxia Protocol poses a substantial risk of serious
             harm to Mr. Smith..................................................................................18

      2.     There are feasible and available alternatives to the Protocol. ................22

   C.     Mr. Smith is Likely to Succeed on His RLUIPA and ARFA Claims........24

      1.     The Protocol substantially burdens Mr. Smith's religious exercise by
             inhibiting audible prayer in violation of RLUIPA. ...............................24

      2.     The Protocol burdens Mr. Smith's religious exercise by inhibiting
             audible prayer in violation of ARFA.....................................................26

   D.     Mr. Smith is Likely to Succeed on His First Amendment Claim for
          Violation of His Right of Access to the Courts. .......................................27

II.    MR. SMITH WILL BE IRREPARABLY HARMED WITHOUT AN
       INJUNCTION.............................................................................................28

III.   THE THREATENED INJURY TO MR. SMITH OUTWEIGHS THE
       HARM AN INJUNCTION WOULD CAUSE THE STATE ......................29

CONCLUSION ...................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alabama v. U.S. Army Corps of Eng'rs*,
  424 F.3d 1117 (11th Cir. 2005) ..........................................................11

*Arthur v. Thomas*,
  674 F.3d 1257 (11th Cir. 2012) (per curiam) ......................................12

*Barber v. Gov. of Ala.*,
  73 F.4th 1306 (11th Cir. 2023) (J. Pryor, J., dissenting) .....................6

*Barbour v. Haley*,
  471 F.3d 1222 (11th Cir. 2006) ..........................................................27

*Bass v. Singletary*,
  143 F.3d 1442 (11th Cir. 1998) ..........................................................27

*Baze v. Rees*,
  553 U.S. 35 (2008) ...............................................................................18

*Boyd v. Warden, Holman Corr. Facility*,
  856 F.3d 853 (11th Cir. 2017) ............................................................17

*Bucklew v. Lombardi*,
  572 U.S. 1131 (2014) ...........................................................................10

*Bucklew v. Precythe*,
  139 S. Ct. 1112 (2019) ...................................................................*passim*

*Burwell v. Hobby Lobby Stores*,
  573 U.S. 682 (2014) .............................................................................25

*Engquist v. Oregon Dep't of Agri.*,
  553 U.S. 591 (2007) .............................................................................12

*Ford v. Wainwright*,
  477 U.S. 399 (1986) .............................................................................15

*Gomez v. U.S. Dist. Ct. for N. Dist. of California*,
  966 F.2d 460 (9th Cir. 1992) (Noonan, J., dissenting) .......................30

*Hamm v. Smith*,
    143 S. Ct. 1188 (2023) .................................................................................8

*Hill v. McDonough*,
    547 U.S. 573 (2006) ...................................................................................29

*Holt v. Hobbs*,
    574 U.S. 352 (2015) ...........................................................................3, 25, 26

*Melendez v. Sec'y, Fla. Dep't of Corr.*,
    No. 21-13455, 2022 WL 1124753 (11th Cir. Apr. 15, 2022)......................29

*Miller v. Hamm*,
    640 F. Supp. 3d 1220 (M.D. Ala. 2022) ......................................................5

*Miller v. Hamm*,
    No. 2:22-cv-506-RAH, 2022 WL 4348724 (M.D. Ala. Sept. 19,
    2022) ...........................................................................................................28

*Nance v. Comm'r, Ga. Dep't of Corr.*,
    59 F.4th 1149 (11th Cir. 2023) ...................................................................24

*Nance v. Ward*,
    142 S. Ct. 2214 (2022)................................................................................13

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of
    Jacksonville*,
    896 F.2d 1283 (11th Cir. 1990) ..................................................................28

*Ohio Adult Parole Authority v. Woodard*,
    523 U.S. 272 (1998)...................................................................................16

*Price v. Commissioner*,
    920 F.3d 1317 (11th Cir. 2019) ..................................................................17

*Ramirez v. Collier*,
    595 U.S. 411 (2022)..........................................................................3, 25, 26

*Reeves v. Comm'r, Ala. Dep't of Corr.*,
    23 F.4th 1308 (11th Cir. 2022) ...................................................................10

*Smith v. Comm'r, Ala. Dep't of Corr.*,
No. 21-13581, 2021 WL 4916001 (11th Cir. Oct. 21, 2021) (Pryor,
J., concurring) ...........................................................................................28

*Smith v. Comm'r, Ala. Dep't of Corr.*,
No. 22-13781, 2022 WL 17069492 (11th Cir. Nov. 17, 2022)...........................8

*Smith v. Hamm*,
No. 2:22-cv-497, 2022 WL 4353143 (M.D. Ala. Jul. 5, 2023)............6, 8, 12, 17

*Thai Meditation Ass'n of Alabama, Inc. v. City of Mobile*,
980 F.3d 821 (11th Cir. 2020) ................................................................26

*U.S. v. Goodwin*,
457 U.S. 368 (1982)..............................................................................17

*Vill. of Westbrook v. Olech*,
528 U.S. 562 (2000)..............................................................................13

*Woods v. Comm'r, Ala. Dep't of Corr.*,
951 F.3d 1288 (11th Cir. 2020) ........................................................9, 13, 14, 15

## Statutes

42 U.S.C. § 1983 ...................................................................................13

42 U.S.C. § 2000cc-1(a)..........................................................................24

42 U.S.C. § 2000cc, *et seq.*........................................................................3

42 U.S.C. § 2000cc-5(7)(A).......................................................................25

Ala. Code § 15-18-82.1(a) ........................................................................14

Ala. Code § 15-18-82.1(b)(2) .....................................................................14

## Other Authorities

Ala. Const. Art. I, § 3.01(V)(a)...............................................................3, 26

Fed. R. Civ. P. 12(b)(1).............................................................................9

U.S. Const. amend. I ...........................................................................*passim*

U.S. Const. amend. VIII....................................................................*passim*

U.S. Const. amend. XIV ..................................................................*passim*

Plaintiff Kenneth Eugene Smith submits this memorandum of law in support of his motion for a preliminary injunction to prohibit Defendants from executing him by nitrogen hypoxia on January 25, 2024, as currently scheduled.

