# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

KENNETH EUGENE SMITH,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀Case No. 2:23-cv-00656-RAH
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀CAPITAL CASE
JOHN Q. HAMM, in his official⠀⠀)
Capacity as Commissioner, Alabama⠀)⠀⠀⠀**EXECUTION SCHEDULED FOR**
Department of Corrections, and⠀⠀⠀)⠀⠀⠀**JANUARY 25, 2024**
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
TERRY RAYBON, in his official⠀⠀)
Capacity as Warden, Holman⠀⠀⠀)
Correctional Facility,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Defendants.⠀⠀⠀)

**DECLARATION OF KATHERINE PORTERFIELD, Ph.D. IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION**

KATHERINE PORTERFIELD, Ph.D. declares under penalty of perjury:

⠀⠀⠀⠀1.⠀⠀⠀⠀I am a clinical psychologist, licensed to practice in New York State. I received my Ph.D. in clinical psychology from the University of Michigan in 1998. I currently consult at Bellevue Hospital at the Bellevue Program for Survivors of Torture where I have evaluated, treated, and supervised the treatment of children, adolescents, and adults who have experienced war trauma and torture.

⠀⠀⠀⠀2.⠀⠀⠀⠀Counsel for Plaintiff Kenneth Eugene Smith asked me to evaluate Mr. Smith's psychological and emotional condition after the preparation for and experience of an attempt to execute him on November 17, 2022 and his reaction to another attempt to execute him. I submit this Declaration in support of Kenneth Eugene Smith's Motion for Preliminary Injunction.

⠀⠀⠀⠀3.⠀⠀⠀⠀On November 17, 2023, I prepared an Expert Report in connection with my work in this case that expresses my findings and opinions. A true and correct copy of my Expert Report, with exhibits, is attached as Exhibit 1.

1

4.      A true and correct copy of my curriculum vitae is attached as Exhibit 2

5.      I incorporate the contents of my Expert Report as if fully stated herein.

6.      The opinions expressed in my Expert Report are my own and are made to a reasonable degree of psychological certainty.

I declare under penalty of perjury that the foregoing is true and correct under 28 U.S.C. § 1746.

Executed: November 18, 2023

_____
KATHERINE PORTERFIELD, Ph.D.

# EXHIBIT 1

**Katherine Porterfield, Ph.D.**
Licensed Psychologist
New York State License number 014105-1

<u>**Report of Psychological Evaluation**</u>
Name: Kenneth Smith
Evaluator: Katherine Porterfield, Ph.D.
Date of Report: November 17, 2023

**Referral request from defense counsel**

Counsel for Mr. Kenneth Smith retained me to evaluate Mr. Smith's psychological and emotional condition, specifically in relation to the preparation for and experience of an attempted execution that took place on November 17, 2022 at W.C. Holman Correctional Facility, as well as his potential reactions to a future attempt at executing him. I met with Mr. Smith on two occasions on 12/29/22 and 1/31/23 and have also had seventeen phone calls with him (dates below). I have been compensated at my hourly rate for this evaluation.

In this report, I will briefly discuss relevant clinical and research literature on the human response to mock execution and other imposed near-death experiences that informs my conclusions regarding Mr. Smith's experiences and functioning. Then I will describe Mr. Smith's psychosocial history and his experience on November 17, 2022 when an attempted execution by lethal injection was conducted on him. I will then describe Mr. Smith's clinical condition and functioning.

At the time of the writing of this report, Mr. Smith has a scheduled execution date of January 25, 2024.

**Sources of information**

1. Phone calls with Kenny Smith: 12/1/22, 12/9/22, 12/16/22, 12/22/22, 1/3/23, 1/16/23, 1/23/23, 2/14/23, 2/28/23, 3/14/23, 4/5/23, 5/9/23, 7/11/23, 8/10/23, 9/1/23, 11/6/23, 11/15/23
2. Visits with Kenny Smith: 12/29/22, 1/31/23
3. See attached appendix of materials considered

**Methodology**

An expert examination of the psychological impact of trauma on an individual requires that the expert have knowledge of the extensive body of research and clinical literature that address the deleterious impact of traumatic events on human functioning, as well as knowledge of the course and prognosis of trauma symptomatology and the therapeutic needs of a trauma survivor. An expert with this knowledge and competency is necessary not only for the proper analysis of the evaluation data, but also in order to conduct interviews that are trauma-focused and sensitive, and to observe proper methodology for maximizing the elicitation of valid and

relevant information from the subject. The clinical interview, characterized by open-ended questioning that is linked to empirically-derived information about diagnosis, trauma sequelae, treatment and prognosis, is the central source of data of an evaluation.[1] In forensic contexts, it is recommended that the clinical interview be supplemented with collateral data from records or other witnesses, as well as psychological measures that are reliable and valid.[2] Measures that include validity scales (scales that assess the likelihood that the individual is presenting themselves truthfully) or measures of malingering (intentionally producing false or exaggerated symptoms) are also useful in forensic contexts.[3]

The evaluation conducted for this report follows the standards laid out above: an evaluator with expertise in severe trauma and its sequelae; use of multiple data sources, including open-ended questioning over time; and malingering assessment and use of psychological measures.

**Qualifications**

My qualifications are outlined in my curriculum vitae, which is attached. In sum, I am a clinical psychologist, licensed to practice in the state of New York. I received my Ph.D. in clinical psychology from the University of Michigan in 1998. My pre-doctoral and postdoctoral training included extensive training in the evaluation and diagnosis of mental disorders. Since 1998, I have worked as a psychologist at Bellevue Hospital and NYU School of Medicine at the Bellevue/NYU Program for Survivors of Torture. I have evaluated, treated and supervised the treatment of numerous children, adolescents and adults who have experienced war trauma and torture. I have evaluated individuals and served as an expert witness in the Military Commissions in Guantanamo Bay, US Federal Courts, Southern and Eastern Districts of New York, Western District of Pennsylvania, Superior Court, Skagit County, Washington, and for immigration proceedings in courts through the Executive Office of Immigration Review. I have conducted evaluations of individuals held at Bagram Airbase, Guantanamo Bay Detention Center, and multiple "black site" prisons around the world.

I have co-authored several publications pertaining to the assessment and treatment of trauma and torture, including as a contributor to the United Nations' *Istanbul Protocol: Manual on the effective investigation and documentation of torture and other cruel, inhuman, or degrading treatment or punishment* and the Cambridge Handbook of Psychology and Human Rights.  My peer-reviewed articles have been published in textbooks and professional journals, including *The Journal of Nervous and Mental Disease*; *The Prevention Researcher*; *Psychiatry: Interpersonal and Biological Processes*; *OMEGA – Journal of Death and Dying*; and *Journal of*

---

[1] Melton GB, Petrila J, Poythress NG, et al. Psychological Evaluations for the Courts. New York: Guilford Press; 1997.

[2] Frankel, A. S., & Dalenberg, C. (2006). The forensic evaluation of dissociation and persons diagnosed with dissociative identity disorder: Searching for convergence. *Psychiatric Clinics of North America, 29*(1), 169–184.

[3] AAPL practice guideline for the forensic assessment (2015). *Journal of the American Academy of Psychiatry and the Law, 43*(2), s3–s53.

*the American Academy of Child & Adolescent Psychiatry*. I regularly serve as a reviewer on several peer-reviewed journals and academic presses. I have trained hundreds of health professionals and attorneys in the country on the evaluation and treatment of war trauma and torture survivors and have lectured or conducted seminars on issues of torture and complex trauma sponsored by a wide variety of organizations, including human rights organizations, governmental entities, universities, and the International Criminal Court.

**Summary of conclusions:**

Kenny Smith's experience on November 17, 2022 of living through an almost four-hour execution process (preceded by weeks of isolation and visits in which he said his final goodbyes to his family) subjected him to severe trauma, the intensity of which I have rarely seen in twenty-five years of practice as a trauma psychologist. During the attempted execution, he was repeatedly and painfully stuck with needles on various parts of his body, placed into stress positions, including an inverted angle with his head below his heart, and left for extended periods in painful, uncomfortable states with no verbal feedback from multiple staff members who were there, despite his attempts to ask for information and seek to contact his lawyer. The evidence indicates that, during the attempted execution, he fluctuated between states of fight/flight arousal and dissociative shut-down, and that each of these adaptive defenses have led to ongoing problems in multiple areas of his functioning. Having someone try to end one's life is one of the most viscerally terrifying and incapacitating human experiences there is. Clinical and research data demonstrate how the neuroendocrine and neurochemical human responses to near-death are highly altering of a person's functioning, leaving severe and sometimes permanent brain-based consequences in cognition, emotion, and perception. Kenny Smith suffers in multiple domains of functioning—that is, his bodily, his cognitive/emotional and his social capacities—indicative of such long-term, pervasive neurophysiological impairment. The results from over thirty-five hours of interview and behavioral observation, review of medical records and data from psychological standardized measures indicate that Mr. Smith is suffering from posttraumatic stress disorder (PTSD) with dissociative features and depression. Mr. Smith's symptoms include hyperarousal and anxiety, intrusive reexperiencing of the attempted execution, dissociation from his environment, avoidance of reminders of the events, social disconnection, and profoundly negative mood and thoughts.

Mr. Smith's functioning has notably declined since May 2023 after a brief period of some symptom improvement. It is my clinical opinion that the current plan of execution and the possibility of having to again face these procedures is completely terrifying for Mr. Smith and leading to ongoing deterioration. His fairly resilient style of coping is insufficient to manage the flood of reminders and the accompanying terror that he currently is experiencing, as he envisions his imminent execution. Like other survivors of life-or-death situations in which they dissociated, Mr. Smith is suffering with the emergence of increasing involuntary sensory experiences (flashbacks) and accompanying distress and avoidance that these engender. These symptoms have notably worsened and will likely continue to do so as he is faced with a repetition of the life-or-death experience of an execution and all of its preparation. As a clinician who has worked with survivors of severe trauma and torture for over twenty-five years, I have only encountered a situation like this—in which a person who was severely traumatized by something done to him was then forced to anticipate and suffer the experience again-- in contexts

of purposeful, state-sponsored torture. Having evaluated and treated people who suffered gang-rape, mock execution, and torture in which they almost died, it is impossible to fully quantify the level of anguish that a person would experience as they prepare for and suffer the events again. Mr. Smith's mental and emotional stability is currently being taxed to an intolerable degree as he is forced to again contemplate, prepare for, and suffer execution.

The Alabama Department of Corrections Execution Procedures (August 2023 and April 2019) do not include any guidelines for execution of a person who suffered a previously failed execution. Practically for Mr. Smith, each step of the execution will be a repeat of the steps taken in 2022 during the lead-up to his first execution attempt (with the new addition of steps required for execution by nitrogen hypoxia). Experiencing these traumatic events again—step by step—will severely trigger his posttraumatic stress disorder, likely thrusting him into states of disabling panic, fight or flight and dissociation that can only be characterized as devastating to the human body and mind.

**Mock execution and other imposed near-death experiences: Empirical and clinical findings**

It is widely understood in clinical and research literature on trauma that the stress of severe traumas, such as near-death experiences, leads to a set of neurophysiological responses in a human being's "fear network." When a person is in fear for his/her life, involuntary nervous system reactions take over and the person enters a mode of functioning that is driven by neurochemical and neuroendocrine responses designed to maximize survival. These responses are controlled by the sympathetic nervous system's hyperarousal ("fight or flight") and the parasympathetic nervous system's shut-down responses ("flag, faint").[4]

To understand the defensive cascade that occurs in conditions of inescapable trauma, it is helpful to conceptualize a curve in which the early stage of a life-threatening trauma results in the hyperarousal and nervous system "uproar" in order to fight against the encroaching threat. If this effort at fight or flight fails, mammals have been shown to experience a state of psychophysiological surrender or collapse, sometimes called "flag" and in its most extreme form, "faint." [See Figure 1]. In situations of inescapable life or death threat, mammals will often enter into states of "tonic immobility," a condition characterized by analgesia (pain relief), inhibition of movement and vocalization and physical tremors.[5] During tonic immobility, the individual is still aware of what is happening, as opposed to in a state of complete fainting. Each of these reactions can be triggered by life-or-death threats and a person can alternate between them during an event. (For example, having a racing heart when running from an assailant and then collapsing into immobility when caught by the assailant and then waking up into fear in the middle of the assault.)

[4] Maeng LY, Milad MR. (2017) Post-traumatic stress disorder: The relationship between the fear response and chronic stress. *Chronic Stress*. doi:10.1177/2470547017713297

[5] Kalaf et al., (2015). Peritraumatic tonic immobility in a large representative sample of the general population: Association with posttraumatic stress disorder and female gender. *Comprehensive Psychiatry*, July, 60 (68-72).

The experience of moving into a state of disconnection in the middle of life-threatening trauma involves not only lowered physiological arousal, but also changes in perceptions and cognitive awareness. Herman, a leader in the study of severe trauma describes this complex state:

> Sometimes situations of inescapable danger may evoke not only terror and rage but also, paradoxically, a state of detached calm, in which terror, rage and pain dissolve. Events continue to register in awareness, but it is as though these events have been disconnected from their ordinary meanings. Perceptions may be numbed or distorted, with partial anesthesia or the loss of particular sensations. Time sense may be altered, often with a sense of slow motion and the experience may lose its quality of ordinary reality.[6]

After such experiences, it has also been robustly proven that the same neurochemical and neuroendocrine reactions that may have helped a person survive a life-or-death event will also recur and reappear after the trauma, causing impairment in an individual's biopsychosocial functioning. This reliving of trauma and the accompanying triggering of states of fear and shut-down are the core difficulties faced by those with stress and trauma-related disorders, such as PTSD.[7]

Life or death situations that are manmade—that is, brought about intentionally by other people—are particularly damaging, as the victim not only must manage the physiological stress reactions brought about by the threat of death, but also the psychological and interpersonal meanings of having another human attempt to end their life. Research on survivors of torture has demonstrated how life-threatening maltreatment leads to worse psychological outcomes. For example, the perceived risk of being killed by a method of torture has been shown to worsen survivors' reactions in the aftermath.[8]

Mock execution has been studied as a particularly severe method of maltreatment that simulates a life-or-death threat. Mock execution is an experience in which a person is made to believe that he will be killed. It includes actions that mirror an actual execution, rather than only a threat of execution. Thus, in mock executions, people are smothered (wet or dry), have guns held to their heads, or are subjected to any number of life-threatening acts.[9] Those who have written about mock execution or studied its impact have noted that it is one of the most severely traumatizing events that a person can suffer. Researchers from Physicians for Human Rights describe the effects of mock execution:

---

[6] Herman, J. (2015). *Trauma and Recovery*. pp. 42-43. Basic Books.
[7] Meyer-Parlapanis, D., Elbert, T., (2015). Torture and its consequences, Psychology of. In: James D. Wright (editor-in-chief), International Encyclopedia of the Social & Behavioral Sciences, 2nd edition, Vol 24. Oxford: Elsevier. pp. 434–441.
[8] Başoğlu, M., & Mineka, S. (1992). The role of uncontrollable and unpredictable stress in post-traumatic stress responses in torture survivors. In M. Başoğlu (Ed.), Torture and Its Consequences: Current Treatment Approaches (pp. 182–225). Cambridge University Press.
[9] This evaluator's experience with mock execution includes evaluating or treating multiple people who have suffered this method of torture, including by water, electric chair, threatened beheading, gun to the head, and being led into a cage with a lion.

According to clinicians who treat torture survivors at the Minnesota-based Center for Victims of Torture, mock executions and other situations where death is threatened force victims to repeatedly experience their last moments before death, create a sense of complete unpredictability (never knowing when death might come), and induce chronic fear and helplessness. Victims who were threatened with death speak of feeling a sense that one is already dead. They often relive these near-death experiences in their nightmares, flashbacks, and intrusive memories. [10]

The severe stress of mock execution is capable of altering brain chemistry and brain structure, leading to chronic posttraumatic symptoms.[11] Researchers found that sensory memories of a severe trauma such as mock execution become "dislodged" from the narrative (linear) memory and are then able to create brain/body "alarm" or "excitation"—that is a terror response—in a survivor even when the person is not trying to "remember" the traumatic event.[12] This research has shown that functionally, a near death experience imposed on a person "has no time or place" in the aftermath—it is essentially able to trigger repeated experiences of terror and alarm in the survivor. Most importantly, this appears to occur through neuroplasticity—or rewiring of the survivor's brain chemistry in response to the trauma. These extreme stress events activate hormones, including cortisol, which are released into the body. Cortisol has been implicated in causing atrophy in brain structures associated with memory formation (hippocampus) and enlargement in brain structures involved in fear maintenance (amygdala).[13]

The above review is included in order to provide a framework, based in clinical and research literature, that is applicable to the experience of Kenny Smith. A mock execution is perhaps the closest parallel to what he experienced, in that he was brought to the point of believing he would be killed. Unlike in mock execution, however, the intent was to complete the execution. Mr. Smith's subjective experience, then, of believing he was about to die and going through the physiological and emotional responses to that, is parallel to others who have had such experiences and lived to describe them.

**Psychosocial history[14]**

---

[10] Physicians for Human Rights, (2005). <u>Break Them Down: Systematic Use of Psychological Torture by US Forces</u>. Washington, DC.

[11] O'Mara, S. (2011). On the imposition of torture, an extreme stressor state, to extract information from memory: A baleful consequence of folk cognitive neurobiology. *Zeitschrift für Psychologie/Journal of Psychology, 219*(3), 159–166.

[12] Elbert, T., Schauer, M., Ruf, M., Weierstall, R., Neuner, F., Rockstroh, B., & Junghöfer, M. (2011). The tortured brain: Imaging neural representations of traumatic stress experiences using RSVP with affective pictorial stimuli. *Zeitschrift für Psychologie/Journal of Psychology, 219*(3), 167–174.

[13] O'Mara, S. (2018) The captive brain: Torture and the neuroscience of humane interrogation, *QJM: An International Journal of Medicine*, Volume 111, Issue 2, pp. 73–78.

[14] I will refer to Kenny Smith as Kenny in his childhood history and his father as Mr. Smith.

