**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| KENNETH EUGENE SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:23-cv-00656-RAH |
| v. | ) | |
| | ) | CAPITAL CASE |
| JOHN Q. HAMM, in his official capacity | ) | |
| as Commissioner, Alabama Department of | ) | EXECUTION SCHEDULED FOR |
| Corrections, and | ) | JANUARY 25, 2024 |
| | ) | |
| TERRY RAYBON, in his official capacity | ) | |
| as Warden, Holman Correctional Facility, | ) | |
| | ) | |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT**

Plaintiff Kenneth Eugene Smith alleges as follows:

**INTRODUCTION**

1.      Plaintiff Kenneth Eugene Smith is in the custody of the Alabama Department of

Corrections ("ADOC") at William C. Holman Correctional Facility ("Holman") under a death

sentence imposed by the State of Alabama despite the jury's recommendation by a vote of 11 to 1

that he be sentenced to life imprisonment without the possibility of parole.  As the Eleventh Circuit

has recognized, "if Smith's trial had occurred today, he would not be eligible for execution

because, in 2017, Alabama amended its capital sentencing scheme" to repeal the authority of

elected circuit court judges to override a jury's sentencing determination.  *See Smith v. Comm'r*,

850 F. App'x 726, 726 n.1 (11th Cir. 2021).  Because the amendment applied only prospectively,

Mr. Smith has been denied relief from his death sentence, even though that same sentence could

not be imposed today given his jury's sentencing vote.

2.    Mr. Smith brings this action under 42 U.S.C. § 1983 to enjoin an imminent deprivation of his rights and privileges secured by the Constitution and laws of the United States.

3.    The State already has tried to execute Mr. Smith once.  On November 17, 2022, Mr. Smith survived ADOC's attempt to execute him by lethal injection when ADOC personnel were unable to place intravenous ("IV") lines to administer lethal drugs to him.  Mr. Smith's was the third consecutive execution that ADOC botched and/or failed for the same reason—its inability to place IV lines in the condemned person.  ADOC's failed attempt to execute Mr. Smith caused him severe and ongoing physical and psychological pain, including severe post-traumatic stress disorder ("PTSD").  ADOC remained willfully blind to the risk of that outcome by failing to investigate what happened and why during its immediate two previous botched and/or failed executions to prevent a recurrence before it attempted to execute Mr. Smith.

4.    Now ADOC seeks to execute Mr. Smith by nitrogen hypoxia—an execution method that has "never been used to carry out an execution and ha[s] no track record of successful use." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1130 (2019) (internal quotation marks and citation omitted).

5.    For years, and as recently as just a few months ago, ADOC had taken the position that nitrogen hypoxia was not a feasible, alternative method of execution.  Then, on the eve of being required to disclose information regarding its failed attempt to execute Mr. Smith by lethal injection, ADOC suddenly changed course, now claiming it is prepared to carry out executions using nitrogen hypoxia.

6.    Mr. Smith's execution by nitrogen hypoxia would violate his constitutional rights. ADOC selected Mr. Smith for the first ever attempted execution by nitrogen hypoxia even though he has an appeal pending in the Alabama Court of Criminal Appeals from the dismissal of a non-

frivolous state postconviction petition that addresses the constitutional problem with attempting to execute Mr. Smith for a second time, and even though other condemned people in Alabama who elected to be executed by nitrogen hypoxia when that option was made available to them in 2018 have exhausted their appeals.

7.      ADOC's selection of Mr. Smith as the test subject for this novel and experimental method is arbitrary and capricious and inconsistent with its own stated "'custom [to] wait[] to move for an inmate's execution until he has exhausted his conventional appeals: direct appeal, state postconviction, and federal habeas." *Woods v. Comm'r, Ala. Dep't of Corrs.*, 951 F.3d 1288, 1292 (11th Cir. 2020) (citation omitted in original).  As such, moving Mr. Smith to the front of the line for execution by nitrogen hypoxia violates his rights to due process and equal protection under the Fourteenth Amendment to the U.S. Constitution.

8.      Moreover, the protocol by which ADOC intends to execute Mr. Smith is constitutionally deficient.  ADOC proposes to carry out Mr. Smith's execution by nitrogen hypoxia by following its recently released Execution Procedures as of August 2023 (the "Protocol").  Ex. 1.[1]

9.      When Mr. Smith challenged his execution by lethal injection in 2022 and proposed nitrogen hypoxia as a feasible and available alternative, he did not agree to be executed without knowing the protocol, much less by ADOC using a protocol that he had never seen and that was hastily introduced as a means to moot Mr. Smith's pending litigation about ADOC's previous failed attempt to execute him by lethal injection and forestall discovery into it.

---

[1] Mr. Smith has filed a copy of the Protocol under seal.  Mr. Smith has filed a copy of the "public version," which includes redactions, on the public docket.

10.     It is clear that the consequences of attempting an execution by nitrogen hypoxia using ADOC's deficient Protocol will be dire.  If not performed correctly, execution by nitrogen hypoxia can result in another botched execution that risks leaving Mr. Smith with permanent injuries.  For example, hypoxemia (low levels of oxygen in the blood), which can lead to hypoxia (low levels of oxygen in organs), can cause severe and permanent injuries short of death, including a persistent vegetative state, stroke, or the painful sensation of suffocation.  Therefore, it is critical that the procedures ADOC employs are designed to reduce those risks to the lowest possible levels.

11.     The Protocol, if used to attempt to execute Mr. Smith by nitrogen hypoxia, exposes him to a severe risk of superadded pain during the execution process, including but not limited to hypoxemia and hypoxia short of death, in violation of his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the U.S. Constitution.  There are several specific problems with the Protocol, which will exacerbate—rather than reduce—the risk of the dire consequences that can result from nitrogen hypoxia for at least the following reasons.

12.     First, it appears that ADOC intends to deliver pure nitrogen to the condemned person from a cannister through tubing that flows into a "one size fits all" mask that a member of the Execution Team will place over the condemned person's face and adjust.  *See* Protocol § X.A.v.; Appendix C, § 2 ¶¶ 26–29.  But the Protocol does not provide any information on the type of mask that will be used, or how the mask will be secured so that it remains sealed and in proper position over the condemned person's face throughout the process.  Indeed, the Protocol contemplates that the condemned person will be permitted to make a statement after the mask is placed over his face.  The protocol therefore assumes the mask will be secured in such a way that the inmate will be able to speak after it is in place, which can dislodge the mask and break the seal.  *Id.* § X.A.ix.  If the mask is not sealed throughout the process, oxygen can leak inside the mask

4

and the condemned person can inhale it.  If the condemned person can inhale oxygen, that likely would prolong the time to reach unconsciousness and could lead to a persistent vegetative state, stroke, or the painful sensation of suffocation.