## PRELIMINARY STATEMENT

In November 2022, the Alabama Department of Corrections ("ADOC") tried, but failed, to execute Mr. Smith by lethal injection when ADOC was unable to establish intravenous ("IV") access, but not before Mr. Smith faced four hours of severe and ongoing physical and psychological pain.  Now, Mr. Smith stands to face his ***second execution attempt***, this time by nitrogen hypoxia—an execution method that has "never been used to carry out an execution and ha[s] no track record of successful use." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1130 (2019) (internal quotation marks and citation omitted).

After years of taking the position that nitrogen hypoxia is not a feasible, alternative method for execution, including just a few months ago, ADOC abruptly changed course.  ADOC now claims it is prepared to carry out executions using nitrogen hypoxia by following its recently released and heavily redacted Execution Procedures as of August 2023 (the "Protocol").  Doc. No. 16-1.

When Mr. Smith challenged his execution by lethal injection in 2022 and proposed nitrogen hypoxia as a feasible and available alternative, he did not endorse ADOC's then-undisclosed (and heavily redacted) Protocol.  Proceeding with Mr.

1

Smith's execution by nitrogen hypoxia would violate Mr. Smith's constitutional rights:

*First*, proceeding with the execution would violate Mr. Smith's right to procedural due process and equal protection under the Fourteenth Amendment because ADOC has moved Mr. Smith to the front of the line for execution by nitrogen hypoxia even though Mr. Smith has a pending appeal and even though there are other condemned people who elected to be executed by nitrogen hypoxia five years ago who have exhausted their appeals.

*Second*, the Protocol lacks critical safeguards, the absence of which exposes Mr. Smith to a severe risk of superadded pain during the execution process, including but not limited to severe and permanent injuries short of death such as persistent vegetative state, stroke, or the painful sensation of suffocation. For example, the Protocol does not provide information on (1) how the mask will remain sealed and in the correct position throughout the execution, (2) how carbon dioxide will be removed from the mask, (3) procedures for a condemned person who vomits inside the mask, (4) the concentration of the gas to be used, or (5) monitoring blood oxygen levels as nitrogen is being administered. *See* Ex. A, Declaration of Robert Jason Yong, M.D. ("Yong Dec.") at 9–11; Ex. B, Declaration of Philip Nitschke, PhD MD  ("Nitschke Dec.") at ¶¶ 7–12.  Indeed, the Supreme Court rejected a condemned person's proposal for nitrogen hypoxia for many of the same

deficiencies that plague ADOC's Protocol.  *See Bucklew*, 139 S. Ct. at 1129 (rejecting condemned person's nitrogen hypoxia proposal for failure to address "essential questions," including "what concentration" of nitrogen should be administered or how the State might protect "against the risk of gas leaks").  ADOC can amend the Protocol to implement safeguards as described herein to substantially reduce the risk to Mr. Smith of superadded pain posed by the Protocol or, alternatively, use a firing squad as an available and feasible alternative.

*Third*, the current Protocol violates Mr. Smith's rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, *et seq*., and the analogous right known as the Alabama Religious Freedom Amendment ("ARFA"), Ala. Const. Art. I, § 3.01(V)(a).  The Protocol provides that a mask will be placed over the condemned person's face before he is permitted to make a statement.  In addition to the risk of dislodging the mask, the Protocol interferes with Mr. Smith's right to speak audibly and to pray audibly with or without a spiritual advisor.  The Protocol thus forces to Mr. Smith to make the untenable choice in violation of RLUIPA and ARFA: he can either abstain from his religious exercise of audible prayer to avoid dislodging the mask or audibly pray and risk the dire consequences of breaking the mask's seal.  *See, e.g.*, *Ramirez v. Collier*, 595 U.S. 411, 427–30 (2022) (ban on audible prayer in execution chamber violates RLUIPA); *Holt v. Hobbs*, 574 U.S. 352, 361, 369 (2015) (policy that forced inmate to violate

3

his religious beliefs or face disciplinary action substantially burdened inmate's religious exercise).  There is no compelling governmental interest that justifies that burden on Mr. Smith's rights, and in any event, there are less restrictive alternatives to accomplish any purported compelling governmental interest.

**Fourth**, Defendants have violated Mr. Smith's First Amendment right of access to the courts.  By heavily redacting the Protocol and rejecting Mr. Smith's requests for an unredacted copy or additional information, Defendants hindered Mr. Smith's efforts to pursue the colorable claims challenging his scheduled execution.

Together, these claims highlight the importance of scrutinizing ADOC's procedures for carrying out Mr. Smith's execution, which have never been tested or "used to carry out an execution and ha[ve] no track record of successful use." *Bucklew*, 139 S. Ct. at 1130 (internal quotation marks and citation omitted).  The Court should grant Mr. Smith's motion and enjoin Defendants from executing him by nitrogen hypoxia using the procedures in ADOC's Protocol.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    *ADOC's first failed attempt to execute Mr. Smith by lethal injection.*

Mr. Smith has already lived through one execution.  On November 17, 2022, Mr. Smith survived ADOC's attempt to execute him by lethal injection when ADOC personnel were unable to place IV lines to administer lethal drugs to him.  The execution attempt lasted four hours, during which Mr. Smith was repeatedly and

painfully stuck with needles on various parts of his body, placed into stress positions, including an inverted angle with his head below his heart, and left for extended periods in painful, uncomfortable states with no feedback from staff members, despite his requests for information and to contact this Court and/or his lawyer.