Kenny Smith was the oldest of five children born to Eugene and Linda Smith. Kenny's father was violent towards his mother, beating her in front of the children. Kenny remembers his father hitting his mother with a beer bottle and slamming her head into a TV set. Kenny's father left the family when he was four years old and would periodically reappear and take Kenny away without permission, essentially kidnapping him. These events were stressful in the family because Kenny's mother would be distressed, trying to find him. Mr. Smith did not support the family and they lived in poverty throughout his childhood. Kenny's father had children with other women, including while he was married to Mrs. Smith. Kenny suffered a head injury when he was an infant, when someone dropped luggage on his head while he was on a train.

When Kenny was six, his infant brother died, an event that deeply affected his mother's mental health and stability. She began to abuse alcohol, often becoming impaired and unable to function. He and his siblings often were alone or with babysitters because their mother was going out. Around age six or seven, Kenny was sexually abused on multiple occasions by two different female babysitters who were in their late teens. These events involved Kenny being fondled. He never told anyone at the time because they told him not to.

Kenny recalled that he was "fearful" throughout his childhood because of his father's erratic behavior. He struggled with migraines throughout childhood and adolescence, often missing school due to headaches. Kenny went on to use marijuana and drink in his adolescence, as well as use Valium, ultimately dropping out of high school. The valium was initially provided to him by his mother when he had migraines. At nineteen, he joined the Marines, and withdrew after several months. He had a car accident at age twenty but was not seriously injured. He does not recall other traumatic events in his life or times when he felt that his life was in danger. He noted that in prison, he has felt "scared" but never "terrified" or afraid for his life.

**Criminal History**

In April 1988, Mr. Smith was indicted in Colbert County, Alabama for murder for pecuniary gain. In May 1996, he was convicted and sentenced to death, although the jury recommended by a vote of 11 to 1 that he be sentenced to life imprisonment without the possibility of parole.[15] In December 2000, the Alabama Court of Criminal Appeals affirmed Mr. Smith's conviction and sentence. In March 2005 and October 2005, respectively, the Alabama Supreme Court and United States Supreme Court declined to hear Mr. Smith's appeal. Thereafter, Mr. Smith unsuccessfully sought post-conviction relief in the Alabama state courts and then in federal courts, culminating in the United States Supreme Court's declining to hear his appeal in February 2022.

**Prior to the attempted execution**

In the months leading up to the attempted execution, before he had been given a date, Mr. Smith was seen by a psychiatrist in the prison, Dr. Polanco, who prescribed Trazodone and Remeron for sleep. According to Mr. Smith, the psychiatrist told him that his symptoms had

---

[15] Kenny was first tried, convicted and sentenced to death in November 1989. He has been on death row since. His first conviction and sentence were overturned on appeal.

developed due to the impending execution and that, because he had no history of mental illness, there was not much else that could be done, except to prescribe the medication. He also saw a psychologist, Dr. Beech, in the months before his execution date and he noted that she was helpful to him by talking with him about anxiety and depression. Additionally, Mr. Smith worked with Dr. Beech in a meditation and creative writing group with other inmates.

In September 2022, Mr. Smith received a date of November 17, 2022 for his execution. He was notified by the warden, who called Mr. Smith to his office and informed him. In the weeks following that, following protocol, Mr. Smith was in a lock-down status in his cell. He was able to make calls to his family and talk to other inmates who sat outside his cell and talked with him. Over the next six weeks, he tried to get his affairs in order for his family, while continuing to communicate with his lawyers about his legal options.

On the Sunday before the scheduled execution, Mr. Smith began to have family visits in preparation for saying goodbye to his family. Various family members visited with him, including his mother and his wife, his sons, his sister, and nieces. A lay minister who served as his spiritual advisor provided communion to Mr. Smith and his family. He recalls these visits as profound for him and his family as they shared what they meant to each other and "cried like babies," in anticipation of the execution day. Throughout the evaluation, Mr. Smith wept trying to explain this and he focused intensely on how excruciating these goodbyes were for his family. He cried, speaking with particular anguish of watching his mother and grandson go through this process of saying goodbye.

On Tuesday, November 15th, Mr. Smith was taken to the infirmary to be examined with a "body chart." He was returned to his cell, where he gathered his belongings and said goodbye to many of his friends on his tier. He was moved to the cell outside the execution chamber—the death cell--on Tuesday and he continued to have family visits on Wednesday, November 16th.

**Events of November 17, 2022[16]**

On Thursday, November 17th, Mr. Smith visited with his wife, mother, sister and daughter-in-law. His son joined later and brought food for him. His lawyer also visited with him. He said goodbye to his family, something that he recounted in detail. Mr. Smith wept while recalling saying goodbye to family members. After his visits he was taken to the infirmary again for another "body chart."

He recalls being taken back to the death cell at approximately 4:45 pm. He was able to call his wife again and his spiritual advisor came to pray with him. Close to 6:00 pm, Mr. Smith stated that the guards ate a meal together, outside of his cell, while watching television. He found

---

[16] I will recount what Mr. Smith told me as his recollection of the events of November 17th. I will also include behavioral descriptions of symptoms that he demonstrated at certain points as he told what happened. Because PTSD is strongly evoked when individuals try to recall a trauma, the clinical presentation of a person while they recount can be very instructive to their symptoms. A parallel would be a stress test, where a cardiologist observes and monitors a patient's condition while they exert effort that affects the heart.

this disquieting, as he said that the tone among the staff was quite jovial and relaxed, while he was trying to pray with his spiritual advisor.

Mr. Smith's spiritual advisor was told that he had to leave and Mr. Smith spoke one more time with his wife.[17] He recalled that CO Earle came to the cell with handcuffs and said he had to take the phone away. Mr. Smith described this moment as starting to feel "surreal" and like he was "not present," a reaction that can be understood to likely be nervous system shut-down. When recounting this moment, Mr. Smith noted that he had no recollection of talking to his wife, but a vivid image of CO Earle holding the handcuffs in front of him. As he reached this part of the narrative, Mr. Smith began closing his eyes and looking downward and he stated he felt his heart racing. (This can be understood as a fight or flight response that was being involuntarily triggered by having to recount/remember the moment). CO Earle directed Mr. Smith to sit on the edge of the bed, which he did. Next, the cell was opened and an extraction team of approximately ten guards entered the cell and surrounded Mr. Smith. He was cuffed and had shackles placed on his feet, while also being held firmly under his arms. Mr. Smith was directed to stand up and he was led to the execution chamber. He recalled that there were three people dressed in business clothing in the chamber when he was led in. He was seated on the gurney and then swung around and placed into a prone position with his arms open and secured and his legs strapped down. CO Earle was giving directions to the others in the room and told one officer to secure a sheet over "the condemned." He remembers CO Earle asking the remaining officers, who he called Team 2, to "check that the prisoner is secure." At some point, leads were placed on his chest, as if to monitor his heart. The COs then stepped back into the corners of the room. CO Earle left the execution chamber and went to the witness area. The people in suits left the room after Mr. Smith was strapped onto the table. In addition, all but three of the corrections officers left the chamber, leaving three who remained in the room for the entire process over the next several hours.

Mr. Smith stated that, once he was strapped down, he figured that he had "only minutes left." In fact, at that point, the United States Court of Appeals for the 11th Circuit had issued a stay of the execution at 7:59 p.m. Mr. Smith was not informed of this information and thus, for the next several hours until the stay was lifted at 10:20 p.m., he was kept strapped to the gurney, anticipating that his execution would occur within minutes. Mr. Smith described trying to stay calm and going over his remarks to the witnesses in his head: he prepared to offer his apology to the witnesses on the victim's side and tell his family that he loved them. However, he recalled that he began to panic, thinking that the prison was going to execute him without bringing the witnesses. One of the guards told him to "calm down" and assured him that the witnesses would be brought in. Mr. Smith stated that it was "terrifying" to him at this point, because he was afraid that he would not be able to say goodbye to his family. He said that he lost his composure for a bit and had to try to "refocus." (Again, a description of the uproar of nervous system arousal.) He laid there for what felt like an hour and no one spoke in the room.

Mr. Smith began to pray in order to try to calm himself down. He noted that he was able to calm down and think of positive things and get himself to a state of "peace." When remembering this part of the execution, Mr. Smith wept and said, "God shows up."

---

[17] Phone records provided to me show that this call to his wife ended at 7:57 p.m.

As time passed, Mr. Smith began to feel cold and he was given a blanket. He felt tightness in his legs, like his circulation was not adequate. He asked what was happening and the guards told him they did not know. He spoke to Deputy Warden Woods for several minutes and noticed that it was approximately 9:30 p.m.

At approximately 10:00 p.m., there was a knock on the door and the three people in suits returned to the chamber. Also with them were two men with IVs and a man with a cart who took a position behind Mr. Smith's head, where he could not see him. No one spoke to Mr. Smith and he said that he was actively working to stay calm in that moment, but as he described it he said, "My head is swimming right now," a likely description of entering into a flashback of dissociation. The men were speaking to each other in a whisper and one of the men was speaking to the man behind Mr. Smith's head. Mr. Smith recalled that one of the personnel took photographs of him on the gurney, something that he found highly distressing.

The man on his left side told Mr. Smith, "I'm going to tie a tourniquet around your arm. It will feel snug." The man put a cotton cloth under his arm and began looking at Mr. Smith's veins. Within a few minutes, the man inserted a needle into his arm, telling him he would feel a "pinch." Mr. Smith felt a sharp pain and exclaimed, "You're in my muscle." The man behind Mr. Smith's head told the IV technician to "back it out," which he did, pulling out the needle slightly and taping it to Mr. Smith's arm. The men discussed whether it was "flowing" or not. While recounting this, Mr. Smith said, "I'm really detached now. Like I'm watching a movie," a description of traumatic dissociation.

Next, the man on his right side loosened the strap on Mr. Smith's arm and began to turn it. While describing this next set of events, Mr. Smith began to hiccup and take large gulps of air, a sign of likely respiratory hyperarousal. The man who had taken Mr. Smith's arm took his hands and tried to ball them up, using a butterfly needle to try to find a vein on his hand.

At this point, Mr. Smith became anxious and asked what the man was doing. He stated loudly in the room, "I need to speak to the judge or my lawyer." He stated his case number and asked to speak to his lawyer. No one responded to these remarks and the IV technician continued to try to insert the needle into his hand. Mr. Smith saw that the other technician had moved down to look at Mr. Smith's right foot and then his left foot, shaking his head no to the person behind Mr. Smith's head, who he could not see. The technicians began to shine a blue light on Mr. Smith's hands and arms, seemingly looking for a vein. One of the men started discussing a vein that "dives down and turns" in the arm and the technician began "sticking" Mr. Smith again in his arm. He recalled that he cried out more at this point, demanding to speak to his lawyer. No one responded to him. When he reached this point in the narrative, Mr. Smith continued to hiccup and state that he needed to use the bathroom. Both of these reactions are frequently seen when a person has been in a state of autonomic nervous system activation and the body is trying

to counter this activation by shutting down. These involuntary processes can bring about changes in breathing and swallowing, as well as bowel and bladder urgency.[18]

Mr. Smith recalled that after they discussed the veins, the man who had been behind his head, who had not touched him, came and stood at his right shoulder. Mr. Smith asked for his lawyer or to speak with the judge. He felt that the man on his right side was trying to find a vein and was "going in and out," of his arm, which was very painful.

Having not succeeded on the right arm, the man who had been sticking him with the needle, said, "Can we invert the table?" The men inverted the table so that Mr. Smith's head was below his body and he was held there, with no explanation of what was happening. Several of the men left the room, leaving Mr. Smith in this inverted position with the guards who had brought him into the chamber. He believes it was about 11 p.m.

Within a few minutes, the people in suits and the IV team filed back into the room and he noticed that one of the men now had a smock, surgical gloves and a mask and shield. This man asked a guard to raise the table so that it was up to the man's chest level, keeping Mr. Smith in an inverted position in which his head was still below his feet. Mr. Smith recalled that the man, who was now at his shoulder, then asked him to turn his head, which he refused to do. The man stepped back and Deputy Warden Woods stepped over to Mr. Smith and then a surgical sheet was placed over his face. At this point, Mr. Smith said "I lost it. I started crying out, asking 'What are you doing?' I'm shaking my head, trying to get the sheet off my face." Mr. Smith became quite anxious recounting this and he described Deputy Warden Woods telling him to "calm down." He again appeared to be experiencing a fight or flight "flashback" that was making his nervous system activate because of the memory trigger.

Mr. Smith, with his face covered, felt panicked and said he was "freaking out," and tried to look down from under the sheet. He recalled seeing a clear plastic sheet over his chest with an open center. He saw that the man had a syringe in his hand and he unbuttoned Mr. Smith's shirt and injected a yellow liquid into his chest. The man said, "You will feel something cool," and the man slid a long needle into his chest. He inserted the needle and, as Kenny perceived it, moved the needle around while it was inserted in his chest. Mr. Smith noted that he "lost all composure," at this point, describing, "Everything became surreal, everything went out the window." (This description of things becoming "surreal" indicated that Mr. Smith likely began again to dissociate at this moment of the execution and experience a rupture in his perception of reality.) He continued to ask, "Does anybody have the authority to contact the judge?" and received no response. Mr. Smith became terrified that he was being injected with a substance that would render him unable to communicate—something that he knew would violate an existing court order.[19] He was again panicked that he would not be able to say his final words to his family and the victim's family, given what he heard had happened in a previous execution. Mr.

[18] Roy HA, Green AL. (2019). The central autonomic network and regulation of bladder function. *Front Neurosci.* Jun 13;13:535. doi: 10.3389/fnins.2019.00535. PMID: 31263396; PMCID: PMC6585191.
[19] *Smith v. Hamm*, No. 2:22-cv-00497, Memorandum Opinion and Order at 15 (DE 22) (M.D. Ala.).

Smith said he was breathing hard at this point, having never had needles in his chest before. He also believed that a numbing substance had been used and that he was being poked in an area that was not numb. He was becoming more anxious and according to him, "I started crying out for the judge and for [my lawyer], saying 'Please stop. You are violating a court order.'"

The man who had been injecting him in the chest and the IV team all stepped back. Mr. Smith tried to gather himself and then said that they stepped back up and the man from behind his shoulder had a large gauge needle with a large cylinder. Mr. Smith said he "freaked out," demanding that someone call his lawyer. Next, Deputy Warden Woods put his hands on Mr. Smith on both sides of his head and said, "This is for your own good," pulling his head to the side. Mr. Smith then recalled searing pain, as he was injected under his collar bone. He said, "It took my breath away" and he recalled that he was gasping and trying to get away by "bucking up" off the table. This also would likely have been a moment of a strong fight or flight reaction in Mr. Smith's nervous system. Mr. Smith recounted that he believed the man tried approximately five times to get this large needle into a vein under his collarbone.[20] He repeatedly asked to speak to his lawyer and to have someone reach out to the judge presiding over his pending case. He recalled giving his case number over and over and no one responding to him. He described himself at this point:

> I was pretty much giving up because nobody was answering—I'm on my own, I was trying to get through the moments because the next thing was to try to run the central line and that was so painful and I was completely gone then. That was hard, the pain, that was consuming…it gets quiet. My body was trying to come off the gurney. I was trying to endure and they just stopped, left me. I couldn't breathe, couldn't stop shaking, I had tears running down my eyes, then everybody just disappeared and I was just left there.

Mr. Smith recalled that he was shaking uncontrollably, unable to catch his breath and in "rough shape," still in an inverted position with his head below his body at this point. The men left, again leaving Mr. Smith with the guards. As he described these moments, Mr. Smith's face reddened and then slackened and he said he felt very "detached." Mr. Smith's reaction here again indicates a dissociative reaction.

After several minutes, the IV team returned and began to gather their equipment and put it away. He began thinking, "They're going to try something else," and felt frightened. One of the IV technicians said to him, "The pain will ease up soon." Mr. Smith said he still did not know what was happening, and when he asked, he was told, "Legal stuff." While Mr. Smith was still inverted with his head down, the IV tech began to talk to him about why lethal injection would be a better "way to go" than gas, because "gas is suffocation," whereas with lethal injection, "you go to sleep and don't wake up." Mr. Smith felt relief that someone was talking with him, but was still unclear what was going to happen next, particularly as this person was talking to him about methods of execution.

---

[20] Afterwards, in a press conference, the commissioner of the Alabama DOC confirmed that this was an attempt to use a central line procedure to establish intravenous access.

Soon, the other IV technician began unhooking Mr. Smith, narrating to him what he was doing as he took the tape off, pulled out the butterfly needle and put cotton and tape over the injection site. He recalled that the two IV technicians were comforting him and saying, "You're ok" and one of the men said he would pray for him. Mr. Smith wept while recounting this and put his head in his hands.

Once the medical personnel left, Mr. Smith was alone in the room with three officers who had been there throughout the execution. He remained in an inverted position. The guards lifted the gurney from the inverted position and unstrapped Mr. Smith's arms, lifted his hands and handcuffed him and then lifted him into a sitting position. Mr. Smith remembered that he felt very physically unstable when the guards lifted him up from the prone position on the gurney. His clothing was wet and he thought he had possibly lost control of his bladder.[21] He described himself as "drawn within," a likely description of being in a state of dissociation, which will be described below. Mr. Smith felt that he would pass out when he sat up and he was trembling. The guards asked if he could stand up and walk and he said that he couldn't. Two guards held him up by his arms—clasping his upper arms and his armpits to guide him out of the chamber. Feeling that he was "clumsy and had no equilibrium," he asked for a wheelchair, which was not provided to him. The guards had him sit right outside of the chamber and gather himself for a few minutes. He then walked with the guards the approximately five-minute walk to the infirmary, the guards still holding each side of his body. They helped lift him onto the examination table once they were inside the infirmary. This entire description of Mr. Smith after he was released from the gurney captures the process of nervous system "shut-down" that is seen in situations of life-threat and loss of control. (See Figure 1.) Physical tremors have been found to be associated with the nervous system response to life-or-death situations.[22]

In the infirmary, Mr. Smith was seen by a nurse. He continued to shake uncontrollably, and he was unable to move his shoulder or turn his head. The nurse began to examine him and because he could not move his arm and shoulder, two guards assisted him in getting him out of his clothes. The nurse asked about wounds and Mr. Smith pointed out needle marks on his hands, arm, and chest. He told the nurse that his shoulder and neck were hurting. The nurse and guards helped Mr. Smith get dressed after the examination, again, because he was in pain. He believes this examination took about twenty minutes.