13.     Second, the Protocol does not contemplate any mechanism to remove the carbon dioxide under the mask as the condemned person exhales so that carbon dioxide does not build to dangerous levels in the condemned person.  If the condemned person inhales carbon dioxide after the mask is placed on his face, he will experience the painful sensation of suffocating and other dire consequences.  This is particularly a problem given the provision in the Protocol that contemplates that the condemned person will be permitted to make a statement after the mask is placed over his face.  *Id.*

14.     Third, the Protocol does not specify the purity of the nitrogen that will be used or how the tanks will be stored when not in use, which is critical to prevent contamination.  If ADOC uses less than 100% pure nitrogen to execute a condemned person, that likely would prolong the time to reach unconsciousness and could lead to the same dire consequences.

15.     Fourth, the Protocol does not contain any provisions both during the days leading up to the execution and during the execution to address the unique situation of Mr. Smith who survived a prior execution attempt and is experiencing PTSD as a result.  People with PTSD, like Mr. Smith, can experience nausea when they are re-exposed to the traumatizing event.  A second attempt to execute Mr. Smith undoubtedly is such an event.  And the Protocol does not provide for any procedures if a condemned person vomits into the mask in which case the condemned person could choke on his own vomit.  Nor does the Protocol make any accommodation for condemned people with PTSD as a result of a previous attempted execution who may experience symptoms

such as intense psychological distress, extreme panic, or sleep disruption leading up to another attempt.

16.     Fifth the Protocol unconstitutionally burdens Mr. Smith's First Amendment rights and violates his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, *et seq.* and the Alabama Religious Freedom Amendment ("ARFA"), Ala. Const. art. I, § 3.01(V).  The Protocol provides that a mask will be placed over the condemned person's face before he is permitted to make a statement.  In addition to the risk of dislodging the mask, those provisions of the Protocol will interfere with Mr. Smith's right to speak audibly and to pray audibly with or without a spiritual advisor.  There is no compelling governmental interest that justifies that burden on Mr. Smith's rights and, in any event, there are less restrictive alternatives to accomplish any purported compelling governmental interest.

17.     There are feasible and available alternatives, including amendments to the Protocol to address its inadequacies.  Absent such amendments, executing Mr. Smith by nitrogen hypoxia according to the Protocol would violate his Eighth and First Amendment rights.

### JURISDICTION AND VENUE

18.     This is an action for a declaratory judgment, injunctive relief, and any other relief available from the Court.

19.     The Court has subject matter jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1367(a), and 2201(a).

20.     Venue is proper in the Middle District of Alabama under 28 U.S.C. § 1391(b).

## PARTIES

21.     Plaintiff Kenneth Eugene Smith, a citizen of the United States and of the State of Alabama, is an inmate at Holman under Defendants' supervision and subject to execution under a state court judgment of conviction for capital murder.

22.     Defendant John Q. Hamm is sued in his official capacity as the Commissioner of ADOC.  ADOC is an administrative department of the State responsible for administering and exercising the direct and effective control over penal and corrections institutions within the State. At all relevant times, Defendant Hamm has been acting under color of state law and as the agent and official representative of ADOC, pursuant to ADOC's official policies and procedures.

23.     Defendant Hamm is responsible for procedures governing the execution of condemned people in Alabama, including developing and implementing the Protocol, and approving changes or amendments to it.  *See* Protocol § I.A ("Approval authority for changes or amendments to this protocol is the Commissioner of the Alabama Department of Corrections"). Additionally, he is statutorily charged with providing the materials necessary to execute condemned people in Alabama.  *See* Ala. Code § 15-18-82 ("It shall be the duty of the Department of Corrections of this State to provide the necessary facilities, instruments, and accommodations to carry out the execution.").

24.     Defendant Hamm also is responsible for ensuring that all prisoners committed to ADOC's custody are treated in accordance with the U.S. and Alabama Constitutions.

25.     Defendant Terry Raybon is sued in his official capacity as the Warden of Holman. At all relevant times, Defendant Raybon has been acting under color of state law and as the agent and official representative of Holman and ADOC, pursuant to ADOC's official policies and procedures.

7

26.     Defendant Raybon is the statutory executioner of all condemned people in Alabama.  *See* Ala. Code § 15-18-82 ("The warden of the William C. Holman unit . . . shall be the executioner.").  In that capacity, Defendant Raybon plays a direct role in each execution that takes place at Holman.  Defendant Raybon organizes the execution team.  *See* Protocol § V.  He is responsible for implementing ADOC policies and procedures governing executions, managing the preparations for an execution, and supervising the execution site during the execution.  Defendant Raybon has specific responsibilities to inventory, inspect, and activate the equipment used in executions by nitrogen hypoxia and to ensure that the equipment is available and functioning properly.  *See id.* §§ V.D.ii, V.D.iv, V.D.v, IX.E.ii, IX.I.v, IX.I.vi, X.A.i, X.A.xii, X.A.xiv, XI.A.iii, XI.A.v.

27.     Defendant Raybon also is responsible for ensuring that all prisoners incarcerated at Holman are treated in accordance with the U.S. and Alabama Constitutions.

## CASE OR CONTROVERSY

28.     There is a real and justiciable case or controversy between the parties.  Defendants intend to execute Mr. Smith by nitrogen hypoxia within a time frame set by the Governor.  Defendants intend to use the Protocol to attempt to accomplish that result, which will subject Mr. Smith to an objectively intolerable risk of superadded pain.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

29.     Mr. Smith has no available administrative remedies because State law exempts "[t]he policies and procedures of the Department of Corrections for executions of persons sentenced to death . . . from the Alabama Administrative Procedure Act, Chapter 22 of Title 41." Ala. Code § 15-18-82.1(g).

## FACTUAL ALLEGATIONS

**A.      Mr. Smith Has PTSD Caused by ADOC's Failed Attempt to Execute Him by Lethal Injection with Deliberate Indifference to His Constitutional Rights**

30.      In November 2022, ADOC tried and failed to execute Mr. Smith because it was unable to place IV lines to deliver lethal drugs into his bloodstream.  ADOC did so despite experiencing the same problem in its two immediately preceding attempts to execute condemned people and without doing any investigation about what happened and why to prevent a recurrence before it attempted to execute Mr. Smith.  Given that, ADOC's attempts to establish intravenous access went "'so far beyond what [is] needed to carry out a death sentence that [it] could only be explained as reflecting pain for pain's sake.'"  *Smith v. Hamm*, No. 2:22-cv-497, 2022 WL 4353143, at *7 (M.D. Ala. Jul. 5, 2023) (citation omitted).  Among other things, ADOC's actions left Mr. Smith with PTSD.  About one year later, ADOC seeks to make Mr. Smith the test case for its novel and largely secret nitrogen hypoxia Protocol.

31.      On July 28, 2022, ADOC botched the execution of Joe Nathan James when it strapped him to a gurney and poked, prodded, and cut him, attempting multiple times over three hours to access a vein for IV injection of the lethal drugs.  On September 22, 2022, ADOC unsuccessfully attempted to execute Alan Eugene Miller because ADOC personnel were unable to set IV lines to administer the lethal drugs after they "painfully punctured [him] with needles over various parts of his body for approximately 90 minutes," which caused "extreme physical pain as well as psychological pain . . . ."  *Miller v. Hamm*, 640 F. Supp.3d 1220, 1241 (M.D. Ala. 2022).  After the botched execution of Mr. James and the failed attempt to execute Mr. Miller, ADOC did nothing to investigate its lethal injection procedures to determine what happened and why in an effort to prevent a recurrence.