ADOC's attempted execution of Mr. Smith came on the heels of two botched executions. On July 28, 2022, ADOC botched the execution of Joe Nathan James when it strapped him to a gurney and poked, prodded, and cut him to access a vein for IV injection of the lethal drugs for over three hours. On September 22, 2022, ADOC unsuccessfully attempted to execute Alan Eugene Miller because ADOC personnel were unable to set IV lines to administer the lethal drugs after they "painfully punctured [him] with needles over various parts of his body for approximately 90 minutes," causing "extreme physical pain as well as psychological pain . . . ." *Miller v. Hamm*, 640 F. Supp. 3d 1220, 1241 (M.D. Ala. 2022).

In August 2022, three weeks after Mr. James's botched execution, Mr. Smith commenced an action in this District against Defendant Hamm, alleging that his execution by lethal injection would violate his right to be free from cruel and unusual punishment under the Eighth Amendment and seeking declaratory and injunctive relief to prohibit ADOC from executing him by lethal injection. *See Smith v. Hamm*, No. 2:22-cv-497, Complaint (Doc. 1) (M.D. Ala.) ("Lethal Injection Action").

As Mr. Smith predicted, ADOC had great difficulty establishing IV access in Mr. Smith.  ADOC's attempts to establish intravenous access went "'so far beyond what [is] needed to carry out a death sentence that [it] could only be explained as reflecting the infliction of pain for pain's sake.'"  *Smith v. Hamm*, No. 2:22-cv-497, 2023 WL 4353143, at *7 (M.D. Ala. Jul. 5, 2023) (citation omitted); *see also Barber v. Gov. of Ala.*, 73 F.4th 1306, 1324 (11th Cir. 2023) (J. Pryor, J., dissenting) ("Mr. Smith's horrifying experience was not a singular event; it was just the latest incident in an uninterrupted pattern of executions by [ADOC] that involved protracted, severely painful, and grisly efforts to establish the intravenous lines necessary to carry the lethal injection drugs into his body.").

Although Mr. Smith survived the execution attempt, he did not leave the execution chamber unscathed; Mr. Smith suffers from posttraumatic stress disorder ("PTSD") with dissociative features and depression.  Ex. C, Declaration of Katherine Porterfield, Ph.D. ("Porterfield Dec.") at 3.   In addition to difficulty sleeping, Mr. Smith's symptoms include nightmares, hypervigilance, hyperarousal, and dissociation (a defense mechanism to suppress threatening thoughts).  Porterfield Dec. at 3, 18–22, 25–26.  In addition to the ongoing psychological consequences, Mr. Smith experienced a great deal of physical pain from ADOC's attempt to execute him.  After the execution, he experienced lingering pain in his arm from repeated needle jabs and in his collarbone from ADOC's attempted central line

6

procedure.  He also experienced back spasms from being restrained on the gurney for nearly four hours.  *See* Ex. D, Declaration of Kenneth Eugene Smith.

      B.     *ADOC's Decision to Make a Renewed Attempt to Execute Mr. Smith by Nitrogen Hypoxia and to Put Him in the Front of the Line.*

Shortly after ADOC's failed execution attempt, Mr. Smith amended his complaint in the Lethal Injection Action to add allegations about that attempt and to add defendants who participated in it.  *See Smith v. Hamm*, No. 2:22-cv-497, Second Amended Complaint (Doc. 71) (M.D. Ala.).  He also served discovery requests on the defendants, seeking, among other things, the identities of the people who participated in and observed ADOC's attempt to execute him and documents concerning ADOC's attempt to execute him.

For ten months after ADOC's failed attempt to execute Mr. Smith by lethal injection, ADOC threatened Mr. Smith with another attempt by the same method and consistently represented that nitrogen hypoxia was not a feasible, alternative method of execution.  *See, e.g.*, *Smith v. Hamm*, No. 2:22-cv-497, Defendants' Motion to Dismiss (Doc. 78) at 24–25 (M.D. Ala.) (motion to dismiss Mr. Smith's second amended complaint on the ground, among others, that nitrogen hypoxia was not an available method of execution).

In December 2022, Defendant Hamm filed a petition for a writ of certiorari in the U.S. Supreme Court challenging the Eleventh Circuit's holding in the Lethal Injection Action that Mr. Smith had plausibly alleged "that nitrogen hypoxia is an

available alternative method" of execution and "that nitrogen hypoxia will significantly reduce his pain." *Smith v. Comm'r, Ala. Dep't of Corr.*, No. 22-13781, 2022 WL 17069492, at *5 (11th Cir. Nov. 17, 2022).  The U.S. Supreme Court denied that petition in May 2023.  *See Hamm v. Smith*, 143 S. Ct. 1188 (2023).  And, in July 2023, this Court denied the defendants' motion to dismiss Mr. Smith's Eighth Amendment claim for declaratory and injunctive relief in the Lethal Injection Action.  *See Smith v. Hamm*, No. 2:22-cv-497, 2023 WL 4353143 (M.D. Ala. Jul. 5, 2023).  Thus, by July 2023, there were no more obstacles to discovery after defendants had delayed it for nearly one year trying unsuccessfully to have Mr. Smith's claims dismissed.

On August 25, 2023, on the eve of its obligation to produce information in the Lethal Injection Action, the State moved for an order from the Alabama Supreme Court authorizing ADOC to execute Mr. Smith by nitrogen hypoxia.  The State filed the motion despite the fact that Mr. Smith has an appeal pending in the Alabama Court of Criminal Appeals from the dismissal of a non-frivolous state postconviction petition that addresses the constitutionality of attempting to execute him for a second time, and even though other condemned people in Alabama who elected to be executed by nitrogen hypoxia when that option was made available to them in 2018 have exhausted their appeals.  In doing so, ADOC has violated its own stated "custom . . . [to] wait[] to move for an inmate's execution until he has exhausted his

conventional appeals: direct appeal, state postconviction, and federal habeas." *Woods v. Comm'r, Ala. Dep't of Corr.*, 951 F.3d 1288, 1292 (11th Cir. 2020).