After the examination, Mr. Smith was taken back to the cell outside the execution chamber. He remembered that as he was walking, he was "still in a shell, like someone else watching this." (This type of description also reflects a dissociative response.) When he returned to the cell, he was told by CO Earle, "We need your clothes for evidence." He was helped out of the clothes and provided other clothes. He asked if he could speak with his wife on the phone

---

[21] In life or death situations, loss of bladder and bowel control can occur as the nervous system reacts to the threat. It is unclear if Kenny did, in fact, lose control of his bladder. Roy HA, Green AL. (2019). The central autonomic network and regulation of bladder function. *Front Neurosci.* Jun 13;13:535. doi: 10.3389/fnins.2019.00535. PMID: 31263396; PMCID: PMC6585191.

[22] Kalaf et al., (2015). Peritraumatic tonic immobility in a large representative sample of the general population: Association with posttraumatic stress disorder and female gender. *Comprehensive Psychiatry*, July, 60, (68-72).

and he spoke with her for several hours. He laid down in the cell but could not sleep. He was then moved back to his regular cell.

On the day after the failed execution, Mr. Smith was visited by two of his attorneys. On the following day, he was examined by a doctor retained by his lawyer with his lawyer present.

In the days following the failed execution, Mr. Smith found himself struggling with sleeplessness, nightmares, and intense emotionality. He would wake up and find himself unable to return to sleep and would lie in bed, crying. Early in the morning on the second day after the failed execution, he was taken to the infirmary when an officer saw him crying. At the infirmary, he was seen by a nurse and then returned to his cell. Shortly after this, he was called to the Captain's office in the prison. Mr. Smith noted that he became anxious as he approached the office, seeing that one of the staff members who had been in the execution chamber was in the office. The Captain assessed him for suicidality and noted that the officer who had seen him that morning said that Mr. Smith said he was suicidal. Mr. Smith denied this, telling the staff that he had just almost died and had no intention of trying to end his own life. He signed a contract with the Captain that he would not harm himself.

Dr. Polanco, the psychiatrist who had seen Mr. Smith in the months before the scheduled execution, met with him a few weeks after the failed execution. Mr. Smith said about this meeting: "I told him I'm anxious, agitated, snapping on people, having nightmares." Dr. Polanco restarted him on Trazodone and Remeron and added Prazosin, for nightmares. The medical records of these contacts will be summarized below, beginning with medical contacts related to mental health that occurred before the attempted execution.

**Medical records**

I was provided with Mr. Smith's medical records from the Alabama Department of Corrections. These records covered a variety of medical and dental procedures from 2004-2023. Below I will discuss records related to Mr. Smith's psychological condition and functioning.

*A. Records before the failed execution:*

There are several records related to Mr. Smith's psychological functioning before the events of November 17, 2022.

- July 18, 2022 (Provider: Dr. Beech): In a note from Dr. Beech, it is noted that Mr. Smith requested to be "placed on MH (mental health) caseload after being informed that he will be given an execution date in July." Regarding Mr. Smith's functioning, it is noted, "Patient reported increased anxiety, tension, depression and a feeling that he is 'spinning his wheels.' His sleep has been fitful when he tries to go back to sleep after breakfast due to anxious thoughts." Due to increased migraines, Mr. Smith asked "to be placed on psychiatric medication that might help with migraines." It is noted that his mindfulness meditation and interpersonal relationships are a source of support for him. He is described as "slightly depressed and anxious."

- July 19, 2022 (Provider: Dr. Polanco): Mr. Smith is noted to have "no history of mental illness prior to jail." Mr. Smith's mental status assessment by Dr. Polanco is unremarkable for symptoms of mental illness and it is noted, "No symptoms reported." He is diagnosed with a rule-out (R/O) of adjustment disorder.[23] He is also diagnosed with substance use disorder in sustained remission. Mr. Smith asks to be referred to a therapist. It is determined that he will not take psychiatric medication and that he will attend individual and group therapy.

- July 25, 2022 (Provider: Dr. Beech.) Mr. Smith is identified as having "tension" around the "current situation" (Presumably, the upcoming receipt of an execution date). He also reports nightmares and the clinician specifies that these nightmares are "not due to trauma." Dr. Beech reviews Mr. Smith's history of adverse childhood experiences (ACE factors) and notes that his history is positive for sexual abuse, emotional abuse, emotional neglect, intimate partner violence in his home, mother treated violently, substance abuse and parental separation/divorce. His substance use history is reviewed and his mood is noted to be "low."

- July 26, 2022 (Provider: Dr. Beech): Mr. Smith is identified as having been placed on the MH caseload and diagnosed with R/O adjustment disorder. It is noted, "He reported anxiety and depression secondary to potentially receiving an execution date within the month." He is described, "Patient expressed a desire to work on maintaining low levels of depression, anxiety and mood stability through the use of effective coping skills."

- August 8, 2022 (Provider: Dr. Beech): Mr. Smith's mood is described as "anxious and depressed." He is diagnosed with adjustment disorder and substance use disorder in remission. He is not prescribed medication at this time. It is noted, "He also reported increasing anxiety and depression regarding the likelihood of him being given an execution date."

- August 29, 2022 (Provider: Dr. Beech): Mr. Smith is diagnosed with R/O adjustment disorder and substance use disorder in remission. He is not prescribed medication at this time. The note states:

  - "Patient reported that he has discussed the possibility of preventative medication with medical and they have determined that there is no medication that they could give him at this point. He reported that he continues to have trouble sleeping at night, which makes his migraines worsen the morning. He is in constant communication with his family,

---

[23] Adjustment disorder is defined as: The development of emotional or behavioral symptoms in response to an identifiable stressor(s) occurring within 3 months of the onset of the stressor(s). (American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders* (5th ed.). Arlington, VA) "Rule/out" means that the clinician is suspecting an adjustment disorder but needs more information to determine if it is present.

who as per his report is starting to be a little more comfortable talking about his getting a date of execution set. He still finds it incredibly difficult to communicate with his mother about this. He reported that he has a circle of close friends that are…able to socialize with, though they find it hard to discuss the above-mentioned matter, as this reminds them of their similar circumstances. He is focused on being present in the moment and not worrying about the future or dwelling on the past."

- October 4, 2022 (Provider: Dr. Polanco): Mr. Smith is identified as having decreased sleep, worry, anxiety and depression. He is quoted as saying, "I'm down, depressed. I was placed on dead [sic] row." He is diagnosed with adjustment disorder and substance use in remission. The note states that he is taking Trazodone and Remeron.

- October 18, 2022 (Provider: Dr. Polanco): Mr. Smith is noted to have "no symptoms" and is identified as saying, "I'm fine. The medications are working." He is to "continue present therapy."

B. *Records after the failed execution*

The first record that I have been provided that was after the failed execution was dated November 23rd, 2022, six days after the attempt. I have not seen medical records that document the contact Mr. Smith described with providers immediately following the failed execution.

- November 23 and 28, 2022 (Providers: Livingston/Stewart): This form, a Mental Health Referral form, appears to have two dates of activities. The first, dated November 23, 2022 identifies "anxiety, muscle tension, insomnia due to failed execution" as the reason for the referral. Then, the document is dated November 28 as having been received by RN Stewart who then marked, "Routine referral required" (in contrast to emergent or urgent referral).

- November 29, 2022 (Provider: Dr. Polanco): Mr. Smith is identified as saying "I'm very anxious, I have nightmares," and his target symptoms are listed as: "anxiety, worry/frustrated, angered, decreased sleep, nightmares." His mood is described as "anxious" and he is diagnosed with adjustment disorder and substance use disorder. Dr. Polanco recommends an increase in the doses of Remeron and Trazedone and the addition of Minipress (Prazosin).

- November 29, 2022 (Provider: Dr. Polanco): In an Informed Consent Form for Mental Health Medication on the same day as the previous form, the purpose of a medication being offered to Mr. Smith, Prazosin, is listed as: "treatment in post-traumatic stress-nightmares, reduce the severity and frequency of nightmare, sleep disturbances/insomnia." Mr. Smith signed the form.

- December 6, 2022 (Provider: Dr. Polanco): Mr. Smith is described as reporting, "I get stomach upset and diarrhea with Trazedone. I'm fine." Dr. Polanco notes "no symptoms reported" and continues Mr. Smith on Remeron and Prazosin but discontinues Trazedone. Mr. Smith is diagnosed with adjustment disorder in remission and substance use disorder in sustained remission.

- December 14, 2022: (Provider: Illegible): In a Chronic Disease Clinic Follow-up, Mr. Smith is identified as "neck pain since failed execution."

- January 26, 2023: (Provider: Dr. Beech): In a Multidisciplinary Treatment Form, Dr. Beech identifies problems of "Depression/Anxiety" that Mr. Smith will address in his individual and group treatment by "identifying triggers to depression" and "identifying effective coping skills to prevent anxiety/depression." These goals are updated from previous goals set in July 2022.

- February 2, 2023 (Provider: Dr. Polanco): In his progress note, Dr. Polanco notes that Mr. Smith reports: "I have less nightmares. I sleep better. Continue my medication." He is described as having symptoms of anxiety and depression and that he is taking Remeron and Prazosin. Mr. Smith is diagnosed with adjustment disorder in remission and substance use disorder and recommended to continue in therapy.

- March 7, 2023 (Witness: Wall): In this Release of Responsibility form, Mr. Smith signs a waiver that he is refusing his psychiatrist appointment and releases Wexford Health Services from responsibility for this missed appointment.

- March 7, 2023 (Provider: Dr. Polanco): In his progress note, Dr. Polanco notes that Mr. Smith "refuses to be seen. Appointment will be rescheduled."

- March 24, 23 (Provider: Unclear): In this Periodic Health Assessment it is noted that "patient refused to have lab work drawn due to anxiety."

- April 3, 2023 (Provider: Dr. Polanco): In his progress note, Dr. Polanco notes that the target symptoms for Mr. Smith are anxiety and depression. Mr. Smith is identified as saying "I have less nightmares. Please continue my medication." Mr. Smith's mood is described as "anxious" and he is diagnosed with adjustment disorder and substance use disorder. It is recommended that he continue therapy.

Summary of medical records: The records reviewed above demonstrate several facts about Mr. Smith's mental health as documented by the Alabama DOC medical providers:

1. He is noted throughout the record to have no mental illness previous to his incarceration, except substance use disorder in sustained remission.
2. He is diagnosed as either having adjustment disorder or being in the process of a R/O of adjustment disorder beginning in July 2022.
3. He is identified as having anxiety, depression and tension starting in July 2022 with these symptoms worsening in August 2022.
4. He is placed on medication sometime before October 2022 and he reports that by October 18, 2022, he is fine and has "no symptoms."
5. Six days after the failed execution, Mr. Smith is identified as having anxiety, muscle tension, insomnia.
6. Twelve days after the execution, his is described as having post-traumatic nightmares and he is placed on medication for nightmares, while his other medication is increased.
7. In December, 2022, he reports neck pain and upset stomach and diarrhea.
8. Between January and April, 2023, he continues to have mental health treatment for anxiety and depression, but his sleep problems and nightmares decrease.
9. He refuses a medical procedure (blood draw) in March 2023 due to anxiety about needles.

**Results of Clinical Evaluation**

I met with Mr. Smith at W.C. Holman Correctional Facility on December 29, 2022 and January 31, 2023 for approximately eight hours and have also had seventeen phone calls with him, totaling another twenty-eight hours. Over the course of these meetings, Mr. Smith has been polite and expressive, answering questions and describing his experiences and feelings. He has frequently been emotional, weeping and expressing intense distress as he discussed the events of November 17, 2022. In most conversations with me, he was affable and forthcoming, but when we would shift into talking about the events of November 17th, he would become more withdrawn, and take long pauses, sighing and hiccupping, as if gulping air. He has spoken of feeling "terrified," during and after the failed execution and, over time, has described a growing depression, withdrawal and sense of intense dread. Mr. Smith's thought process has been goal-directed and his speech and language are within normal limits. His attention was adequate, though at times he would stare and seem to lose his train of thought, or abruptly change the subject, when it was about the execution. He demonstrated good insight and an ability to reflect on his experience, despite having impairing symptoms of posttraumatic stress (which will be described below). He reported some lessening of depressive symptoms in May 2023, but these increased again in June. During recent phone calls (September-November 2023), Mr. Smith has demonstrated worsening signs of depression, specifically low mood, diminished energy, poor concentration and feelings of hopelessness, as well as increasing dissociation, as evidenced by flat affect, disconnection of emotion and spells of blankness when responding.

Mr. Smith is diagnosed with posttraumatic stress disorder, with dissociation, and depression, which will be described below.

**Posttraumatic Stress Disorder (PTSD)**

Earlier in this report, I reviewed information about the impact of life-or-death events on human functioning, based on clinical and research literature. Here, I will briefly explain the condition of PTSD with dissociation before describing Mr. Smith's symptoms. After I describe Mr. Smith's diagnosis in detail, I will review the standardized measures that I administered to Mr. Smith and their results.

Trauma, defined as a life-threatening event, or an event in which there is severe threat to the individual's bodily and/or psychic safety, mobilizes neurochemical and endocrine systems throughout the brain and body to react to the threat. These reactions—such as "fight or flight" activation and/or shut down and dissociation--while adaptive to the individual's survival in the moment of trauma, can lead to difficulties after the trauma. Memories of the traumatic events return intrusively, thereby activating the same brain and body reactions that occurred during the trauma and leading to severe discomfort and impairment in survivors. PTSD, then, entails symptoms across multiple domains, including intrusive reexperiencing of memories, alterations in arousal and mood, and avoidance and numbing.

Dissociation is a neurophysiological process emanating from the human nervous system in which neurochemical and neuroendocrine reactions to excessive stress cause alterations in consciousness, changing perceptions of the senses, the environment, and the self. Dissociation represents a lowering of consciousness, sometimes to the point of an actual rupture of consciousness and awareness. Clinical models of dissociation explain how humans, like other animals, when under severe threat, will sometimes experience the release of neurochemicals that are anesthetic and that lower the experience of pain and fear. When humans experience this peritraumatic ("during the trauma") dissociation, they are often left with residual difficulties after the trauma. If the individual suffers multiple traumatic events that lead to frequent and lengthy periods of peritraumatic dissociation, the after-effects will likely be more pervasive and more severe. These can include altered states of consciousness that linger after the traumatic events, such as time distortions, memory fragmentation or amnesia, bodily symptoms, and emotional numbing and perceiving reality or their body in a distorted way (derealization and depersonalization).[24]

Below, I will describe Mr. Smith's symptoms of PTSD, with dissociation following the DSM-5 criteria.[25]

A. Exposure to traumatic event:

Mr. Smith's experience of being prepared for execution, taken to the execution chamber and put through several hours of attempts by multiple men, holding him down, to try to end his life with lethal injection would constitute a series of severe traumas. Mr. Smith has experienced some early trauma, such as domestic violence in his family by his father, sexual abuse by a babysitter, loss of a sibling, and his mother's severe alcoholism. These traumas likely worsened his current

---

[24] Frewen, P. & Lanius, R. (2014). Trauma related altered states of consciousness: Exploring the 4-D model. *Journal of Trauma and Dissociation*. 15: (436-456).
[25] American Psychiatric Association. (2022). Diagnostic and Statistical Manual of Mental Disorders (5th ed., text rev.).

symptom presentation, but none of these life events are central to his symptom presentation listed below. Additionally, the ongoing threat of being subjected to another attempt at execution, now by nitrogen hypoxia, is a unique traumatic stressor for Mr. Smith that is exacerbating the symptoms listed below.

B. <u>Intrusive symptoms: One symptom required for diagnosis of PTSD, Mr. Smith meets criteria for all five symptoms</u>

A hallmark posttraumatic symptom is intrusive reexperiencing of memories of and bodily reactions to traumatic events. These intrusions are highly uncomfortable, as they trigger physiological states of arousal (discussed below) which are central to a person's threat detection system. Mr. Smith has multiple symptoms of intrusive reexperiencing of the failed execution and accompanying distress.

- *Recurrent, involuntary and intrusive distressing memories of the event*: Mr. Smith struggled intensely in the immediate aftermath of the failed execution with frequent images and memories coming back to him. For example, he described a typical experience of trying to go to sleep in the weeks after the execution: "I couldn't go back to sleep because my mind was trying to go back to the crap –I started thinking about when they put me on the table and …I started reliving that part and was like, 'No, no, stop Kenny, I am not ready for that.'" On a visit with his wife and mother, several months after the execution, Mr. Smith described becoming anxious as he walked towards the visiting room and had a flashback to walking to the execution chamber. When discussing the guards, he stated, "I can see them now, with me on the gurney, looking through the observation window."

  In the evaluation, when discussing the possibility of being executed again, Mr. Smith spontaneously started describing that he could have "bled out" into his chest if the needle had punctured a vein in his neck. He described this in detail— an image of physical damage being done to his body. On another occasion, while speaking about his legal situation, he spontaneously began to talk about having a mask over his face as he is executed by gas, an image he noted comes at him "rapid-fire." Survivors of trauma frequently find their mind being consumed with images of the trauma and of other ways they could be hurt again.

- *Dissociative reactions (flashbacks) in which the individual feels as if the trauma were recurring:* In the weeks and months since the execution, Mr. Smith has had multiple experiences of flashbacks to the details of the execution. These can appear as flashbacks—quick images—or longer memories. For example, in mid-December, he described struggling with images of being on the gurney and having a staff member move his head forcefully to the side, so that a needle could be put into his neck. This image caused Mr. Smith intense anxiety when it would come back to him and when he recounted it to me. In March 2023, a canine search unit came onto Mr. Smith's tier, and he had what he called an "anxiety attack." In this moment, Mr. Smith could not calm down because he began thinking of the guard

force who entered the cell to take him to the execution chamber. He noted, "I started thinking, are they coming to get me?"