32.     In August 2022, three weeks after Mr. James's botched execution, Mr. Smith commenced an action in this District against Defendant Hamm, alleging that his execution by lethal injection would violate his right to be free from cruel and unusual punishment under the Eighth Amendment and seeking declaratory and injunctive relief to prohibit ADOC from executing him by lethal injection. *See Smith v. Hamm*, No. 2:22-cv-497, Complaint (DE 1) (M.D. Ala.) ("Lethal Injection Action")

33.     After the botched execution of Mr. James and the failed attempt to execute Mr. Miller, ADOC remained willfully blind to the insufficiency of its lethal injection procedures and forged ahead with Mr. Smith's execution, which was scheduled for November 17 at 6 p.m.[2]

34.     Before it attempted to execute Mr. Smith, Defendants and ADOC knew or should have known based on the difficulties that occurred during Mr. James's execution and Mr. Miller's attempted execution that the IV Team would have great difficulty establishing intravenous access, resulting in severe physical and psychological pain to Mr. Smith.

35.     They further knew or should have known that what they allegedly had done to Mr. Miller—as described in a pleading that he filed in this District—stated a plausible claim for violation of the Eighth Amendment right to be free from cruel and unusual punishment. *See Miller v. Hamm*, No. 2:22-cv-506, 2022 WL 16721093, at *13–15 (M.D. Ala. Nov. 4, 2022).

36.     Despite all that, Defendants and ADOC recklessly and knowingly charged ahead with deliberate indifference to Mr. Smith's Eighth Amendment right to be free from cruel and unusual punishment.

37.     As Mr. Smith foresaw, and as happened in the previous two executions, ADOC was unable to place IV lines for delivery of the lethal drugs to him and its repeated, unsuccessful

---

[2] All times referenced in this Complaint are Central Time.

attempts to do so caused Mr. Smith severe and ongoing physical and psychological pain. *See Barber v. Gov. of Ala.*, 73 F.4th 1306, 1324 (11th Cir. 2023) (J. Pryor, J., dissenting) ("Mr. Smith's horrifying experience was not a singular event; it was just the latest incident in an uninterrupted pattern of executions by Alabama's Department of Corrections ('ADOC') that involved protracted, severely painful, and grisly efforts to establish the intravenous lines necessary to carry the lethal drugs into his body.").

38.     A little before 8:00 p.m. on November 17, corrections officers handcuffed and put leg irons on Mr. Smith, removed him from the holding cell where he was located, escorted him to the execution chamber, and strapped him to a gurney with restraints around his arms, legs, and feet. Mr. Smith remained strapped to the gurney unable to move for nearly four hours even though a stay of the execution issued by the United States Court of Appeals for the Eleventh Circuit was in place until it was vacated by the U.S. Supreme Court at approximately 10:20 p.m. *See Smith v. Comm'r Ala. Dep't of Corrs.*, No. 22-13846-P, 2022 WL 19831029 (11th Cir. Nov. 17, 2022), *vacated sub nom.*, *Hamm v. Smith*, 143 S. Ct. 440 (2022).

39.     Mr. Smith was not told that the Eleventh Circuit had stayed his execution. Nor was Mr. Smith released from the gurney restraints and removed from the execution chamber while the stay was in place. He believed that when he was taken into the execution chamber, all of his appeals had been exhausted, and that he would be killed imminently.

40.     As a man of faith, Mr. Smith sought to maintain his dialogue with God. He thanked God for the week he had just had with his family and quietly sang to himself the contemporary hymn, "I'm not alone."

41.     As time passed with no apparent steps to accomplish the execution and no information from the three corrections officers who remained in the execution chamber with him,

Mr. Smith became increasingly distressed due to the lack of circulation caused by the restraints and because his witnesses, including his wife, son, and daughter-in-law, had not arrived and he feared he would be killed without the ability to address them and the victim's family as he had planned.

42.     At around 10:00 pm, three men wearing medical scrubs (the "IV Team") who were not identified to Mr. Smith, and have not been identified to him since, entered the execution chamber.  At the same time, two men and one woman dressed formally, one holding an accordion folder and two holding a notepad and pen, also entered the execution chamber.  Those people also were not identified to Mr. Smith and have not been identified since.  Nor has ADOC disclosed the roles they served in the execution process or otherwise explained their presence in the execution chamber, which was particularly distressing because some of them appeared to be taking pictures or video with their cell phones.

43.      On information and belief, others, including Defendants, observed activities in the execution chamber from an adjacent room.

44.     ADOC's then-governing protocol for executing condemned people by lethal injection authorized only two methods for establishing IV access: the "standard procedure" or, if that was unavailable, "a central line procedure."

45.     It should be a straightforward process to establish IV access by those procedures or to determine that neither is achievable.  According to the Emergency Nurses Association Clinical Practice Guideline for Difficult Intravenous Access, "[t]he average time requirement for peripheral IV cannulation is reported at 2.5 to 16 minutes, with difficult IV access requiring as much as 30 minutes."  ENA Clinical Practice Guideline: Difficult Intravenous Access (Revised Oct. 2015). And "[p]atients experience increased and potentially significant pain in association with multiple

IV attempts." J. Fields, *et al.*, *Association between multiple IV attempts and perceived pain levels in the emergency department*, 15 J. Vasc. Access 514, 518 (2014); A. Bahl, *et al.*, *Defining difficult intravenous access (DIVA): A systematic review*, J. Vasc. Access 1, 1 (Nov. 2021) ("multiple venipuncture attempts sometimes required for successful [IV] insertion . . . can cause pain and anxiety for the patient").

46.     But, as it had with Messrs. James and Miller, ADOC took well in excess of 30 minutes attempting unsuccessfully to obtain IV access to administer the lethal drugs to Mr. Smith.

47.     In an unsuccessful attempt to establish two IV lines by the standard procedure, the IV Team jabbed Mr. Smith repeatedly, sliding the catheter needle continuously in and out of his arms and hands, while ignoring Mr. Smith's complaints that they were penetrating his muscles and causing severe pain.

48.     Having failed to establish IV access by the standard procedure, the IV Team next tried to do so using a central line procedure. Toward that end, at the request of the IV Team, the corrections officers tilted the gurney backwards so that Mr. Smith lay in a reverse crucifixion position with his head below his feet. Neither the IV Team nor anyone else in the execution chamber explained why they requested that or informed Mr. Smith about the procedure they were about to attempt.

49.     After placing a blue surgical drape with a clear plastic shield in the face area over Mr. Smith, one of the members of the IV Team, who was wearing a surgical gown, face mask, and clear plastic shield over his face, made five or six needle jabs with a clear syringe in Mr. Smith's collarbone area, causing him severe pain. Then, the same IV Team member inserted a large gauge needle into Mr. Smith's collarbone area and made multiple jabs, which caused Mr. Smith so much pain that he contorted against the restraints on the gurney injuring his right shoulder and had

difficulty breathing.  After what seemed like an eternity to Mr. Smith, the needle jabs stopped.  All the while the IV Team, the corrections officers, and the three other people in the execution chamber ignored Mr. Smith's complaints about the severe pain he was experiencing and his pleas to contact the court presiding over the Lethal Injection Action and/or his counsel.