At the same time the State filed its motion, defendants reversed position and moved to dismiss the Lethal Injection Action on the ground that "Defendant Hamm has determined that nitrogen hypoxia is an available means of execution and will be used in the execution of" Mr. Smith and also "has determined that lethal injection is not available as to Plaintiff and will not be used in any future execution attempt of" Mr. Smith. *Smith v. Hamm*, No. 2:22-cv-497, Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure (Doc. 104) at ¶ 3 (M.D. Ala.). And, on August 29, the defendants moved to stay discovery in the Lethal Injection Action. On September 20, this Court entered a judgment enjoining Defendants "from executing Kenneth Eugene Smith by lethal injection" and dismissed the Lethal Injection Action. *Smith v. Hamm*, No. 2:22-cv-497, Final Judgment and Order (Doc. 112) at 3 (M.D. Ala.).

C.    *Mr. Smith's Claims*

On November 8, 2023, Mr. Smith filed his complaint in this action after the Alabama Supreme Court authorized ADOC to make a second attempt to execute him. Doc. No. 1. On the same day, Governor Ivey scheduled Mr. Smith's execution for January 25, 2024. Ex. E. Contemporaneously with this motion, Mr. Smith has filed an amended complaint in which he asserts that his execution on January 25,

2024 using the Protocol would (1) violate his rights under the equal protection and due process clauses of the Fourteenth Amendment (First Claim); (2) violate his right to be free from cruel and unusual punishment under the Eighth Amendment (Second Claim); (3) violate his rights to freedom of speech and free exercise of his religion under the First Amendment (Third Claim); (4) substantially burden his right to exercise his religion under RLUIPA (Fourth Claim); (5) burden his right to exercise his religion under ARFA (Fifth Claim); and (6) violate his right of access to the courts (Sixth Claim).  Doc. No. 16.

## LEGAL STANDARD

A court may grant a preliminary injunction if the plaintiff establishes "(1) a substantial likelihood of success on the merits; (2) that irreparable injury would result unless the injunction were issued; (3) that the threatened injury to him outweighs whatever damage the proposed injunction might cause the defendants; and (4) that, if issued, the injunction would not be adverse to the public interest." *Reeves v. Comm'r, Ala. Dep't of Corr.*, 23 F.4th 1308, 1319–20 (11th Cir. 2022). While such relief is not available as a matter of right, the Supreme Court has granted a preliminary injunction where, as here, the totality of equities favor doing so.  *See, e.g.*, *Bucklew*, 139 S. Ct. at 1118 (noting the inmate "received a stay of execution and five years to pursue the argument" that Missouri's execution protocol was unconstitutional as applied to him); *Bucklew v. Lombardi*, 572 U.S. 1131 (2014)

10

(granting stay).  Mr. Smith need only show that one of his claims is likely to succeed for the Court to grant his motion.  *See Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1134 (11th Cir. 2005).

## ARGUMENT

In moving for a preliminary injunction, Mr. Smith seeks only to preserve the status quo while he litigates his constitutional, RLUIPA, and ARFA claims.  Mr. Smith is likely to prevail on the merits of those claims.  And absent relief, he undoubtedly will suffer irreparable harm—death by an untested and novel execution method using a deficient Protocol.  A preliminary injunction would not substantially injure Defendants because they will still be able to carry out their execution either by amending the Protocol to cure its deficiencies or, alternatively, firing squad. Finally, a preliminary injunction is also in the public's interest to ensure that the State implements adequate safeguards before using a novel execution method.

## I.   MR. SMITH IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS.

### A.   Mr. Smith is Likely to Succeed on His Fourteenth Amendment Claim.

Defendants have violated Mr. Smith's right to procedural due process and equal protection under the Fourteenth Amendment because ADOC has moved Mr. Smith to the front of the line for execution by nitrogen hypoxia despite that there are other condemned people who elected to be executed by nitrogen hypoxia five years

ago that have exhausted their appeals. Defendants' actions facilitated their desire to moot Mr. Smith's federal action after his first failed execution and to avoid discovery in that action. Such conduct violates the equal protection and due process clauses of the Fourteenth Amendment.

> **1.    Moving forward with Mr. Smith's second execution by nitrogen hypoxia while he has a pending appeal violates his right to equal protection.**

To succeed on his equal protection claim, Mr. Smith must establish that Defendants are treating Mr. Smith "disparately from other similarly situated persons," and that the disparate treatment is not "rationally related to a legitimate government interest." *Arthur v. Thomas*, 674 F.3d 1257, 1262 (11th Cir. 2012) (per curiam) (internal quotation marks and citation omitted). "[A]n equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that [he] has been irrationally singled out as a so-called 'class of one.'" *Engquist v. Oregon Dep't of Agri.*, 553 U.S. 591, 601 (2007). That is because "[w]hen those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference." *Id.* at 602. Thus, "[a] plaintiff may successfully allege a violation of his equal protection rights as a 'class of one' by showing 'that [he] has been intentionally treated differently from others similarly situated and that

there is no rational basis for the difference in treatment.'"  *Smith*, 2023 WL 4353143, at *12 (quoting *Vill. of Westbrook v. Olech*, 528 U.S. 562, 564 (2000)).

As it applies to Mr. Smith, Defendants have deviated from their custom to "'wait[] to move for an inmate's execution until he has exhausted his conventional appeals: direct appeal, state postconviction, and federal habeas.'"  *Woods*, 951 F.3d at 1292 (citation omitted).  Defendants intend Mr. Smith to be the first person to be executed by nitrogen hypoxia despite the fact that he has an appeal from the denial of a state postconviction petition pending in the Alabama Court of Criminal Appeals.