Mr. Smith also experiences dissociative flashbacks in which he is detached from his perceptions and feelings. When describing himself during the execution, Mr. Smith gave a hallmark description of dissociation:

> During it, I felt drawn in, like I was looking out windows…Like it was happening to someone else, and I get to watch. That first week back, it was like walking in a dream.

When recounting the events of November 17th, Mr. Smith stared into space at times and would take deep breaths. He described himself as feeling "hollow" at these moments, a likely dissociative experience.

- *Marked physiological reactions to external or internal reminders of the trauma event:* Mr. Smith described chronic difficulty with hyperarousal (See also Criteria E below) when he would be reminded of the attempted execution or try to describe it to people. Mr. Smith noted that he would tremble when he started thinking about being on the gurney and he would especially become physically activated when remembering the attempt to put a central line into his neck. On one occasion, Mr. Smith said that he felt that he was shaking uncontrollably when remembering this moment. He also noted that he woke up in the night for several weeks covered in sweat after intrusive nightmares of the execution. Once, when two staff members were passing by his cell, Mr. Smith described his heart beginning to race, as one of them made eye contact with him. A dental procedure in May, 2023 became terrifying for Mr. Smith when the dental practitioner approached him with a needle and he began to shake and tense up. He also noted that he is frequently nauseated, especially if he has a reminder of the attempted execution.

Some of these symptoms occurred during the evaluation, when Mr. Smith recounted the failed execution and when he saw guards outside of the visiting room who had participated in the execution. During the description of the attempted execution, Mr. Smith would pause for long periods and take in and expel large gulps of air, sometimes hiccupping, a sign of anxious breathing. He would stare blankly at times as if he had lost his train of thought. He also suddenly required the bathroom while beginning to give the description of being strapped down onto the gurney. On the phone, he would pause and sigh heavily, as if gathering himself, when recounting certain details of the attempted execution. When discussing legal developments in his case, Mr. Smith noticed that his chest would tighten and he felt "tensed up and ready to fight." When describing his memories of the line being attempted in his neck, Mr. Smith stated, "I'm anxious right now, a little bit jittery. Shit, I can't avoid this." Mr. Smith described feeling "exhausted" and "drained" from reviewing what had happened

on several phone calls. After our two in-person meetings, Mr. Smith went to bed and had migraines that lasted for several days.

- *Intense psychological distress in response to external or internal reminders or cues of the trauma*: Mr. Smith's environment provides multiple reminders of the events of the failed execution, as the unit in which he is incarcerated is very close to the execution chamber. He has to pass by this area in order to go to the visiting room, the infirmary and the captain's office. He noted that when he has to see this area, he feels anxious and agitated. He has this reaction when he sees certain guards and officers who participated in the attempted execution, finding himself feeling agitated as he thinks about how they handled him in the chamber. His first visit with his family after the failed execution was anxiety-provoking for him and he realized that it was because he would be seeing them in the visiting room where he said goodbye to them.

  Internal reminders, such as thoughts of the execution, bring him even more anxiety. For example, Mr. Smith has described at length his intense fear of being put through an execution again. He described an excruciating process of remembering each aspect of what happened—such as saying goodbye to his family, being taken out of the death cell by multiple guards, being strapped down to the gurney and having the execution begin—and then attempting to block or stop each of these memories. When telling the story of the failed execution, he would alternate between crying and then becoming detached, as if losing his train of thought. For a survivor of a life-or-death experience, this process of intrusively remembering what happened, experiencing the accompanying physiological and psychological distress of the event and then attempting to stop this cascade of memories and anxiety is an arduous and exhausting process. Mr. Smith described this cycle, saying, "Sometimes when I think about it, Oh my God, saying goodbye, running the gauntlet…watching my family go through this…dragging my family through this again. And I think, I've got to get away from these thoughts." In further example of this, Mr. Smith became notably agitated when he spoke about future attempts to execute him, given new procedures, "They can work all night, there's no stopping time. Or if they did stop, they can start again tomorrow."[26]

- *Recurrent, distressing dreams in which the content or affect of the dream are related to the trauma:* In the days and weeks following the failed execution, Mr. Smith had nightmares many nights. These would be nightmares in which he would be saying goodbye to his family, giving away his belongings and then being strapped to the gurney in the execution chamber. He had recurrent nightmares of the staff members who participated in the failed execution and also of people trying to execute him with gas. He found the dreams highly distressing and would wake from them and have difficulty falling back to sleep. These

---

[26] Mr. Smith was referring to a procedural change announced by the Alabama DOC where death warrants will no longer expire at midnight.

dreams have diminished over the course of several months but they still occur and are linked to images from the failed execution.

C. <u>Persistent avoidance of stimuli associated with the event</u>: One required for diagnosis of PTSD, Mr. Smith meets criteria for two.

Mr. Smith tries to shut down his overwhelming feelings and block out memories of the attempted execution. This "strategy" of shutting down or numbing is common in victims of trauma. This conscious blocking of memories, thoughts and external reminders of a trauma is a hallmark symptom of PTSD. This is actually a remarkably ineffective strategy, for as trauma victims attempt to stop thoughts or memories from coming into their mind, they are often gripped with chronic intrusive memories that appear and startle them. Thus, survivors often feel like they are suffering a kind of psychic whiplash as they try to stop being reminded while being bombarded with involuntary physiological reactions to the trauma.

- *Avoidance of thoughts/memories/feelings about the event*: Mr. Smith described a concerted effort that he makes to not let his mind return to the memories of the attempted execution. He described how he can picture himself on the gurney but then actively stops his thoughts, saying, "[I] don't let myself go to images of once they started…not intentionally. [I] don't go past there." He described himself avoiding thinking about it, but having memories return unbidden. Mr. Smith had written regularly in his journal, but has been unable to do so since the failed execution, explaining, "I'm afraid I'll start writing about what happened." This kind of perception of the traumatic memory being involuntarily recalled is common in survivors.

- *Avoidance of external reminders of the event:* Mr. Smith has multiple external reminders of the attempted execution in his environment that he has attempted to avoid. These include seeing the staff members who participated in the failed execution and passing by the area of the unit where the execution chamber is. Mr. Smith described how he has to talk to himself when he is brought near the chamber, saying, "Ok, this ain't that, Kenny. It's not that," in order to calm himself. Seeing guards who participated in the attempted execution is highly triggering for him and he noted that he will try to stay in his cell or not look at guards or staff who were part of the process.

  Survivors of traumatic events often find that conversations about the trauma are exceedingly difficult, as symptoms of hyperarousal and dissociation come flooding in. Thus, many survivors report avoiding conversations. Mr. Smith noted that in the weeks following the failed execution, he was asked by many of the men on his unit about what happened, as well as by his lawyers. He described himself as trying to "back up" and "get away" from people when they would ask questions, knowing that he would become very distressed when remembering. He said that he tries to "not relive it," by not talking about what happened. When meeting for this evaluation and speaking on the phone, Mr. Smith would try to discuss other aspects of what happened, such as the days before the execution and

would avoid details of the actual failed execution, until directly queried. He said when other inmates talk about execution, "I get tightness. I draw up," so he tries to stop the conversation. When his lawyers send him legal work on his case, he stated that he cannot read it because he becomes too anxious, so his wife reads it for him. He avoids phone calls with family at times because he is afraid they will ask questions about what happened.

D. <u>Negative alterations in cognitions and mood:</u> Two required for diagnosis of PTSD, Mr. Smith meets criteria for four

- *Persistent negative emotional state:* Mr. Smith struggles with strong negative feelings about the execution attempt and how it affected him, as well as his family. He described feeling intensely distressed and angry about what happened. He wept on many occasions, as he recounted the events of the execution. He also noted that anger and tension will come over him quickly and he will have to try to calm these reactions down, saying, "I'll take really big breaths and just exhale and let [my] body settle, let the tension wash off me."

   Mr. Smith described other negative feelings that he struggles with from the failed execution, including shame and humiliation. Mr. Smith cried while describing the humiliation of people taking pictures of him on the gurney and watching him struggle. He noted how fear can get stirred up when he remembers certain details, such as when one of the personnel turned his head, in order to reach his collarbone area. He became agitated at one point, describing how he was "probed" during the failed execution and that he was just a "meat sack."

- *Persistent or exaggerated negative beliefs or expectations about oneself, others or the world.* Mr. Smith stated that he has struggled with his feelings about people, after the experience of the attempted execution. He described his understanding of the COs having to do their job, but noted that he cannot understand how the people in the room were capable of letting him be in pain and not responding to him. These thoughts recur when he sees certain staff members, leading him to feel angry, irritable and upset.

- *Markedly diminished interest or participation in significant activities:* Mr. Smith reported that he had no interest in engaging in his usual activities in the months after the failed execution. For instance, he stopped coming out of his cell for recreation time and had no interest in chess, something he usually spends a lot of time doing with friends. After about two months, this improved and he found himself more able to engage in some activities, like chess. However, as he has had to talk with his lawyers about an impending execution, he has become more withdrawn, wanting to stay in his cell.

- *Feeling detached or estranged from others:* Mr. Smith has experienced a marked change in his ability to feel connected to others since the failed execution. This began in the immediate aftermath of the execution when he found himself not

wanting to come out of his cell and socialize with his friends. He stated, "I don't let guys come over to me because I'm afraid I might snap at them." This experience of increased irritability leading to isolation from others is common after severe trauma. Mr. Smith noted that he has felt isolated from family and finds himself unable to talk with them as frequently. He described this, saying "This added another layer of detachment for me." He expressed feeling alone because no one can understand his experience but also expressed bewilderment, saying, "I can't explain why I don't want to talk to people."

E. <u>Alterations in arousal and reactivity:</u> Two required for diagnosis of PTSD, Mr. Smith meets criteria for five

Hyperarousal constitutes a set of posttraumatic symptoms of increased and inappropriate stress response in the body, often experienced with trouble breathing, heart racing and dread. Characterized by physiological discomfort, such as racing heart, perspiration and trembling, hyperarousal is understood to be the sympathetic nervous system activating a "fight or flight" response. The response, while necessary during a trauma, is activated involuntarily after trauma and it is one of the most difficult and impairing symptoms of PTSD, as it puts survivors through repeated states of terror and fear. Individuals in a state of hyperarousal are poised for danger. Mr. Smith reported that he was always "on guard" for danger in the days and months after the execution attempt. He reported some improvement in this symptom over the past months, though he noted that he still can feel "panicky" with a racing heart and feeling of dread. He also described difficulty focusing and paying attention, even on activities that he wants to complete, a sign of impaired concentration, possibly due to hyperarousal.

- *Irritable behavior and angry outbursts:* One of the most consistent symptoms that Mr. Smith reports is chronic irritability and anger. He has described numerous ways that he feels irritable since the events of November 17th, including feeling agitated by noise in his unit (something that never bothered him), feeling short-tempered with people when they talk with him, feeling jumpy when someone approaches him. He has noted that this symptom has diminished since the first few months after the failed execution, but that it is still a noticeable feeling, particularly when he sees things that remind him of the execution (certain personnel, the chamber, etc.)

- *Hypervigilance:* Mr. Smith described chronic hypervigilance over the months since the failed execution, something that he stated is a marked difference for him in how he usually feels. Mr. Smith noted that he has managed well during his incarceration, never getting into fights or having disciplinary issues. His demeanor has changed, however, as he finds himself vigilant to his environment and constantly watching for officers and guards. He stated that he finds himself imagining guards coming to get him to take him to the chamber. He described his "radar" being up in ways that he has not experienced for a long time in prison. After executions were permitted to go forward, Mr. Smith began to describe himself as "fearful" and described a "sickening feeling" taking over. With his recent execution date set for January 2024, he feels unbearably anxious and vigilant.

- *Exaggerated startle response:* Mr. Smith has experienced a chronically increased startle response since the failed execution. He has noted multiple ways he finds himself being "jumpy" or easily startled. For example, he described the noises of the unit as very agitating for him—sounds like weights being dropped, doors being slammed or people yelling. He described this across many months, though it has diminished somewhat.

- *Problems with concentration:* Mr. Smith described some difficulty with concentrating in the first months after the failed execution. For example, he had difficulty playing chess and struggled with his meditation practice. He has been able to return to these activities somewhat. However, he stated that he feels forgetful and like he is "not there," sometimes, forgetting what people tell him or feeling unable to focus on conversations.

- *Sleep disruption:* In the initial two months after the failed execution, Mr. Smith would awaken early—at approximately 4 a.m. and be unable to return to sleep, as he used to do. He also noted that he had night sweats in the first several days after being brought back from the execution chamber and placed in his cell. He also described feeling fatigued in a way that he has not before. He reported some improvement in his sleep over several months, but then a return to early awakening in February as he became anxious about another execution being attempted. He reported lying awake thinking about what would be done to him, feeling like his "brain will not shut up."

**Depression**

In addition to PTSD, Mr. Smith is diagnosed with depression, moderate. This condition worsened over the course of the evaluation, emerging approximately six weeks after the failed execution. Mr. Smith describes feeling withdrawn from others, low mood, diminished interest in activities, decreased energy and frequent tearfulness. In the earlier part of the evaluation, his mood was more defined by anxiety and irritability, but over the course of the months in which we spoke, he became more despairing, expressing deep despondence and hopelessness. He described having difficulty getting out of bed and just wanting to lie there. He noted, "I'm not equipped for this, for these feelings. I don't know how to navigate this." He stated that he has felt "heart-sick" since the failed execution, thinking about what his family has gone through and may still have to go through if he is executed. Mr. Smith's energy seemed diminished over time and he spoke in a flat tone in later conversations, saying he felt "apathetic" and "somber." He noted increased tearfulness a few months after the execution, saying that he felt near tears frequently. He cried frequently during phone calls and meetings for this evaluation. In May, Mr. Smith noted that he felt the depression had improved somewhat. As of the writing of this report, his depressive symptoms have once again worsened.

*Psychological Measures*

Mr. Smith was administered several measures in order to examine his functioning and self-report of symptoms in a standardized format with comparative norms. These measures were administered after several hours of open-ended interviewing in person and on the phone. The measures are summarized below. In short, the measures indicated:

- o Mr. Smith demonstrated good effort to answer questions truthfully and complete tasks presented to him.
- o There was no indication of malingering by Mr. Smith.
- o The diagnosis of PTSD with dissociative features and depressive symptoms was confirmed by standardized measures.

1. <u>Trauma Symptom Inventory-2 (TSI-2)</u> [27]: The TSI-2 is a standardized test of trauma-related symptoms and behaviors. This measure is widely-used and has been validated across numerous settings and populations to assess a wide range of trauma-related symptoms emanating from various types of traumas. There are 12 clinical scales and 12 subscales on the TSI-2 that tap different domains of symptoms and a score is obtained for each scale, resulting in a four broad-band factors: Self-disturbance, Posttraumatic Stress, Externalization, and Somatization.

Mr. Smith's results on the TSI-2 indicated that he is suffering **severe and pervasive psychological distress that is trauma-related across multiple dimensions of functioning**. **He scored in the clinically elevated range (T$\geq$ 65) on all four broadband factor scores: Posttraumatic stress, Externalization, Self-disturbance and Somatization. His score on the Posttraumatic stress scale placed him in the 99th percentile of individuals tested.**

He demonstrated problematic or clinically elevated scores—that is, scores that are identified as warranting significant clinical concern and that indicate impairment in the individual's functioning across multiple scales and subscales listed below.

<u>Problematic range (T = 60-65) scales (Area of clinical concern):</u>
Depression
Relational avoidance
Reduced self awareness
Tension reduction behavior

<u>Clinically elevated range (T > 65) scales (Area of impairment):</u>
Anxiety
Hyperarousal
Anger
Intrusive experiences
Defensive avoidance
Dissociation
Pain
General somatic problems
Sexual Concerns

---

[27] Briere, J. (1995). <u>Trauma Symptom Inventory Professional Manual</u>. Psychological Assessment Resources.

This level and breadth of clinically significant impairment and distress is noteworthy, as his symptoms cut across multiple aspects of his functioning and in severe ways. These results are confirming of what was determined in the clinical interview.

2. Test of Memory Malingering (TOMM)[28]: The TOMM is a visual recognition test used to discern malingered vs. true memory impairments in individuals. FINDINGS: **Mr. Smith's performance on the TOMM was within normal limits. His scores indicated that he had put forth his best effort and was not attempting to portray his cognitive functioning in an impaired light in terms of learning and memory.**

3. The PTSD Checklist for DSM-5 (PCL-5)[29]: The PCL-5 is a validated, reliable self-report measure of symptoms of posttraumatic stress disorder. Research has shown that higher scores on the measure support the diagnosis of posttraumatic stress disorder. Data from this measure can be helpful in identifying an individual's need for treatment of PTSD and which areas are most severe. FINDINGS: **Mr. Smith surpassed the cut-off score for clinical indication of PTSD and need for treatment and he demonstrated high severity of symptoms in all symptom domains. Thus, his results on this measure support the diagnosis of PTSD, which will be described below.**

4. Beck Depression Inventory[30]: The Beck Depression Inventory is a validated, reliable self-report measure of characteristic attitudes and symptoms of depression. **FINDINGS: Mr. Smith's results on this measure indicated a moderate level of depression, including symptoms of chronic sadness, hopelessness, feeling guilty, irritable and having low energy and sleep problems.**

**Physical symptoms**

It is not within my clinical expertise to evaluate Mr. Smith's physical symptoms, but I will recount them here, as there were several physical symptoms that have troubled him since the failed execution. I have also not been provided with medical records regarding Mr. Smith's care before or after the failed execution. Mr. Smith's reported physical symptoms after the failed execution include: neck pain and stiffness, shoulder pain, swollen, bruised foot and increase in frequency of migraines and waxing and waning nausea. Mr. Smith noted that his neck, shoulder and foot pain emerged in the aftermath of his straining and moving in response to pain of being stuck with needles in multiple locations on his body. Mr. Smith recalled that he tried to "come off the table" at one point and his feet felt like they were violently curled in response to the pain. By his own report, he was given a shot in his neck by medical personnel several weeks after the

---

[28] Tombaugh, T. N. (1996). Test of Memory Malingering. North Tonawanda, NY: Multi-Health Systems.; Tombaugh, T. N. (1997). The test of memory malingering (TOMM): Normative data from cognitively intact and cognitively impaired individuals. *Psychological Assessment, 9*(3), 260–268.
[29] Weathers, F.W., Litz, B.T., Keane, T.M., Palmieri, P.A., Marx, B.P., & Schnurr, P.P. (2013). The PTSD Checklist for *DSM-5* (PCL-5). Scale available from the National Center for PTSD.
[30] Beck, A. T., Ward, C. H., Mendelson, M., Mock, J., & Erbaugh, J. (1961). An inventory for measuring depression. *Archives of General Psychiatry*, 4, 561-571.

failed execution to address shoulder and neck pain and given Naproxen for the foot pain. He was also given an X-ray and told that his neck had arthritis and his shoulder had "old damage." Mr. Smith also has a lifelong history of chronic migraines and he reports that they have been frequent and severe since the events of November 17, 2022.