50.     ADOC and the IV Team abandoned their efforts to obtain IV access shortly before midnight, long after it should have been apparent that they would not succeed.  Mr. Smith was unable to stand, walk, or dress and undress himself without assistance when his ordeal concluded and the corrections officers released him from the gurney restraints.

51.     Mr. Smith experienced and continues to experience a great deal of physical and psychological pain from ADOC's attempt to execute him.  After the execution, he experienced lingering pain in his arm from repeated needle jabs and in his collarbone from ADOC's attempted central line procedure.  He also experienced back spasms from being restrained on the gurney for nearly four hours.

52.     Mr. Smith also has had chronically severe psychological consequences, including severe PTSD.  In addition to difficulty sleeping, Mr. Smith's symptoms include nightmares, hypervigilance, hyperarousal, and disassociation (a defense mechanism to suppress threatening thoughts).

**B.     ADOC's Decision to Make a Renewed Attempt to Execute Mr. Smith by Nitrogen Hypoxia and to Put Him in the Front of the Line**

53.     Even after its failed attempt to execute Mr. Smith by lethal injection in November 2022, ADOC insisted that it would attempt to do so again by that method.  In late August 2023, ADOC suddenly switched its position, on the eve of discovery deadlines in the Lethal Injection Action, and announced that due to Mr. Smith's unique circumstances lethal injection is not an available method to execute him and that it would execute him instead by nitrogen hypoxia.

14

ADOC chose Mr. Smith as the first condemned person to be subject to execution by that novel and untested method of execution even though he has an appeal pending in the Alabama Court of Criminal Appeals from denial of a state postconviction petition and there are other condemned people who chose to be elected by nitrogen hypoxia five years ago and whose appeals have exhausted. In addition, ADOC's actions had the effect of rendering the Lethal Injection Action moot before ADOC was required to engage in discovery and disclose what happened during its botched execution of Mr. James and its failed attempts to execute Mr. Miller and Mr. Smith.

### 1. ADOC Selected Mr. Smith for the First Ever Nitrogen Hypoxia Execution Contrary to Its Custom of Waiting Until Condemned People Have Exhausted Their Appeals to Execute Them

54.     In May 2023, Mr. Smith timely filed a petition in the Circuit Court of Jefferson County seeking an injunction preventing the State from attempting to execute him again by any method (the "State Court Petition").

55.     The State Court Petition arises from ADOC's failed attempt to execute Mr. Smith in November 2022. Mr. Smith contends that another attempt to execute him is constitutionally prohibited because it would follow "a series of abortive attempts," including ADOC's "single, cruelly willful attempt" to execute Mr. Smith, *La. ex rel. Francis v. Resweber*, 329 U.S. 459, 471 (1947) (Frankfurter, J., concurring), which "demonstrate[s] an 'objectively intolerable risk of harm' that officials may not ignore." *Baze v. Rees*, 553 U.S. 35, 50 (2008) (plurality op.) (quoting *Farmer v. Brennan*, 511 U.S. 825, 846 & n.9 (1994)).

56.     As the claim that Mr. Smith asserts in the State Court Petition did not arise until ADOC's failed attempt to execute him in November 2022, it could not have been asserted in any previous state or federal postconviction proceeding.

57.     On August 11, the circuit court dismissed the State Court Petition.  Mr. Smith's appeal from that dismissal is pending in the Alabama Court of Criminal Appeals.

58.     Defendants seek to execute Mr. Smith by nitrogen hypoxia despite Mr. Smith's pending appeal from the dismissal of the State Court Petition in the Alabama Court of Criminal Appeals and contrary to ADOC's own stated "'custom [to] wait[] to move for an inmate's execution until he has exhausted his conventional appeals: direct appeal, state postconviction, and federal habeas." *Woods v. Comm'r, Ala. Dep't of Corrs.*, 951 F.3d 1288, 1292 (11th Cir. 2020) (citation omitted in original).

59.     There are other condemned people in Alabama whose appeals have exhausted and who elected to be executed by nitrogen hypoxia.

60.     In 2018, the State authorized nitrogen hypoxia as a method of execution and permitted condemned people whose capital convictions were then final to elect to be executed by that method instead of lethal injection.  *See* Ala. Code § 15-18-82.1(b)(2).  The authorizing legislation served to moot litigation brought by condemned people in Alabama challenging the constitutionality of execution by lethal injection.  *See In re: Alabama Execution Protocol Litig.*, No. 1:12-cv-316, Joint Motion to Dismiss (Doc. 427) (M.D. Ala.).

61.     Mr. Smith was not a party to that litigation and did not elect to be executed by nitrogen hypoxia in 2018.  But "[n]early 50 . . . death sentenced inmates in Alabama elected nitrogen hypoxia during the election period," including death-sentenced inmates "who have exhausted their conventional appeals." *Woods*, 951 F.3d at 1291–92.  Those inmates have yet to be executed because ADOC only recently finalized a protocol for doing so.  *See id.*

62.     In addition, on information and belief, ADOC gave at least one condemned person who it intends to execute by nitrogen hypoxia a grace period so that the condemned inmate and

his counsel could review the Protocol *before* the State moved for authority to execute him under its procedures.

63.     ADOC did not provide Mr. Smith with any comparable grace period; the State moved for authority to execute him by nitrogen hypoxia on the same day it released a heavily redacted version of the Protocol.

64.     Even though Mr. Smith has an appeal pending in the Alabama Court of Criminal Appeals and other condemned people who elected to be executed by nitrogen hypoxia five years ago have exhausted their appeals, the State chose Mr. Smith to be the first condemned person to be subject to execution pursuant to its experimental nitrogen hypoxia Protocol.

### 2.     ADOC'S Selection of Mr. Smith for the First-Ever Nitrogen Hypoxia Execution Served to Moot the Lethal Injection Action

65.     Shortly after ADOC's failed execution attempt, Mr. Smith amended his complaint in the Lethal Injection Action to add allegations about that attempt and to add defendants who participated in it.  In his second amended complaint, Mr. Smith sought declaratory and injunctive relief to prohibit ADOC from making another attempt to execute him by lethal injection.  He also served discovery requests on the defendants, seeking, among other things, the identities of the people who participated in and observed ADOC's attempt to execute him and documents concerning ADOC's attempt to execute him.

66.     For ten months after ADOC's failed attempt to execute Mr. Smith by lethal injection, ADOC threatened Mr. Smith with another attempt by the same method.  It consistently represented that it would do so and that nitrogen hypoxia was not a feasible, alternative method of execution.  For example:

- In December 2022, Defendant Hamm filed a petition for a writ of certiorari in the U.S. Supreme Court challenging the Eleventh Circuit's holding in the Lethal

Injection Action that Mr. Smith had plausibly alleged "that nitrogen hypoxia is an available alternative method" of execution and "that nitrogen hypoxia will significantly reduce his pain." *Smith v. Comm'r, Ala. Dep't of Corrs.*, No. 22-13781, 2022 WL 17069492, at *5 (11th Cir. Nov. 17, 2022).