In May 2023, Mr. Smith filed a petition for relief from his death sentence in the Circuit Court of Jefferson County, asserting that a second attempt to execute him by any method would violate his Eighth Amendment right to be free from cruel and unusual punishment under the U.S. Constitution and his analogous right under the Alabama Constitution.  Ex. F.  Mr. Smith is in a unique position as one of only two living people in the country who have survived an execution attempt.  He plainly could not have brought his claim in prior state postconviction or federal habeas proceedings, which became final before ADOC's failed attempt to execute him in November 2022.  Nor could he have asserted his claim in his prior method-of-execution claim in this Court because a claim that "challenges the validity of [his] conviction or sentence" is not available in a federal action under 42 U.S.C. § 1983.  *See Nance v. Ward*, 142 S. Ct. 2214, 2221 (2022).  In August 2023, the state court

dismissed Mr. Smith's petition.  His appeal is now fully briefed before the Alabama Court of Criminal Appeals.  Yet despite Mr. Smith's pending appeal and contrary to Defendants' custom, they seek to execute Mr. Smith.

In addition to Mr. Smith's pending appeal, which should make him ineligible for execution now, there are other condemned people who elected to be executed by nitrogen hypoxia who have exhausted their appeals.  In 2018, the State authorized nitrogen hypoxia as a method of execution for condemned people in Alabama.  *See* Ala. Code § 15-18-82.1(a).  Condemned people whose capital convictions were final when the legislation was enacted had a 30-day window beginning June 1, 2018 to elect to be executed by nitrogen hypoxia rather than lethal injection.  *See* Ala. Code § 15-18-82.1(b)(2).   Mr. Smith did not so elect.   But "[n]early 50 . . . death-sentenced inmates in Alabama elected nitrogen hypoxia during the election period," including death-sentenced inmates "who have exhausted their conventional appeals."  *Woods*, 951 F.3d at 1291–92.  However, Defendants have not sought to execute any of those condemned people and have instead focused on Mr. Smith.  *See id.* at 1292.

Even though these other condemned people elected to be executed by nitrogen hypoxia five years ago and their appeals exhausted before Mr. Smith's appeals, Defendants chose Mr. Smith to be the first condemned person to be subject to execution by the experimental method of nitrogen hypoxia.  The only thing that

14

distinguishes Mr. Smith from these other condemned people—aside from the foregoing facts—is that Mr. Smith had pursued federal litigation in this Court against Defendants and other State representatives for violation of Mr. Smith's constitutional rights during his first botched execution by lethal injection. By moving Mr. Smith to the front of the line for execution by nitrogen hypoxia, Defendants were able to moot that federal litigation just in time to avoid their discovery obligations. But that is not a rational basis for Defendants' disparate treatment of Mr. Smith. Mr. Smith simply asks that he be treated the same as other similarly-situated inmates on death row and that he be permitted to exhaust his appeals before his execution is carried out.

> **2.     Moving forward with Mr. Smith's second execution by nitrogen hypoxia to moot discovery obligations violates his right to due process.**

To succeed on the due process claim, Mr. Smith must show "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process." *Woods*, 951 F.3d at 1293 (citation omitted). The Supreme Court has emphasized its "heightened concern for fairness and accuracy" when reviewing "the process requisite to the taking of a human life." *Ford v. Wainwright*, 477 U.S. 399, 414 (1986). All three requirements are satisfied here.

First, Defendants intend to deprive Mr. Smith of his life without due process. Despite having been sentenced to death, Mr. Smith still has a "residual life interest."

*See Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 281 (1998) ("We agree that respondent maintains a residual life interest, *e.g.*, in not being summarily executed by prison guards."); *id.* at 288 (O'Connor, J., joined by Souter, Ginsburg, and Breyer, JJ., concurring in part and concurring in judgment) ("A prisoner under a death sentence remains a living person and consequently has an interest in his life."); *id.* at 291 (Stevens, J., concurring in part and dissenting in part) ("There is, however, no room for legitimate debate about whether a living person has a constitutionally protected interest in life. He obviously does.").

Second, the state action requirement is satisfied here because Defendants are responsible for initiating the execution process in a constitutional manner, setting up the election process at Holman, honoring Mr. Smith's appeals, and/or for carrying out Mr. Smith's execution.

Third, as described above, Defendants seek to execute Mr. Smith despite his pending appeal and contrary to their stated custom to await completion of all appeals. They sought authority to do so only after moving unsuccessfully twice in this Court and unsuccessfully seeking the intervention of the U.S. Supreme Court to dismiss Mr. Smith's Lethal Injection Action.  And by moving for authority to execute Mr. Smith, Defendants mooted the Lethal Injection Action coincidentally on the eve of their discovery obligations into Mr. Smith's failed execution.

Under the Due Process clause of the Fourteenth Amendment, "while an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right." *U.S. v. Goodwin*, 457 U.S. 368, 372 (1982). Defendants' arbitrary and capricious decision to seek to execute Mr. Smith by nitrogen hypoxia despite his pending appeal and to moot then-pending litigation violates Mr. Smith's due process rights.

**B.     Mr. Smith is Likely to Succeed on His Eighth Amendment Method-Of-Execution Claim.**

Mr. Smith's impending execution under the Protocol violates the Eighth Amendment's prohibition on "cruel and unusual punishment." U.S. Const. amend. VIII. To prevail on his claim, Mr. Smith must show that the method of execution poses "a substantial risk of serious harm," an "objectively intolerable risk of harm" that "prevents [Defendants] from pleading that they were subjectively blameless." *Price v. Commissioner*, 920 F.3d 1317, 1326 (11th Cir. 2019) (cleaned up). Mr. Smith must also identify an "alternative" method of execution that is "'feasible, readily implemented, and in fact significantly reduces the substantial risk of pain posed by the state's planned method of execution.'" *Smith*, 2023 WL 4353143, at *6 (quoting *Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853, 858 (11th Cir. 2017)). Mr. Smith's claim satisfies both elements.

17

### 1.   ADOC's nitrogen hypoxia Protocol poses a substantial risk of serious harm to Mr. Smith.

The Supreme Court has explained that a method of execution presents a "substantial risk of serious harm" when it involves "torture or a lingering death," *Baze v. Rees*, 553 U.S. 35, 49–50 (2008) (citations omitted), or the "superadd[ing]" of "terror, pain, or disgrace," *Bucklew v. Precythe*, 139 S. Ct. 1112, 1124 (2019) (citations omitted).