## Resilience

Mr. Smith demonstrates remarkable resilience, both in terms of his use of internal resources, such as prayer, meditation, journaling and yoga, as well as his reliance on external resources, most importantly his relationships with his wife, his children, his grandchildren and other friends and family. Additionally, friendships with other incarcerated men have been helpful to him. These resources have served him in the aftermath of the failed execution, in that he has relied on family members as sources of comfort and support and has tried to use his meditation practice to manage his symptoms. He stated that the "grounding" he has in his faith and his relationships has helped him to survive what he went through. He has noted however, that many of his strategies that were helpful to him before, such as journaling and meditating, are more difficult for him to do since the failed execution and he feels that his "spirit" has been altered by the execution.

## Mr. Smith's clinical condition in relation to the execution events and future execution

In my clinical experience of over twenty-five years of working with survivors of torture and war trauma, I have evaluated and treated many individuals who suffered near-death traumas, including mock execution, kidnapping, and torture. What Kenny Smith experienced was one of the most severely debilitating traumas a person can endure—that of being purposely brought almost to the point of death—and he suffers marked and profound psychological damage from this experience. The experience of anticipating one's death in real time has been shown to flood the body with neurophysiological survival responses that involve cardiac, respiratory, gastrointestinal, perceptual, and cognitive reactions in the short term and potential long-term changes in neurochemical functioning. Mr. Smith experienced these types of reactions during the attempted execution and his ongoing and severe symptoms suggest that his neurophysiological reactions are currently dysregulated.

During life-or-death threats, people often experience dissociation into a state of altered consciousness, as if they are not in their body or as if the external world is not real. Mr. Smith clearly experienced these dissociative reactions, and they continue to cause him impairment. These dissociative reactions include ongoing difficulty with his focus and concentration, bodily discomfort, spaciness, as well as feeling disconnected from other people. Unfortunately, it is widely proven empirically that individuals who suffered dissociation during a trauma will have poorer functioning after the trauma and will possibly develop more symptoms of intrusive remembering over the next months or years, as their sensory systems come back "online."[31] In addition to dissociating, Mr. Smith also experienced severely distressing thoughts during the

---

[31] Schauer M, Elbert T. (2010). Dissociation following traumatic stress. *Z Psychol/J Psychol*.; 218(2):109–27.

failed execution, such as imagining the destruction that the needles were doing to his chest and collar bone and perceiving the imminent entrance of deadly substances into his body. Survivors of near-death traumas often experience pointed concrete thoughts of the physical body destruction that is about to take place. Survivors have described feeling terror, horror, and gut-wrenching disgust about the literal destruction of the body that is about to take place. Mr. Smith also had these experiences of horror and disgust, as well as shame at imagining being watched during this and even photographed. In the aftermath of the failed execution, Mr. Smith's emotional reactions have coalesced into ongoing feelings of humiliation and dread, both of which cause Mr. Smith substantial discomfort that he attempts to manage by shutting off his feelings.

Like other survivors I have evaluated and, as documented in the literature, Mr. Smith experiences intrusive memories of the events of the failed execution with extreme dread and fear. In my clinical experience, individuals who are remembering and recounting having almost been killed become severely psychologically distressed and physically destabilized as they revisit these events. I have seen survivors panic, dissociate, aggressively resist and plead to not recount such events, as well as suffer nausea, pain, and urgency of the bowel and bladder. Mr. Smith also demonstrated this hyperarousal, physical discomfort, and vigorous avoidance attempts, even when he was seemingly choosing to talk about what happened, such as in our meetings.

Mr. Smith's depression is also a condition that I have seen in multiple individuals who faced a man-made near-death experience, such as torture or mock execution. Like others, Mr. Smith's initial relief at being alive, particularly in relation to his loved ones, has given way to a feeling of sickening dread and anguish, as he faces the next planned attempt on his life. His mood is frequently quite low and he feels diminished energy and motivation. Even his relationships with others feel muted for him, as he wards off connection to his loved ones in anticipation of having to say goodbye to them again. His fear of putting his family—especially his wife, mother and children—through another execution is paralyzing for him. Hence, like other patients I have seen who have been through torture or other uncontrollable experiences of harm, he has retreated inward into a state of serious depression.

All of these clinical findings indicate that Mr. Smith is highly impaired, with chronic symptoms of PTSD and depression. While he is able to function on the surface, he moves through his environment with a barely controlled panic and despair, always on edge that his symptoms can bring him back to the experience of the attempted execution. These events were destructive and damaging to Mr. Smith and have left serious, pervasive problems in his biopsychosocial functioning. Mr. Smith's ability to manage the reminders of the attempted execution that are all around him is impressive, but it is fragile. He is easily triggered into states of arousal and dissociation, which leave him exhausted and demoralized. Hence, he retreats into himself and tries to shut down his feelings, his activities, and his relationships. The new execution date set for Mr. Smith will begin a process of reexperiencing of reminders and details that are sure to be highly triggering for Mr. Smith. Procedures, such as moving him into lock-down status, examining him pre-execution, setting up visit protocols with his family to say goodbye to him again, managing his last meal and his personal effects will be highly distressing, as these events will flood him with memories and involuntary fear reactions from his experiences in November 2022. Additionally, the actual procedures of the execution, such as holding him in

the death watch cell, having multiple guards bring him into the chamber, strapping him to the gurney, and beginning physical procedures that will bring about his suffocation through nitrogen hypoxia will likely create a panic reaction that is completely destabilizing to his mind and nervous system. This clinical prediction is made based on the extensive scientific literature (cited throughout this report) on life or death traumatic experiences and the posttraumatic symptoms and conditions that they engender, as well as my own extensive clinical experience from twenty-five years working with survivors of severe trauma and torture.

Mr. Smith's impairments and clinical conditions warrant treatment. To be left in this impaired condition, in the environment where he was traumatized is likely to worsen his already tenuous psychological functioning. The threat of having to experience another execution and all of its procedures will most certainly cause him severe suffering, destabilization and psychological deterioration.

Please do not hesitate to contact me with questions or further relevant information.

Sincerely,

Katherine Porterfield, Ph.D.
Licensed Psychologist
NY State License 014105-1



FIGURE 1: The freeze-flight-fight-fright-flag-faint defense cascade (Reproduced from Schauer M, Elbert T. (2010). Dissociation following traumatic stress. *Z Psychol/J Psychol*.; 218(2):109–27. doi:10.1027/0044-3409/a000018.)

# Appendix: Materials Considered List

AAPL practice guideline for the forensic assessment (2015). *Journal of the American Academy of Psychiatry and the Law*, 43(2), s3–s53.

Alabama Department of Corrections Execution Procedures (August 2023).

American Psychiatric Association. (2013). <u>Diagnostic and Statistical Manual of Mental Disorders</u> (5th ed.). Arlington, VA.

American Psychiatric Association. (2022). Diagnostic and Statistical Manual of Mental Disorders (5th ed., text rev.). Arlington, VA.

Başoğlu, M., & Mineka, S. (1992). The role of uncontrollable and unpredictable stress in post-traumatic stress responses in torture survivors. In M. Başoğlu (Ed.), <u>Torture and Its Consequences: Current Treatment Approaches</u> (pp. 182–225). Cambridge University Press.

Beck, A. T., Ward, C. H., Mendelson, M., Mock, J., & Erbaugh, J. (1961). An inventory for measuring depression. *Archives of General Psychiatry*, 4, 561-571.

Briere, J. (1995). <u>Trauma Symptom Inventory Professional Manual</u>. Psychological Assessment Resources.

Description of Smith family.

Elbert, T., Schauer, M., Ruf, M., Weierstall, R., Neuner, F., Rockstroh, B., & Junghöfer, M. (2011). The tortured brain: Imaging neural representations of traumatic stress experiences using RSVP with affective pictorial stimuli. *Zeitschrift für Psychologie/Journal of Psychology*, 219(3), 167–174.

Execution Procedures Confidential (April of 2019).

Frankel, A. S., & Dalenberg, C. (2006). The forensic evaluation of dissociation and persons diagnosed with dissociative identity disorder: Searching for convergence. *Psychiatric Clinics of North America,* 29(1), 169–184.

Frewen, P. & Lanius, R. (2014). Trauma related altered states of consciousness: Exploring the 4-D model. *Journal of Trauma and Dissociation*. 15: (436-456).

Herman, J. (2015). <u>Trauma and Recovery</u>. Basic Books.

Kalaf et al., (2015). Peritraumatic tonic immobility in a large representative sample of the general population: Association with posttraumatic stress disorder and female gender. *Comprehensive Psychiatry*, July, 60 (68-72).

Kenneth Eugene Smith medical and dental records (2004–2023).

Kenneth Eugene Smith family tree.

Maeng LY, Milad MR. (2017) Post-traumatic stress disorder: The relationship between the fear response and chronic stress. *Chronic Stress*. doi:10.1177/2470547017713297.

McFeely, W.S. (2000). Proximity to Death (Chapter 5). W. W. Norton & Company.

Melton GB, Petrila J, Poythress NG, et al. (1997). Psychological Evaluations for the Courts. New York: Guilford Press;.

Meyer-Parlapanis, D., Elbert, T., (2015). Torture and its consequences, Psychology of. In: James D. Wright (editor-in-chief), International Encyclopedia of the Social & Behavioral Sciences, 2nd edition, Vol 24. Oxford: Elsevier. pp. 434–441.

O'Mara, S. (2018). The captive brain: Torture and the neuroscience of humane interrogation, *QJM: An International Journal of Medicine*, Volume 111, Issue 2, pp. 73–78.

O'Mara, S. (2011). On the imposition of torture, an extreme stressor state, to extract information from memory: A baleful consequence of folk cognitive neurobiology. *Zeitschrift für Psychologie/Journal of Psychology*, 219(3), 159–166.

Petitioner's Reply Brief in Support of His Petition for a Writ of Habeas Corpus by Prisoner in State Custody Under Death Sentence (pages 2–7), filed in Smith v. Dunn, No. 2:15 (N.D. Ala.) on March 16, 2016.

Physicians for Human Rights, (2005). Break Them Down: Systematic Use of Psychological Torture by US Forces. Washington, DC.

Roy HA, Green AL. (2019). The central autonomic network and regulation of bladder function. *Front Neurosci*. Jun 13;13:535. doi: 10.3389/fnins.2019.00535. PMID: 31263396; PMCID: PMC6585191.

Schauer M, Elbert T. (2010). Dissociation following traumatic stress. *Z Psychol/J Psychol*.; 218(2):109–27. doi:10.1027/0044-3409/a000018.

Second Amended Complaint (Doc. 71), filed in Smith v. Hamm, No. 2:22-cv-497 (M.D. Ala.) on December 6, 2022.

Smith v. Hamm, No. 2:22-cv-497, Memorandum Opinion and Order at 15 (Doc. 22) (M.D. Ala.), issued on October 16, 2022.

State of Alabama's Motion to Set an Execution Date, filed in Ex parte Kenneth Eugene Smith, No. 1000976 (Ala. S. Ct.) on August 25, 2023.

Tombaugh, T. N. (1996). Test of Memory Malingering. North Tonawanda, NY: Multi-Health Systems.

Tombaugh, T. N. (1997). The test of memory malingering (TOMM): Normative data from cognitively intact and cognitively impaired individuals. *Psychological Assessment*, 9(3), 260–268.

van der Kolk, B. A. (2014). <u>The Body Keeps the Score: Brain, Mind, and Body in the Healing of Trauma.</u> Viking.

Weathers, F.W., Litz, B.T., Keane, T.M., Palmieri, P.A., Marx, B.P., & Schnurr, P.P. (2013). <u>The PTSD Checklist for DSM-5</u> (PCL-5). Scale available from the National Center for PTSD.

# EXHIBIT 2

# Katherine A. Porterfield, Ph.D.



New York State License # 014105-1
Kporterfield1@gmail.com

## Education

**University of Michigan,** Ann Arbor, Michigan
**Doctor of Philosophy**, Clinical Psychology (1998)
**Master of Philosophy,** Clinical Psychology (1994)
**Dissertation Topic:** Meeting the Needs of Parentally Bereaved Children: A Model of Child-Centered Parenting
**Awards:** Regents Fellowship (1992-1996); Power Fellowship (1995-1996); Summer Research Fellowship (1994, 1995); Rackham Dissertation Grant (1997)

**Georgetown University,** Washington, D.C.
**Bachelor of Arts,** Interdisciplinary Studies: English, philosophy, history.
 (1986)
**Awards:** Graduated cum laude; National Jesuit Honor Society
Extensive extracurricular theater and social service experience

## Licensure

New York State License # 014105-1

## Professional and Board Memberships

*Committee to Protect Journalists,* Secondary Traumatic Stress Advisory Group (2019).

*American Psychological Association*, Member (2008-2012).

*International Society for Traumatic Stress Studies*, Member (Ongoing).

Warrior Relief, Board member. (2013).

826NYC, Advisory Board member (2005-present).

Hands of Change, Advisory Board member (2003-2008).

**Editorial/Reviewer Positions**

*Istanbul Protocol: Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment,* Editorial working group contributor: Psychological evidence of torture. (2018-2021).

*APA Books,* Invited peer reviewer, American Psychological Association, Washington, DC (2018).

*Journal of Traumatic Stress,* Ad hoc reviewer. (2017-present).

*Journal of Clinical Child and Adolescent Psychology,* Ad hoc reviewer, American Psychological Association, Div. 53. (2015).

*Journal of Clinical Psychology,* Ad hoc reviewer, Wiley Periodicals. (2015).

*Cambridge University Press Medical Group,* Ad hoc reviewer, Cambridge, UK (2014).

*Anxiety, Stress, and Coping: An International Journal*, Ad hoc reviewer, Brunner-Routledge Press. (2013).

*The Psychosocial Impact of Detention and Deportation on Migrant Families.* Inter-American Commission on Human Rights, Washington, DC. Expert reviewer on report by authors Brabeck, K., Lykes, MB., Lustig, S. (2013).

*International Journal of Law and Psychiatry*, Ad hoc reviewer, Universite de Montreal. (2012).

*American Psychological Association Task Force on the Psychosocial Effects of War on Children and Families Who Are Refugees From Armed Conflict Residing in the United States*, Chair. American Psychological Association. (2008-2010).

## Clinical Experience/Employment

**New York University School of Medicine**, New York, NY
**Clinical Instructor, Psychiatry** (5/03-9/21)

**Bellevue/NYU Program for Survivors of Torture**, New York, NY
**Psychological Consultant** (7/19-present)
**Senior Psychologist** (7/08-present)
**Clinical Co-Director** (11/01-7/08)
**Staff Psychologist** (9/99-11/01)
Provided clinical services to adults, children/adolescents and families at this clinic for survivors of torture and war trauma. Conducted evaluation and assessment services as well as individual, family, and group therapy. Provide trainings and consultations nationally on issues pertaining to trauma, torture, and refugee mental health. Supervised psychological, psychiatric and social work trainees. Currently, serve as consultant for individual grant-funded projects and trainings.

**Journalist Trauma Support Network,** Dart Center for Journalism and Trauma, Columbia University School of Journalism, New York, NY.
**Consulting Psychologist** (11/20-present)

**Freedom House**, Washington, DC.
**Consultant** (2/18-present)
Consulted with managers and teams at Freedom House on trauma-informed practices and conducted trainings and workshops on trauma-facing work in human rights across the organization.
Conducted trainings with Freedom House-funded programs in Iraq and Pakistan on trauma-informed human rights practices and addressing secondary traumatic stress.

**United States District Court, Southern and Eastern Districts of New York,** New York, NY.
**Psychological expert/Consultant** (Varied)
Served as evaluator/consultant in Federal District Court for several cases.

**Office of Military Commissions Chief Defense Counsel,** Washington, DC/Guantanamo Bay, Cuba
**Psychological expert/Consultant** (9/08-present)

Serve as evaluator/consultant for defense teams in Office of Military Commissions in Guantanamo Bay. Have conducted extensive evaluations of several detainees, including psychological testing, interview, and observation.

**NYU Child Study Center**, New York, NY
**Post-Doctoral Fellow** (9/98-8/99)
Recipient of clinical fellowship at this multidisciplinary mental health clinic for children and adolescents. Provided assessment, evaluation, and treatment services for children and families within the Center's Anxiety Disorders Clinic, Attention Deficit/Hyperactivity Clinic, Infant and Early Childhood Development Clinic, and Learning and Academic Achievement Institute. Consulted at The Children's Storefront in Harlem, NY. Provided parenting workshops through the Center's Parenting Institute.

**University Center for the Child and Family,** Ann Arbor, MI
**Intern/Practicum Student** (9/93-10/96)
Recipient of training fellowship on clinical and research issues pertaining to loss in families. Provided individual, couples, and family therapy. Conducted therapy groups with divorced parents, bereaved siblings, and children from violent homes. Administered psychological assessments for custody, forensic, and academic evaluations (WAIS/WISC, MMPI, Exner Rorschach). Areas of specialization: loss and bereavement in families, therapy with the deaf and hearing-impaired.

**University of Michigan Hospital,** Child and Adolescent Psychiatric Division, Ann Arbor, MI
**Practicum Student** (1/94-5/94)
Administered psychological assessment and co-led Social Skills Group for inpatient adolescents.