- In February 2023, the defendants in the Lethal Injection Action moved to dismiss Mr. Smith's Second Amended Complaint on the ground, among others, that nitrogen hypoxia supposedly was not an available method of execution, as Mr. Smith had alleged, despite the Eleventh Circuit's prior contrary determination. *See Smith v. Hamm*, No. 2:22-cv-497, Defendants' Motion to Dismiss (Doc. 78) at 24–25 (M.D. Ala.).

- On July 28, 2023, the State relied on supposed changes in its lethal injection procedures as a basis to seek dismissal of the State Court Petition. *See Smith v. State*, No. CC-89-1149.61, State of Alabama's Motion to Dismiss Smith's Successive Rule 32 Petition (Doc. 53) at 10–12 (Ala. Cir. Ct. Jefferson Cnty.)

67.    In May 2023, the U.S. Supreme Court denied Defendant Hamm's petition for a writ of certiorari. *See Hamm v. Smith*, 143 S. Ct. 1188 (2023). In July 2023, the district court denied the defendants' motion to dismiss Mr. Smith's Eighth Amendment claim for declaratory and injunctive relief in the Lethal Injection Action. *See Smith v. Hamm*, No. 2:22-cv-497, 2023 WL 4353143 (M.D. Ala. July 5, 2023). Thus, by July 2023, there were no more obstacles to discovery after defendants had delayed it for nearly one year trying unsuccessfully in the District Court, Court of Appeals, and U.S. Supreme Court to have Mr. Smith's claims dismissed.

68.    Under the District Court's scheduling order in the Lethal Injection Action, the parties' initial disclosures required by Federal Rule of Civil Procedure 26(a)(1) were due on

August 29. And, by operation of Rule 26(d)(2)(B), the defendants' responses to Mr. Smith's then nearly nine-month-old discovery requests were due by September 7.

69.     On August 25—the eve of its discovery obligations ripening in the Lethal Injection Action—the State moved in the Alabama Supreme Court for an order authorizing ADOC to execute Mr. Smith by nitrogen hypoxia.

70.     At the same time the State filed its motion, defendants reversed position and moved to dismiss the Lethal Injection Action on the ground that "Defendant Hamm has determined that nitrogen hypoxia is an available means of execution and will be used in the execution of" Mr. Smith and "Defendant Hamm has determined that lethal injection is not available as to Plaintiff and will not be used in any future execution attempt of" Mr. Smith. *Smith v. Hamm*, No. 2:22-cv-497, Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure (Doc. 104) at ¶ 3 (M.D. Ala.). And, on August 29, the defendants moved to stay discovery in the Lethal Injection Action.[3]

71.     Defendants' efforts to avoid discovery in the Lethal Injection Action are consistent with the historical lack of transparency into ADOC's execution procedures. The State exercises no greater power than when it executes condemned people. Consequently, the process by which the State does so demands maximum transparency to ensure that it is consistent with the Constitution and the values of the State's citizens. ADOC's execution processes, however, are anything but transparent.

72.     ADOC conceals the identity of the participants in executions, what they do, and what "pre-execution" procedures it performs on condemned people. The only witnesses to those

---

[3] On September 20, the District Court entered a judgment enjoining Defendants "from executing Kenneth Eugene Smith by lethal injection" and dismissed the Lethal Injection Action. *Smith v. Hamm*, No. 2:22-cv-497, Final Judgment and Order (Doc. 112) at 3 (M.D. Ala.).

"pre-execution" procedures are ADOC personnel and the condemned person (who with the rare exception of Mr. Miller and Mr. Smith) ordinarily do not live to describe it. And, as ADOC's statements after the botched execution of Mr. James and the failed attempts to execute Mr. Miller and Mr. Smith indicate, ADOC cannot be relied on for a forthcoming and accurate explanation about those events.

73.     On November 1, a slim majority of six justices of the Alabama Supreme Court granted the motion for an order authorizing ADOC to execute Mr. Smith by nitrogen hypoxia, with two justices dissenting. On November 8, the Governor scheduled Mr. Smith's execution by nitrogen hypoxia during "a thirty-hour time-frame . . . beginning at 12:00 a.m. on Thursday, January 25, 2024, and expiring at 6:00 a.m. on Friday, January 26, 2024.

**C.     ADOC's Nitrogen Hypoxia Protocol Poses an Intolerable Risk of Superadded Pain to Mr. Smith**

74.     ADOC has never attempted to execute a condemned person by nitrogen hypoxia. Nor has any other state or the federal government.

75.     When it moved for authorization to execute Mr. Smith by that method, ADOC released a heavily redacted copy of the Protocol, which includes procedures for executing condemned people by nitrogen hypoxia. Despite his requests through counsel, neither Mr. Smith nor his counsel were provided with an unredacted copy of the Protocol or any other information about the process by which ADOC intends to execute Mr. Smith until November 22, 2023 after this Court ordered Defendants to produce an unredacted copy of the Protocol. *See* Ex. 2.

76.     As one commentator has described it, ADOC's nitrogen hypoxia Protocol is "'a vague, sloppy, dangerous and unjustifiably deficient protocol . . . .'" Ed Pilkington, *'Astonishingly cruel': Alabama seeks to test execution method on death row 'guinea pig'* (The Guardian Sept. 2,

2023), https://www.theguardian.com/world/2023/sep/02/alabama-execution-nitrogen-kenneth-smith.

77.     Despite its vagueness, it is apparent that the Protocol is wholly inadequate to protect Mr. Smith from violation of his Eighth Amendment right to be free from cruel and unusual punishment.

78.     There is sparse research on how long a human must be exposed to 100% pure nitrogen to cause death, what happens if a human is exposed to less than 100% pure nitrogen for a prolonged period of time, or on the pain or sensations that a human exposed to nitrogen might experience. The American Veterinary Medical Association has advised that nitrogen hypoxia is an acceptable method of euthanasia for pigs but "is unacceptable for other mammals" because nitrogen "create[s] an anoxic environment that is distressing for some species."[4]

79.     If it does not cause death, nitrogen hypoxemia can cause dire consequences, including a persistent vegetative state, a stroke, or the painful sensation of suffocation.

80.     A persistent vegetative state is characterized by a profound and long-lasting loss of consciousness and cognitive function, including awareness, reasoning, and memory, and is often considered a long-term or permanent condition.

81.     A stroke is a serious medical condition involving brain damage that can cause failure of speech, paralysis of limbs, and other serious effects.

82.     The Protocol fails to account for and instead exacerbates the risks of those dire consequences.

---

[4] American Veterinary Medical Association, AVMA Guidelines for the Euthanasia of Animals: 2020 Edition.

83.     It appears that the Protocol provides for nitrogen gas to be delivered through tubing into a mask placed and adjusted over the condemned person's face by a member of the execution team:

> The mask will be placed and adjusted on the condemned inmate's face.  One Execution Team member will monitor the pulse oximeter while the Execution Team Captain verifies that the mask has been properly placed.  The Execution Team Members responsible for secondary posts will be dismissed from the execution chamber after the mask has been properly placed.