The Protocol, as currently drafted, does just that.  To be clear, no state or federal government has ever used nitrogen hypoxia before as a means of execution. In describing the novel method in *Bucklew*, the Supreme Court explained that nitrogen hypoxia has "never been used to carry out an execution" and has "no track record of successful use." *Id.* at 1130.  If it does not cause death, nitrogen hypoxemia can cause dire consequences, including a persistent vegetative state, a stroke, or the painful sensation of suffocation.  Yong Dec. at 5.  It is, therefore, critical that the State implement procedural safeguards to reduce the risk of pain from a novel method to condemned inmates like Mr. Smith.  But the Protocol, as currently drafted, is wholly inadequate for that purpose.

***First***, the Protocol does not provide adequate detail on the mechanism of delivery of the nitrogen, or how a mask will remain sealed and in the correct position throughout the execution.  Delivery of nitrogen gas requires a closed chamber or tightly sealed mask to prevent the condemned individual from breathing oxygen.

Yong Dec. at 9.   Breathing oxygen will likely prolong the time to reach unconsciousness, thereby increasing the risk of persistent vegetative state, stroke, or the painful sensation of suffocation.  Yong Dec. at 10.

The Protocol does not contain any guidance on the type of mask that will be used, how it will be placed and adjusted and by whom, what training the person(s) placing and adjusting the mask will receive and who will provide the training, how and under what criteria the person(s) will determine whether the mask has been "properly placed," or what will happen if the mask becomes displaced during the procedure.  Nitschke Dec. at ¶¶ 8.1-8.3.  Indeed, ADOC requires spiritual advisors to complete a waiver form that acknowledges the risk that nitrogen can leak outside the mask.  Ex. G.  If nitrogen can escape outside the mask, it follows that oxygen can infiltrate inside the mask.

Additionally, the Protocol contemplates that speaking may dislodge or otherwise alter the placement of the mask.  *See* Protocol § X.A.xiii (following the condemned inmate's final statement, "[t]he team members inside the execution chamber will make a final inspection of the mask" and verify "proper placement").  Nevertheless, there is nothing in the Protocol to explain how Defendants will ensure that the mask remains sealed if the condemned person speaks, prays, or otherwise moves during the administration of nitrogen.  Nor are there any procedures for what happens if the mask is dislodged.

**Second**, the Protocol does not specify how exhaled carbon dioxide will be removed from the mask. The ability to remove exhaled carbon dioxide from the mask is critical to the use of nitrogen as an execution method as it differentiates hypoxemia (inability to intake oxygen while expelling carbon dioxide) from asphyxia (inability to intake oxygen and inability to exhale carbon dioxide). Yong Dec. at 4. If the mask does not include a mechanism for removing carbon dioxide, the condemned person could breathe exhaled carbon dioxide and experience hypercarbia, asphyxiation, and the painful sensation of suffocation. Yong Dec. at 10.

**Third**, the Protocol fails to provide procedures for a condemned person who vomits inside the mask, which might cause the condemned person to choke and asphyxiate. Nitschke Dec. at ¶ 12.1; Yong Dec. at 10. Mr. Smith, who has PTSD from his first attempted execution, is particularly susceptible to this risk. Porterfield Dec. at 21, 30.

**Fourth**, the Protocol does not specify the purity of the nitrogen gas that will be used or any procedures to test or otherwise determine whether it has been contaminated in the process of manufacture, transportation, or storage. If ADOC uses less than 100% pure nitrogen then the condemned person may transition to a persistent vegetative state, have a stroke, or experience the painful sensation of suffocation. Yong Dec. at 11.

20

***Fifth***, the Protocol does not provide for continued monitoring of blood oxygen levels as the nitrogen is being administered.  Rather, the Protocol only accounts for monitoring blood oxygen levels for two minutes after the mask is placed on the condemned person's face.  *See* Protocol at §§ X.A.v, vi.  Without procedures in place to monitor blood oxygen during the administration of nitrogen, Defendants would be ignorant of oxygen infiltrating the mask thereby increasing the risk of dire consequences short of death.  Nitschke Dec. at ¶ 11.1; Yong Dec. at 11.

***Finally***, the Protocol fails to provide procedures for the unique circumstance of Mr. Smith who survived an attempted execution and now suffers PTSD.  The Protocol provides for procedures in the lead up to an execution, including for notifying the condemned person, providing the condemned person a schedule for the week of the execution (the "Death Watch observation period"),  placing the condemned person in a holding/observation cell, and providing for visitations during the execution week.  Protocol at §§ IV–VIII.  But the Protocol fails to provide procedures and basic safeguards for condemned people like Mr. Smith who have survived an attempted execution, have PTSD, and may experience exacerbating symptoms—such as intense psychological distress, extreme panic, or sleep disruption—as they are forced to re-experience the days and weeks leading up to another execution attempt.  Porterfield Dec. at 3–4.

The absence of these safeguards subjects Mr. Smith to a substantial risk of harm including the risk of a lingering death and the superaddition of terror, pain, and/or disgrace.   The Supreme Court previously rejected a condemned person's proposal for nitrogen hypoxia for many of the same deficiencies that plague ADOC's Protocol.  *See Bucklew*, 139 S. Ct. at 1129 (rejecting condemned person's nitrogen hypoxia proposal for failure to address "essential questions" including but not limited to "what concentration" of nitrogen should be administered or how the State might protect "against the risk of gas leaks").