**Preventive Intervention Project,** Judge Baker Children's Center, Boston, MA
**Project Coordinator** (9/90-8/92)
Coordinated longitudinal project examining a family-based intervention for depressed parents. Contributed to development of assessment battery, coding systems, and reliability studies, participated in grant and manuscript writing.

**McLean Hospital**, Belmont, MA
**Mental Health Worker** (5/89-8/90)
Responsibilities on a 23-bed locked psychosocial unit included milieu management, treatment planning, case presentation at treatment conferences and crisis intervention. Co-led adolescent group.

**Castle School,** Cambridge, MA
**Senior Counselor/Team Leader** (2/87-3/89)
Responsibilities at a 12-bed residential school for emotionally disturbed adolescents included milieu and case management, crisis intervention, hiring and scheduling staff.

**Adolescent and Family Development Project,** Harvard University, Boston, MA
**Research Assistant**       (6/89-1/91)
Coded interviews using Q-Sort of Ego Processes.

**La Casa de la Mujer**, Chimbote, Perú
**Community Organizer**  (6/86-11/86)
Planned and participated in workshops providing psychological, legal, and educational information in impoverished communities.

## Teaching/Training Experience

**New York University Medical School,** NY, NY
**Clinical Instructor**
Clinical Supervisor, Psychological Interns and Externs, Psychiatric Residents (1999-present)
Third year Residents Course Co-Director: Introduction to Clinical Work with Survivors of Torture (2003-2006)
Lecturer, Intern and Residents Seminars, (2001-present)

*The Second City,* Detroit, MI; New York, NY
**Facilitator/Improvisation Instructor (**1994-present)
Design and conduct intensive workshops for businesses, focusing on team-building, creativity, and communication skills in organizations. Clients include Pfizer Pharmaceuticals, Major League Baseball, MTV, and General Motors.

**Performer/Understudy**  (1994-2001)
Served as performer and understudy for Main Stage company, corporate theater company and touring company of *The Second City*, Detroit, MI.

**Zone, Sports Media Consulting,** Cleveland, OH (2007-present)
Conduct sports media training and consultations for professional athletes, coaches, general managers and collegiate athletes and coaches, including NBA, NHL and MLB.

**The American Musical and Dramatic Academy**, New York, NY
**Improvisation Instructor** (1/99-12/99)
Designed and taught improvisation course for acting students in this conservatory program.

**The University of Michigan,** Ann Arbor, MI
**Graduate Student Instructor** (1994, 1996)
Utilized role-play, lecture and discussion formats in this course on introductory counseling skills. Supervised undergraduate teaching assistants.

**Gilda's Club**, New York, NY
**Improvisation Instructor** (2/97-2/99)
Taught course on improvisation at a wellness center for individuals with cancer.

**Georgetown University,** Washington, DC
**Improvisation Instructor** (Summer, 1997)
Taught course on improvisation at the Alumni College.

**The Castle School**, Cambridge, MA
**Drama Teacher** (2/87-2/89)
Taught drama and improvisation at this residential school for emotionally disturbed teens.

## Publications

**Porterfield, K.** (2023). Trauma-informed client communication strategies for lawyers. In Maki, H., Florestal, M., McCallum, M., and Wright, J. (Eds.) *Trauma-informed law: A primer for lawyer resilience and healing.* American Bar Association (Chicago, IL).

UN Office of the High Commissioner for Human Rights (OHCHR), (2018). *Manual on the effective investigation and documentation of torture and other cruel, inhuman or degrading treatment or punishment ("Istanbul Protocol")*. Contributing editor of updated manual.

**Porterfield, K**. (2020). Principles of care of survivors of organized violence in a global society, In Rubin, N and Flores, R. (Eds.) *The Cambridge handbook of psychology and human rights,* Cambridge University Press.

WITNESS. (2020). *Video as evidence field guide: Using video to support accountability for sexual and gender-based violence crimes (SGBV).* Invited contributor. Retrieved at https://vae.witness.org/video-as-evidence-field-guide/.

Brabeck, K.M., **Porterfield, K**., & Loughry, M. (2015). Psychosocial and mental health issues, assessment, and interventions with immigrant individuals and families facing detention and deportation in the United States. In D. Kanstroom and M.B. Lykes (eds) *The new deportations delirium: Interdisciplinary responses.* New York University Press.

Lindhout, A. & **Porterfield, K.** (2014). Healing in forgiveness: A discussion with Amanda Lindhout and Dr. Katherine Porterfield. *European Journal of Psychotraumatology, Vol. 5. Available online at: http://www.ejpt.net/index.php/ejpt.*

American Psychological Association. (2010). *Resilience and recovery after war: Refugee children and families in the United States: Report of the APA task force on the psychosocial effects of war on children and families who are refugees from armed conflict in the United States*. Washington, DC. Lead author/Chair.

**Porterfield, K**. & Akinsulure-Smith, A. (2007). Therapeutic work with children and families. In H. Smith & A. Keller (Eds.), *Like a refugee camp on First Avenue: Insights and experiences from the Bellevue/NYU Program for Survivors of Torture* (pp 299-335). New York, Grant-funded publication.

Keller, A., Lhewa, D., Rosenfeld, B., Sachs, E., Aladjem, A., Cohen, I., Smith, H., **Porterfield, K.**, Wilkinson, J., Perdomo, L., & Smith, Y. A. (2006). Traumatic experiences and psychological distress among an urban refugee population. *Journal of Nervous and Mental Disease, 194 (3), 188-194.*

Saldinger, A., Cain, A., & **Porterfield, K.** (2005). Traumatic stress in adolescents anticipating parental death. *The Prevention Researcher, 12(4), 17-20.*

Saldinger, A., Cain, A., **Porterfield, K.** & Lohnes, K. (2004). Facilitating attachment between school-aged children and a dying parent. *Death Studies, 915-938.*

Saldinger, A., **Porterfield, K.,** & Cain, A. (2004). Meeting the needs of parentally-bereaved children: A framework for child-centered parenting. *Psychiatry: Interpersonal and Biological Processes, 67(4)*, 331-352.

Saldinger, A., Cain, A., & **Porterfield, K.** (2003). Managing traumatic stress in children anticipating parental death. *Psychiatry: Interpersonal and Biological Processes,* 66 (2), 168-181.

**Porterfield, A.**, Cain, A., & Saldinger, K. (2002-2003). The impact of early loss history on parenting of bereaved children: A qualitative study. *Omega: Journal of Death and Dying,* 47(3):203-220.

Beardslee, W, Salt, P., **Porterfield, K.**, et al. (1993). Comparison of preventive interventions for families with parental affective disorder. *J. Am. Acad. Child Adolesc. Psychiatry,* 32(2), 254-263.

## Presentations

Porterfield, K. (July 23, 2023). *Trauma-informed reporting: Biopsychosocial approaches.* Training for Ochberg Fellows, Columbia University School of Journalism, NY, NY.

Porterfield, K. (June 8, 2023, March 10, 2023, December 15, 2022). *Trauma-informed journalism: Biopsychosocial approaches.* Training for the New York Times reporting staff.

Porterfield, K. (May 26, 2023). *Interviewing children affected by trauma*, Training for Romanian journalists sponsored by UNICEF and the Dart Center for Journalism and Trauma, (Virtual).

Porterfield, K. (May 20, 2023). *Coping with stress, trauma and burnout*, Training for San Antonio Association of Hispanic Journalists, (Virtual).

Porterfield, K. (May 3, 2023). *Trauma-informed coverage of gun violence*, Training for the Trace staff. Brooklyn, NY.

Porterfield, K. (April 3, 2023). *Interviewing survivors of trauma in a post-conflict setting.* Zan Times. Remote training for Afghani journalists.

Porterfield, K. (April 1, 2023). *Trauma-informed journalism.* Christopher J. Georges Conference on College Journalism. Nieman Foundation. Harvard University. Cambridge, MA.

Porterfield, K. (January 19-20, 2023). *Trauma-informed journalism: A biopsychosocial approach to well-being.* Training for the Nieman Foundation Fellows, Harvard University, Cambridge, MA.

Porterfield, K. (November 21, 2022). *Trauma-informed approaches to interviewing survivors of trauma.* International Rescue Committee. (Virtual).

Porterfield, K. (October 19, 2022). *Interviewing children in the context of trauma.* Presentation for Early Childhood Global Reporting fellows. Dart Center for Journalism and Trauma. (Virtual).

Porterfield, K. (September 8, 2022, July 25, 2022). *Trauma-informed interviewing: Biopsychosocial approaches.* Training for PBS NewsHour staff. (Virtual).

Porterfield, K. (June 27-28, 2022). *Creating a trauma-informed journalism practice.* Two-day training for IWMF: Reclaiming Voices conference for exiled Afghani women journalists. Washington, DC.

Porterfield, K. (May 5, 2022). *Trauma-informed interviewing: Biopsychosocial approaches.* Training for New York Times reporting staff. (Virtual).

Porterfield, K. (April 12, 2022, April 25, 2022). *The biopsychosocial imprint of secondary traumatic stress in journalism.* Training for Axios Media. (Virtual).

Einashe, I. & Porterfield, K. (March 18, 2022, March 25, 2022). *The biopsychosocial imprint of trauma in journalism: How to recognize, how to respond.* Two-day training for Refugee Journalism Project for 20 refugee journalists working in UK in exile. (Virtual)

Porterfield, K. (March 17, 2022). *Coping through the trauma of COVID-19: Cultivating biopsychosocial wellbeing in critical care staff.* Critical Care Grand Rounds, Columbia University, New York Presbyterian Hospital. (Virtual)

Porterfield, K. (March 15, 2022). *Trauma-informed journalism: Biopsychosocial approaches.* Training for Prologue podcast. (Virtual).

Porterfield, K. (March 8, 2022). *Trauma-informed interviewing: Biopsychosocial approaches.* Training for Religion News Service. (Virtual).

Porterfield, K. (March 2, 2022). *Trauma-informed journalism: Biopsychosocial approaches.* Training for Beech Hill podcast. (Virtual).

Porterfield, K. (February 14, 2022). *Trauma-informed journalism: Biopsychosocial approaches.* Training for NPR podcast "Louder Than a Riot." (Virtual).

Sachs, E., Newman, E., Shapiro, B., & Porterfield, K. (January 28 and February 4, 2022). *Treating journalists in distress.* Two-part training for Comcast/Compsych clinicians serving NBC News. CEs provided. (Virtual).

Akinsulure-Smith, A, and Porterfield, K. (January 27, 2022). *Trauma-informed work with persecuted minorities.* Two-part training for Hammurabi Human Rights Organization, Iraq. (Virtual).

Porterfield, K. and Meneses, R. (January 6 and 13, 2022). *Trauma and resilience: A workshop for freelance journalists.* Two-day workshop sponsored by Dart Center Europe and the Rory Peck Trust. (Virtual).

Porterfield, K. (December 13-14, 2021). *Trauma-informed practice for journalists.* Part of team for two-day training with Next Generation Safety and International Women's Media Foundation. (In-person).

Porterfield, K. (December 8, 2021). *The biopsychosocial imprint of trauma in journalism: Recognizing and developing a wellbeing practice*. Training for Insider Media staff. (Virtual).

Porterfield, K. (November 18, 2021). *The biopsychosocial imprint of trauma in journalism: Recognizing and developing a wellbeing practice*. Training for Time Magazine newsroom staff. (Virtual).

Porterfield, K. (October 26, 2021). *Trauma-informed lawyering: A biopsychosocial approach*. Training for Columbia University Government Program clinic. NY, NY. (Virtual)

Porterfield, K. (October 22, 2021). *Trauma-informed lawyering: a biopsychosocial approach*. Training for Columbia University Immigration and International human rights clinics. NY, NY. (Virtual)

Porterfield, K. (October 13, 2021). *Trauma-informed work with incarcerated people*. Training for NYU Solitary Confinement and Prison Teaching Projects. NY, NY. (Virtual)

Porterfield, K. (September 29, 2021). *Cultivating resilience in the ICU and ECMO team*. Invited panelist at 32nd Annual ELSO International Conference. (Virtual).

Porterfield, K. (September 13, 2021). *The biopsychosocial imprint of trauma in journalism: Recognizing and developing a wellbeing practice.* Training for Society for Professional Journalists. (Virtual).

Porterfield, K. (September 1-2, 2021). *The biopsychosocial imprint of trauma in journalism: Recognizing and developing a wellbeing practice.* Training for Dart Centre Europe: Red de Mujeres Comunicadoras de Internacional. (Virtual)

Porterfield, K. (August 27, 2021). *Managing stress amidst crisis: press-freedom work in Afghanistan.* Workshop presented for Dart Center for Journalism and Trauma. (Virtual).

Porterfield, K. (August 25, 2021, October 12, 2021). *Secondary traumatic stress in journalism: A biopsychosocial approach to wellbeing*. Two-part training for Patch Media staff. (Virtual).

Porterfield, K. (August 16, 2021). *Trauma-informed press freedom work: A biopsychosocial approach to wellbeing.* Training for staff at Free Press Unlimited. (Virtual).

Edwards, S, Colon, R. & Porterfield, K. (July 22, 2021). *Treatment of an adolescent victim of sex trafficking: Medical and mental health considerations.* Mental health and medical conference, Adolescent Health Center, Mt. Sinai Hospital. (Virtual).

Porterfield, K. (July 14, 2021). *The biopsychosocial imprint of trauma and trauma-informed interviewing.* Training for Lost in Europe staff. (Virtual).

Porterfield, K. (July 8, 2021). *The biopsychosocial imprint of trauma: Tips for journalists.* Training for Radiolab Staff. (Virtual).

Porterfield, K. (June 29, 2021, August 18, 2021). *Coping through trauma: Journalist well-being practice in a crisis.* Training for Miami Herald newsroom staff. (Virtual).

Porterfield, K. (June 24, 2021). *Secondary traumatic stress in journalism: A biopsychosocial approach to well-being.* Training for McClatchy News Organization staff. (Virtual).

Porterfield, K. (June 17, 2021). *The biopsychosocial imprint of trauma: How to recognize, how to respond.* Training for Journalist in Distress (JID) Network caseworkers. (Virtual).

Pradhan, A., Prasow, A., Sethi, A., & Porterfield, K. (May 4, 2021). *Guantanamo and beyond: A panel discussion on military commissions, torture and the way forward.* Invited participant. Webinar for American Bar Association, Criminal Justice Division.

Porterfield, K. (April 29, 2021). *Secondary traumatic stress in journalism: A biopsychosocial approach to well-being.* Training for Public Source News staff (Virtual).

Porterfield, K. (April 9, 2021). *Understanding the biopsychosocial imprint of complex trauma.* 2021 Annual Conference Tennessee Association of Criminal Defense Lawyers. (Virtual).

Porterfield, K. (April 7, 2021). *The biopsychosocial imprint of trauma: Working with traumatized clients.* 2021 Annual Conference (CLE's provided). The Public Defenders Association of Pennsylvania. (Virtual).

Sachs, E., Porterfield, K, Newman, E., & Shapiro, B. (March 26, 2021, April 4, 2021). *Trauma-informed therapeutic practice with journalists.* Training for pilot program of Journalist Trauma Support Network. Dart Center for Journalism and Trauma. (Virtual).

Einashe, I. & Porterfield, K. (March 3-4, 2021). *Trauma-informed field work with children and their families: Creating a frame for effective and ethical interviewing.* Training for *Norwegian Refugee Council* staff by the Dart Center for Journalism and Trauma. (Virtual)

Porterfield, K. (February 18, 2021). *Enhancing well-being during a time of chronic stress.* Webinar for Physicians for Human Rights staff. (Virtual)

Porterfield, K. (February 12, 2021). *Secondary trauma in the legal profession.* Invited panelist at Wake Forest Law Review Symposium. (Virtual)

Porterfield, K. (December 3, 2020). *Coping with the stress of COVID-19 in legal work.* Federal Public Defender Conference, District of Kansas. (Virtual)

Porterfield, K. (November 24, 2020, February 2, 2021). *Enhancing well-being during a time of chronic stress.* Webinars for Covid Tracking Project staff. (Virtual)

Porterfield, K. (November 12, 2020, February 18, 2021). *Enhancing well-being during a time of chronic stress.* Webinars for Physicians for Human Rights staff. (Virtual)

Porterfield, K. (October 27, 2020). *Working with traumatized client: the biopsychosocial imprint of trauma.* Advancing Real Change Seminar. (Virtual)

Porterfield, K. (October 19, 2020). *Secondary traumatic stress in journalism: A biopsychosocial approach to well-being.* Training for the International Women's Media Foundation, Hazardous Environments Training. Washington, DC. (Virtual)

Porterfield, K. (October 14, 2020). *Interviewing individuals in solitary confinement: Recognizing and responding to trauma.* Training for NYU Solitary Confinement Project. NY, NY. (Virtual)

Porterfield, K. (October 2, 2020). *Enhancing well-being during a time of chronic stress: Lessons from the trauma field.* Webinar for Federal Defenders of San Diego CJA conference. (Virtual)

Porterfield, K. (September 28, 2020). *The biopsychosocial imprint of complex childhood trauma.* Webinar for University of Texas Law School Capital Punishment Clinic. (Virtual)

Porterfield, K. (June 23, 2020). *Enhancing well-being during a time of stress: A model of self-assessment and care.* Webinar for CCR Intern class. NY, NY. (Virtual)

Porterfield, K. (June 18, 2020). *Trauma-informed work with incarcerated youth.* Webinar for Center for Motivation and Change. NY, NY. (Virtual)

Porterfield, K. (June 3, 2020). *Recognizing and responding to the biopsychosocial impact of stress: Enhancing well-being in yourself and your team.* Webinar for Freedom House international management team. Washington, DC. (Virtual)

Porterfield, K. (May 22, 2020). *Working with traumatized populations during a time of stress.* Webinar for International Women's Media Foundation staff. Washington, DC. (Virtual)

Porterfield, K. (May 2020-October 2020). *Coping through trauma: A biopsychosocial approach to managing stress and well-being in an ongoing trauma.* Webinars for New York Presbyterian Pulmonary Critical Care teams. NY, NY. (Virtual)

Porterfield, K. (April 30, 2020). *Enhancing well-being during a time of stress: A model of self-assessment and care.* Webinar for Military Commissions Defense Operations staff. Washington, DC. (Virtual)

Porterfield, K. (April 22, 2020). *Recognizing and responding to the biopsychosocial impact of stress: Enhancing well-being in yourself and your team.* Webinar for Center for Constitutional Rights management team. Washington, DC. (Virtual)

Porterfield, K. (April 9, 2020). *Enhancing well-being during a time of stress: A model of self-assessment and care.* Webinar for Center for Constitutional Rights staff. Washington, DC. (Virtual)

Porterfield, K. (April 8, 2020). *Enhancing well-being during a time of stress: A model of self-assessment and care.* Webinar for Freedom House Emergency Assistance Program. Washington, DC. (Virtual)

Porterfield, K. (March 30, 2020). *Making the world hurt less: Enhancing wellbeing during a time of stress.* Webinar for International Women's Media Foundation. Washington, DC. (Virtual)

Porterfield, K. (March 19, 2020). *Lessons learned from journalists covering pandemics.* Webinar for International Women's Media Foundation. NY, NY. (Virtual)

Porterfield, K. and Sachs, E. (February 28, 2020, March 27, 2020). *Secondary traumatic stress in journalism: A biopsychosocial approach to well-being.* Training for the Nieman Foundation Fellows, Harvard University, Cambridge, MA. (Virtual)

Porterfield , K. (February 14, 2020). *The biopsychosocial imprint of trauma in human rights work.* Training for Cardozo Law School, Immigrant Rights Project. New York, NY.