Protocol § X.A.v; *see also id.* Appendix C, § 2 ¶¶ 26–29.

84.     The Protocol does not contain any guidance on the type of mask that will be used, how it will be placed and adjusted and by whom, what training the person(s) placing and adjusting the mask will receive on how to do that and who will provide the training, how and under what criteria it will be determined whether the mask has been "properly placed," or what will happen if the mask becomes displaced during the procedure.

85.     It is critical that the mask be properly secured and sealed throughout the process. An acknowledgement form that ADOC intends to require spiritual advisors who serve condemned people being executed by nitrogen hypoxia expressly warns of the possibility that nitrogen can leak outside the mask.  If nitrogen can escape outside the mask, it follows that oxygen can infiltrate inside the mask.  In that event, the time to unconsciousness will increase, posing a severe risk of dire consequences to the condemned inmate, including being left in a persistent vegetative state, experiencing a stroke, or experiencing the painful sensation of suffocating.

86.     Many variables affect proper placement and securing of a mask.  Variations in nose structure, facial hair, obesity, and other anatomic characteristics can increase the difficulty of mask ventilation.  The Protocol does not account for those variations among condemned people to ensure

that a mask is fitted securely to each condemned person that ADOC intends to execute by nitrogen hypoxia.

87.     In addition, movement of the face or head can dislodge a mask and break the seal, which is more likely in an execution setting than, for example, in a medical setting.  The protocol exacerbates that possibility because it affords the condemned person an opportunity to speak *after* the mask is placed over his face:

> [After mask is placed,] [t]he Warden will enter the execution chamber [**redacted – filed under seal**] and read the execution warrant.  The condemned inmate will be given the opportunity to make a final statement (no more than two minutes).

*Id.* § X.A.ix.

88.     Speaking or attempting to speak may dislodge or otherwise alter the placement of the mask, which may result in an imperfect seal and leaking.  Although the Protocol contemplates that, after the condemned person speaks, "[t]he team members inside the execution chamber will make a final inspection of the mask," *id.* § X.A.xiii, there is nothing in the Protocol to explain how that inspection will be completed and what it will entail to ensure that the mask remains sealed after the condemned person speaks and, if not, adjusting the mask appropriately.  Nor are there any procedures for what happens if the mask is dislodged thereafter.

89.     The Protocol is constitutionally deficient because it does not specify any criteria for inspecting the mask.  There are no provisions identifying how the "team members" will determine if the mask is secure and will prevent oxygen from leaking inside the mask.  Furthermore, there are no provisions detailing the training the "team members" will receive, their level of experience with the masks being used, or the metrics that will be used to ensure that the mask is "properly placed" and passes the "final inspection."

90.     Moreover, while it is important to ensure that oxygen is not present under the mask for the condemned person to inhale, it is equally important to ensure that the carbon dioxide that the condemned person exhales does not remain under the mask for the condemned person to inhale.

91.     The theory underlying the novel method of execution by nitrogen hypoxia is that because nitrogen is odorless and colorless, a human inhaling it will continue to breathe normally and continue to exhale carbon dioxide.  In theory, that would avoid a buildup of excess carbon dioxide, which is what causes the sensation and pain of suffocation when a human is deprived of oxygen by other means.

92.     If carbon dioxide that the condemned person exhales is trapped under the mask for the condemned person to inhale, carbon dioxide will build up in the condemned person's body, causing him to experience the sensation and pain of suffocation.  The Protocol contemplates that "breathing air" will be supplied to the condemned person after the mask is placed and before nitrogen is pumped into the mask.  *Id.* §§ X.A.ii, X.A.iv.  That means that carbon dioxide can be trapped under the mask even before nitrogen flows into the mask.  There is nothing in the Protocol to indicate that there is any mechanism to remove the carbon dioxide that the condemned person exhales that otherwise will be trapped under the mask and can cause suffocation and other dire consequences.  Absent such a mechanism, the theory on which execution by nitrogen hypoxia is based collapses.

93.     The Protocol also is constitutionally deficient because it does not specify the purity of the nitrogen gas that will be used or any procedures to test or otherwise determine whether it has been contaminated.  If ADOC uses less than 100% pure nitrogen for a prolonged period of time, that entails a severe risk of the dire consequences from nitrogen hypoxia.  Moreover, even if ADOC has obtained 100% pure nitrogen for use in executions, the Protocol lacks any information

about testing to ensure the purity, the source of the nitrogen, how it is transported or stored. Without that information, it is impossible to assess whether there is a risk that the nitrogen has been contaminated in the process of manufacture, transportation, or storage.

94.    The Protocol also provides that when the condemned person is escorted to the execution chamber and placed on a gurney a "pulse oximeter will be placed and secured on the condemned inmate." *Id.* § X.A.iii.  A pulse oximeter measures the level of oxygen in the blood. Under the Protocol, an execution team member is responsible for monitoring the pulse oximeter while the mask is placed and adjusted on the condemned person's face and for two minutes thereafter. *Id.* §§ X.A.v, vi.  There are no procedures for monitoring the pulse oximeter after pure nitrogen is introduced, which could reveal that the execution should be halted because oxygen is infiltrating the mask and raising the risk of dire consequences short of death.

95.    The Protocol is constitutionally deficient in other respects.  It fails to provide procedures for the unique circumstance of Mr. Smith who survived an attempted execution, has PTSD, and may experience nausea if he is re-exposed to the traumatizing experience.  The Protocol fails to provide procedures for a condemned person who vomits inside the mask, which might cause the condemned person to choke.

96.    In addition, the Protocol provides for procedures in the lead up to an execution, including for notifying the condemned person, providing the condemned person a schedule for the week of the execution, the "Death Watch observation period," the placement of the condemned person in a holding/observation cell, and visitation during the execution week. *Id.* §§ IV–VIII. But the Protocol fails to provide procedures and basic safeguards for condemned people like Mr. Smith who have survived an attempted execution, have PTSD, and may experience exacerbating symptoms—such as intense psychological distress, extreme panic, or sleep

disruption—as they are forced to re-experience the days and weeks leading up to another execution attempt.

97.    Instead, ADOC's procedures exacerbate Mr. Smith's PTSD.  Since November 8, when the Governor scheduled his planned execution, Mr. Smith has been on "single walk" status, which means that he cannot share the same space with other Holman inmates—some of whom he has developed familial relationships with over decades.  Ex. 3.  Although nothing in the Protocol addresses "single walk" status, Defendants intend to maintain Mr. Smith isolated from his brothers on that status for 78 days through his planned execution.

98.    "Single walk" status deprives Mr. Smith of the fellowship of his brother inmates when he needs their friendship most.  It also deprives him of the companionship of his family during this critical period.  Holman has a common visiting space.  While Mr. Smith is on "single walk" status, Mr. Smith's family cannot schedule a visit with him when any other Holman inmate has a scheduled visit.  Mr. Smith's "single walk" status also interferes with his relationship with his counsel when he needs their advice most because their visits are constrained for the same reason.  And while Defendants recently permitted Mr. Smith to select one religious service that he will be permitted to attend each week accompanied by two corrections officers, his "single walk" status also burdens the exercise of his religion.  Ex. 4.