### 2.    There are feasible and available alternatives to the Protocol.

When Mr. Smith challenged his execution by lethal injection in 2022 and proposed nitrogen hypoxia as a feasible and available alternative, he did not agree to be executed by a protocol devoid of safeguards or one that was haphazardly concocted as a means to moot Mr. Smith's Lethal Injection Action.  Mr. Smith stands by his position that nitrogen hypoxia ***with proper controls*** is a feasible and readily available alternative method that would significantly reduce the substantial risk of severe pain threatened by the current Protocol.  In particular, ADOC can amend the Protocol to cure its deficiencies by including provisions to:

- Measure each condemned person subject to execution by nitrogen hypoxia for a custom fit mask to reduce the risk that oxygen leaks under the mask or, alternatively, use a closed space or a hood.
- Provide a condemned person an opportunity to speak and to audibly pray without being masked.

22

- Disclose the training "team members" will receive in placing and adjusting the mask over the condemned person's face, their level of experience with the masks being used, and the metrics that will be used to ensure the mask is "properly placed" and passes the "final inspection."

- Add a mechanism to remove carbon dioxide that the condemned person exhales from under the mask.

- Disclose the source of the nitrogen to be used, and information about its transportation and storage to avoid contamination.

- Require testing of the nitrogen gas before use to ensure purity of the nitrogen gas.

- Add procedures to monitor the pulse oximeter throughout the process.

- Add procedures to halt the execution if the condemned person vomits into the mask.

- Add procedures for attempting to execute condemned people who have survived a previous attempt and are experiencing PTSD as a result.

- Employ a third-party licensed medical provider who (1) will be permitted to observe the execution process from the time the condemned person is taken into the execution chamber until completed, and (2) has the authority to call off or postpone the execution if, in his or her judgment, the condemned person is at risk of serious injury short of death.

Alternatively, if Defendants are unwilling or unable to amend the Protocol so that it complies with constitutional requirements, the firing squad is an available and feasible alternative that will substantially reduce the risk to Mr. Smith of superadded pain posed by the Protocol.  Ex. H, Declaration of Jonathan I. Groner, MD. ("Groner Dec.").  Utah has a protocol for using a firing squad to carry out executions, which "is 'sufficiently detailed to permit a finding that the State could carry it out relatively

23

easily and reasonably quickly.'"  *Nance v. Comm'r, Ga. Dep't of Corr.*, 59 F.4th 1149, 1155 (11th Cir. 2023) (quoting *Bucklew*, 139 S. Ct. at 1129).

### C.   Mr. Smith is Likely to Succeed on His RLUIPA and ARFA Claims.

#### 1.   The Protocol substantially burdens Mr. Smith's religious exercise by inhibiting audible prayer in violation of RLUIPA.

Mr. Smith is a man of faith.  During ADOC's first execution attempt, Mr. Smith audibly maintained his dialogue with God in exercise of his religious belief. He thanked God for the week he had just had with his family and quietly sang to himself the contemporary hymn, "I am not alone."  The current Protocol, however, requires the use of a mask and contains no procedures to ensure the mask remains sealed and in proper position while the condemned person is praying at the time of his death.  This substantially burdens Mr. Smith's religious exercise by inhibiting audible prayer at the time of his execution.

RLUIPA provides: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a).  "In RLUIPA, in an obvious effort to effect a complete separation from the First

Amendment case law, Congress deleted reference to the First Amendment and defined the 'exercise of religion' to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 696 (2014) (*quoting* 42 U.S.C. § 2000cc-5(7)(A)).  RLUIPA thus provides more "expansive protection" for religious liberty than the United States Supreme Court case law.  *Hobbs*, 574 U.S. at 358.

To maintain a RLUIPA claim, Mr. Smith bears the initial burden of demonstrating that the State's action burdens his exercise of religion grounded in a sincerely held religious belief.  *Id.* at 361.  Mr. Smith seeks to pray audibly during his execution which is a traditional form of religious exercise.  As the Supreme Court recently recognized, "there is a rich history" of audible prayer at the time of a condemned person's execution, "dating back well before the founding of the nation." *Ramirez*, 595 U.S. at 427 (ban on audible prayer in the execution chamber violated RLUIPA).  The Protocol requires use of a mask but provides no guidance on how to secure the mask to confirm a tight seal.  Because movement of the condemned person while speaking, including small mouth movements such as quiet but audible prayer, may break the seal and cause leaking, *see* Yong Dec. at 9, Mr. Smith faces an untenable choice: he can either abstain from his religious exercise of audible prayer to avoid dislodging the mask or audibly pray and risk the dire consequences of breaking the mask's seal.  RLUIPA protects Mr. Smith from making this choice.

*See Hobbs*, 574 U.S. at 361 (policy that forced inmate to violate his religious beliefs or face disciplinary action substantially burdened inmate's religious exercise).

Once Mr. Smith demonstrates that he is likely to succeed on his RLUIPA claim, Defendants must prove that the burden on Mr. Smith's religious exercise is justified by a compelling governmental interest and is the least restrictive means to further any purported compelling governmental interest. *See Ramirez*, 595 U.S. at 426–27; *Hobbs*, 574 U.S. at 362. The Supreme Court has characterized this standard as "exceptionally demanding." *Hobbs*, 574 U.S. at 364. "If a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Id.* at 365 (cleaned up). Defendants cannot demonstrate that the absence of safeguards to allow for prayer during the administration of nitrogen is justified by a compelling governmental interest or is the least restrictive means to further any purported interest.

### 2.   The Protocol burdens Mr. Smith's religious exercise by inhibiting audible prayer in violation of ARFA.

The Protocol similarly violates Mr. Smith's rights under the lesser standard of ARFA. ARFA provides the "[g]overnment shall not burden a person's freedom of religion . . . ." Ala. Const. Art. I, § 3.01(V)(a). Unlike RLUIPA, ARFA does not require proof that the government "substantially" burdened religious exercise, only that it "burden[ed]" it. Under ARFA, "*any* burden—even an incidental or insubstantial one—suffices to trigger strict scrutiny." *Thai Meditation Ass'n of*

26

*Alabama, Inc. v. City of Mobile*, 980 F.3d 821, 840 (11th Cir. 2020) (emphasis in original).   Thus, even if the Court does not find that the Protocol *substantially* burdens Mr. Smith's religious exercise, Mr. Smith is likely to succeed under this lesser standard.