Porterfield, K. (December 11, 2019). *The biopsychosocial imprint of complex trauma: Implications for evaluation and treatment.* Grand Rounds, St. Elizabeth's Hospital, Washington, DC.

Porterfield, K. (November 14-15, 2019). *The biopsychosocial imprint of trauma; and secondary traumatic stress: Strategies for well-being.* Presentations at Federal Defenders Orientation Training, Santa Fe, NM.

Porterfield, K. (November 1, 2019). *The biopsychosocial imprint of trauma in vulnerable populations.* Columbia University Law School. Capital and immigration clinics. NY, NY.

Porterfield, K. (October 24, 2019). *The biopsychosocial imprint of trauma in human rights advocacy.* Columbia University Law School. International Human Rights Clinic. NY, NY.

Porterfield, K. (September 21, 2019). Interviewing traumatized children. Presenter at *Through the Eyes of Young Children: Reporting on Children and the International Refugee Crisis*. Conference sponsored by DART Center for Journalism and Trauma, Columbia School of Journalism, New York, NY.

Porterfield, K. (September 20, 2019). *Recognizing and preventing secondary traumatic stress in journalism; Safety training for female journalists.* Sponsored by ROAAAR and International Women's Media Foundation. Brooklyn, NY.

Porterfield, K. (September 18th, 2019). *The biopsychosocial impact of trauma: Recognizing trauma and enhancing well-being.* Training for Immigrant Justice Corps. New York, NY.

Porterfield, K. (April 19, 2019). *The biopsychosocial impact of trauma: Working with traumatized populations.* Training for Columbia Law School Immigration Clinic, NY, NY.

Porterfield, K. (April 4, 2019). *Recognizing and responding to traumatized patients in a medical setting.* Presentation at Global Health Conference, Physician Assistants for Global Health and Mount Sinai Health System Dept of PA Services. NY, NY.

Porterfield, K. (March 1, 2019). *The biopsychosocial impact of trauma: Human rights work with traumatized populations*. Training for staff of the Center for Constitutional Rights, NY, NY.

Porterfield, K. (January 26, 2019). *Secondary traumatic stress in journalism: A biopsychosocial approach to well-being.* Training to the Nieman Foundation Fellows, Harvard University, Cambridge, MA.

Porterfield, K. (November 16, 2018). *The biopsychosocial imprint of childhood trauma: Complex post-traumatic stress disorder.* Presentation at 26th Annual Virginia Bar Association Capital Defense Workshop, Richmond, VA.

Porterfield, K. (November 8, 2018). *The biopsychosocial imprint of trauma; Secondary traumatic stress: Strategies for well-being.* Presentations at Federal Capital Habeas Unit training, Santa Fe, NM.

Porterfield, K., Pradhan, A., Satterthwaite, M., Singh, A., (October 19, 2018). *The meaning of torture in national security.* Invited panelist. Why International Law Matters: 97th Annual Meeting of the American Branch of the International Law Association. Fordham Law School, New York, NY.

Porterfield, K. (October 3, 2018). *Uncompartmentalizing: Learning from a refugee health care experience.* Invited panelist at Critical Issues in Emergency Medicine Conference. Bellevue Hospital Emergency Medicine Department, NY, NY.

Porterfield, K. (June 19, 2018). *The biopsychosocial imprint of trauma*. Plenary Presentation. Federal Death Penalty Authorized Case Consultation and Training Conference, Administrative Office of the US Courts. Atlanta, GA.

Porterfield, K. (June 4, 2018*). The imprint of trauma in human rights work.* Training for Center for Reproductive Rights. New York, NY.

Haidt, J., Porterfield, K., Van Bavel, J. (June 3, 2018). *The roots of extremism: The fundamentalist in your brain.* Invited panelist. World Science Festival, New York, NY.

Porterfield, K. (May 15, 2018). *The imprint of trauma in human rights work.* Training for Reprieve. New York, NY.

Porterfield, K. (March 21, 2018). *The biopsychosocial imprint of trauma: How to recognize, how to respond.* Plenary Presentation. Capital Habeas Unit National Conference, Federal Judicial Center, Santa Fe, New Mexico.

Porterfield, K., Kleinman, S., Katz, C, Mukherjee, E. (February 26, 2018). Changes in policy and practice in asylum law. Invited panelist. New York County Psychiatric Society. New York, NY.

Porterfield, K. (February 13, 2018). The imprint of trauma in human rights work. Training for Physicians for Human Rights national and international staff.  New York, NY.

Porterfield, K. and Smith, H. (February 16, 2018). *Building the foundation of trauma-based treatment for refugee clients.* Day-long training for mental health providers. Sponsored by Better Health for Northeastern New York & Alliance for Better Health Care. Albany, NY.

Porterfield, K. (January 18, 2018). *Interviewing survivors of trauma in a journalism context.* Presentation at Dart Center for Journalism and Trauma, Columbia University. New York, NY.

Porterfield, K. (January 10, 2018). *The biopsychosocial imprint of complex trauma: Implications for evaluation and treatment in forensic and community contexts.* Full-day training sponsored by Institute of Law, Psychiatry, and Public Policy at the University of Virginia, and by the Virginia Department of Behavioral Health and Developmental Services. Jointly provided by the Office of Continuing Medical Education of the University of Virginia School of Medicine.

Porterfield, K. (November 30, 2017). *The impact of enhanced interrogation and rendition.* Testimony at public hearings for North Carolina Commission of Inquiry on Torture. Raleigh, NC.

Porterfield, K. (July 7-10, 2017*). The biopsychosocial impact of trauma: Issues for journalists.* Training for International Women's Media Foundation, Hazardous Environment Training, Mexico City, Mexico.

Porterfield, K. (June 14, 2017). *Working with traumatized prisoners: barriers and strategies for attorneys.* Invited presentation to The Innocence Project staff and interns. New York, NY.

Porterfield, K. (May 17, 2017). *The biopsychosocial impact of trauma: Human rights work with traumatized populations.* Full day training for staff of MADRE, New York, NY.

Porterfield, K. (May 11, 2017). *Human rights and psychology: A view from Guantanamo.* Presentation at the Watkinson School. Hartford, CT.

Porterfield, K. (March 24, 2017). *The biopsychosocial impact of trauma: Treatment and care of survivors.* One-day workshop. Institute for Individual and Family Counseling, University of Miami School of Education and Human Development. Miami, FL.

Akinsulure-Smith, A; Porterfield, K.; Smith, H. (December 9, 2016). *Assessment and treatment of torture survivors: Resilience-centered healing.* Invited Webinar. American Psychological Association Division 56 Webinar Series.

Porterfield, K. (October 13, 2016) *Interviewing survivors of trauma and torture in a human rights context.* Invited lecturer at Columbia University Law School Human Rights Clinic.  New York, NY.

Porterfield, K. (October 6, 2016). *Working with traumatized clients: Strategies for advocates and lawyers.* Presentation at CUNY Law School Family Law and Immigration and Human Rights Clinics.  Brooklyn, NY.

Porterfield, K. (September 22-25, 2016). *International Criminal Court: Trial advocacy training program.* Office of the Prosecutor. Invited faculty. Hague, Netherlands.

Porterfield, K. (August 11, 2016). *Introduction to complex trauma.* Invited presenter to Federal Capital Habeas Corpus Conference. Washington, DC.

Akinsulure-Smith, A; Porterfield, K.; Smith, H. (August 4, 2016). *Assessment and treatment of torture survivors: Integrative approach to service provision.* Invited Symposium. American Psychological Association Convention. Denver, CO.

Porterfield, K. (June 8, 2016) *Human rights and psychology.* Grand Rounds, Maimonides Hospital, Brooklyn, NY.

Porterfield, K., Lebowitz, L. (May 13, 2016). *The impact of childhood trauma.* Federal Capital Habeas Project Annual Conference. Atlanta, Georgia.

Porterfield, K. (February 5, 2016). *Trauma and the refugee client: Barriers and strategies for care.* Webinar for SUNY Albany School of Public Health: Center for Public and Continuing Education Series: Advancing Cultural Competence in the Workplace.

Porterfield, K. and LeBoeuf, D. (January 23, 2016). *Childhood trauma: Moving past checklists and diagnoses.* Presentation (Via remote) to the Alabama Criminal Defense Lawyers Association. Birmingham, AL.

Porterfield, K. (November 3, 2015). *Impact of psychological torture: Perspectives from Guantanamo and the Bellevue/NYU Program for Survivors of Torture.* Invited presentation to the American Academies of Science, Engineering and Mathematics Human Rights Committee, Washington, DC.

Porterfield, K. (October 30, 2015) *Moving past checklists and diagnoses: Childhood trauma.* Federal Death Penalty Strategy Session, Administrative Office of the US Courts, Fort Lauderdale, FL.

Porterfield, K. (October 20, 2015). *A psychologist's view from death row and Guantanamo.* Presentation at the Watkinson School. Hartford, CT.

Porterfield, K. (October 16, 2015) *Interviewing survivors of trauma and torture in a human rights context.* Invited lecturer at Columbia University Law School Human Rights Clinic. New York, NY.

Porterfield, K. (October 14, October 21, 2015). W*orking with traumatized clients: Strategies for lawyers and advocates.* Training for the staff at The Bronx Defenders. New York, NY.

Porterfield, K., Figley, C, Smith, C., Gobin, R., Gold, S., Rom-Rymer, B., and Rhoades, G., (September 25, 2015) *The Hoffman Report: Division 56 discusses initial reactions and plans.* Webinar sponsored by APA Division 56.

Porterfield, K. (September 16, 2015). *Traumatic grief in victims and families.* Invited training for Administrative Office of the US Courts, Defense-Initiated Victim Outreach, Alexandria, VA.

Porterfield, K. (July 22-23, 2015). *Communication strategies with a traumatized client and Self-care for staff.* Presentations at "Building Awareness, Skills and

Knowledge: A Community Response to the Torture Survivor Experience" Conference sponsored by Refugee Services National Partnership for Community Training and Tennessee Office for Refugees, Nashville, TN.

Sowards, G, LeBoeuf, D., Holdman, S., Poteet, D., Nevin, D., Porterfield, K. (July 13, 2015). *From Death Row to Guantanamo: Practical ethics in the interface between law and mental health.* Panel presentation at the International Congress of Law and Mental Health, Vienna, Austria.

Porterfield, K. (May 28, 2015). *Impact of trauma on the refugee family with children: Clinical considerations and recommendations for care; Working with clients who have suffered trauma: Strategies for effective communication; Secondary trauma and self-care in working with traumatized refugee populations.* Intensive Case Management Training Conference, Lutheran Immigration and Refugee Service, Baltimore, MD.

Porterfield, K. (May 2, 2015) *Resilience and recovery after wrongful incarceration. Working with those who have experienced wrongful incarceration.* Invited speaker at the 2015 Innocence Network Conference. Orlando, FL.

Porterfield, K. (January 22, 2015). *Secondary trauma for lawyers and advocates conducting human rights work.* Invited presentation to the Innocence Project staff and students. New York, NY.

Porterfield, K. (November 19, 2014). *Working with traumatized clients: Strategies for advocates and lawyers.* Presentation to Georgia Capital Defenders Annual Conference, St. Simons Island, GA.

Porterfield, K. (October 23-25, 2014). *Complex trauma in mitigation.* National Association of Criminal Defense Lawyers: 16th Annual Making the Case for Life Seminar. (October 23-25, 2014). Charlotte, NC.

Porterfield, K. (October 16, 2014). *Working with traumatized clients: Strategies for advocates and lawyers.* Presentation at CUNY Law School Family Law and Immigration Clinics. Brooklyn, NY.

Porterfield, K. (June 6, 2014, September 18, 2014, October 21,2014) *Working with traumatized prisoners: Barriers and strategies for attorneys.* Invited presentation to The Innocence Project staff. New York, NY.

Porterfield, K. (May 13, 2014). *The psychological effects of chronic systematic child abuse and neglect: Lessons learned from the field.* Invited Speaker, 22nd

Annual Children's Justice Conference, Washington State Department of Social and Health Services, Spokane, WA.

Porterfield, K. (May 5-18, 2014). *Working effectively with traumatized children and families in the aftermath of torture and refugee trauma: Core principles.* Two week E-Learning Seminar for refugee service providers for Gulf Coast Jewish Family and Community Services, National Partnership for Community Training.

Porterfield, K. (April 23, 2014). *The unmaking of the underdog.* TEDx Presentation, TEDx Editors' Pick, Franklin and Marshall College, Lancaster, PA.

Porterfield, K. (April 9, 2014). *A graded therapeutic approach to the traumatized refugee client.* Webinar presented to staff of Jewish Family Services and affiliated clinicians, Syracuse, NY.

Porterfield, K. (March 26, 2014). *Human rights and the role of psychologists: A view from Guantanamo.* Invited speaker, The Watkinson School, Hartford, CT.

Porterfield, K. (March 13, 2014) *Childhood trauma: What the research—established and emerging—teaches us about clients.* Authorized Case Training and Consultation Conference, Federal Death Penalty Resource Counsel. Louisville, Kentucky.

Porterfield, K. (March 6, 2014) *Inhuman incarceration: an interdisciplinary discussion on the consequences of the prison industrial complex.* Invited panelist. CUNY School of Law, Queens, NY.

Porterfield, K. (November 21, 2013) *Working with traumatized prisoners: Barriers and strategies for attorneys.* Invited presentation to The Innocence Project staff and student lawyers. New York, NY.

Porterfield, K. (October 15-16, 2013) *Working clinically with traumatized refugee children and families; Complex marginalization and the refugee client; Unspoken human rights conference: Restoring dignity and healing from trauma and torture.* Interdisciplinary conference sponsored by Refugee Services National Partnership for Community Training. Utica, NY.

Porterfield, K. (October 15, 2013). *Working with traumatized immigrant and refugee clients in a legal context.* Presentation to CUNY School of Law Immigration Clinic. New York, NY.

Porterfield, K. (May 17, 2013). *Working clinically with the traumatized refugee child and family*. Two Week E-learning Seminar for Gulf Coast Jewish Family and Community Services Providers.

Porterfield, K. (April 16, 2013). *Working clinically with the traumatized refugee child and family and complex marginalization: Addressing the refugee experience in your agency.* Presentations at Building Bridges Conference: The Refugee Journey, Fargo, ND.

Porterfield, K. (March 13, 2013). *Managing secondary trauma in work with refugees*. Webinar Conference Call facilitated for Gulf Coast Jewish Family & Community Services.

Porterfield, K. (February 13, 2013). *Human rights abuses and the role of psychologists.* Presentation at Fordham Law School Seminar on International Law and Terrorism, New York, NY.

Porterfield, K. (February 12, 2013). *Psychological evaluations in the war on terror.* Presentation to The Watkinson School, Hartford, CT.

Porterfield, K. and Akinsulure-Smith, A. (December 6, 2012) *Human rights abuses: Impunity and advocacy: The view from Guantanamo and the Hague.* Presentation at City College of New York; Psychology Department.

Porterfield, K. (November 16, 2012) *Traumatized clients in capital cases: Barriers and strategies for attorneys*. Invited presenter, Virginia Bar Association Capital Defense Training, Richmond, VA.

Porterfield, K. and Akinsulure-Smith, A. (October 26, 2012) *Human rights abuses: Impunity and advocacy: The view from Guantanamo and the Hague.* Presentation at Bellevue Hospital Center Psychiatry Case Conference.

Porterfield, K. (June 6, 2012) *Traumatizing lives, traumatizing imprisonment: Working with multiply traumatized clients in prisons.* Presentation at Arnold and Porter Law Firm, New York, NY.

Porterfield, K. (May 15, 2012) *Traumatized clients: Signs, symptoms, and strategies for building relationships.* Office of the Appellate Defender, New York, NY.

Porterfield, K., Akinsulure-Smith, A, O'Hara, S. (April 19, 2012) *Refugees and psychosocial well-being*. Invited panelist at United Nations Psychology Day

conference, Human Rights for Vulnerable People: Psychological Contributions and the United Nations Perspective, New York, NY.

Porterfield, K. (April 17, 2012) *Working effectively with traumatized children and families in the aftermath of torture and refugee trauma: Core principles*. Webinar presented for National Partnership for Community Training, Florida Center for Survivors of Torture, New York, NY.

Porterfield, K. (March 23, 2012) *Clients traumatized by incarceration and security measures: Signs, symptoms and strategies for building relationships*. Presentation at Bureau of Prisons Homicides Authorized Case Training and Consultation Conference, Denver, CO.