99.    Finally, the Protocol burdens Mr. Smith's rights to free speech and to free exercise of his religion under the First Amendment and violates his rights under RLUIPA.  Under the Protocol, Mr. Smith will be masked as soon as he enters the execution chamber and remain masked thereafter.  *Id.* § X.A.v.  In addition to the other deficiencies associated with the mask, it will prevent or substantially interfere with Mr. Smith's ability to make a statement as permitted by the Protocol, *id.* § X.A.ix, and to pray audibly as to which "there is a rich history . . . at the time of a

prisoner's execution, dating back well before the founding of our Nation." *Ramirez v. Collier*, 595 U.S. 411, 427 (2022). Any such statement or prayer may not be audible and may risk consequences associated with dislodging the mask and/or building the level of carbon dioxide under the mask.

100. Significantly, there may be other problems with the Protocol that are shielded beneath redactions. But based only on what is disclosed, execution by nitrogen hypoxia using the procedures in the Protocol poses a severe risk of superadded pain to Mr. Smith.

**D      There are Feasible and Available Alternatives to the Protocol**

101. Feasible and available alternative methods of execution exist that would reduce the risk to Mr. Smith from the Protocol.

102. ADOC can amend the Protocol to cure its deficiencies by including provisions to:

- Measure each condemned person subject to execution by nitrogen hypoxia for a custom fit mask to reduce the risk that oxygen leaks under the mask or, alternatively, use a closed space or a hood;

- Provide a condemned person an opportunity to speak and to audibly pray without being masked.

- Disclose the training "team members" will receive in placing and adjusting the mask over the condemned person's face, their level of experience with the masks being used, and the metrics that will be used to ensure the mask is "properly placed" and passes the "final inspection."

- Add a mechanism to remove carbon dioxide that the condemned person exhales from under the mask.

- Disclose the source of the nitrogen to be used, and information about its transportation and storage to avoid contamination.

27

- Require testing of the nitrogen gas before use to ensure purity of the nitrogen gas.

- Add procedures to monitor the pulse oximeter throughout the process.

- Add procedures to halt the execution if the condemned person vomits into the mask;

- Add procedures for attempting to execute condemned people who have survived a previous attempt and are experiencing PTSD as a result.

- Employ a third-party licensed medical provider who will be permitted (1) to observe the execution process from the time the condemned person is taken into the execution chamber until completed, and (2) has the authority to call off or postpone the execution if, in his or her judgment, the condemned person is at risk of serious injury short of death.

103.    Alternatively, if Defendants are unwilling or unable to amend the Protocol so that it complies with constitutional requirements, the firing squad is an available and feasible alternative that will substantially reduce the risk to Mr. Smith of superadded pain posed by the Protocol.   Utah has a protocol for using a firing squad to carry out executions, which "is 'sufficiently detailed to permit a finding that the State could carry it out relatively easily and reasonably quickly.'" *Nance v. Comm'r, Ga. Dep't of Corrs.*, 59 F.4th 1149, 1155 (11th Cir. 2023) (quoting *Bucklew v. Precythe*, 139 S. Ct. 1112, 1129 (2019)); *see also* Deborah W. Denno, *The Firing Squad as "A Known and Available Alternative Method of Execution" Post-Glossip*, 49 U. Mich. J.L. Reform 749, 778–92 (2016).

## CLAIMS FOR RELIEF

### First Claim for Relief

### Violation of Mr. Smith's Right to Due Process and to Equal Protection Under the Laws Under the Fourteenth Amendment to the U.S. Constitution

104.    Mr. Smith incorporates paragraphs 1 through 101.

105.    At all relevant times, Defendants have been acting under color of state law.

106.    The Fourteenth Amendment to the U.S. Constitution provides, in relevant part, that "No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

107.    It is Defendants' "'custom [to] wait[] to move for an inmate's execution until he has exhausted his conventional appeals: direct appeal, state postconviction, and federal habeas." *Woods*, 951 F.3d at 1292 (citation omitted in original).

108.    Mr. Smith has not exhausted his appeals.

109.    The State Court Petition is a state postconviction proceeding.

110.    Mr. Smith's appeal from the dismissal of the State Court Petition is pending in the Alabama Court of Criminal Appeals.

111.    Other condemned people in Alabama who elected to be executed by nitrogen hypoxia five years ago have exhausted their appeals.  *See id.* at 1291–92.

112.    Defendants sought and obtained authority to execute Mr. Smith by nitrogen hypoxia even though he has not exhausted his appeals and even though other condemned people who elected to be executed by nitrogen hypoxia have exhausted their appeals.

113.    Defendants' actions toward Mr. Smith are arbitrary and capricious and violate its own stated custom regarding selecting condemned people for execution.

114.    Defendants' disparate treatment of Mr. Smith is not rationally related to a legitimate government interest.

115.    Mr. Smith has the right to be treated the same as all other condemned people in Alabama.

116.    Mr. Smith will suffer irreparable harm in the absence of an injunction.

**Second Claim for Relief**

**Violation of Mr. Smith's Right to be Free from Cruel and Unusual Punishment Under the Eighth and Fourteenth Amendments to the U.S. Constitution**

117.    Mr. Smith incorporates paragraphs 1 through 101.

118.    At all relevant times, Defendants have been acting under color of state law.

119.    The Eighth Amendment to the U.S. Constitution, as applicable to the State through incorporation into the due process clause of the Fourteenth Amendment, prohibits "cruel and unusual punishments."  U.S. Const. amend. VIII.

120.    A method of execution violates the Eighth Amendment if "the risk of pain associated with the State's method is substantial when compared to a known and available alternative." *Bucklew*, 139 S. Ct. at 1125 (citations and internal quotation marks omitted).

121.    The U.S. Supreme Court has described punishments as unconstitutionally cruel "when they involve torture or a lingering death," *In re Kemmler*, 136 U.S. 436, 447 (1890), or when they "involve the unnecessary and wanton infliction of pain, *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).  The Eighth Amendment forbids "forms of punishment that intensified the sentence of death with a (cruel) superadd[ition] of terror, pain, or disgrace." *Bucklew*, 139 S. Ct. at 1124 (citation and internal quotation marks omitted, alterations in original).

30

122.    Defendants intend to execute Mr. Smith by nitrogen hypoxia using the Protocol, which would expose Mr. Smith to a severe risk of a persistent vegetative state, a stroke, or the painful sensation of suffocation, *i.e.*, superadded pain.

123.    There are feasible and available alternatives that would reduce the risk to Mr. Smith from executing him by nitrogen hypoxia using the Protocol, including amending the Protocol as indicated in paragraph 100 and execution by firing squad.

124.    Mr. Smith will suffer irreparable harm in the absence of an injunction.

### Third Claim for Relief

### Violation of Mr. Smith's Right to Freedom of Speech and Free Exercise of His Religion Under the First Amendment to the U.S. Constitution

125.    Mr. Smith incorporates paragraphs 1 through 101.

126.    At all relevant times, Defendants have been acting under color of state law.

127.    The First Amendment to the U.S. Constitution, as applicable to the State through incorporation into the due process clause of the Fourteenth Amendment, provides, in relevant part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech."