> **D.**   **Mr. Smith is Likely to Succeed on His First Amendment Claim for Violation of His Right of Access to the Courts.**

The Constitution guarantees Mr. Smith the right of access to the courts.   *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances.").   "The purpose of recognizing an access claim is to provide vindication for a separate and distinct right to seek judicial relief." *Barbour v. Haley*, 471 F.3d 1222, 1226 (11th Cir. 2006) (citation omitted).   To successfully assert a right of access claim, Mr. Smith must demonstrate Defendants' actions "have frustrated or impeded [his] efforts to pursue a nonfrivolous legal claim." *Bass v. Singletary*, 143 F.3d 1442, 1445 (11th Cir. 1998).   Defendants have hindered Mr. Smith's efforts to pursue the colorable claims in his complaint by providing him only the heavily redacted Protocol.

Neither ADOC nor any other state or federal government have attempted to execute a condemned person by nitrogen hypoxia.   The only information that Defendants have provided Mr. Smith about the process is the vague and heavily redacted Protocol.   Mr. Smith requested an unredacted copy of the Protocol and/or additional information to ensure adequate safeguards are in place to protect his

constitutional rights, but Defendants have declined these requests.  Doc. 1-3.  In doing so, Defendants have withheld key facts from Mr. Smith and his counsel that are necessary to support his challenge to the Protocol.  Because Mr. Smith has identified a colorable underlying claim, ancillary to the right of access to the courts, Mr. Smith is likely to succeed on this claim.

## II.    MR. SMITH WILL BE IRREPARABLY HARMED WITHOUT AN INJUNCTION.

There is nothing more final and irreversible than death.  What Mr. Smith stands to suffer, however, would compound that.  Without a preliminary injunction, Mr. Smith is scheduled for an unconstitutional death that will strip him of his "'final dignity.'"  *Miller v. Hamm*, No. 2:22-cv-506-RAH, 2022 WL 4348724, at *21 (M.D. Ala. Sept. 19, 2022) (citing *Smith v. Comm'r, Ala. Dep't of Corr.*, No. 21-13581, 2021 WL 4916001, at *5 (11th Cir. Oct. 21, 2021) (Pryor, J., concurring)).  Under ADOC's Protocol, Mr. Smith will suffer a needlessly painful execution attempt in violation of his constitutional rights.  Moving forward with the execution under the Protocol would result in irreparable injury as it "cannot be undone through monetary remedies."  *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).

28

### III.   THE THREATENED INJURY TO MR. SMITH OUTWEIGHS THE HARM AN INJUNCTION WOULD CAUSE THE STATE

The balance of equities weighs heavily in Mr. Smith's favor.  "The public interest is served when constitutional rights are protected."  *Melendez v. Sec'y, Fla. Dep't of Corr.*, No. 21-13455, 2022 WL 1124753, at *17 (11th Cir. Apr. 15, 2022) (citation and internal quotation marks omitted).  This case involves serious constitutional violations.  The State has scheduled Mr. Smith for execution by nitrogen hypoxia despite the facts that (1) Mr. Smith has not exhausted his appeals; (2) the Protocol subjects Mr. Smith to a heightened risk of superadded pain including the painful sensation of suffocation, stroke, or a transition to a persistent vegetative state; (3) the Protocol places a substantial burden on his religious exercise by inhibiting audible prayer; and (4) Defendants have impeded Mr. Smith's right of access to the courts by heavily redacting the Protocol.

There is little research regarding death by nitrogen hypoxia.  When the State is considering using a novel form of execution that has never been attempted anywhere, the public has an interest in ensuring the State has researched the method adequately and established procedures to minimize the pain and suffering of the condemned person.  Thus, it is in the public's interest to ensure Defendants comply with the Constitutional protections afforded to Mr. Smith.

To be sure, the State and victims have an interest in carrying out timely executions.  *See Hill v. McDonough*, 547 U.S. 573, 584 (2006).  But Mr. Smith does

not seek an injunction to prevent the State from executing him forever—only from attempting an unconstitutional execution. Any harm to Defendants is less consequential than the harm Mr. Smith stands to suffer. After all, "[t]he state will get its man in the end. In contrast, if persons are put to death in a manner that is determined to be cruel, they suffer injury that can never be undone, and the Constitution suffers an injury that can never be repaired." *Gomez v. U.S. Dist. Ct. for N. Dist. of California*, 966 F.2d 460, 462 (9th Cir. 1992) (Noonan, J., dissenting).

## CONCLUSION

For the foregoing reasons, the Court should grant Mr. Smith's motion for a preliminary injunction to enjoin Defendants from executing him using the current nitrogen hypoxia Protocol on January 25, 2024.

DATED: November 20, 2023

    */s/ Andrew B. Johnson*

Andrew B. Johnson (ASB: 8504-r76j)
BRADLEY ARANT BOULT
  CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203
(205) 521-8000
ajohnson@bradley.com

Jeffrey H. Horowitz*
David A. Kerschner*
Robert M. Grass*
ARNOLD & PORTER KAYE
  SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
(212) 836-8000
jeffrey.horowitz@arnoldporter.com
david.kerschner@arnoldporter.com
robert.grass@arnoldporter.com

Ashley Burkett* (ASB: 2789-T79G)
Angelique Ciliberti (ASB: 1504-T44C)
ARNOLD & PORTER KAYE
  SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
(202) 942-5000
ashley.burkett@arnoldporter.com
angelique.ciliberti@arnoldporter.com

*Attorneys for Plaintiff Kenneth Eugene
Smith*

*admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I certify that on November 20, 2023, I electronically filed the foregoing with the Clerk of the Court using the Pacer system, which will send notification to the following:

Richard D. Anderson
Assistant Attorney General
Office of the Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL 36130
Richard.Anderson@AlabamaAG.gov

*Attorney for Defendants*

  */s/ Andrew B. Johnson*
Of Counsel