Porterfield, K. (March 12, 2012) *Traumatized clients: Signs, symptoms, and strategies for building relationships.* Neighborhood Defenders Service, Harlem, NY.

Porterfield, K. (March 8, 2012) *Working effectively with traumatized children and families in the aftermath of torture and refugee trauma: Core principles,* Presentation at Fostering the Resilient Spirit: Holistic Responses in the Torture Treatment Field. Tulane University School of Social Work, New Orleans, LA.

Porterfield, K. (February 13, 2012) *Working clinically with traumatized children and families*. Half day training provided at Center for Family Life, Brooklyn, NY.

Porterfield, K. (November 11, 2011*) Harnessing knowledge: Advocacy and prevention and bearing witness: The experience of the media*. Invited panelist at Recovery from Trauma: Lessons from Ground Zero and Beyond. Peter C Alderman Foundation/NYU Hospital, New York, NY.

Porterfield, K., Keller, A., & Xenakis, S. (November 5, 2011) *Torture and maltreatment in the war on terror: Rupturing professional and clinical bonds,* Panelist at International Society for Traumatic Stress Studies, Baltimore, MD.

Porterfield, K., LeBoeuf D., Holdman, S., (November 4, 2011) *Traumatized clients: Signs, symptoms, and strategies for building relationships*. Invited speaker at Federal Death Penalty Resource Counsel, New Orleans, LA.

Porterfield, K. (June 8, 2011) *Multicultural issues in service provision to traumatized refugees.* Invited speaker at US Committee for Refugees and Immigrants Conference, Arlington, VA.

Porterfield, K. (May 13, 2011) *Complex trauma.* Invited speaker at Habeas Corpus Resource Center Spring Conference, San Francisco, CA.

Porterfield, K. and Keller, A. (January 14, 2011) *Interviewing trauma survivors in a legal context.* Half-day training for Open Society Institute Justice Initiative Team, New York, NY.

Porterfield, K. (January 13, 2011). *Inner healing after war.* Invited panelist at United Nations NGO on Mental Health, New York, NY.

Porterfield, K. (January 11, 2011). *Torturing the mind: U.S. involvement in psychological torture.* Invited panelist at New York Religious Campaign Against Torture, New York, NY.

Porterfield, K. (June 16, 2010). *Working with traumatized children in an asylum context.* Invited speaker at Asylum Officers' Training, Newark, NJ.

Porterfield, K (April 23, 2010). *Complex trauma as a factor in mitigation.* Invited speaker at Seventh National Seminar on the Development and Integration of Mitigation Evidence: New Science, New Strategies, Seattle, Washington.

Porterfield, K. (March 19, 2010). *Working with traumatized refugee populations.* Invited Panelist at Boston College Conference Deportation, Migration, Human Rights, Boston, MA.

Porterfield, K. (February 26, 2010). *Working with traumatized individuals in a legal/human rights context.* Presentation to Center for Constitutional Rights Staff, New York, NY.

Porterfield, K. (December 7, 2009) *Integrated treatment of a first responder from 9/11: CBT methods in a long-term treatment.* Grand rounds invited presenter, Manhattan Psychiatric Center, New York, NY.

Porterfield, K. (October 15, 2009). *Introduction to exposure therapy.* Counseling Methods Course, City College, New York, NY.

Porterfield, K. (September 11, 2009) *Integrated treatment of a first responder from 9/11: CBT methods in a long-term treatment.* Invited speaker for Bellevue Hospital Case Conference, New York, NY.

Porterfield, K., Akinsulure-Smith, A, Kia-Keating, M. and Betancourt, T. (August 7th, 2009). *War-affected children residing in the U.S.: Challenges and new directions for psychologists.* Chair of Panel at the American Psychological Association 2009 Convention, Toronto.

Porterfield, K. (July 19, 2009). *Working with traumatized children in a legal/human rights context*. Presentation to Kids in Need of Defense (KIND) staff retreat, Washington, DC.

Porterfield, K., Xenakis, S., and Keram, E. (June 12, 2009). *Psychological issues in working with detainees in Guantanamo.* Panel Presentation to Office of Military Commission Defense Counsel, Washington, DC.

Porterfield, K. (May 17, 2009). *Interviewing trauma survivors in a legal/human rights context.* Presentation at ACLU Human Rights Documentation Training, ACLU National Office, New York, NY.

Porterfield, K (March 29, 2009). *Interviewing survivors of torture and trauma in a legal context.* Seminar presented to Columbia University Law School, International Human Rights Clinic, New York, NY.

Porterfield, K (March 4, 2009). Recognizing and Responding to the Traumatized Refugee Child and Family. Presentation at Health Care for Immigrant Families: What the Pediatrician Should Know, Conference sponsored by New York Chapter 3, District II, of the American Academy of Pediatrics, New York, NY.

Porterfield, K. (February 24, 2009). *Interviewing survivors of torture and trauma in a legal context.* Seminar presented to CUNY Law School Immigration and International Women's Human Rights Clinics.

Porterfield, K., Keller, A. (June 28, 2008). *How to recognize, document and understand the effects of torture.* Training for Military Commissions Defense: Capital Case Consult, Washington College of Law, American University, Washington, DC.

Porterfield, K. (May 9, 2008). *Interviewing survivors of gender-based violence in a legal context.* Training for Human Rights USA, New York, NY.

Porterfield, K. and Keller, A. (April 18, 2008). *Interviewing Survivors of trauma in a legal context: Barriers and strategies.* Training for Office of Military Commissions, Office of the Chief Defense Counsel, Guantanamo Team.

Porterfield, K. (April 16, 2008). *Understanding the effects of refugee trauma and vicarious traumatization.* Full day staff training at Interfaith Migration Ministries, New Bern, North Carolina.

 Porterfield, K. (April 16, 2008). *Working with refugee children in school*s. Training for Guidance and ESL staff, New Bern Public Schools, Craven District, New Bern, North Carolina.

Porterfield, K. (April, 2, 2008). *Trauma, testimony, and recovery: Human rights tensions and challenges in the treatment of torture survivors*. Invited lecturer for Human Rights: A Culture in Conflict, Georgetown University.

Porterfield, K. (February 14, 2008). *Interviewing survivors of trauma in a legal context*. Seminar presented to CUNY Law Immigration and Domestic Violence Clinics, New York.

Porterfield, K. & Gray, A. (January 23, 2008). *Serving children who are torture survivors.* Webinar provided for the National Consortium of Torture Treatment Centers.

Porterfield, K. (January 15, 2008). *Interviewing survivors of gender-based violence: clinical considerations.* Training provided for Human Rights Watch Research Staff.

Porterfield, K, Nguyen, L., Gutierrez, G., (November 15, 2007). *Psychology, law and torture: Retraumatization and reenactment in torture victims.* Panelist, ISTSS National Conference, Baltimore, MD.

Porterfield, K. (October 24, 2007). *Interviewing survivors of torture in a legal context.* Training provided for Center for Constitutional Rights Asylum Attorneys, Davis Polk Law Firm, New York.

Porterfield, K. (February 15, 2007) *Interviewing survivors of torture in a legal context.* Training provided for Center for Constitutional Rights Guantanamo Habeas Project, New York, NY.

Porterfield, K. (January 25, 2007). *Pinochet to Rumsfeld: Acountability to US officials for torture.* Invited panelist at event sponsored by the Center for Constitutional Rights and The Nation, New York, NY.

Porterfield, K (August 23, 2006). *Introduction to clinical issues with traumatized patients.* Psychological Interns Seminar, Bellevue Hospital, New York, NY.

Porterfield, K. (June 5, 2006). *From horror to hope: Clinical work with children and adolescents affected by war.* Invited presenter at Living in a State of High Alert: Traumatized Children and Families in a Stressful Society. Manhattan Child and Adolescent Services Committee Conference, Fordham University, New York, NY.

Porterfield, K. (March 6, 2006, November 30, 2005) *Interviewing survivors of torture in a legal context.* Training provided for Center for Constitutional Rights Guantanamo Habeas project, New York, NY.

Porterfield, K. (September 30, 2005). *Clinical work with war-traumatized children.* The University Center for the Child and Family, University of Michigan, Ann Arbor, MI.

Porterfield, K. (September 29, 2005). *From horror to hope: Clinical work with children and adolescents affected by war.* Invited Lecturer, University of Michigan Department of Psychology, Ann Arbor, MI.

Porterfield, K. and Schoen, S. (September 23, 2005). *Interviewing survivors of torture in a legal context.* Training provided for attorneys working on Guantanamo and Abu Ghraib cases, Center for Constitutional Rights, New York, NY.

Porterfield, K. and Schoen, S. (August 4, 2005). *Interviewing survivors of torture in a legal context.* Training provided for attorneys working on Guantanamo and Abu Ghraib cases, American Civil Liberties Union, New York, NY.

Porterfield, K. (July 14, 2005). *Through my eyes:Children's drawings from conflict zones.* Invited Panelist at Chelsea Art Museum Exhibit, Sponsored by Amnesty International.

Porterfield, K. (February 5, 2005) *Integrated treatment with a survivor of gang rape in Kosovo.* Presentation to William Alan White Institute, Refugee Trauma Study Group, New York, NY.

Porterfield, K. & Akinsulure-Smith, A. (November 15, 2004). *Two short term group treatment models for war trauma survivors.* Workshop presented at International Society for Traumatic Stress Studies 20th Annual Meeting: "War as a Universal Trauma." New Orleans, LA.

Porterfield, K. (April 21, 2004). *From horror to hope: Clinical work with children and adolescents affected by war.* Rachel Summerfield Memorial Lecture, University of Chicago, Chicago, IL.

Porterfield, K. (March 24, 2004) *Integrated treatment with a survivor of gang rape in Kosovo.* Presentation to Institute for Contemporary Psychotherapy, New York, NY.

Porterfield, K. & Akinsulure-Smith, A. (April 15, 2003). *Responding to disasters: mental health assessment and self-care.* Presentation for Beth Israel Social Work In-Service Training, New York, NY.

Porterfield, K. (September 12, 2002). *Psychiatry takes to the Streets: Bellevue Hospital responds to 9/11.* NYU Psychiatry Grand Rounds Panel Presentation, New York, NY.

Porterfield, K. (June 17, 2002). *Caring for traumatized refugee children: Identification, advocacy, and treatment; Traumatized youth and families: The road to recovery.* Eighteenth Annual Manhattan Child and Adolescent Services Committee Conference, New York, NY.

Porterfield, K. (June 6, 2002). *Psychological and physical consequences of torture and refugee trauma.* Presentation to Multicultural Integration Grantees, United States Department of State, New York, NY.

Porterfield, K. (May 29, 2002). *An integrated treatment approach of a traumatized rescue worker from September 11th.* Psychological Interns Seminar, Bellevue Hospital, New York, NY.

Porterfield, K. (May 20, 2002). *Recognizing and responding to traumatized children in schools.* Presentation for teachers/guidance counselors at Liberty High School, New York, NY.

Smith, H. & Porterfield, K. (April 9, 2002). *Psychological and physical consequences of torture and refugee trauma: Introduction to clinical issues; Caring for traumatized refugee children: Identification, advocacy, and treatment.* Presentations at World Relief Conference on Refugee Mental Health, Boise, Idaho.

Porterfield, K. (February 15, 2002). *Caring for traumatized refugee children: Identification, advocacy, and treatment.* Presentation for interns and post-doctoral fellows: The NYU Child Study Center, New York, NY.

Porterfield, K. (January 25, 2002). *Recognizing and responding to traumatized children in schools.* Presentation for teachers and guidance counselors at Brooklyn International Middle School, Brooklyn, NY.

Porterfield, K. (January 16, 2002). *Caring for traumatized refugee children: Identification, advocacy, and treatment.* Presentation for Child Life staff, Bellevue Hospital Center, New York, NY.

Porterfield, K. (November 19, 2001). *Recognizing and responding to traumatized Children in schools.* Presentation for guidance counselors: Manhattan Comprehensive Day and Night School, New York, NY.

Porterfield, K. (October 13, 2001). *Responding to children's needs in the wake of the World Trade Center attacks*. Presentation for parents at St. Ignatius Loyola School, New York, NY.

Porterfield, K. (October 3, 2001). *Recognizing and responding to traumatized children in schools.* Presentation for teachers and staff: Brooklyn International High School, Brooklyn, NY.

Leviss, J. & Porterfield, K. (January 16, 2001). *Working with traumatized refugee populations: Medical and psychological considerations*. Department of Community Medicine, St. Vincent's Hospital, New York, NY.

Porterfield, K. (January 8, 2001). *Effects of refugee trauma on children and families*. Metropolitan Hospital/Behavioral Health Services: Child and Adolescent Case Conference, New York, NY.

Porterfield, K. (November 17, 2000) *Competencies that social workers need to enter the field of international social welfare.* Invited panel member at the

International Social Welfare Symposium for the Columbia University School of Social Work, New York, NY.

Porterfield, K. and Leviss, J. (October 4, 2000). *Recognizing and responding to refugee trauma.* Training at the Floating Hospital, New York, NY.

Keller, A. and Porterfield, K. (September 13, 2000). *Psychological and physical consequences of torture: Introduction to clinical issues*. Training for Jamaica Clinic Staff, Queens, NY.

Porterfield, K. and Leviss, J. (August 2, 2000) *Psychological and physical consequences of torture: Introduction to clinical issues*. Training for Ryan Health Center Mental Health Staff: New York, NY.

Porterfield, K. (July 13, 2000) *Psychological and physical consequences of torture: Introduction to clinical issues*. Training at Coney Island Hospital Department of Behavioral Health, Brooklyn, NY.

Porterfield, K. (June 28, 2000, August 16, 2000) *Working with traumatized refugees in resettlement: Identification and advocacy*. Training for resettlement staff of Catholic Community Services, Newark, NJ.

Porterfield, K. (June 23, 2000). *Recognizing and responding to traumatized refugee children and families; Working with language interpreters*. Presentations at Interfaith Refugee Ministry Conference: "Kosovar Albanians in Connecticut: Honoring the Past, Building for the Future," Waterbury, CT.

Porterfield, K. (June 8, 2000). *Helping your child's adjustment after war*. Presentation to Kosovar Albanian parents at Yonkers Public Schools and Bilingual/ESL Department: Yonkers, NY.

Smith, H. and Porterfield, K. (May 13, 2000). *Mental health needs of the refugee family*. Presentation to Bosnian, Kosovar Albanian and Roma refugees, Bridge Refugee Services, Knoxville, TN.

Smith, H. and Porterfield, K. (May 12-13, 2000). *Psychological and physical consequences of torture and recognizing; Responding to traumatized refugee children in school.* Presentations at Post-traumatic Stress Disorder Conference for Bridge Refugee and Sponsorship Services, Knoxville, TN.

Porterfield, K. (March 30, 2000). *Caring for traumatized refugee children: identification, advocacy, and treatment; Recognizing and responding to traumatized refugee children in school.* Presentations at Bellevue/NYU/Solace Conference: Refugee Resettlement: Therapeutic Factors and Interventions: New York, NY.

Porterfield, K. (March 22, 2000). *Recognition of trauma in children and practical strategies for helping refugee children in school.* Presentation for Staff Development at Belleville School Number Four: Belleville, NJ.

Porterfield, K. (March 18, 2000). *Introduction to clinical issues in refugees traumatized by war.* Presentation to refugee community leaders, Lutheran Social Services, Fargo, North Dakota.

Porterfield, K. (March 16-17, 2000). *Psychological and physical consequences of torture; Recognizing and responding to traumatized refugee children; Helping the refugee family heal; Secondary traumatization and burnout, post-traumatic stress disorder; Clinical aspects of working with traumatized refugees, and working with interpreters and working multiculturally.* Presentations at Lutheran Social Services Conference: Building Bridges: From Newcomer to Citizen: Fargo, North Dakota.

Impalli, E, Porterfield, K., and Keller, A. (March 1, 2000). *Clinical assessment and interventions with survivors of torture and refugee trauma.* Presentation at Catholic Community Services: Newark, NJ.

Impalli, E. and Porterfield, K. (February 17, 2000). *Therapeutic and pragmatic issues in clinical interviewing with interpreters.* Presentation at International Institute of New Jersey's Cross Cultural Counseling Center: Jersey City, NJ.

Keller, A. and Porterfield, K. (January 20, 2000). *The impact of trauma on refugee children.* Presentation at International Rescue Committee: New York, NY.

Porterfield, K. (December 16, 1999). *Practical strategies for helping refugee children in school.* In-service training for District 10 Guidance Counselors, Bronx, NY.

Porterfield, K, and Rolovic, S (November 16, 1999). *The unpredictable nature of trauma in children: A family-based approach to working with families from Kosovo.* Presentation at the 1999 National ORR Conference: Resettlement Through the Eyes of a Refugee Child, Washington, DC.

Steinberg, D. and Porterfield, K. (June, 1999). *Separation anxiety and panic in a preschooler: Assessment and treatment*. Presentation at Child and Adolescent Psychiatry Grand Rounds, New York University Medical Center, New York, NY.

Porterfield, K. (April, 1999). *The transition towards adolescence: Influences on girls' self-feelings*. Presentation to parents at Marymount Middle School, New York, NY.

Porterfield, K. (May, 1999). *The family life cycle: Marriage and parenting.* Presentation to parents at St. Ignatius Loyola Elementary School, New York, NY.

Porterfield, K. and Saldinger, A. (April, 1998). *Child-centered parenting of the parentally bereaved child.* Presentation at the American Orthopsychiatry Conference, Washington, DC.

Porterfield, K. (May, 1998). *The family life cycle: Marriage and parenting.* Presentation to parents at St. Ignatius Loyola Elementary School,  New York, NY.

Porterfield, K. (April, 1996). *Divorce groups for children: The parental component.* Presentation to the University Center for the Child and Family, Ann Arbor, MI.

Miller, J., Porterfield, K. and Litzenberger, B. (October, 1995). *Psychotherapy with the deaf and hearing-impaired*. Presentation to the University Center for the Child and Family, Ann Arbor, MI.

Porterfield, K. (April, 1995) *A time-limited, problem-focused psychotherapy with an eating-disordered adolescent*. Presentation to the University Center for the Child and Family, Ann Arbor, MI