128.    Defendants' Protocol provides for Mr. Smith to be masked when he enters the execution chamber and to remain masked throughout the procedure.

129.    Masking will interfere with Mr. Smith's right to make an audible statement and to pray audibly.  Any statement or prayer may not be audible and may risk consequences associated with dislodging the mask and/or building the level of carbon dioxide under the mask.

130.    Mr. Smith will suffer irreparable harm in the absence of an injunction.

**Fourth Claim for Relief**

**Violation of Mr. Smith's Rights Under RLUIPA**

131.    Mr. Smith incorporates paragraphs 1 through 101.

132.    At all relevant times, Defendants have been acting under color of state law.

133.    RLUIPA provides: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a).

134.    "In RLUIPA, in an obvious effort to effect a complete separation from the First Amendment case law, Congress deleted reference to the First Amendment and defined the 'exercise of religion' to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 696 (2014) (*quoting* 42 U.S.C. § 2000cc-5(7)(A)). RLUIPA thus provides more "expansive protection" for religious liberty than the United States Supreme Court case law. *Holt v. Hobbs*, 574 U.S. 352, 358 (2015).

135.    The Protocol that Defendants intend to use to execute Mr. Smith substantially burdens Mr. Smith's religious exercise to pray audibly because he will be masked as soon as he enters the execution chamber which may prevent Mr. Smith's prayers from being audible.

136.    The Protocol further substantially burdens Mr. Smith's religious exercise to pray audibly by forcing Mr. Smith to choose between abstaining from his religious practice of audible prayer at the end of his life or face the dangerous consequences of dislodging the mask while

praying. *See id.* at 361 (policy that forced inmate to comply with policy in violation of his religious beliefs or face disciplinary action substantially burdened inmate's religious exercise).

137.   Defendants cannot establish that the burden on Mr. Smith's religious exercise is justified by a compelling governmental interest and, even if they could, cannot establish that the burden on Mr. Smith's religious exercise is the least restrictive means to further any purported compelling governmental interest. *See id.* at 362.

138.   Mr. Smith will suffer irreparable harm in the absence of an injunction.

**Fifth Claim for Relief**

**Violation of Mr. Smith's Rights Under ARFA**

139.   Mr. Smith incorporates paragraphs 1 through 101.

140.   At all relevant times, Defendants have been acting under color.

141.   ARFA provides: "Government shall not burden a person's freedom of religion even if the burden results from a general rule of applicability, except . . . if it demonstrates that application of the burden to the person (1) Is in furtherance of a compelling governmental interest; and (2) Is the least restrictive means of furthering that compelling governmental interest." Ala. Const. art. I, § 3.01(V).

142.   The Protocol that Defendants intend to use to execute Mr. Smith burdens Mr. Smith's religious exercise to pray audibly because he will be masked as soon as he enters the execution chamber which may prevent Mr. Smith's prayers from being audible.

143.   The Protocol further burdens Mr. Smith's religious exercise to pray audibly by forcing Mr. Smith to choose between abstaining from his religious practice of audible prayer at the end of his life or face the dangerous consequences of dislodging the mask while praying. *See*

*id.* at 361 (policy that forced inmate to comply with policy in violation of his religious beliefs or face disciplinary action substantially burdened inmate's religious exercise).

144.    Defendants cannot establish that the burden on Mr. Smith's religious exercise is justified by a compelling governmental interest and, even if they could, cannot establish that the burden on Mr. Smith's religious exercise is the least restrictive means to further any purported compelling governmental interest. *See id.* at 362.

145.    Mr. Smith will suffer irreparable harm in the absence of an injunction.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Smith respectfully requests that this Court grant the following relief:

1.  With respect to the First Claim for Relief,

    a.  A declaration that attempting to execute Mr. Smith by nitrogen hypoxia before he has exhausted his pending appeals would violate his right to equal protection under the laws under the Fourteenth Amendment to the U.S. Constitution.

    b.  A preliminary and permanent injunction prohibiting Defendants from executing Mr. Smith by nitrogen hypoxia until he has exhausted his pending appeals or, alternatively, a stay of execution pending completion of Mr. Smith's appeals.

2.  With respect to the Second Claim for Relief,

    a.  A declaration that attempting to execute Mr. Smith by nitrogen hypoxia using the procedures outlined in the Protocol would violate his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the U.S. Constitution.

    b.  A preliminary and permanent injunction prohibiting Defendants from executing Mr. Smith by nitrogen hypoxia using the procedures outlined in the Protocol.

3.   With respect to the Third Claim for Relief,

   a.   A declaration that attempting to execute Mr. Smith by nitrogen hypoxia using the Protocol would violate his right to freedom of speech and free exercise of his religion under the First Amendment to the U.S. Constitution.

   b.   A preliminary and permanent injunction prohibiting Defendants from attempting to execute Mr. Smith by nitrogen hypoxia using the Protocol.

4.   With respect to the Fourth Claim for Relief,

   a.   A declaration that attempting to execute Mr. Smith by nitrogen hypoxia under the current Protocol would substantially burden his right to religious exercise under RLUIPA.

   b.   A preliminary and permanent injunction prohibiting Defendants from attempting to execute Mr. Smith by nitrogen hypoxia using the Protocol.

5.   With respect to the Fifth Claim for Relief,

   a.   A declaration that attempting to execute Mr. Smith by nitrogen hypoxia under the current Protocol would burden his right to religious exercise under ARFA.

   b.   A preliminary and permanent injunction prohibiting Defendants from attempting to execute Mr. Smith by nitrogen hypoxia using the Protocol.

6.   Such other relief as this Court deems just and proper.

Respectfully submitted, this 20th day of November, 2023.


   _/s/ Andrew B. Johnson_____
   Andrew B. Johnson
   BRADLEY ARANT BOULT
    CUMMINGS LLP
   1819 Fifth Avenue North
   Birmingham, Alabama 35203

(205) 521-8000
ajohnson@bradley.com

Jeffrey H. Horowitz*
David A. Kerschner*
Robert M. Grass*
ARNOLD & PORTER KAYE
  SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
(212) 836-8000
jeffrey.horowitz@arnoldporter.com
david.kerschner@arnoldporter.com
robert.grass@arnoldporter.com

Ashley Burkett*
Angelique Ciliberti (ASB: 1504-T44C)
ARNOLD & PORTER KAYE
  SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
(202) 942-5000
ashley.burkett@arnoldporter.com
angelique.ciliberti@arnoldporter.com

*Attorneys for Plaintiff Kenneth Eugene Smith*

*admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I certify that on November 28, 2023, I electronically filed the foregoing with the Clerk of

the Court using the Pacer system, which will send notification to the following:

Richard D. Anderson
Assistant Attorney General
Office of the Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL 36130
Richard.Anderson@AlabamaAG.gov

*Attorney for Defendants*

    /s/ Andrew B. Johnson                    <br>Of Counsel