# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

KENNETH EUGENE SMITH,    )
    )
    Plaintiff,    )
    )
v.    )    Case No.  2:23-cv-00656-RAH
    )
JOHN Q. HAMM,    )
Commissioner of the Alabama    )
Department of Corrections,    )
    )
and    )
    )
TERRY RAYBON, Warden,    )
Holman Correctional Facility,    )
    Defendants.    )

---

## DEFENDANTS' COMBINED MOTION TO DISMISS
## AND RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

---

Steve Marshall
*Alabama Attorney General*

Richard D. Anderson*
*Alabama Assistant Attorney General*
 *Counsel of Record

Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130-0152
(334) 242-7300

December 4, 2023    Richard.Anderson@AlabamaAG.gov

## Table of Contents

Table of Contents .................................................................................................. ii

Table of Authorities ............................................................................................. v

INTRODUCTION .................................................................................................. 1

STANDARDS OF REVIEW ................................................................................. 3

ARGUMENT FOR MOTION TO DISMISS ........................................................ 5

I.      Claim I – Due Process and Equal Protection ............................................ 6

   A.   Due Process ........................................................................................ 6

      1.   Procedural Due Process ............................................................. 8

      2.   Substantive Due Process ........................................................... 12

   B.   Equal Protection ................................................................................ 14

   C.   Judicial Estoppel of Claim I ............................................................. 17

   D.   Claim Preclusion of Claim I ............................................................. 20

II.     Claim II –Cruel and Unusual Punishment ............................................... 21

   A.   Judicial Estoppel of Claim II ........................................................... 21

   B.   No Actual Risk of Injury Pleaded .................................................... 26

      1. Claims Regarding the Mask .......................................................... 27

         a.   Mask Fit ............................................................................... 28

         b.   Carbon Dioxide Entrapment ................................................ 31

      1. Claims Regarding Nitrogen Purity ................................................ 32

2.    Claim Regarding Pulse Oximeters ...................................................... 33

3.    No Knowledge of Substantial Risks ................................................. 34

III.    Claims III, IV, and V – First Amendment, RLUIPA, and ARFA .......... 36

A.    Legal Framework ................................................................................ 37

1.    First Amendment rights are subject to reasonable time, place, or manner restrictions, particularly in the penal context. ....................................................................................... 37

2.    RLUIPA offers inmates broader protection against the substantial burdening of their sincerely held beliefs, but there is a burden-shifting framework for claim evaluation. ............... 42

3.    ARFA is an Alabama state law similar to RLUIPA. ......................... 43

B.    Smith's Allegations ........................................................................... 45

C.    Analysis ............................................................................................. 47

1.    RLUIPA ............................................................................................ 47

2.    First Amendment ............................................................................. 50

3.    ARFA ............................................................................................... 53

4.    Smith's Single-Walk Status ............................................................. 56

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION ...................... 56

I.    Smith is not substantially likely to succeed on the merits. ...................... 57

A.    Claim II – Cruel and Unusual Punishment ............................................ 57

1.    Smith is not likely to show that his alternatives to the protocol would significantly reduce a substantial risk of severe pain........................................................................................... 57

2.    Even if Smith shows some risk of asphyxiation or the
      sensation of suffocation, he will not meet his burden.......................... 64

3.    Smith's Eighth Amendment claim will fail because he has
      not provided a "veritable blueprint." .................................................... 66

4.    The State's method is constitutional under the Eighth
      Amendment because it is not deliberately designed to inflict
      unnecessary pain. ................................................................................. 68

5.    Smith's vague reference to a firing squad does not satisfy
      his burden. ........................................................................................... 70

6.    Claims III, IV, and V – First Amendment, RLUIPA, ARFA
      ............................................................................................................. 73

7.    Smith does not have a claim for violation of his "right of
      access to the courts." ........................................................................... 77

IV.   The equities favor denial of the injunction. ............................................ 78

A. Smith has not shown a substantial threat of irreparable harm.............. 79

B.    Preventing the State from carrying out Smith's lawfully
      imposed sentence would be adverse to the public interest. ................. 80

CONCLUSION ..................................................................................................... 82

CERTIFICATE OF SERVICE ............................................................................. 84

# Table of Authorities

## Cases

*Arthur v. State*,
    71 So. 3d 733 (Ala. Crim. App. 2010) ................................................................15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009). ......................................................... 4, 5, 14, 10

*Atl. Coast Line R. Co. v. Brotherhood of Locomotive Engineers*,
    398 U.S. 281 (1970). ..............................................................10

*Barber v. Governor of Ala.*,
    73 F.4th 1306 (11th Cir.), *cert. denied sub nom. Barber v. Ivey*,
    143 S. Ct. 2545 (2023) ...........................................................57

*Barts v. Joyner*,
    865 F.2d 1187 ......................................................................10

*Bayshore Ford Truck Sales, Inc.*,
    471 F.3d 1233 (11th Cir. 2006) ...........................................5, 54

*Baze v. Rees*,
    553 U.S. 35 (2008) ......................................................... passim

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................... 4, 27, 48

*Bowles v. Desantis*,
    934 F.3d 1230 (11th Cir. 2019) .............................................81

*Boyd v. Warden, Holman Corr. Fac.*,
    856 F.3d 853 (11th Cir. 2017) ......................................... 27, 29

*Brooks v. Warden*,
    810 F.3d 812 (11th Cir. 2016) .............................................4, 78

*Brown v. Bd. of Educ.*,
    344 U.S. 1 (1952) ...............................................................1

*Buck v. Kuykendall,*
    267 U.S. 307 (1925) ............................................................................81

*Bucklew v. Precythe,*
    139 S. Ct. 1112 (2019) ................................................................ passim

*Calderon v. Thompson,*
    523 U.S. 538 (1998) ...........................................................................79

*Cate v. Oldham,*
    707 F.2d 1176 (11th Cir. 1983).........................................................80

*City of St. Louis v. Praprotnik,*
    485 U.S. 112 (1988). ..........................................................................11

*Clark v. Community for Creative Non-Violence,*
    468 U.S. 288 (1984). ..........................................................................37

*Club Madonna, Inc. v. City of Miami Beach,*
    924 F.3d 1370 (11th Cir. 2019).........................................................10

*Cnty. of Sacramento v. Lewis,*
    523 U.S. 833 (1998) ...........................................................................13

*Collins v. City of Harker Heights,*
    503 U.S. 115 (1992) ...........................................................................12

*Corn v. City of Lauderdale Lakes,*
    997 F.2d 1369 (11th Cir. 1993).........................................................14

*Cotton v. Jackson,*
    216 F.3d 1328 (11th Cir. 2000)...........................................................9

*Crandle v. Singleton,*
    2:17-cv-00140, 2020 WL 4044712 (S.D. Ala. June 18, 2020)...........41

*Cutter v. Wilkinson,*
    544 U.S. 709 (2005) ..................................................................... 42, 75

*Daniels v. Williams,*
  747 U.S. 327 (1986) ...........................................................................................7

*Dorman v. Aronofsky,*
  36 F.4th 1306 (11th Cir. 2022).................................................................. passim

*Estelle v. Gamble,*
  429 U.S. 97 (1976) .........................................................................................68

*Ex parte Snyder,*
  929 So. 2d 447 (Ala. 2005) ...........................................................................44

*Exxon Mobil Corp. v. Saudi Basic Industr. Corp.,*
  544 U.S. 280 (2005) ................................................................................. 11, 12

*Ferguson v. Warden, Fla. State Prison,*
  493 F. App'x 22 (11th Cir. 2012) ............................................................ passim

*GJR Investments, Inc. v. County of Escambia, Florida,*
  132 F.3d 1359 (11th Cir. 1998).....................................................................16

*Glossip v. Gross,*
  576 U.S. 863 (2015) ............................................................................ 30, 34, 62

*Gomez v. U.S. Dist. Ct. for the N. Dist. of Cal.,*
  503 U.S. 653 (1992) .......................................................................................82

*Griffin Indus., Inc. v. Irvin,*
  496 F.3d 1189 (11th Cir. 2007).....................................................................16

*Hakim v. Hicks,*
  223 F.3d 1244 (11th Cir. 2000)...................................................... 39, 40, 50, 52

*Heffron v. Int'l Soc'y for Krishna Consciousness,*
  452 U.S. 640 (1981) .......................................................................................37

*Hernandez v. CIR,*
  490 U.S. 680 (1989) .......................................................................................39

*Hill v. McDonough*,
    547 U.S. 573 (2006) ........................................................................82

*Hohe v. Casey*, 868 F.2d 69, 72–73 (3d Cir. 1989). ..............................80

*Holt v. Hobbs*, 574 U.S. 352 (2015) .......................................................43

*Hosey-Bey v. Williams*,
    2:12-cv-00959, 2015 WL 4988388 (M.D. Ala. Aug. 19, 2015). .........41

*Hubbard v. Campbell*,
    379 F.3d 1245 (11th Cir. 2004)..........................................................15

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
    505 U.S. 672 (1992) ...........................................................................37

*Jackson v. Danberg*,
    594 F.3d 210 (3d Cir. 2010)...............................................................30

*Jallali v. Nova Se. Univ., Inc.*,
    486 F. App'x 765 (11th Cir. 2012) .....................................................78

*Johnson v. Brown*,
    581 F. App'x 777 (11th Cir. 2014) .....................................................41

*Jones v. Comm'r, Ga. Dep't of Corr.*,
    811 F.3d 1288 (11th Cir. 2016)............................................................5

*Jones v. Hendrix*,
    599 U.S. 465 (2023) ...........................................................................12

*Leib v. Hillsborough Cty. Public Transp. Comm'n*,
    558 F.3d 1301 (11th Cir. 2009).................................................... 13, 16

*Lewis v. Casey*,
    518 U.S. 343 (1996) ...........................................................................78

*Long v. Sec'y, Dep't of Corr.*,
    924 F.3d 1171 (11th Cir. 2019)............................................................4

*Lucky Brand Dungarees, Inc. v. Marcel Fashions Group, Inc.*,
   140 S. Ct. 1589 (2020) .................................................................. 20, 56

*Madden v. Kentucky*,
   309 U.S. 83 (1940) ................................................................................16

*Marsh v. Fla. Dep't of Corr.*,
   330 F. App'x 19 (11th Cir. 2009) .......................................................41

*McKinney v. Pate*,
   20 F.3d 1550 (11th Cir. 1994)..............................................................13

*Middlebrooks v. Parker*,
   22 F.4th 621 (6th Cir. 2022)................................................................22

*Mitchum v. Foster*,
   407 U.S. 225 (1972) .............................................................................54

*Nance v. Comm'r, Ga. Dep't of Corr.*,
   59 F.4th 1149 (11th Cir. 2023)............................................................26

*Nance v. Ward*,
   597 U.S. 159 (2022) ...................................................................... passim

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ...................................................................... passim

*Pardo v. Palmer*,
   500 F. App'x 901 (11th Cir. 2012) ......................................................29

*Pennhurst State Sch. & Hosp. v. Halderman*,
   465 U.S. 89 (1984) ...............................................................................55

*Presley v. Scott*,
   4:13-cv-02067, 2014 WL 71468376 (N.D. Ala. Dec. 15, 2014). ................. 39, 76

*Price v. Dunn*,
   920 F.3d 1317 (11th Cir. 2019)..............................................................2

*Ramirez v. Collier,*
   595 U.S. 411 (2022). .......................................................................74

*Rodriguez v. Burnside,*
   38 F.4th 1324 (11th Cir. 2022)........................................................42

*Samra v. Taylor,*
   38 F.4th 141 (11th Cir. 2022).............................................................1

*Sandin v. Conner,*
   515 U.S. 472 (1995) ........................................................................38

*Sause v. Bauer,*
   138 S. Ct. 2561 (2018) ....................................................................38

*Siegel v. LePore,*
   234 F.3d 1163 (11th Cir. 2000)........................................................79

*Sims v. Sec'y, Fla. Dep't of Corr.,*
   75 F.4th 1224 (11th Cir. 2023)........................................................42

*Smith v. Comm'r, Ala. Dep't of Corr.,*
   844 F. App'x 286 (11th Cir. 2021). .................................................45

*Smith v. Dunn,*
   516 F. Supp. 3d 1310 (M.D. Ala. 2021) ............................... 47, 53, 76

*Smith v. State,*
   588 So. 2d 561 (Ala. Crim. App. 1991) .............................................3

*Smith v. State,*
   908 So. 2d 273 (Ala. Crim. App. 2000) .............................................3

*Snowden v. Hughes,*
   321 U.S. 1 (1944) ............................................................................16

*Thai Meditation Ass'n of Ala., Inc.,*
   980 F.3d 821 (11th Cir. 2020)........................................................44

*Thrasher v. Woodfin*,
    2:19-cv-01007, 2020 WL 4742811 (N.D. Ala. July 17, 2020) ............................41

*Turner v. Safley*,
    482 U.S. 78 (1987) ....................................................................................... 38, 39

*United States v. Tohono O'odham Nation*,
    563 U.S. 307 (2011) ................................................................................................20

*Wackerly v. Jones*,
    398 F. App'x 360 (10th Cir. 2010) .........................................................................30

*Wall v. CDC*,
    588 F. Supp. 3d 1301 (M.D. Fla. 2022). .............................................................79

*Wellons v. Comm'r, Ga. Dep't of Corr.*,
    754 F.3d 1260 (11th Cir. 2014) ................................................................... passim

*Wilkerson v. Utah*,
    99 U.S. 130 (1879) ....................................................................................... 68, 69

*Wilkinson v. GEO Group, Inc.*,
    617 F. App'x 915 (11th Cir. 2015) .........................................................................41

*Williams v. Sec'y for Dep't of Corr.*,
    131 F. App'x 682 (11th Cir. 2005) .........................................................................41

*Woods v. Comm'r, Ala. Dep't of Corr.*,
    951 F.3d 1288 (11th Cir. 2020) ...............................................................................8

*Zinnerman v. Burch*,
    494 U.S. 113 (1990) .................................................................................................8

**Statutes**

§ 15-18-82 ..........................................................................................................................7
18 U.S.C. § 3626(a)(2) ................................................................................................5, 82
28 U.S.C. § 1367(a) .........................................................................................................53
28 U.S.C. § 2283 (West 2023) ...................................................................................5, 54
42 U.S.C. § 2000cc-1(a). ................................................................................................43

**Other Authorities**

Alabama Religious Freedom Amendment (ARFA),
ALA. CONST. art. I, § 3.01(V) ...................................................................36

Deborah W. Denno, *The Firing Squad as "A Known and Available Alternative Method of Execution" Post*-Glossip, 49 U. Mich. J.L. Reform 749, 781 (2016) ........................................................................71

Lily Guo, *Non-Rebreather Mask: What Is It, When Is It Used, and More*, OSMOSIS, https://www.osmosis.org/answers/non-rebreather-mask (last visited Nov. 29, 2023). .................................................................50

Religious Land Use And Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq* ..........................................................................36

RESTATEMENT (SECOND) OF JUDGMENTS § 24, Comment b, p. 199 (1982) ...........20

*Thai Meditation Association of Alabama, Inc.*, law. 83 F.4th 922, 929–30 (11th Cir. 2023) ......................................................................45

**Rules**

Rule 8(d)(1) of the Alabama Rules of Appellate Procedure.....................................8

## INTRODUCTION

Smith may have a new complaint, but he is not writing on a clean slate. Having vigorously argued—and won—that nitrogen hypoxia is a feasible and readily available alternative to lethal injection, Smith now seeks this Court's intervention to prohibit Alabama from employing nitrogen hypoxia. Accordingly, much of his complaint should be barred by judicial estoppel. In any event, each of his claims is speculative and should be dismissed for failing to furnish a plausible basis for relief.

After Alabama moved to set Smith's execution in the summer of 2022, Smith filed an action in this Court seeking to enjoin the State from carrying out his execution. (Ex. A.).[1] Smith alleged that Defendants deprived him of a full and fair opportunity to elect nitrogen hypoxia and that he would have elected nitrogen hypoxia if given the opportunity. *Id.* ADOC was ultimately permitted to proceed with lethal injection, but medical personnel were unable to establish proper venous access before the death warrant expired, and the execution was called off.

In amended pleadings before and after the lethal injection attempt, Smith maintained that he would have elected nitrogen hypoxia and that "[a]s a matter of law, nitrogen hypoxia is an available and feasible method of execution. *Price v.*

---

1. Because this Court presided over Smith's prior § 1983 lawsuit, the Court may take judicial notice of those proceedings. In general, a court may take judicial notice of its own dockets, state-court records, dockets stored in online databases, and the dockets of other federal courts. *See, e.g.*, *Brown v. Bd. of Educ.*, 344 U.S. 1, 3 (1952) (per curiam); *Samra v. Taylor*, 38 F.4th 141, 143 n.1 (11th Cir. 2022) ("A court may take judicial notice of its own records….").

*Dunn*, 920 F.3d 1317, 1328-29 (11th Cir. 2019)." (Ex. E at 18; Ex. G ¶ 250.) As a matter of law, "feasible" and "readily implemented" means that "the State really can put [the plaintiff] to death, though in a different way than it plans." *Nance v. Ward*, 597 U.S. 159, 169 (2022). When a plaintiff obtains relief, as Smith did when this Court entered a final order ensuring his election of nitrogen hypoxia as his method of execution, the "order gives the State a pathway forward." *Id.* Thus, when Smith—whose sentence was ready to be executed in 2022—repeatedly pleaded to this Court that nitrogen hypoxia was "feasible" and readily available, he was telling this Court that if he received the requested relief, the State could move forward with the execution of his sentence.

So the State did. In August 2023, the defendants agreed to "honor [Smith's] chosen method of execution—nitrogen hypoxia—and will not now, nor in the future, conduct any execution of [Smith] via lethal injection." (Ex. K at 1.) The State successfully moved the Alabama Supreme Court to authorize Smith's execution by nitrogen hypoxia, and Governor Ivey set Smith's execution for a thirty-hour time period beginning at midnight on January 25, 2024.[2]

---

2. Smith now has two ongoing actions: the present § 1983 action in this Court, plus an appeal from a successive Rule 32 petition in the Alabama Court of Criminal Appeals. In his state-court action, Smith contends that a second attempt to execute him—not by lethal injection, but by *any* method—would be cruel and unusual because he suffers from severe post-traumatic stress disorder (PTSD) due to the November 2022 execution attempt. (Ex. L.) While a Rule 32 petition is considered a conventional postconviction proceeding in an Alabama capital case, a *successive* Rule 32 petition is not. Smith's conventional appeals—direct appeal, Rule 32, and federal habeas—concluded on March 1, 2022, when the Supreme Court denied certiorari.

Now, however, Smith has filed a new § 1983 complaint and two amendments arguing that the relief he obtained earlier this year did not give the State a path forward. Instead, he has radically shifted his position, including the assertion of new claims that he could have but did not bring in his prior lawsuit. Smith's shifting view of what "feasible" and "readily available" means subjects many of his claims to dismissal under the PLRA and the doctrines of res judicata and judicial estoppel. Even apart from this history though, Smith has failed to plead facts sufficient to support valid causes of action. His claims fail at the pleading stage, thus Defendants' motion to dismiss should be granted.

And even if Smith has pleaded a valid claim, he is unlikely to succeed on the merits. And equity demands that a stay be denied. It has now been 35 years since Smith participated in the murder for hire of Elizabeth Sennett. *See Smith v. State*, 588 So. 2d 561, 565-66 (Ala. Crim. App. 1991); *accord Smith v. State*, 908 So. 2d 273, 279-281 (Ala. Crim. App. 2000). Smith received a lawful death sentence and both the State, the victims of Smith's crime, and the people of Alabama who have an interest in seeing just punishments carried out will be irreparably harmed by a stay. There is nothing inequitable about executing Smith for the crime he committed by the method he demanded until it was finally available. The stay should be denied.

## STANDARDS OF REVIEW

In analyzing the sufficiency of pleadings in a complaint, courts employ a two-

pronged approach: (1) the court is not bound to accept conclusory statements of the elements of a cause of action, and (2) where there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face" and that rises "above the speculative level." *Id.* at 555, 570.

"[A] court may grant a stay of execution *only* if the moving party establishes that: '(1) he has a substantial likelihood of success on the merits; (2) he will suffer irreparable injury unless the injunction issues; (3) the stay would not substantially harm the other litigant; *and* (4) if issued, the injunction would not be adverse to the public interest.'" *Brooks v. Warden*, 810 F.3d 812, 818 (11th Cir. 2016) (citations omitted). Courts should apply a "strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Long v. Sec'y, Dep't of Corr.*, 924 F.3d 1171, 1176 (11th Cir. 2019). Under the PLRA, a stay of execution may not be granted unless such relief is "narrowly drawn," be the only possible way "to correct

the harm the court finds requires preliminary relief," and "be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). Additionally, injunctive relief must be authorized by a statute passed by Congress (such as § 1983). Where the Court exercises pendant or supplemental jurisdiction over state law claims, the Anti-Injunction Act, 28 U.S.C. § 2283 (West 2023), limits injunctive relief interfering with state judicial proceedings to certain *in rem* actions and cases removed to federal court from a state forum. *See In re Bayshore Ford Truck Sales, Inc.*, 471 F.3d 1233, 1250–51 (11th Cir. 2006).

## ARGUMENT FOR MOTION TO DISMISS

Smith's complaint did not plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*. Smith's complaint is chock-full of legal conclusions that the Court need not accept on motion to dismiss. *See id.* In the Eighth Amendment context, an allegation "at the highest order of abstraction [such as] that [a State] could 'obtain their drugs from another source' … does not provide 'enough facts to state a claim to relief that is plausible on its face." *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1295 (11th Cir. 2016).

## I.      Claim I – Due Process and Equal Protection

In Claim I, Smith alleges that Defendants Hamm and Raybon have acted in an "arbitrary and capricious manner" by seeking to execute him "by nitrogen hypoxia," even though "[o]ther condemned people in Alabama who elected to be executed by nitrogen hypoxia five years ago have exhausted their appeals." (Doc. 31 ¶¶ 111–13.) Although he styles his first claim as a violation of both due process and equal protection, Smith seeks only a declaratory judgment "that attempting to execute [him] by nitrogen hypoxia before he has exhausted his pending appeals would violate his right to *equal protection* under the laws under the Fourteenth Amendment" and a "preliminary and permanent injunction prohibiting Defendants from executing [him] by nitrogen hypoxia until he has exhausted his pending appeals." (*Id.* at 34 (emphasis added).) The Due Process Clause is not mentioned in his claim for relief. Nor does Smith specify whether he alleges a procedural or substantive due process violation. Regardless, Claim I fails to state a due process or equal protection claim on which relief may be granted, and his claim is due to be dismissed on the grounds of judicial estoppel and res judicata.

### A.      Due Process

Claim I fails to state a due process claim. The Due Process Clause applies to deliberate decisions of government officials to deprive a person of life, liberty, or property without following appropriate procedures. *Daniels v. Williams*, 747 U.S.

327, 330–33 (1986). Here, Defendants are sued in their official capacity because Smith alleges that they "sought and obtained authority to execute Mr. Smith by nitrogen hypoxia." (Doc. 31 ¶ 112.) However, Smith concedes that his execution will occur as a result of an order of the Alabama Supreme Court authorizing ADOC to execute him by nitrogen hypoxia. (*Id.* ¶ 73.) Smith's complaint assigns no responsibility to either Defendant for filing motions in the Alabama Supreme Court, and he cites no Alabama law that would support a finding that the Commissioner of ADOC or the Warden of Holman Correctional Facility have the authority or responsibility to seek execution warrants.

State law does not assign to either Defendant the authority or responsibility to seek an order to carry out Smith's sentence. Defendants carry out an execution only upon the direction of the Governor, who must have authorization from the Alabama Supreme Court. And the law requiring the Warden to execute a judicial sentence of death upon receipt of a lawful court order uses the mandatory "shall" to describe his (or her) duties. ALA. CODE § 15-18-82. The same law requires the Commissioner to provide the facilities, instruments, and accommodations to carry out the sentence. (Doc. 31 ¶ 23.)

Neither Defendant had a role in petitioning the court to execute Smith's sentence, and the complaint does not plead facts or law to the contrary. Thus, Defendants are wholly unconnected to the alleged unconstitutional act of "seeking

and obtaining" an execution date for Smith. Nor is either Defendant going to carry out the execution of Smith's sentence as a discretionary act. Both are legally required to follow the order of the Alabama Supreme Court and the directive of the Governor.

Aside from this fatal deficiency, Smith's complaint also fails to state a valid procedural or substantive due process violation or an equal protection cause of action. His claim is also due to be dismissed under the doctrine of judicial estoppel.

### 1. Procedural Due Process

A procedural due process claim requires proof of "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process." *Woods v. Comm'r, Ala. Dep't of Corr.*, 951 F.3d 1288, 1293 (11th Cir. 2020). "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinnerman v. Burch*, 494 U.S. 113, 125 (1990). A procedural due process violation is incomplete "unless and until the State fails to provide due process." *Id*. at 123.

The process for obtaining an order authorizing the execution of a death sentence is set out in Rule 8(d)(1) of the Alabama Rules of Appellate Procedure: "The Supreme Court shall at the appropriate time enter an order authorizing the Commissioner of the Alabama Department of Corrections to carry out the inmate's

sentence of death within a time frame set by the governor." The complaint does not allege or plead that the process established by the Alabama Supreme Court is inadequate or procedurally deficient, or that either Defendant was directly involved in that process. *See Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir. 2000) (per curiam) ("It is the state's failure to provide adequate procedures to remedy the otherwise procedurally flawed deprivation of a protected interest that gives rise to a federal procedural due process claim."). Assuming arguendo that some other state official acted inappropriately by seeking execution of Smith's sentence, the complaint fails to state a claim because it does not allege or plead that Defendants were responsible *or* that Smith was denied an opportunity to respond to the State's motion to set an execution date prior to the Alabama Supreme Court's order.

Moreover, Smith concedes that he is not attacking a state process or procedure but instead an alleged deviation from an alleged custom. (Doc. 31 ¶ 107 (citing *Woods*, 951 F.3d at 1292).) But the proper process for challenging such deviation was in opposition to the motion filed in the Alabama Supreme Court pursuant to Rule 8(d)(1). Smith has not alleged that the state forum was constitutionally inadequate, or that this suit could remedy whatever irregularity allegedly occurred.

Even if he had properly alleged a procedural problem with the proceedings before the Alabama Supreme Court, "lower federal courts possess no power whatsoever to sit in direct review of state court decisions." *Atl. Coast Line R. Co. v.*

*Brotherhood of Locomotive Engineers*, 398 U.S. 281, 296 (1970). Thus, if Smith faces "the threat of immediate irreparable injury sufficient to justify an injunction under usual equitable principles, [he] is undoubtedly free to seek such relief from the [Alabama] appellate courts, and might possibly in certain circumstances seek such relief from th[e Supreme] Court as well." *Id*. "Unlike the Federal District Court, [the Supreme] Court does have potential appellate jurisdiction over federal questions raised in state court proceedings, and that broader jurisdiction allows [that] Court correspondingly broader authority to issue injunctions 'necessary in aid of its jurisdiction.'" *Id*. Review by the U.S. Supreme Court provides procedural due process.

Moreover, the Alabama Supreme Court's order broke the chain of causation necessary to prove a § 1983 claim. *See Barts v. Joyner*, 865 F.2d 1187, 1195 (noting that the "intervening acts of the prosecutor, grand jury, judge and jury" each "break the chain of causation unless plaintiff can show that these intervening acts were the result of deception or undue pressure by the defendant[s]); *see also Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1378 (11th Cir. 2019). Smith's claim is not facially plausible unless he has pleaded factual content allowing the court to infer that Defendants are liable for the misconduct alleged. *Iqbal*, 556 U.S. at 662. Under state law, Defendants merely carry out the orders of the Alabama Supreme Court and Governor once authorization is granted, so they cannot be responsible for the

allegedly unconstitutional and "arbitrary and capricious" act. Without more, this Court assumes regularity—that the relevant authority does not "lie[] somewhere other than where the applicable law purports to put it." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988).

For the same reasons, a preliminary injunction is not needed to stop Defendants from "arbitrary and capricious" acts targeting Smith for execution. His execution has been ordered by the Alabama Supreme Court. If that Court's decision were tainted, then Smith's remedy would lie with that Court or an appeal to the United States Supreme Court.

Smith says that that he was moved "to the front of the line for execution" (Doc. 31 ¶ 7), but the Alabama Supreme Court disagreed (and as explained below, the assertion is neither true nor legally relevant). Because the authority of the Defendants to execute his sentence in January 2024 flows from the judgment of the Alabama Supreme Court, the only federal review authority for that decision lies with the United States Supreme Court. *Exxon Mobil Corp. v. Saudi Basic Industr. Corp.*, 544 U.S. 280, 285 (2005) (discussing *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983)). To the extent Smith is asking this Court to undo that judgment, his claim is precisely the type of claim barred by the *Rooker-Feldman* doctrine: "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and

inviting district court review and rejection of those judgments." *Exxon Mobil Corp.*, 544 U.S. at 284.

### 2. Substantive Due Process

Substantive due process protects individual liberty against "certain government actions regardless of the procedures used to implement them." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). If Smith intended to assert a substantive due process claim, his complaint identifies only the State's decision to seek his execution while a successive postconviction petition was pending in the state appellate courts as the relevant governmental action. Smith characterizes this action as "arbitrary and capricious" and in violation of a custom. (Doc. 31 ¶ 111.) This does not state a substantive due process claim.

First, Smith does not set out his theory for alleging a substantive due process violation (if that is what he is pleading). Even if he did, however, he does not have a substantive right to a second or successive round of postconviction review. In the Eighth Amendment context, for example, the Supreme Court recently held that the Eighth Amendment does not create a "freestanding entitlement to a second or successive round of postconviction review." *Jones v. Hendrix*, 599 U.S. 465, 488 (2023). And Smith's interest in his life cannot form the basis of the alleged substantive due process right because the decision about the appropriate time for the execution of his sentence is distinct from the decision as to whether he could be

sentenced to death.

Merely describing Defendants' alleged actions as "arbitrary and capricious" fails to satisfy the pleading requirements for a substantive due process claim. This circuit recognizes "an 'arbitrary and capricious due process claim' as one of several closely related substantive due process claims," but a plaintiff who fails "to articulate the basis of his arbitrary and capricious due process claim" provides "a sufficient ground for its dismissal." *Leib v. Hillsborough Cty. Public Transp. Comm'n*, 558 F.3d 1301, 1308 (11th Cir. 2009). As most of this circuit's precedent regarding "arbitrary and capricious due process claims" involve zoning and property regulation, the need to articulate a theory for relief is of heightened importance; a plaintiff fails to state a claim if the alleged violation is deprivation of a state-created right. *See McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994) (en banc). Smith appears to allege a state-created right, created through a *custom*, as to when the State seeks execution of condemned inmates. That is insufficient to support a valid § 1983 claim.

Additionally, in the substantive due process context, the Supreme Court speaks to the "cognizable level of executive abuse of power as that which shocks the conscience" and "violates the 'decencies of civilized conduct.'" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998) (quoting *Rochin v. California*, 342 U.S. 165, 172–73 (1952)). This is conduct "intended to injure in some way unjustifiable by any government interest." *Id*. at 849. Such conduct must be "an abuse of executive

13

power" that is "so clearly unjustified by any legitimate objective of law enforcement as to be barred by the Fourteenth Amendment." *Id*. at 840. Smith fails to allege facts that, if proven, would satisfy this standard.

Smith did not plead facts that would establish that the governmental action bears no "substantial relation to the public health, safety, morals, or general welfare." *Corn v. City of Lauderdale Lakes*, 997 F.2d 1369, 1374–75 (11th Cir. 1993). Smith does not dispute that the State had reason to seek execution of his sentence just last year. He did not challenge the timing of the State's action then and provides no reason this time would be different. *See Iqbal*, 556 U.S. at 678. Smith's complaint fails to plead how the State's normal and valid interest in executing his sentence at the end of his federal habeas proceeding would somehow dissipate.

### B.      Equal Protection

Claim I fails to state an equal protection claim upon which relief can be granted. The State sought and obtained an order to carry out Smith's execution in 2022. (Doc. 31 ¶ 3.) When the State determined that the appropriate time had come to seek authorization to execute his lawful sentence, Smith did not contend that the State had violated any custom or norm in reaching that decision, regardless of who was residing on death row awaiting execution by nitrogen hypoxia. Only now does Smith allege that his rights were violated on the basis that he has a second or successive postconviction pending in state court.

If Smith's theory is that he is being treated differently than other inmates with pending second or successive petitions, his claim fails as a matter of law (or judicial notice). Alabama has executed or sought to execute other inmates with second or successive postconviction petitions pending. *See, e.g.*, *In re Hutcherson*, 468 F.3d 747 (11th Cir. 2006); *Hubbard v. Campbell*, 379 F.3d 1245 (11th Cir. 2004); *Arthur v. State*, 71 So. 3d 733, 738 (Ala. Crim. App. 2010) (noting that the State sought an execution warrant after the Alabama Supreme Court granted Arthur a stay of execution to permit litigation of a successive petition). In *Arthur*, the State sought execution through a renewed motion to set an execution date with full knowledge of the pendency of Arthur's successive petition.[3]

Smith also alleges that the State moved him "to the front of the line for execution by nitrogen hypoxia." (Doc. 31 ¶ 7.) But that allegation is contradicted by Smith's admission that he was already scheduled to be executed in 2022. (*Id.* ¶ 30.) His status as a condemned prisoner whose sentence is due to be executed has not changed. Yet the complaint relies on the conclusory premises that he was moved back in "the line" and now forward again. Smith imagines there is a distinct "line for execution by nitrogen" but identifies no factual basis for his speculation.

Moreover, Smith does not allege facts that would support a class-of-one equal

---

[3]For the same reason, Smith's due-process claim fails to the extent it relies on the premise that it is "arbitrary and capricious" to carry out Smith's sentence "despite his pending appeal" (Doc. 19 at 17).

protection claim. A plaintiff "must demonstrate that [he was] treated differently than someone who is *prima facie identical in all relevant respects*." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205 (11th Cir. 2007). Smith fails to identify any specific comparators or the facts alleged to make him and others "identical … in all relevant aspects." *Id.* at 1205–06 (11th Cir. 2007). Just as in *GJR Investments, Inc. v. County of Escambia, Florida*, 132 F.3d 1359, 1367–68 (11th Cir. 1998), Smith's complaint merely alleges that "faceless 'other'" inmates "were given better treatment" and fails to state a claim because it does not "attempt to show in some fashion that these 'other' applicants were situated similarly to the plaintiff." Indeed, in his motion for a preliminary injunction, Smith concedes he "is in a unique position" because he "survived an execution attempt." (Doc. 19 at 13; *see also id.* at 21).

Moreover, a class-of-one claim requires pleading that Defendants acted "for the purpose of discriminating against him." *Leib*, 558 F.3d at 1307 (quoting *Young Apartments, Inc. v. Town of Jupiter, Fla.*, 529 F.3d 1027, 1032 n.1 (11th Cir. 2008)). But Smith concedes that the State sought to carry out his sentence last year and does not allege that the State was improperly motivated by discriminatory intent then. Nor does the complaint allege how a non-discriminatory governmental decision in 2022 became discriminatory in 2023. Characterizing certain conduct as "arbitrary and capricious" is not enough. *Snowden v. Hughes*, 321 U.S. 1, 10 (1944); *see also Madden v. Kentucky*, 309 U.S. 83, 88 (1940) ("The burden is on the one attacking"

a classification "to negative every conceivable basis which might support it.").

## C.    Judicial Estoppel of Claim I

Claim I of the second amended complaint is also barred by the doctrine of judicial estoppel. Smith seeks to have the Court order the Defendants to treat him differently than individuals who elected nitrogen hypoxia in 2018. He says he should not be at the "front of the line" and appears to encourage the State to seek execution of others "who elected to be executed by nitrogen hypoxia five years ago." (Doc. 31¶¶ 7, 111.) But in the original complaint in his previous § 1983 lawsuit, Smith pleaded that, had ADOC handled the distribution of election forms differently, "he would have chosen to be executed by nitrogen hypoxia" in June 2018, just like those he now identifies as having elected five years ago. (Ex. A ¶ 79.) Smith alleged that he would "be irreparably harmed" if ADOC did not treat him identically to those who elected nitrogen in June 2018. (*Id.* ¶ 98.) He sought a "preliminary and permanent injunction prohibiting Defendants from enforcing any waiver of [his] right to elect nitrogen hypoxia as the method of his execution." (*Id.* at 18.) Smith clearly sought relief from this Court requiring the State to treat him identically to those who elected nitrogen hypoxia in 2018. He continued to seek this treatment throughout those proceedings. (*See, e.g.*, Ex. E ¶¶ 14, 74, 100 (claiming Smith "would have chosen to be executed by nitrogen hypoxia" in June 2018).)

"[W]here a party assumes a certain position in a legal proceeding, and

succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 680 (1895). Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Id*. The rule "protect[s] the integrity of the judicial process" by "prohibiting parties from deliberately changing positions according to the exigencies of the moment" and "prevent[s] improper use of judicial machinery." *Id*. at 749–50 (cleaned up).

Smith's claim is estopped for two reasons. First, Smith—having argued that he should be treated identically to those who elected nitrogen hypoxia five years ago—cannot now argue that he should be treated differently. Smith has been "first in line" since the State sought his execution last year at a time he did not challenge. Now, he wishes to backtrack and receive special treatment; an attempt at judicial manipulation that ought not be permitted.

Second, Smith repeatedly asserted in the prior proceeding that "[a]s a matter of law, nitrogen hypoxia is an available and feasible method of execution." (Ex A ¶ 55; *see also* Ex. G ¶ 250.) Ultimately, this Court agreed. (Ex. I at 19.) But if a method of execution is "feasible" and "readily implemented," then "the State really can put

[the plaintiff] to death, though in a different way than it plans." *Nance*, 597 U.S. at 169. Now that the State is prepared to execute him, Smith's new position is that nitrogen hypoxia is *not* readily available to execute him until those who elected nitrogen hypoxia in 2018 are executed. Smith cannot have it both ways.

Several factors support the application of judicial estoppel here. First, Smith's position is "clearly inconsistent" with his position *just last year* that nitrogen hypoxia was available to execute his sentence and that he should be treated the same as all others who elected it in 2018. *New Hampshire*, 532 U.S. at 750. Second, Smith succeeded in persuading the Court to grant an injunction requiring ADOC to use nitrogen hypoxia to execute his sentence, and his most recent position creates the perception that this Court was misled. *Id*. Third, Smith seeks an unfair advantage in this litigation by placing himself "in line" behind other condemned inmates he once said ADOC was required to view as his equals. Fourth, if Smith's latest attempt at manipulation is not stopped, it will "impose an unfair detriment" on ADOC. *Id.* at 751. All of these factors "firmly tip the balance of equities in favor of barring" Smith's new claim. *Id.*

Finally, *Nance* is also instructive because it reiterated that "claims relied on to forestall an execution" or "to interpose unjustified delay" should not be countenanced by a federal court. *Id*. at 174. Federal courts must also be wary of any attempts to manipulate the court system to protect the timely enforcement of a

sentence. *Id*. Smith's manipulative claim, seeking to game this Court to Defendants'
detriment, should be dismissed.

### D.     Claim Preclusion of Claim I

"[C]laim preclusion prevents parties from raising issues that could have been
raised and decided in a prior action – even if they were not actually litigated. If a
later suit advances the same claim as an earlier suit between the same parties, the
earlier suit's judgment 'prevents litigation of all grounds for, or defenses to, recovery
that were previously available to the parties, regardless of whether they were
asserted or determined in the prior proceeding.'" *Lucky Brand Dungarees, Inc. v.
Marcel Fashions Group, Inc.*, 140 S. Ct. 1589, 1594–95 (2020) (quoting *Brown v.
Felsen*, 442 U.S. 127, 131 (1979)). "Suits involve the same claim (or 'cause of
action') when they 'aris[e] from the same transaction,' *United States v. Tohono
O'odham Nation*, 563 U.S. 307, 316 (2011) (quoting *Kremmer v. Chemical Constr.
Corp.*, 456 U.S. 461, 482 n. 22 (1982)), or involve a 'common nucleus of operative
facts,' RESTATEMENT (SECOND) OF JUDGMENTS § 24, Comment b, p. 199 (1982)."
*Id*. at 1595. If a plaintiff wins in a prior case, "the plaintiff cannot bring a second
independent action for additional relief." *Id*. Because Smith did not raise and resolve
this claim previous, they were preparing to execute his judicial sentence.

Smith's previous lawsuit alleged an equal protection claim against Defendants
different than the presented here. (Ex. G.) Nonetheless, this demonstrates that Smith

could have asserted his equal protection claim in that original proceeding. If there are individuals on death row whose appeals have been concluded longer than Smith's, they were there when the State first moved for his execution. Yet, when Smith requested a consent judgment for entry of an injunction by this Court to secure his right to be executed by nitrogen hypoxia, he did not request (or secure) any judicial relief for the purpose of moving him backward in line for purposes of execution of sentence. Because he failed to assert this claim when he had the chance, his current, new claim is barred by res judicata and should be dismissed under Rule 12(b)(6) and the PLRA.

## II.    Claim II –Cruel and Unusual Punishment

In Claim II, Smith alleges that nitrogen hypoxia, the method of execution that he sought and obtained through litigation "would violate his constitutional rights" based on a number of highly speculative allegations. (Doc. 31 ¶ 6.) Primarily, Smith contends that the protocol would expose him to a "severe risk of a persistent vegetative state, a stroke or the painful sensation of suffocation[.]" (*Id.* ¶ 122.) This claim is (a) barred by judicial estoppel and (b) rests entirely on speculative assertions that fail to state a claim upon which relief can be granted.

### A.    Judicial Estoppel of Claim II

In Smith's previous method-of-execution challenge, he *repeatedly* urged this Court to grant him relief from lethal injection on the promise that his chosen

alternative, nitrogen hypoxia, was "feasible and *readily available*." (Ex. A ¶¶ 54, 85, 87; Ex. C at 15; Ex. E ¶¶ 14, 74; Ex. G ¶¶ 250, 264.) As discussed above, the Supreme Court has long recognized that method-of-execution claims present opportunities to delay execution. The Supreme Court does not "for a moment countenance 'last-minute' claims relied on to forestall an execution." *Nance*, 597 U.S. at 174. Indeed, the Supreme Court instructed "'[c]ourts [to] police carefully against attempts to use [method-of-execution] challenges as tools to interpose unjustified delay.'" *Id.* (quoting *Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 (2019)).

Judicial estoppel is one tool to police unjustified method-of-execution claims. In a recent writing in the Sixth Circuit, Judge Thapar explained:

> Rooted in equity, the rule of judicial estoppel "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (citing 18 James Wm. Moore et al., *Moore's Federal Practice* § 134.30, p. 134–62 (3d ed. 2000)). And it may prove a useful tool for identifying inmates who are more interested in delaying their executions than in avoiding unnecessary pain. *See Bucklew*, 139 S. Ct. at 1129.

*Middlebrooks v. Parker*, 22 F.4th 621, 628 (6th Cir. 2022).

Having previously claimed that nitrogen hypoxia was a feasible and readily available alternative to lethal injection and having thereby successfully *obtained* injunctive relief against execution by lethal injection, Smith now seeks to prohibit Alabama from employing nitrogen hypoxia; his latest proposed method is the firing squad (Doc. 31 ¶ 103). Smith may not take this new and contradictory position

"simply because his interests have changed." *New Hampshire*, 532 U.S. at 749.

Smith should be held to his prior positions:

- In his original § 1983 complaint seeking to bar the State from executing him by lethal injection, Smith alleged that he wanted to be executed by nitrogen hypoxia instead. (Ex. A.)[4]

- Smith repeated his preference for execution by nitrogen hypoxia when he filed a motion for preliminary injunction in November 2022. Smith supported his alternative with, among other things, the declaration of Dr. Joel Zivot. (Ex. C.) Through Dr. Zivot, Smith maintained that "we may breathe in increasing concentrations of nitrogen and be unaware of it" and that "nitrogen gas inhalation would at least not produce feelings of shortness of breath." (Ex. D ¶¶ 24, 26, 95.)

- Smith again relied on Dr. Zivot's declaration when he filed his second amended complaint after the State was unable to obtain intravenous access to carry out his execution. (Ex. G ¶ 251.)

- During an October 2022 hearing before this Court, Smith's counsel asserted that Smith still wished to "elect nitrogen hypoxia." (Ex. B at 17–18.)

- In November 2022, Smith's counsel asserted that nitrogen hypoxia was "a viable alternative here that would relieve the State of the possibility of cruel and unusual punishment." (Ex. F at 21.)

- Smith maintained his position after preparations for his first execution were called off, confirming with this Court on May 24, 2023, that "his preferred method of execution at the present moment is by nitrogen hypoxia." (Ex. H at 8.) This Court's order dismissing his prior lawsuit gave him a permanent injunction against execution by lethal injection. (Ex. I at 19.)

Now that nitrogen hypoxia is truly available to ADOC as a method of

---

[4] Smith even stated that he would have elected nitrogen hypoxia in 2018 in order to "delay[ ] his execution for years" suggests his true motive for choosing that method, (Ex. A ¶ 95), and his present complaint should be read in light of that concession too.

execution, the only way that Smith can stave off his impending execution is an about-face: a highly speculative parade of horribles attempting to show that *nitrogen hypoxia* is cruel and unusual punishment.

The clearest example of Smith's gamesmanship is the contrast between his repeated assurances to this Court that the State did not need to employ lethal injection because nitrogen hypoxia was "a feasible, readily implemented alternative procedure" for his execution. (Ex. A ¶¶ 54, 85, 87; Ex. C at 15; Ex. E ¶¶ 14, 74; Ex. G ¶¶ 250, 264); *see Bucklew*, 139 S. Ct. at 1121. But now, Smith has predictably come before this Court, painting himself as a "test subject" and nitrogen hypoxia as "novel and experimental" and an "untested" method that "can cause dire consequences." (Doc. 19 at 17, 20, 24; Doc. 31 ¶¶ 7, 53, 64.) Partially on that basis, Smith has urged this Court to grant an injunction preventing his execution. (Doc. 19 at 17, 20, 24.) Indeed, this Court has relied on Smith's allegations about the "novel execution method" as grounds for granting discovery, even though this Court noted in its previous final order that "[i]n no fewer than two hearings before this Court, Plaintiff [Smith] has confirmed that nitrogen hypoxia is his chosen and preferred method of execution." (Doc. 28 at 3; *see also* Ex. K at 1.) Throughout the prior litigation, Smith *always* knew that nitrogen hypoxia had not been previously used as a method of execution. That Smith's alleged concerns about the novel nature of hypoxia emerge only now, when they are most useful to him, is strong evidence that

that he is attempting to manipulate the judicial process to his benefit.

Estoppel is especially warranted because Smith's present claims could have been, and should have been, brought prior to the present action. In *Nance v. Ward*, 597 U.S. at 164, the Supreme Court explained that in a § 1983 action, the plaintiff must show an alternative method "that is feasible, readily implemented, and in fact significantly reduces" the risk of harm identified. The pleadings must permit the court to engage in a "comparative exercise" to determine "whether the State has cruelly 'superadded' pain to the punishment of death." *Id*. (quoting *Bucklew*, 139 S. Ct. at 1126). A § 1983 litigant is not entitled to an order preventing the State from executing his sentence (which would be habeas relief), so he must give "the State a pathway forward." *Id.* at 169. If Smith had genuine concerns about nitrogen hypoxia, he had the opportunity—and requirement—to plead a "virtual blueprint" in his prior lawsuit.

Instead of alleging a pathway forward, Smith's improper use of the judicial machinery seeks to prevent the State from delivering long-overdue justice. *New Hampshire*, 532 U.S. at 749–50. One need look no further than his new proposal—death by firing squad. (Doc. 31 ¶ 103.) Of course, Smith knows that execution by firing squad is not authorized under Alabama law and would further delay his execution, but it is readily apparent that delay is the whole purpose of this action. To accept that firing squad is *really* his preferred method would create "the perception

that either the first or second court was misled." *New Hampshire*, 532 U.S. at 750.

While Smith also claims that *the protocol* makes the State's method unconstitutional, his alternatives are far from *Nance*'s "virtual blueprint." As described below, he offers a series of speculative potential problems with nitrogen hypoxia and "fixes" those problems with a list of vague potential tweaks. Notably, though Smith cites to the Eleventh Circuit's decision in *Nance*, none of his solutions are "sufficiently detailed to permit a finding that the State could carry it out relatively easy and reasonably quickly." *Nance v. Comm'r, Ga. Dep't of Corr.*, 59 F.4th 1149, 1155 (11th Cir. 2023).

This Court should not reward Smith's shifting positions. Instead, Smith should be judicially estopped from (i) any claim that nitrogen hypoxia is cruel and unusual, (ii) any comparison between nitrogen hypoxia and an alternative such as a firing squad, (iii) any claim that the protocol is cruel and unusual, given Smith's burden to specify a blueprint in the earlier case, and/or (iv) any claim that a necessary aspect of execution by nitrogen hypoxia (e.g., wearing a mask, the risk of contamination, the risk of impure nitrogen, etc.) is cruel and unusual.

### B.  No Actual Risk of Injury Pleaded

A plaintiff cannot simply speculate that he might suffer superadded pain. Smith's burden is to allege a factual basis for his Eighth Amendment claim that "must be enough to raise a right to relief above the speculative level." *Twombly*, 550

U.S. at 555; *see also Boyd v. Warden, Holman Corr. Fac.*, 856 F.3d 853, 871 n.2 (11th Cir. 2017). Plaintiffs in method-of-execution challenges face the "heavy burden" of showing that a State's chosen method of execution is in fact "cruelly inhumane." *Baze v. Rees*, 553 U.S. 35, 53, (2008). Despite this, Smith's complaint is replete with speculation about *possible* risks, and he seeks this Court's aid in carrying out a searching inquiry into every "who, what, where, when, and how" (*see* Doc. 20) related to the State's development of the nitrogen hypoxia protocol. (Doc. 20-1.) Section 1983 is not a license to sift through documents and facilities for possible claims. The Constitution "does not authorize courts to serve as 'boards of inquiry' charged with determining 'best practices' for executions." *Bucklew*, 139 S. Ct. at 1125 (quoting *Baze*, 533 U.S. at 51–52 & nn.2–3).

Smith's allegations are slim and speculative. (*See* Doc. 31, ¶¶ 74–100). Paragraphs 74–82 plead no specific facts about "the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual," *Baze*, 553 U.S. at 50, and the remaining paragraphs are just guesswork. Again, it is Smith's burden to plead a constitutional violation, not the State's burden to win pre-approval of its method.

### 1. Claims Regarding the Mask

In paragraphs 83 through 92, Smith raises allegations regarding Alabama's use of a mask to deliver nitrogen to the condemned. Smith must allege how the State's method superadds pain as compared to an alternative, but he has not done so.

Instead, he presents a number of guesses about how things *might* go wrong *if* Alabama used an inadequate mask or failed to secure it properly.

### a.      Mask Fit

First, Smith complains that the protocol does not specify what mask will be used or how it will be secured. (Doc. 31 ¶ 84.) But there has never been any requirement that a state's execution protocol specify every detail of the execution process. *See, e.g.*, *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1267 (11th Cir. 2014) ("Wellons has not established a substantial likelihood of success on the merits of his claim that the dearth of information regarding the nature of the pentobarbital that will be used in his execution and the expertise of those who will carry it out violates the First Amendment or his right to due process."). Nevertheless, Smith speculates that after nitrogen has begun to flow into the mask, oxygen *might* "infiltrate" the mask based on the allegation that some nitrogen flowing *into* the mask will also necessarily flow *out* of the mask. (Doc. 31 ¶ 85.)

Setting aside the fact that Smith assumes the mask would lack one-way valves and ignores the effects of positive air pressure, Smith makes no allegations at all about how much oxygen would have to "infiltrate" the mask to cause him to suffer physical injury short of death. (*Id.*) Would the air inside the mask have to be 1% oxygen? 2%? 10%? Smith does not say. Instead, he simply makes a bare allegation that hypothetical oxygen infiltration creates a "severe risk" of harm. (*Id.*) His burden

calls for something more. *Baze*, 553 U.S. at 50; *Wellons*, 754 F.3d at 1265 ("We have held that speculation that a drug that has not been approved will lead to severe pain or suffering 'cannot substitute for evidence that the use of the drug is sure or very likely to cause serious illness and needless suffering.'"); *Ferguson v. Warden, Fla. State Prison*, 493 F. App'x 22, 25 (11th Cir. 2012) ("[S]peculation as to the parade of horribles that could *possibly* occur during his execution does not meet the burden of proof required by the Eighth Amendment."); *Pardo v. Palmer*, 500 F. App'x 901, 904 (11th Cir. 2012) (same).

In paragraphs 86 through 89, Smith alleges that the fit of the mask is important and complains that the protocol does not "account for" the fact that facial structure, facial hair, and "other [unspecified] anatomic characteristics" can "increase the difficulty of mask ventilation." (Doc. 31 ¶ 86.) Smith notes that the protocol does not "detail[] the training the 'team members' will receive" or "their level of experience with the masks being used[.]"[5] (*Id.* ¶ 89.) Because Smith does not dispute that the protocol provides that "[t]he mask will be placed and adjusted on the condemned inmate's face" and that ADOC personnel will "verif[y] that the mask has been properly placed," he must be claiming that the protocol somehow creates

---

5. Notably, Smith *does not* allege that the team members will be *inadequately* trained or that they will have *insufficient* experience with the masks used. *Cf. Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853, 861 (11th Cir. 2017) (claim that execution team was "wholly unprepared and inadequately trained as to constitutional execution procedures").

an "objectively intolerable risk of harm" by not including specific instructions for fitting the mask to individual inmates. *Glossip v. Gross*, 576 U.S. 863, 877 (2015). But a lack of some detail in the published protocol does not, on its own, create any risk of harm. The invited inferences that ADOC personnel *might* be insufficiently trained in mask placement and that *could* result in an improperly fit mask are likewise speculative. As the Supreme Court explained in *Baze*, that "an execution method may result in pain…by accident…does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." 553 U.S. at 50; *see also Jackson v. Danberg*, 594 F.3d 210, 227 (3d Cir. 2010) ("speculating about what [] officials might do" is not sufficient to show that a method of execution poses "intolerable" risk); *Wackerly v. Jones*, 398 F. App'x 360, 363 (10th Cir. 2010) (court addressing a method-of-execution claim "need not address [a] hypothetical scenario" put forward by plaintiff); *Wellons*, 754 F.3d at 1265; *Ferguson*, 493 F. App'x at 25. Because Smith alleges nothing more than the possibility that the mask might not be properly fitted to his face, he fails to state a claim.

Similarly, in paragraphs 87 through 89, Smith speculates that "movement of the face or head *can* dislodge a mask" and complains that allowing him to make his final statement or prayers after the mask has been fitted "*may* result in an imperfect seal and leaking." (Doc. 31 ¶¶ 87, 88 (emphasis added).) First, Smith's bare claim that speaking "can dislodge" a mask is itself highly speculative. Smith concedes that

the protocol calls for a final inspection of the mask, but he argues that this is insufficient because the protocol does not specify how the inspection will be carried out and does not specifically provide for readjusting the mask after the inspection. (*Id.* ¶ 88.) This is essentially a reprise of Smith's argument about the initial mask fitting, and for the same reasons, Smith's speculations that ADOC personnel might accidentally fail to notice a displaced mask or that, absurdly, they would *notice* that the mask was dislodged but fail to readjust it, are insufficient. *See Baze*, 553 U.S. at 50; *Jackson*, 594 F.3d at 227; *see also Wackerly*, 398 F. App'x at 363; *Wellons*, 754 F.3d at 1265; *Ferguson*, 493 F. App'x at 25.

### b.     Carbon Dioxide Entrapment

Smith's second claim regarding the mask, found in paragraphs 90 through 92, is that carbon dioxide could possibly become trapped under the mask, forcing him to rebreathe it, which allegedly would "cause[ ] the sensation and pain of suffocation." (Doc. 31 ¶ 91.) Smith contends that there "is nothing in the Protocol to indicate that there is any mechanism to remove the carbon dioxide that the condemned person exhales[.]" (*Id.* ¶ 92.) But this is *not* an allegation that carbon dioxide *will* be trapped under the mask, or that the mask actually *does not* have a mechanism for coping with the inmate's exhalation of carbon dioxide—and Smith does not make any such allegation. Instead, he once again speculates that *maybe* ADOC did not consider or make allowance for the fact that humans exhale carbon

dioxide. (*Id.* ¶¶ 90–92.) Indeed, Smith fails to allege any facts that would back up his speculations. He does not identify any studies, news articles, or reports showing that carbon dioxide entrapment inside a mask is such a prevalent problem that ADOC has *likely* selected a mask that will subject him to that harm. Claims as fundamentally speculative as this are not sufficient to warrant relief. *Baze*, 553 U.S. at 50; *Jackson*, 594 F.3d at 227; *see also Wackerly*, 398 F. App'x at 363; *Wellons*, 754 F.3d at 1265; *Ferguson*, 493 F. App'x at 25.

### 1. Claims Regarding Nitrogen Purity

Smith first alleges that ADOC "intends to deliver pure nitrogen" to him through the mask. (Doc. 31 ¶ 12.) Then he shifts his claim to note that the protocol is "constitutionally deficient" because it "does not specify the purity of the nitrogen gas" that ADOC will use to carry out his execution and does not "specify" how ADOC will determine "*whether* it has been contaminated." (*Id.* ¶ 93 (emphasis added).) As an initial matter, Defendants are unaware of any precedent for the proposition that the United States Constitution requires an execution protocol to set out every possible detail regarding how an execution will be carried out. *See, e.g.*, *Wellons*, 754 F.3d at 1267. But in any event, Smith does not make *any* specific allegations to back up his speculation: He does not identify any storage conditions that could lead to contamination, nor does he make *any* allegations about studies, reports, news accounts, or industrial data to suggest that nitrogen in pressurized

cannisters can actually become "contaminated." Smith also fails to make any factual allegations regarding what possible contaminants there might be, and he does not make any allegations about what sort of testing would detect contaminants. But more to the point, he also does not allege that contamination is either likely or that ADOC will, in fact, *use* contaminated or impure nitrogen to execute him. Indeed, Smith concedes that "it is *impossible* to assess whether there is a risk that the nitrogen has been contaminated." (Doc. 31 ¶ 93 (emphasis added).) At no point do Smith's speculations rise to the point of stating a claim on which he could obtain relief. *Baze*, 553 U.S. at 50; *Jackson*, 594 F.3d at 227; *see also Wackerly*, 398 F. App'x at 363; *Wellons*, 754 F.3d at 1265; *Ferguson*, 493 F. App'x at 25.

### 2.    Claim Regarding Pulse Oximeters

In paragraph 94, Smith again raises speculative concerns about the process of nitrogen hypoxia. He notes that the protocol calls for placing a pulse oximeter on the condemned to monitor oxygen levels in the blood, but he asserts that "there are no procedures [outlined in the protocol] for monitoring the pulse oximeter after pure nitrogen is introduced[.]" (Doc. 31 ¶ 94.) Smith speculates that monitoring the pulse oximeter after nitrogen has begun to flow "*could* reveal that … oxygen is infiltrating the mask[.]" (*Id.* (emphasis added).) At best, Smith's allegations now amount to double speculation: *if* oxygen infiltrates the mask, then monitoring the pulse oximeter *might* reveal that fact. But Smith's allegation suffers the same infirmities

as his assertions discussed above; he does not allege that ADOC personnel will *not* monitor the pulse oximeter after nitrogen has begun to flow, but merely that the protocol does not *specify* that they will do so. Nor does Smith allege facts that would show that the protocol's provisions for monitoring his EKG readings would not provide satisfactory assurance that the execution was proceeding as planned. (*See* Doc. 31-1 at 18.) These speculative allegations are insufficient to state a claim. *Baze*, 553 U.S. at 50; *Jackson*, 594 F.3d at 227; *see also Wackerly*, 398 F. App'x at 363; *Wellons*, 754 F.3d at 1265; *Ferguson*, 493 F. App'x at 25.

At bottom, Smith's allegations regarding possible Eighth Amendment violations do not point to any genuine risks. Instead, they are largely a criticism of the text of the protocol, coupled with vague speculations about how things *might* go wrong. None of Smith's factual allegations regarding the mask, the nitrogen, or the pulse oximeters show that by employing nitrogen hypoxia, Smith's chosen method of execution, Defendants will subject him to superadded "terror, pain, or disgrace." *Bucklew*, 139 S. Ct. at 1116.

### 3.  No Knowledge of Substantial Risks

The level of "objectively intolerable risk of harm" required to plead a valid Eighth Amendment method-of-execution claim requires facts that would "prevent[] prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Glossip*, 576 U.S. at 877 (quoting *Baze*, 553 U.S. at 50).

But as Smith stresses, nitrogen hypoxia has never been used for judicial executions. (Doc. 31 at 1, 20.) For his part, Smith pleads that he has only "sparse research on how long a human must be exposed to 100% pure nitrogen to cause death, what happens if a human is exposed to less than 100% pure nitrogen for a prolonged period of time, or on the pain or sensations that a human exposed to nitrogen might experience." (Doc. 31 at 21.)

If Smith cannot provide this Court specific factual pleadings to support his various speculative attacks on how his execution might cause harm, he surely has not pleaded sufficient facts to establish that ADOC officials were aware of, but disregarded, a substantial risk. For example, Smith does not allege that there has been a rash of compressed nitrogen contamination due to improper storage throughout the southeastern United States, or that improper storage conditions are likely to exist in Atmore, Alabama, or at Holman Correctional Facility. Similarly, Smith fails to allege that particular types of masks are known to be notorious for creating conditions ripe for carbon dioxide rebreathing. The second amended complaint contains no facts, nor can it, that would allow this Court to find that Defendants have ignored an alternative means of administering nitrogen gas for purposes of an execution that would be known to be safer than the one to be employed against Smith. Smith cannot plead a proper Eighth Amendment claim without pleading facts showing that ADOC officials are aware of, but are

disregarding, known substantial risks.

### III.    Claims III, IV, and V – First Amendment, RLUIPA, and ARFA

In his third, fourth, and fifth claims for relief (Doc. 31 ¶¶ 125–45), Smith contends that an execution under the nitrogen hypoxia protocol would violate his First Amendment rights to freedom of speech and free exercise of his religion, his rights under the Religious Land Use And Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.*, and his rights under the Alabama Religious Freedom Amendment (ARFA), ALA. CONST. art. I, § 3.01(V). Smith takes issue with the fact that the protocol calls for him to be masked in the execution chamber, which he contends "will interfere with [his] right to make an audible statement and to pray audibly." (Doc. 31 ¶¶ 128–29; *see id.* ¶ 16.) He claims that this requirement "substantially burdens [his] religious exercise to pray audibly" because the mask *may* "prevent [his] prayers from being audible." (*Id.* ¶ 135; *see id.* ¶ 16.) Moreover, Smith claims that if he speaks while masked, he "may risk consequences associated with dislodging the mask and/or building the level of carbon dioxide under the mask" (*id.* ¶ 129), which "forc[es him] to choose between abstaining from his religious practice of audible prayer at the end of his life or face the dangerous consequences of dislodging the mask while praying" (*id.* ¶ 136). Finally, Smith alleges that keeping him on "single-walk" status pending his execution burdens his exercise of religion. (*Id.* ¶ 98.) For the reasons that follow, Smith has failed to state

36

a claim, and dismissal is proper under Rule 12(b)(6).

### A.  Legal Framework

#### 1.  First Amendment rights are subject to reasonable time, place, or manner restrictions, particularly in the penal context.

While the Constitution generally protects the rights to freedom of speech and free exercise of religion, that protection is not absolute. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired," *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 647 (1981), and "the government need not permit all forms of speech on property that it owns and controls," *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992). Rather, the government may impose reasonable time, place, or manner restrictions.

For example, in *Clark v. Community for Creative Non-Violence*, political demonstrators wished to camp in Lafayette Park "to call attention to the plight of the homeless," but a National Park Service regulation prohibited camping in those locations. 468 U.S. 288, 289 (1984). Assuming while not deciding that the camping was protected speech, the Supreme Court held that the restriction was reasonable:

> Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions. We have often noted that restrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

*Id.* at 293–94 (collecting cases).

Concerning the free exercise of religion, the Supreme Court addressed reasonable time, place, or manner restrictions in *Sause v. Bauer*, 138 S. Ct. 2561 (2018). In that case, officers came to the petitioner's home pursuant to a noise complaint, but the petitioner began to "engage in a course of strange and abusive conduct." *Id.* at 2562. She claimed that she knelt and began praying at one point, but an officer ordered her to stop. *Id.* The Court noted:

> There can be no doubt that the First Amendment protects the right to pray. Prayer unquestionably constitutes the "exercise" of religion. At the same time, there are clearly circumstances in which a police officer may lawfully prevent a person from praying at a particular time and place. For example, if an officer places a suspect under arrest and orders the suspect to enter a police vehicle for transportation to jail, the suspect does not have a right to delay that trip by insisting on first engaging in conduct that, at another time, would be protected by the First Amendment.

*Id.* at 2562–63.

In the penal context, while inmates do not lose all of their constitutional rights upon conviction and incarceration, *Sandin v. Conner*, 515 U.S. 472, 485 (1995), their rights can be limited by reasonable regulations. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Per *Turner*, the reasonableness of a challenged regulation depends on four factors:

> (1) whether there is a "valid, rational connection" between the regulation and a legitimate governmental interest put forward to justify

38

it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether the regulation represents an "exaggerated response" to prison concerns.

*Hakim v. Hicks*, 223 F.3d 1244, 1247–48 (11th Cir. 2000); *see Turner*, 482 U.S. at 89–91.

An inmate who claims that his free exercise rights have been violated must demonstrate that the government "has placed a substantial burden on the observation of a central religious belief or practice" without "a compelling governmental interest justif[ying] the burden." *Hernandez v. CIR*, 490 U.S. 680, 699 (1989). In other words, "an inmate must show that prison officials administered or implemented a policy or regulation, not reasonably related to any legitimate penological interest or security measure, which substantially burdens and significantly interferes with the practices of the inmate's religion or restricts his free exercise of a sincerely held religious belief." *Presley v. Scott*, 4:13-cv-02067, 2014 WL 7146837, at *16 (N.D. Ala. Dec. 15, 2014).

For instance, in *Presley v. Scott*, the District Court for the Northern District of Alabama considered the case of a Native American inmate whose sacred items were seized during a shakedown after an officer found contraband in his cell. *Id.* at *9. Considering the *Turner* factors, the court first examined the regulation that governs the exercise of religious rights by inmates and deemed it reasonable:

> [Regulation 333] seeks to balance the free-exercise rights of Native American prisoners against the need to reduce the threat of violence and disorder in the facility. It allows Native American practitioners to personally possess certain limited religious objects and to store and use other objects in a designated ceremonial ground. It allows Native American adherents some means for expressing their religion …. The regulation expressly authorizes inmates to keep in their personal possessions a medical bag, feathers, and dream-catcher. Although the regulation does prohibit the personal possession of other religiously significant objects, such as pipes, moccasins, and "talking sticks," this limitation is logically related to legitimate security and penological objectives of the institution. The personal possession of smoking pipes could inhibit the ability of prison officials to prevent the use of contraband substances and drugs. Talking sticks could become sharpened weapons. The judgment of officials that these items should be made available to inmates only at designated times and places needed for religious ceremonies is logically and reasonably related to legitimate governmental concerns. Likewise, limiting inmates to the possession of only one medicine bag of a certain size is logically related to the security need to limit and control the possession of contraband that might be hidden in such a container. Thus, ADOC Regulation 333, at least as it is pleaded in these factual allegations by plaintiff, is reasonable and valid under the First Amendment.

*Id.* at *17. However, the court found that the officers' actions in seizing and destroying the plaintiff's sacred items in spite of his repeated protestations were not necessarily reasonable and allowed the plaintiff's First Amendment claim to go forward. *Id.* at *18.

While strict scrutiny is applied to constitutional violations outside the penal context, the courts show greater deference to prisons in considering whether regulations violate inmates' constitutional rights. *Hakim*, 223 F.3d at 1247. As an example, if an inmate adopts a new name for religious reasons while incarcerated,

the prison cannot be compelled to use only the new name in its records, but a dual-name policy in which the inmate's new name is added to his identification card "is sufficient to satisfy an inmate's free exercise claim." *Id.* at 1248. Thus, in *Hakim*, while the district court considered the potential administrative burden the prison would incur by adding an "AKA" designation to the inmate plaintiff's identification card, the court held that the burden was minimal and the cost de minimis, and under *Turner*, the regulation was an unreasonable violation of the inmate's First Amendment rights. *Id.* at 1249. Courts within this Circuit continue to apply the *Turner* analysis to inmate free exercise claims. *E.g.*, *Wilkinson v. GEO Group, Inc.*, 617 F. App'x 915, 917 (11th Cir. 2015); *Johnson v. Brown*, 581 F. App'x 777, 780–81 (11th Cir. 2014); *Marsh v. Fla. Dep't of Corr.*, 330 F. App'x 19, 181–82 (11th Cir. 2009) ("Free exercise of religion claims brought by prisoners, however, are analyzed under a more deferential standard, the reasonableness test articulated by the Supreme Court in *Turner*."); *Williams v. Sec'y for Dep't of Corr.*, 131 F. App'x 682, 685 (11th Cir. 2005); *Thrasher v. Woodfin*, 2:19-cv-01007, 2020 WL 4742811, at *5–6 (N.D. Ala. July 17, 2020); *Crandle v. Singleton*, 2:17-cv-00140, 2020 WL 4044712, at *3 (S.D. Ala. June 18, 2020); *Hosey-Bey v. Williams*, 2:12-cv-00959, 2015 WL 4988388, at *6 (M.D. Ala. Aug. 19, 2015).

### 2. RLUIPA offers inmates broader protection against the substantial burdening of their sincerely held beliefs, but there is a burden-shifting framework for claim evaluation.

"RLUIPA prohibits imposing a 'substantial burden' on an incarcerated person's religious exercise unless that burden furthers a compelling government interest using the least restrictive means." *Sims v. Sec'y, Fla. Dep't of Corr.*, 75 F.4th 1224, 1228 (11th Cir. 2023) (quoting 42 U.S.C. § 2000cc-1(a)). The law was enacted to protect inmates from the "'frivolous or arbitrary' barriers imped[ing] institutionalized persons' religious exercise," *Cutter v. Wilkinson*, 544 U.S. 709, 716 (2005), and it "provides greater religious protection than the First Amendment," *Dorman v. Aronofsky*, 36 F.4th 1306, 1313 (11th Cir. 2022).

The RLUIPA standard is stricter than the *Turner* analysis in that reviewing courts "assess whether a prison policy *as applied to an individual prisoner* is the 'least restrictive means' of furthering a 'compelling governmental interest.'" *Rodriguez v. Burnside*, 38 F.4th 1324, 1332 (11th Cir. 2022); *see id.* at 1333 ("*Turner* makes no comparable, individualized demands. It only requires a prison's policy to be rationally related to a legitimate government interest."). Thus, "[i]f a claim fails under the RLUIPA—which embeds a heightened standard for government restrictions of the free exercise of religion—it necessarily fails under the First Amendment." *Dorman*, 36 F.4th at 1313.

RLUIPA sets forth a burden-shifting framework for petitioners. 42 U.S.C.

§ 2000cc-1(a). First, the inmate "must show that a government rule, regulation, practice, or policy substantially burdens his exercise of religion." *Dorman*, 36 F.4th at 1313 (citing *Ramirez v. Collier*, 142 S. Ct. 1264, 1277 (2022)). If the inmate makes this showing, then the burden shifts to the government to "prov[e] that the challenged directive is the 'least restrictive means of furthering a compelling governmental interest.'" *Id.* (citing *Ramirez*, 142 S. Ct. at 1277).

As to the inmate's burden, the question under RLUIPA is not whether he can "engage in other forms of religious exercise," but rather "whether the government has substantially burdened religious exercise." *Id.* at 1314 (quoting *Holt v. Hobbs*, 574 U.S. 352, 360–61 (2015). The Eleventh Circuit has held that "a substantial burden is 'more than an inconvenience' and is 'akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly.'" *Id.* (quoting *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 980 F.3d 821, 829–30 (11th Cir. 2020)) (further quotation omitted). For example, in *Holt v. Hobbs*, 574 U.S. 352 (2015), the Supreme Court found a substantial burden where an inmate was not permitted to grow a half-inch beard for religious reasons, and if he refused to shave, he would "face serious disciplinary action."

### 3.  ARFA is an Alabama state law similar to RLUIPA.

ARFA, a provision of the Alabama Constitution ratified in 1998, states in relevant part:

(a) Government shall not burden a person's freedom of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

(b) Government may burden a person's freedom of religion only if it demonstrates that application of the burden to the person:

> (1) Is in furtherance of a compelling governmental interest; and

> (2) Is the least restrictive means of furthering that compelling governmental interest.

While ARFA is similar to RLUIPA, there is very little state law concerning it. Beyond one dissent in the Alabama Supreme Court, *see Ex parte Snyder*, 929 So. 2d 447, 459–68 (Ala. 2005) (Parker, J. dissenting), Alabama appellate courts have offered minimal interpretation of its contours. When the Eleventh Circuit addressed ARFA in November 2020, that court noted:

> Before rushing headlong into that state-law briar patch, a word about the possibility of certifying this question to the Alabama Supreme Court: Certification, frankly, was our preference—so much so, in fact, that, having raised the issue with the parties at oral argument, we directed them to file supplemental briefs addressing the possibility. This, after all, strikes us as precisely the sort of question that a state court *should* definitively resolve: It is purely legal, it implicates fundamental constitutional and public-policy interests, and it is unsettled—as the district court observed, "there is little to no Alabama case law providing guidance on what [ARFA] means." Regrettably, though, we have concluded that the question doesn't satisfy the certification standard under Alabama Rule of Appellate Procedure 18.

*Thai Meditation Ass'n of Ala., Inc.*, 980 F.3d 821, 837 (11th Cir. 2020). Unable to certify, the Eleventh Circuit ultimately concluded that ARFA requires strict scrutiny for "*any* burden—even an incidental or insubstantial one." *Id.* at 840 (citation

omitted). In a later case, the Eleventh Circuit described "the ARFA standard [as] almost identical to the RLUIPA standard," so the court did "not address the ARFA claim separately." *Smith v. Comm'r, Ala. Dep't of Corr.*, 844 F. App'x 286, 289 n.2 (11th Cir. 2021).[6]

## B. Smith's Allegations

Smith's contentions arise from his speculative concerns about the mask to be used. Per the execution protocol, the mask will be placed on the condemned inmate's face after he is brought into the execution chamber and strapped to the gurney. (Doc. 31-1 at 16–17.) The Execution Team Captain will verify at that time "that the mask has been properly placed." (*Id.* at 17.) The condemned's spiritual advisor will then be admitted to the chamber to minister to him in the fashion predetermined by the inmate and approved by the Warden. (*Id.*) Once the Warden has ascertained that there are no stays, the witnesses will be admitted to the viewing rooms, and the Warden will proceed to read the death warrant and give the condemned an opportunity to make a final statement. (*Id.*) Prior to the activation of the nitrogen hypoxia system, "[t]he team members inside the execution chamber will make a final inspection of the mask" and verify that it is properly placed. (*Id.*)

Smith has stated his concerns about the mask, asserting, "It is critical that the

---

6. The Eleventh Circuit again addressed ARFA in October 2023 in the subsequent appeal of *Thai Meditation Association of Alabama, Inc.*, and cited no additional guiding state law. 83 F.4th 922, 929–30 (11th Cir. 2023).

mask be properly secured and sealed throughout the process."[7] (Doc. 31 ¶ 85.) He claims that if the condemned moves his head, the mask may be dislodged (*id.* ¶ 87), and that "[s]peaking or attempting to speak may dislodge or otherwise alter the placement of the mask, which may result in an imperfect seal and leaking" (*id.* ¶ 88). While Smith acknowledges that there will be a final check of the mask's placement following his last words, he remarks that there are no "procedures for what happens if the mask is dislodged thereafter." (*Id.*) As discussed in Claim II, Smith also notes that it is "important to ensure that the carbon dioxide that the condemned person exhales does not remain under the mask for the condemned person to inhale" (*id.* ¶ 90), but the protocol does not "indicate that there is any mechanism to remove the carbon dioxide that the condemned person exhales" (*id.* ¶ 92).

Smith says that being masked will "prevent or substantially interfere" with the exercise of his rights. (*Id.* ¶ 99). In particular, Smith claims that he risks (1) being unheard while making a statement or praying, (2) dislodging the mask by moving his head while speaking, or (3) building up carbon dioxide within the mask by speaking. Smith's proposed remedy, as least as to his RLUIPA, ARFA, and First Amendment rights, is that he be given "an opportunity to speak and to audibly pray without being masked." (*Id.* ¶ 102.)

---

7. Smith explains, "If nitrogen can escape outside the mask, it follows that oxygen can infiltrate inside the mask." (Doc. 31 ¶ 85.) As discussed above, this is an oversimplification, as Smith fails to account for the positive pressure of the gas entering the mask.

Smith also briefly alleges that being kept on "single-walk" status burdens his exercise of religion (*id.* ¶ 98), although none of his claims for relief would redress the alleged harm (*id.* at 34–35). It is Holman Correctional Facility's policy that after a death warrant is issued and the inmate is informed, he is placed on single-walk status as a heightened security measure. *Smith v. Dunn*, 516 F. Supp. 3d 1310, 1325 (M.D. Ala. 2021). This is not a new policy—indeed, this Court considered evidence about it in the Willie Smith execution litigation in 2021. *Id.* While Smith admits that Defendants allow him to attend one religious service per week, he claims without providing specifics that his status burdens his religious exercise. (Doc. 31 ¶ 98.)[8]

## C. Analysis

### 1. RLUIPA

As discussed above, an inmate asserting a RLUIPA claim must first "show that a government rule, regulation, practice, or policy substantially burdens his exercise of religion." *Dorman*, 36 F.4th at 1313. The primary religious exercise at issue is praying audibly, which Smith contends will be substantially burdened by the provision of the protocol mandating that he be strapped down and masked once he is brought into the execution chamber.

---

8. Smith's other grievances about his single-walk status include his deprivation "of the fellowship of his brother inmates when he needs their friendship most," deprivation "of the companionship of his family," and interference with visitation from counsel. *Id.* None of these specifically implicate the First Amendment, RLUIPA, or ARFA.

To survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citations omitted). Here, Smith has not alleged facts showing that the protocol substantially burdens his right to pray audibly.

First, Smith has offered nothing but speculation that he will be unable to be heard once he is masked. While Smith does not specify the persons to whom he wishes to audibly communicate and at what points during the execution, he may have a spiritual advisor with him in the execution chamber, which is not a large room. Smith failed to allege facts plausibly showing that his spiritual advisor, standing near the gurney, will be unable to hear him. To the extent that Smith wishes to be heard by witnesses,[9] he will be given the same opportunity as every other condemned inmate to make a final statement, for which purpose a microphone is used. (*See* Doc. 31-1 at 9 ("[T]he Warden or his/her designee will verify that the microphone inside the execution chamber is working properly and can be heard inside each viewing room.").) Again, Smith has failed to offer more than speculation that he will not be audible, even under those conditions.

Second, Smith's claims of potential physical harm resulting from dislodging

---

9. Whether Smith has a right to be *heard* by any particular group or person is questionable. If, for example, a witness were to plug her ears during Smith's final statement or prayers, he would have no right to compel her to listen to him.

the mask if he prays aloud are speculative. As Smith acknowledges, the protocol mandates that the Execution Team members in the chamber conduct a final check of the mask's placement after the condemned makes his last statement—that is, following (1) strap-down, (2) the condemned's time with his spiritual advisor while the witnesses are brought in, and (3) the reading of the death warrant. (Doc. 31 ¶ 88; *see* Doc. 31-1 at 16–17.) If Smith were to move his mouth so violently while praying or otherwise making his final statement that the mask were to become unseated, this would be corrected, per the protocol, prior to the introduction of pure nitrogen gas.[10]

Third, Smith's claim that he might be harmed by a buildup of carbon dioxide within the mask if he prays aloud or speaks is again speculative. Even if true, he has not pleaded any facts that would explain how excess carbon dioxide would burden his religious exercise. But more importantly, no facts in the complaint explain how speaking inside the mask would build up any more carbon dioxide than simply breathing. Nor has Smith identified a mask in which rebreathing carbon dioxide would be an issue so as to cause him pain. For example, simple masks have exhalation ports, while non-rebreather masks like Hudson face masks use one-way valves to prevent rebreathing of exhaled carbon dioxide. *E.g.*, Lily Guo, *Non-*

---

10. While Smith is correct that the protocol does not state what would happen if the condemned were to dislodge the mask after the final check (Doc. 31 ¶ 88), he fails to plead that the Execution Team members charged with monitoring the condemned would not reseat the mask or why they would not do so.

*Rebreather Mask: What Is It, When Is It Used, and More*, OSMOSIS, https://www.osmosis.org/answers/non-rebreather-mask (last visited Nov. 29, 2023). Moreover, Smith has not pleaded the volume of carbon dioxide that would lead to pain or the length of exposure to reach that point.

The other portion of Smith's claim bearing RLUIPA analysis is his contention that keeping him on single-walk status burdens his religious exercise. (Doc. 31 ¶ 98.) Again, Smith is permitted to attend one religious service per week of his choosing. (*Id.*) He does not specify in the complaint how his status burdens his religious exercise. As his complaint offers nothing more than a vague contention that his religious liberties are being curtailed, this claim is due to be dismissed.

### 2. First Amendment

If an inmate's RLUIPA claim fails, so too should his First Amendment claim. *Dorman*, 36 F.4th at 1313. Still, considering the *Turner* factors, Smith has not pleaded facts that if true, would render unreasonable the protocol provision for masking at the time of strap-down.

The first consideration is "whether there is a 'valid, rational connection' between the regulation and a legitimate governmental interest put forward to justify it." *Hakim*, 223 F.3d at 1247. Here, the directive that the condemned be masked when he is brought to the chamber and restrained to the gurney serves the legitimate governmental interests of (1) ensuring the safety of the Execution Team by masking

the condemned when all are present to assist, (2) ensuring that the mask is properly seated, even if the condemned becomes combative, by having a large number of Team members on hand, and (3) ensuring that the execution proceeds smoothly.

The second consideration is "whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates." *Id.* Here, Smith wishes to pray audibly. He has pleaded nothing but speculative allegations that he will be unable to be heard when he is masked. As discussed above, Smith may have a spiritual advisor in the chamber, and he will be allowed to make his final statement—a prayer, if he so desires—into a microphone so that it may be heard by the witnesses as well. (*See* Doc. 31-1 at 9 (microphone check), 17 (timing of spiritual advisor's entry to execution chamber).) Smith has alleged no facts that, if true, would support the notion that he would risk his safety to pray while masked because the mask might become unseated or he might rebreathe expelled carbon dioxide. Again, the mask will be checked a final time before the nitrogen gas is introduced (*id.* at 17), so if Smith were to dislodge it through the motion of his jaw, the placement would be corrected. Smith has also provided nothing suggesting that he is at actual risk of pain due to rebreathing carbon dioxide, much less that he would be at heightened risk by speaking instead of merely breathing while masked.

The third consideration is "whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation

of prison resources generally." *Hakim*, 223 F.3d at 1247. Again, Smith has pleaded no facts showing that his desired religious practice—praying audibly—will actually be hampered if he is masked at the time that he is restrained. Defendants are not trying to prevent Smith from praying at the time of his execution, silently or aloud.

The final consideration is "whether the regulation represents an 'exaggerated response' to prison concerns." *Id.* at 1247–48. Defendants cannot predict how any given inmate will react during his execution, which is obviously a stressful time. Masking the condemned when the full Execution Team is present to assist serves to protect the Team members, to ensure a good fit on the mask, and to provide a smooth transition from the condemned's last words to the introduction of the nitrogen gas, eliminating the possibility of the inmate becoming combative in front of witnesses. *See Baze*, 553 U.S. at 57 (a State has a legitimate interest in selecting a method it regards as "preserving the dignity of the procedure").

Turning then to Smith's vague complaint that single-walk status interferes with his religious exercise, the *Turner* analysis still favors Defendants. First, there is a "valid, rational connection" between the single-walk regulation and prison security, which is a legitimate governmental interest. *Hakim*, 223 F.3d at 1247. Second, as to "whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates," *id.*, it is difficult to say because Smith has not informed this Court or Defendants of what religious exercise has been

curtailed. He is being permitted to attend one service per week of his choosing. That he cannot socialize with the rest of death row at that time does not prevent Smith from worshipping in a corporate setting, if that is indeed his desire. Third, as to "whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally," *id.*, Smith is being accommodated by allowing him to attend services, and he has not provided further information about what religious exercise he is being denied. Finally, as to "whether the regulation represents an 'exaggerated response' to prison concerns," *id.* at 1247–48, the practice of separating a condemned inmate from the rest of the death-row population is not an "exaggerated response" to Holman's legitimate security concerns.

### 3. ARFA

At the outset, based upon the paucity of state law concerning the contours of ARFA, Defendants respectfully suggest that the Court should decline to exercise supplemental jurisdiction over this state-law claim. While this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), the Court is not obligated to exercise that jurisdiction, particularly here, where there is minimal guiding state authority and where the federal-law claims are ripe for dismissal. Although Defendants acknowledge that the Court exercised supplemental jurisdiction over an ARFA claim in a previous inmate § 1983 action, *Smith*, 516 F. Supp. at 1337,

Defendants maintain that supplemental jurisdiction is not necessary, particularly as Smith's RLUIPA and First Amendment claims should be dismissed.

Even if the Court decides to exercise pendant or supplemental jurisdiction, however, Smith's ARFA claim cannot serve as the basis for injunctive relief. Pursuant to the Anti-Injunction Act, 28 U.S.C. § 2283, a federal court "may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." Section § 1983 claims are a recognized exception to the Act. *E.g.*, *Mitchum v. Foster*, 407 U.S. 225, 242–43 (1972) ("[W]e conclude that, under the criteria established in our previous decisions construing the anti-injunction statute, § 1983 is an Act of Congress that falls within the 'expressly authorized' exception of that law."). But when a federal court considers a state claim under supplemental or pendant jurisdiction, its power to issue an injunction, even in the context of a § 1983 complaint, is more limited. As the Eleventh Circuit noted in *In re Bayshore Ford Truck Sales, Inc.*, 471 F.3d 1233, 1250–51 (11th Cir. 2006):

> Ordinarily, a federal court may issue an injunction "in aid of its jurisdiction" in only two circumstances: (1) the district court has exclusive jurisdiction over the action because it had been removed from state court; or, (2) the state court entertains an *in rem* action involving a res over which the district court has been exercising jurisdiction in an *in rem* action.

Smith's ARFA claim fits neither exception. The state-law claim did not come to this Court via removal, and it does not concern an in rem action. Therefore, at least as to

his ARFA claim, Smith's motion for preliminary injunction should be denied.

Turning then to the merits of the ARFA claim, while ARFA largely tracks RLUIPA, its requirement on the petitioner is lighter: he must show that the government has burdened his freedom of religion, not *substantially* burdened, as RLUIPA requires. Even still, for the reasons discussed above, Smith has failed to show that the protocol burdens his stated religious practice of praying audibly. He has offered nothing more than speculation that his prayers will not be audible (particularly as the protocol anticipates that he will make his final statement into a microphone). Likewise, he has offered nothing but speculation as to his claim that he might somehow dislodge the mask if he prays aloud, and again, should the mask be unseated, the Execution Team members are obligated to conduct a final check of the mask's placement following the condemned's last statement. (Doc. 31-1 at 16–17.) Finally, Smith pleaded no facts showing that his claim concerning a potential buildup of carbon dioxide in the mask is anything but speculation.

To the extent that Smith is calling for this Court to order Defendants to conform the ADOC's conduct to Smith's view of ARFA, Defendants contend that the Eleventh Amendment deprives the Court of subject-matter jurisdiction to do so. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."). Should this

Court opt to exercise subject-matter jurisdiction over Smith's ARFA claim, the claim should be dismissed pursuant to Rule 12(b)(6).

### 4.  Smith's Single-Walk Status

As for Smith's claim concerning single-walk, the vagueness of his claim prevents thorough analysis, but based on what he has presented, Defendants have not burdened his freedom of religion. Smith is permitted to attend a service of his choosing every week. He has not stated what other religious needs are not being met. And he has not alleged that his requested relief would cure the alleged harm.

Smith's contentions about single-walk status are also due to be dismissed because they are subject to claim preclusion. "[C]laim preclusion prevents parties from raising issues that could have been raised and decided in a prior action—even if they were not actually litigated." *Lucky Brand Dungarees, Inc.*, 140 S. Ct. at 1594. Like all other condemned inmates at Holman, Smith was placed on single-walk prior to his November 2022 execution date. If he believed that single-walk status interfered with his religious freedoms, then he could have brought a claim against Defendant Hamm in his December 2022 amended complaint in his earlier § 1983 action. He did not. Smith's claim concerning single-walk should be dismissed.

### RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

As discussed above, each of Smith's claims for relief is speculative, precluded, or both. Claims of this nature do not warrant the extraordinary relief of a

preliminary injunction. *Barber v. Governor of Ala.*, 73 F.4th 1306, 1323 (11th Cir.), *cert. denied sub nom. Barber v. Ivey*, 143 S. Ct. 2545 (2023) ("purely speculative" claims did not warrant preliminary injunction). But even if Smith's complaint satisfies the pleading standard for one or more claims, he is not likely to succeed on them, and the equities favor the execution of this long-delayed sentence.

## I.   Smith is not substantially likely to succeed on the merits.

### A.   Claim II – Cruel and Unusual Punishment

#### 1.   Smith is not likely to show that his alternatives to the protocol would significantly reduce a substantial risk of severe pain.

Smith is not likely to satisfy his "heavy burden" under the Eighth Amendment of showing that the State's nitrogen hypoxia protocol is "cruelly inhumane." *Baze*, 533 U.S. at 53. A method-of-execution challenge is a "comparative exercise," *Nance*, 597 U.S. at 164, and Smith is not likely show that the State's protocol is cruel and unusual *in comparison* to Smith's hazily sketched out proposal (Doc. 31 ¶ 102). Even if he shows that his proposal is feasible and readily available, he will not "show that it would significantly reduce a substantial risk of severe pain." *Bucklew*, 139 S. Ct. at 1130.

At the outset, Smith claims, "*If it does not cause death*, nitrogen hypoxemia can cause dire consequences, including a persistent vegetative state, a stroke, or the painful sensation of suffocation." (Doc. 19 at 18 (emphasis added)). But as Smith's expert Dr. Yong concedes, "Breathing in 100% nitrogen gas would result in

hypoxemia, eventual end-organ damage, and ultimately death." (Doc. 19, Ex. A at 5.) The question, then, is whether there is a substantial risk that Smith will not breathe sufficient nitrogen gas to cause death. Smith offers six arguments, and none is likely to succeed.

**First**, Smith states that execution by nitrogen hypoxia requires a "tightly sealed mask." (Doc. 19 at 18.) He does not allege that the State will use or is likely to use a loosely sealed mask, so he has not even alleged a substantial risk. As a matter of fact, the State will use a mask tightly sealed by five separate straps. (*See* Stewart Aff't, Ex. M at ¶ 3.) In design and in practice, the mask demonstrates no substantial risk of becoming loose or dislodged. (*Id.* at ¶ 4.) As Smith's expert Dr. Nitschke declares, two "reliable way[s] to deal with the issue of the seal of the facemask" are "to either re-position or apply manual pressure to the mask." (Doc. 19, Ex. B at 5.) Smith is not likely to show a substantial risk that the State would not employ either of these simple and reliable ways to ensure a proper seal.

Another of Smith's experts, Dr. Yong, agrees that a mask secured by straps is one of the options, although Dr. Yong prefers to hold a mask manually to a patient's face. (Doc. 19, Ex. A at 6.) Perhaps that is the preference in the medical context where patients are generally non-combative, but Dr. Yong's declaration does not support that there is a substantial risk introduced by the State's use of tightened straps instead.

Smith is not likely to show that his alternative, a "custom fit mask" (Doc. 31 ¶ 102), would significantly reduce the alleged risk. For one, he has not shown that a "custom fit mask" is feasible and readily available, as required under *Nance*. He is also not likely to prove a significant difference in the risk of "oxygen leaks" while wearing an unspecified "custom" mask and the mask the State is likely to use. Smith's expert Dr. Yong offered no opinion on the feasibility or desirability of a "custom" mask. Smith has not alleged any physical condition or abnormality that would prevent a normal, commercially available mask—the kind likely to be used by the State—from fitting him properly.

The bulk of Smith's argument about the mask is complaints about a lack of detail in the published protocol. But a lack of detail is not grounds for this Court to find that there is a substantial risk that the State will not use a tightly sealed mask. That Smith does not know, for example, just "how it will be placed and adjusted and by whom" does not mean there is any risk. (Doc. 19 at 25; *see also id.* (complaining that the protocol does not identify "the type of mask," "explain how Defendants will ensure that the mask remains sealed," or disclose "what happens if the mask is dislodged," etc.)) Smith's burden is to show a substantial risk; simply raising questions does not suffice to show a likelihood of success.

Additionally, Smith is not likely to show that his proposed alternative will reduce whatever risk he faces due to the lack of detail in the State's protocol. Smith's

alternative does not identify a type of mask, does not explain how Defendants will ensure the mask remains sealed, or disclose what happens if the mask is dislodged. Without a feasible and available alternative, Smith will not succeed on his claim.

Smith argues that "oxygen can infiltrate inside the mask." (Doc. 19 at 25). Smith is not likely to succeed on this argument either. The factual basis for his claim is ADOC's waiver for spiritual advisers, acknowledging the risk that nitrogen can leak outside the mask. (Doc. 19 at 25.) It is possible that an insignificant amount of nitrogen, which is likely to be pumped into the mask at a rapid rate, could escape despite the mask's tight seal. But it does not follow that there is a substantial risk that that outside air would infiltrate the mask in a meaningful quantity. Smith has not identified how much oxygen he believes is substantially likely to infiltrate nor what level of oxygen would be substantially likely to cause harm.

Even if outside air could infiltrate the mask, despite its tight seal, that air would be quickly replaced by pure nitrogen being mechanically pumped into the mask.

Further, the State is likely to use a mask that has a commercial/industrial purpose of keeping the wearer safe from outside air. For example, masks used to protect the wearer from paint fumes in confined spaces would be designed to prevent or minimize gas infiltration. Smith has not alleged and is not likely to prove that the State will use a mask that permits significant infiltration of outside air.

Finally, even if Smith has shown a substantial risk that the State would use a loosely fitting mask or that the mask would become dislodged (and not reseated), the primary result, he admits, would be to "prolong the time to reach unconsciousness." (Doc. 19 at 25.) But he has not shown any evidence that a prolonged time to unconsciousness would involve a substantial risk of severe pain.

**Second**, Smith complains that the protocol "does not specify how exhaled carbon dioxide will be removed from the mask." (Doc. 19 at 26.) Again, the absence of some detail in the protocol does not mean that Smith faces a substantial risk of severe pain.

There is no substantial risk that the State will not use a mask with an exhalation port or one-way valve to prevent rebreathing of exhaled carbon dioxide. In fact, the State intends to use a mask featuring "exhalation valves for venting carbon dioxide." (See Stewart Aff't, Ex. M at ¶ 5.) People who have worn the State's mask report no "problems breathing or with the entrapment of carbon dioxide." (*Id.*) Because it features a valve mechanism, the State's likely method is identical to Smith's alternative; he cannot show that his alternative will significantly reduce any risk from carbon dioxide.

Smith has not shown that carbon dioxide poses a substantial risk of severe pain in this context. Smith's expert Dr. Yong states only that re-breathing carbon dioxide "*could* cause asphyxiation, hypercarbia, and the sensation of suffocation."

(Doc. 19, Ex. A at 7.) Dr. Yong does not render an opinion that asphyxiation due to carbon dioxide is a substantial risk. Observations of people who have worn the State's mask suggest that any possible re-breathing of carbon dioxide has not produced asphyxiation and the like. (See Stewart Aff't, Ex. M at ¶ 5.)

**Third**, Smith complains that he is "particularly susceptible" to the risk of vomiting, which "might cause [him] to choke and asphyxiate." (Doc. 19 at 26.) Smith is not likely to show a substantial risk of choking and asphyxiation.  While Dr. Porterfield states that Smith has reported nausea, there is no evidence that he has vomited as a result of his alleged PTSD—even facing allegedly triggering events, such as a dentist approaching him with a needle or the prison guards involved in the lethal injection attempt.

Inhaling pure nitrogen will cause Smith to become insensate. To succeed on the merits, then, he must show that *precisely* between the time nitrogen is introduced and his loss of consciousness, he is "sure or very likely" to vomit, "sure or very likely" to choke on his vomit, and "sure or very likely" before losing consciousness to experience "severe pain" as a result. *Glossip*, 576 U.S. at 877. Any one of these steps is speculative; the conjunction of them, even more so.

Even if there is a substantial risk of asphyxiation due to vomit, Smith is unlikely to show that his alternative would significantly reduce the risk. With respect to his vomiting and PTSD contentions, Smith's alternative merely suggests that the

62

State "Add procedures to halt the execution if the condemned person vomits into the mask" and "Add procedures for attempting to execute condemned people who have survived a previous attempt and are experiencing PTSD as a result." (Doc. 31 ¶ 102.) Smith does not explain what should happen after the "halt" or specify what such "procedures" would entail that could prevent him from vomiting or give the State a pathway forward. That is no "veritable blueprint." *Nance*, 597 U.S. at 169. Because Smith has provided no remedy for the alleged risk, his claim will not succeed; there is no exception to the alternative requirement for as-applied challenges, *see Bucklew*, 139 S. Ct. at 1126–29; *id.* at 1130 ("A minor reduction in risk is insufficient; the difference must be clear and considerable.").

*Fourth*, Smith will not succeed on his claim about nitrogen purity. While Dr. Yong states that a person may not die if "exposed to less than 100% nitrogen," that risk to Smith is not substantial because the State will use 99.999% UHP grade pure nitrogen. (See Stewart Aff't, Ex. M at ¶ 6.)

*Fifth*, Smith is not likely to succeed on his Eighth Amendment claim on the ground that the protocol "does not provide for continued monitoring of blood oxygen." (Doc. 19 at 27.) According to Smith, the pulse oximeter "could reveal that the execution should be halted because oxygen is infiltrating the mask." (Doc. 31 ¶ 94.) But as discussed above, he is not likely to show that oxygen will infiltrate the mask to a degree that could produce a substantial risk of "dire consequences." (*Id.*).

That the protocol does not specify continuous monitoring does not make it likely that ADOC personnel will not continue to monitor the pulse oximeter. The contrary assertion in Smith's motion that "[w]ithout procedures in place …, Defendants would be ignorant of oxygen infiltrating the mask" (Doc. 19 at 27) is unfounded speculation not supported by any facts in the complaint or any of Smith's declarations.

*Finally*, Smith is not likely to succeed on the ground that the protocol lacks "safeguards" for inmates with PTSD. (Doc. 19 at 27). In his motion, Smith describes some symptoms of PTSD. And he claims that the absence of "safeguards" subjects him to "risk of a lingering death and the superaddition of terror, pain, and/or disgrace." (*Id.* at 27–28). But he does not elaborate, nor does his alternative provide a description of the safeguards that would eliminate the alleged risks.

### 2. Even if Smith shows some risk of asphyxiation or the sensation of suffocation, he will not meet his burden.

The Eighth Amendment does not guarantee "a painless death." *Bucklew*, 139 S. Ct. at 1124. "Some risk of pain is inherent in any method of execution—no matter how humane—if only from the prospect of error in following the required procedure." *Baze*, 553 U.S. at 47. Even Smith's proposed alternatives cannot rule out the possibility of pain. "It is clear, then, that the Constitution does not demand the avoidance of all risk of pain in carrying out executions." *Id.* While Smith has not

shown a substantial risk of asphyxiation or the sensation of suffocation, even if he does, the risks would not rise to the level of unconstitutionally severe or serious pain.

In *Bucklew*, the Supreme Court found it "instructive" to examine past methods of execution, and it began with hanging:

> [T]he predominant method of execution in this country was hanging. …, [but] it was no guarantee of a quick and painless death. "Many and perhaps most hangings were evidently painful for the condemned person because they caused death slowly," and "[w]hether a hanging was painless or painful seems to have been largely a matter of chance." The force of the drop could break the neck and sever the spinal cord, making death almost instantaneous. But that was hardly assured…. More often it seems the prisoner would die from loss of blood flow to the brain, which could produce unconsciousness usually within seconds, or suffocation, which could take several minutes. But while hanging could and often did result in significant pain, its use "was virtually never questioned." Presumably that was because, in contrast to punishments like burning and disemboweling, hanging wasn't "*intended* to be painful" and the risk of pain involved was considered "unfortunate but inevitable."

*Bucklew*, 139 S. Ct. at 1124 (2019) (citations omitted). If hanging often caused death by suffocation over several minutes, and hanging is a constitutional method of execution, then *a fortiori* the State's nitrogen hypoxia protocol, which presents much more remote risks, is plainly constitutional. Smith has not alleged and will not prove that it will "often" happen that an inmate has PTSD, suffers nausea, vomits precisely after nitrogen flows but before unconsciousness, that such vomit enters the inmate's airway and causes asphyxiation, and that asphyxiation will cause severe pain. And even Smith proved all that, he still would not show the risks are any *greater* than

65

hanging. Unintended risks of pain, especially improbable ones, are not constitutional violations. *See also Bucklew*, 139 S. Ct. at 1125 (State need not adopt every "arguably more humane" method available).

The Supreme Court in *Bucklew* sustained Missouri's lethal injection protocol despite evidence that:

- lethal injection "would subject him to several minutes of 'severe pain and suffering,' during which he would choke and suffocate on his own blood";

- "for up to several minutes he 'could be aware that he is choking or unable to breathe but be unable to 'adjust' his breathing to remedy the situation'";

- "Mr. Bucklew would be highly likely to experience feelings of 'air hunger' *and the excruciating pain of prolonged suffocation*"; and

- "lethal injection would take up to several minutes … and that Bucklew would experience excruciating pain during this period"

*Bucklew*, 139 S. Ct. at 1138–39 (Breyer, J., dissenting) (citation omitted). Smith has not alleged harms of such high probability, severity, and duration. Thus, he has not shown the kind of substantial risk of severe pain cognizable under the Eighth Amendment.

### 3. Smith's Eighth Amendment claim will fail because he has not provided a "veritable blueprint."

Under Supreme Court precedent, a §1983 claimant bring a method-of-execution challenge is "compelled … to propose an alternative way for the State to carry out his death sentence." *Nance*, 597 U.S. at 169. He must "present a 'proposal'

that is 'sufficiently detailed' to show that an alternative method is both 'feasible' and 'readily implemented.'" *Id.* (quoting *Bucklew*, 139 S. Ct. at 1129). Because a §1983 claimant takes "th[e] sentence as a given," he must provide "a veritable blueprint for carrying the death sentence out" and "persuade[] a court that the State could readily use his proposal to execute him." *Id.* "If a State refuses to adopt such an alternative in the face of … *documented advantages*, without a legitimate penological justification …, then a State's refusal to change its method can be viewed as 'cruel and unusual' under the Eighth Amendment." *Baze*, 553 U.S. at 52 (emphasis added).

Smith is not likely to succeed on his §1983 claims because he has not provided a veritable blueprint for the State to execute him by nitrogen hypoxia. First, with respect to the equipment, his alternative suggests a "custom fit mask" and "Add[ing] a mechanism to remove carbon dioxide"—neither of which he has shown to be available and feasible. (Doc. 31 ¶ 102.) Second, Smith's demands for disclosure are not feasible to the extent that they could compromise security or the ability to carry out the execution. For example, disclosing the source of the nitrogen could undermine its availability for use in executions. *See Bucklew*, 139 S. Ct. at 1120 (documenting how "pressure from anti-death-penalty advocates induced the company that manufactured sodium thiopental to stop supplying it for use in executions"). Third, even if Defendants had the power to give a third-party medical provider "authority to call off or postpone the execution," (*id.*), Smith is not likely

to show the availability and feasibility of requiring someone meeting that description. *See also id.* at 1125 ("a State isn't required to modify its protocol in ways that would require the involvement of 'persons whose professional ethics rules or traditions impede their participation'"). Fourth, three of Smith's amendments suggest the State "Add procedures" but do not detail the contents of those procedures. (*Id.*) It is not enough, for example, to propose the State "halt the execution if [Smith] vomits" (*id.*) without providing a complete "pathway forward." *Nance*, 597 U.S. at 169.

Smith's "amend[ments]" (Doc. 31 ¶ 102) are not "sufficiently detailed," "feasible," and "readily implemented," *Nance*, 597 U.S. at 169, and do not have "documented advantages," *Baze*, 553 U.S. at 52.

### 4. The State's method is constitutional under the Eighth Amendment because it is not deliberately designed to inflict unnecessary pain.

The "primary concern of the drafters [of the Eighth Amendment] was to proscribe tortures and other barbarous methods of punishment." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (cleaned up). Originally understood, the Eighth Amendment proscribed "unnecessary cruelty" where "circumstances of terror, pain, or disgrace were … superadded." *Wilkerson v. Utah*, 99 U.S. 130, 135–36 (1879) (citing "atrocities" such as being "embowelled alive, beheaded, and quartered," "public dissection," or "burning alive"). "What each of the forbidden punishments had in

common was the *deliberate infliction of pain for the sake of pain*—'superadd[ing]' pain to the death sentence through torture and the like." *Baze*, 553 U.S. at 48 (emphasis added). Never faced with a truly torturous method of execution, the Supreme Court has "never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment." *Id.*; *see, e.g.*, *Bucklew*, 139 S. Ct. 112; *Wilkerson*, 99 U.S. at 134–35 (permitting firing squad); *In re Kemmler*, 136 U.S. 436, 446 (1890) (permitting electrocution).

Smith is not likely to succeed on his Eighth Amendment claim because the nitrogen hypoxia method is not deliberately designed to inflict unnecessary pain. Smith does not allege that the State's protocol was designed to cause him to suffer. To the contrary, Smith has stated that nitrogen hypoxia would pose a lower risk of pain (than lethal injection) and that it is designed for that purpose. *See* Ex. A ¶ 56 ("According to sponsors of the 2018 legislation, nitrogen is a 'more humane' method of execution than lethal injection, similar to 'how aircraft passengers lose consciousness if the plain depressurizes.'" (quoting Kim Chandler, *Alabama Senate votes to allow execution by nitrogen gas*, Associated Press (Feb. 22, 2018)).

To the extent that contemporary Supreme Court doctrine has been "more forgiving," *Bucklew*, 139 S. Ct. at 1126,[11] it nonetheless requires a showing of

---

[11] *Bucklew* applied a "more forgiving" standard only because the inmate's claim failed to meet the lower burden too; thus, it was not "necessary" to decide whether the inmate "must show that the State *intended* its method to inflict [unnecessary] pain." 139 S. Ct. at 1126.

cruelty and unreasonableness on behalf of the State. The "standard that governs 'all Eighth Amendment method-of-execution claims'" is "whether the State's chosen method of execution *cruelly superadds pain* to the death sentence," which "a prisoner must show [by] a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt *without a legitimate penological reason*." *Id.* at 1125.

Smith may disagree with the penological reasons offered by the State for its protocol; he may think they should be outweighed by other considerations. But the mere fact that the State has legitimate penological reasons for its method means that Smith cannot show a violation of the Eighth Amendment. Smith has not pointed to any aspect of the State's nitrogen hypoxia method that involves pain for the sake of pain, as opposed to any other justification. His claim should fail because the protocol does not "cruelly superadd[] pain" "without … reason." *Id.*; *see also id.* at 1124 (noting that hanging was unquestioned at the time of the Eighth Amendment's adoption because it "wasn't '*intended* to be painful'"); *Baze*, 553 U.S. at 48, 50.

### 5. Smith's vague reference to a firing squad does not satisfy his burden.

To the extent that the Court considers Smith's proposal of a firing squad (Doc. 31 ¶ 103), despite the State's estoppel arguments above, Smith is not likely to succeed. He will not show a significant reduction of a substantial risk of severe pain, compared to nitrogen hypoxia, nor has he provided a veritable blueprint. Smith's

allegation amounts to the clause "Utah has a protocol for using a firing squad to carry out executions" and a citation to a law review article. (*Id.*) This is not a detailed proposal with documented advantages as required by *Nance* and *Baze*.

Assuming that a mere citation to fifteen pages of a law review article could satisfy Smith's burden, its description of Utah's method is still not a blueprint but a patchwork of facts "based on a limited number of available sources, some of them official (Utah statutes and provisions), as well as books, articles, and newspaper accounts that describe past executions." Deborah W. Denno, *The Firing Squad as "A Known and Available Alternative Method of Execution" Post-*Glossip, 49 U. Mich. J.L. Reform 749, 781 (2016) ("Denno").

By Smith's own lights, his firing-squad proposal is insufficiently detailed and would not reduce his alleged risks. For example, Utah apparently places a hood over the inmate (Denno at 783 n.244), but if Alabama did that, Smith would complain he must have "an opportunity to speak and to audibly pray without being [hood]ed," (Doc. 31 ¶ 102). Smith could equally complain of Utah's method (as pleaded) that it does not "[d]isclose the training 'team members' will receive in [shooting] …, their level of experience with the [guns] being used, and the metrics that will be used to ensure the [target and shots are] 'properly placed.'" (*Id.*) The Utah method (as pleaded) does not appear to "[d]isclose the source of the [firearms or ammunition] to be used." (*Id.*) Smith does not tell us whether Utah "require[s] testing of the

[firearms or ammunition] before use." (*Id.*) He does not detail any "procedures to halt the execution" if something goes wrong nor any "procedures for attempting to execute condemned people who have survived a previous attempt and are experiencing PTSD as a result." (*Id.*) Finally, his firing-squad alternative does not appear to "[e]mploy a third-party licensed medical provider…." (*Id.*)

If, according to Smith, such amendments are required for Alabama's nitrogen hypoxia protocol to be constitutional, then Smith must provide *at least* the same detail in his blueprint. The State, of course, has no burden under the Eighth Amendment to provide such information, but it *is* Smith's burden to detail his alternative. Because he has not provided a blueprint, and he has argued that features of his own alternative make it unconstitutional cruel and unusual punishment,  Smith has not pleaded a feasible and readily available alternative.[12]

Attached to his motion, Smith offers a cursory declaration from Dr. Groner on the mechanism by which a firing squad causes death: "These bullets will tear open the heart causing immediate loss of the pumping function of the heart … caus[ing] the blood flow to the brain to cease immediately." (Doc. 19, Ex. H ¶¶ 6–7). According to Dr. Groner, "a few seconds later," "the individual cannot experience pain." (*Id.* ¶¶ 8–9.) Dr. Groner does not compare the risks of a firing-

---

[12] For the avoidance of doubt, it is not the State's position that a firing squad would be unconstitutional. But Smith cannot simultaneously argue that a firing squad is available and feasible and that it would be unconstitutional (per the reasons he gives about nitrogen hypoxia).

squad protocol to the risks of nitrogen hypoxia; the pain of bullets tearing open the heart to the pain of nitrogen hypoxia; nor the risk of error inherent to each method. The article Smith cites asserts without support that expert marksmen "would not miss" (Denno at 787); if such blithe assurances are sufficient, then the State's protocol more than passes muster. Smith is not likely to show an alternative to nitrogen hypoxia that significantly reduces a substantial risk of severe pain.

### 6.  Claims III, IV, and V – First Amendment, RLUIPA, ARFA

Smith is not likely to succeed on his RLUIPA, First Amendment, or ARFA claims. The crux of these claims is the allegation that "Mr. Smith faces an untenable choice: he can either abstain from … audible prayer to avoid dislodging the mask or audibly pray and risk the dire consequences of breaking the mask's seal." (Doc. 19 at 32). Even if Smith's complaint has pleaded sufficient facts to satisfy his burden, he is not likely to succeed for at least three reasons.

First, the factual premise is false. Smith will be able to speak audibly—even assisted by a microphone, (Doc. 31-1 at 9)—and speaking will not dislodge the mask or break its seal, which is secured by five tight straps. (*See* Stewart Aff't, Ex. M at ¶ 3.) ADOC personnel have observed and heard wearers speaking (even without a microphone), and the mask does not become dislodged or loose. (*Id.* at ¶ 4.) Further, Smith is not likely to show that Defendants would be unable or unwilling to reseat the mask in the unlikely event that it becomes dislodged or loose. He has not even

alleged that Defendants *will* be unable or unwilling to do so—only that the protocol lacks detail. Yet his own witnesses state that Defendants can reliably ensure a proper seal if they "re-position or apply manual pressure to the mask." (Doc. 19, Ex. B at 5.) The protocol's failure to include a sentence like "ADOC will re-position or apply manual pressure if needed" does not burden Smith's religious rights. Further, for the reasons detailed above with respect to Claim II, there is no substantial risk of severe pain associated with oxygen entering the mask.

Second, Smith proposes no alternative. *See Ramirez v. Collier*, 595 U.S. 411, 432 (2022). His sole proposal is to provide "an opportunity to speak and to audibly pray without being masked" (Doc. 31 ¶ 102), but that would not cure the alleged risk from Smith "praying *at the time of his death*." (Doc. 19 at 30) (emphasis added). If it is Smith's religious belief that he wishes to pray or speak audibly at all times— and doing so would risk "dire consequences"—then he has lodged an objection to *any* nitrogen hypoxia protocol involving a mask, yet provided no alternative. Thus, by default, the State's protocol is the least restrictive means, 42 U.S.C. § 2000cc-1(a), and Smith's claim will fail under RLUIPA, the First Amendment, or ARFA.

Third, Smith will lose even if the burden is shifted to Defendants to show that masking him before he has the opportunity to make a final statement is "the 'least restrictive means of furthering a compelling governmental interest.'" *Dorman*, 36

F.4th at 1313. Defendants have a compelling governmental interest in the safety and security of the execution chamber. Defendants also have a strong interest in maintaining the safety of their personnel, including during judicial executions. As the Supreme Court has noted, prisons are entitled to deference in matters of security:

> We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns. While the Act adopts a "compelling governmental interest" standard, "[c]ontext matters" in the application of that standard. Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. They anticipated that courts would apply the Act's standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."

*Cutter*, 544 U.S. at 722–23 (citations omitted).

The protocol states that the condemned will be strapped to the gurney and that "[t]he mask will be placed and adjusted on the condemned inmate's face" while the full Execution Team is present in the chamber. (Doc. 31-1 at 16–17.) Only after the mask is placed and the Team Captain has verified proper placement are the members of the Team who will not remain in the chamber dismissed to their secondary posts. (*Id.* at 17.) In other words, the full Execution Team is present during this critical stage to ensure that the condemned is correctly restrained and masked, even if he resists or becomes combative. This way, the condemned is secured and prepared for execution before the witnesses arrive, and the execution may proceed smoothly once

75

the Warden reads the death warrant. If the mask placement were saved until after the condemned's last words, there would be far fewer members of the Execution Team on hand to ensure that it was properly positioned—and mask placement is, of course, one of Smith's alleged concerns. Moreover, if the condemned were to resist, the Execution Team members would have a more difficult time seating the mask correctly without the assistance of the full Team. Because Defendants will satisfy their burden on RLUIPA, they will also satisfy their lower burden under the First Amendment and the *Turner* test. *See, e.g.*, *Presley*, 2014 WL 7146837, at *16 (asking whether challenge measure was "reasonably related to any legitimate penological interest or security measure").

Likewise, Smith's ARFA claim will fail because Defendants can show that the protocol's mask requirement "[i]s in furtherance of a compelling governmental interest" and "[i]s the least restrictive means of furthering that compelling governmental interest." Defendants have a compelling governmental interest in the safety and security of the execution chamber, as well as a strong interest in maintaining the safety of their personnel, including during judicial executions.[13] That interest is furthered by masking the condemned while he is being restrained, with the full Execution Team present to assist, which serves to facilitate the

---

13. *See, e.g.*, *Smith*, 516 F. Supp. 3d at 1338 ("As previously determined in this court's analysis of Smith's federal RLUIPA claim, the ADOC has a compelling interest in maintaining safety, security, and solemnity during an execution[.]").

preparation of the condemned for execution, to protect the Execution Team, and to ensure that the mask is properly positioned, even if the condemned resists—which also protects the condemned.

As to Smith's single-walk status, even if the burden were to shift, the practice of keeping a condemned inmate on single-walk is "the 'least restrictive means of furthering a compelling governmental interest.'" *Dorman*, 36 F.4th at 1313. When a death warrant is delivered, the condemned is put on single-walk as a security measure—a reasonable practice, as reactions on death row can be volatile or unpredictable, especially when a long-time inmate's date is announced. Defendants do not seek to deprive Smith of his religious freedoms, and he is being permitted to attend services. Should the burden shift to Defendants, the practice of moving a condemned inmate to single-walk status "[i]s in furtherance of a compelling governmental interest" and "[i]s the least restrictive means of furthering that compelling governmental interest," as it goes to the heart of death-row security in the run-up to an execution, always a time of heightened emotion within the prison. Again, Defendants have a strong interest in maintaining the safety of their personnel and everyone else at the facility.

### 7. Smith does not have a claim for violation of his "right of access to the courts."

Smith's second amended complaint does not include a claim alleging a violation of his right of access to the courts. There is no mention of access to the

courts and no mention of the First Amendment beyond Smith's claim that the nitrogen hypoxia protocol will involve him being masked. Just as a party "cannot amend a complaint by attaching documents to a response to a motion to dismiss," neither can a party amend a complaint by attorney argument in a motion for a preliminary injunction. *Jallali v. Nova Se. Univ., Inc.*, 486 F. App'x 765, 767 (11th Cir. 2012).

Smith is not likely to succeed on this claim, which is a run-of-the-mill complaint about discovery disguised as a constitutional violation. The right of access to the courts guarantees prisoners only a "reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement," *Lewis v. Casey*, 518 U.S. 343, 356 (1996), not a means a constitutionalizing discovery disputes. And the constitutional minimum is clearly satisfied here, in no small part by the fact that this case has been initiated.

## IV.   The equities favor denial of the injunction.

In this case, the Court must evaluate whether Smith will suffer irreparable harm without the requested injunction and whether such injunction would substantially harm the State and the public interest. *Brooks*, 810 F.3d at 818. The balance of the equities favors the State.

### A. Smith has not shown a substantial threat of irreparable harm.

Smith has not shown that he will suffer irreparable harm absent an injunction. The State does no cognizable harm, let alone irreparable harm, when it carries out a lawful and just sentence. To the contrary, punishing the guilty is the fulfillment of the public's "moral judgment." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). Consequently, the execution of Smith's lawful sentence—on its own—cannot be deemed an irreparable harm. Smith's primary argument for irreparable harm fails.

Smith's second argument for irreparable harm is that he "will suffer a needlessly painful execution attempt in violation of his constitutional rights." Doc. 19 at 34. To the extent the alleged pain is intrinsic to the method of nitrogen hypoxia, Smith should be judicially estopped from resisting it as irreparably harmful, and that he voluntarily chose nitrogen hypoxia undermines any finding of irreparable harm, *see, e.g.*, *Wall v. CDC*, 588 F. Supp. 3d 1301, 1304–05 (M.D. Fla. 2022). To the extent that the threat is specific to the State's protocol, rather than nitrogen hypoxia itself, Smith has not shown that he "*will suffer*" at all. He has merely speculated about remote risks—not a substantial and imminent harm.

The alleged violation of Smith's constitutional rights is "not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000). And even "the assertion of First Amendment rights does not automatically require a finding of

irreparable injury." *Hohe v. Casey*, 868 F.2d 69, 72–73 (3d Cir. 1989). Rather, it is "purposeful … suppression of speech [which] constitutes irreparable harm for preliminary injunction purposes." *Id.* at 73 (quoting *Goldie's Bookstore v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984)). Smith must show "direct penalization, as opposed to incidental inhibition, of First Amendment rights." *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983). If it violates Smith's First Amendment rights that he must speak or pray with a mask (and a microphone), that burden is an incidental one flowing from reasonable and neutral regulations designed to ensure the safety and efficacy of the execution. Smith has not alleged that the State will purposefully suppress his speech. There is no irreparable harm.

### B. Preventing the State from carrying out Smith's lawfully imposed sentence would be adverse to the public interest.

"Both the State and the victims of crime have an important interest in the timely enforcement of a sentence." *Bucklew*, 139 S. Ct. at 1133. Smith has been on death row since 1990 for the brutal murder-for-hire of Liz Sennett. Smith's actions are monstrous and worthy of his sentence. As the Eleventh Circuit has explained:

> [W]hile "neither [the State] nor the public has any interest in carrying out an execution" based on a defective conviction or sentence, *see Ray v. Comm'r, Ala. Dep't of Corr.,* 915 F.3d 689, 702 (11th Cir. 2019), "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a [valid] sentence," *Hill* [*v. McDonough*, 547 U.S. 573, 584 (2006)]. Stays of executions where the conviction and sentence are valid impose a cost on the State and the family and friends of the murder victim. As we have stated many times, "[e]ach delay, for its span, is a commutation of a death sentence to one of imprisonment."

> *Thompson v. Wainwright,* 714 F.2d 1495, 1506 (11th Cir. 1983); *see McNair v. Allen,* 515 F.3d 1168, 1176 (11th Cir. 2008) (same); *Jones v. Allen,* 485 F.3d 635, 641 (11th Cir. 2007) (same); *Williams v. Allen,* 496 F.3d 1210, 1214 (11th Cir. 2007) (same); *Schwab v. Sec'y, Dep't of Corr.,* 507 F.3d 1297, 1301 (11th Cir. 2007) (per curiam) (same); *Rutherford v. McDonough,* 466 F.3d 970, 978 (11th Cir. 2006) (same); *Lawrence v. Florida,* 421 F.3d 1221, 1224 n.1 (11th Cir. 2005) (same).

*Bowles v. Desantis*, 934 F.3d 1230, 1248 (11th Cir. 2019).

Smith murdered Mrs. Sennett thirty-five years ago. His conventional appeals were fully litigated as of March 2022, and he has been represented by competent counsel at every stage of the proceedings. Smith's present challenge is meritless, and further delay to the execution of his just sentence would not serve no public benefit.

Further, Smith is scheduled for execution by the very method that he doggedly asked for—right up to the moment that he finally got it. His about-face on nitrogen hypoxia and his newfound desire for a firing squad are further reason to deny Smith's motion on equitable grounds—even if the Court does not dismiss the claims on grounds of judicial estoppel or claim preclusion. Having invoked the revised statute making nitrogen hypoxia available in Alabama, pleaded that nitrogen hypoxia was a feasible and available way to execute him, and induced the State to agree to execute him with nitrogen hypoxia, Smith cannot turn around and assail the same provision as unconstitutional. *See generally Buck v. Kuykendall*, 267 U.S. 307, 316–17 (1925).

Waiting years to raise his concerns with nitrogen hypoxia, the method he chose, Smith has lodged exactly the kind of "'last-minute' claim relied on to forestall

an execution" that this Court should "not for a moment countenance." *Nance*, 142 S. Ct. at 2225; *Bucklew*, 139 S. Ct. at 1134 ("Last-minute stays should be the extreme exception, not the norm, and … 'an applicant's attempt at manipulation,' 'may be grounds for denial of a stay.'"); *Hill v. McDonough*, 547 U.S. 573, 584–85 (2006); *Gomez v. U.S. Dist. Ct. for the N. Dist. of Cal.*, 503 U.S. 653, 654 (1992) (per curiam) ("A court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief."). "Courts should police carefully against attempts … to interpose unjustified delay." *Bucklew*, 139 S. Ct. at 1134.

"The people of [Alabama], the surviving victims of [Smith's] crimes, and others like them deserve better." *Id.* Such gamesmanship, which would thwart the State's and society's strong interests in carrying out Smith's just and lawful sentence, should not be rewarded.

## CONCLUSION

For the above reasons, Smith's second amended complaint is due to be dismissed. Further, Defendants oppose the injunctive relief requested by Smith, and for the above-mentioned reasons, preliminary injunctive relief should be denied.

In the event the Court determines that preliminary injunctive relief is warranted, any injunction should be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2).

Respectfully submitted,

Steve Marshall
*Attorney General*


**<u>s/ Richard D. Anderson</u>**
Richard D. Anderson
*Assistant Attorney General*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 4, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send notification of such filing to the following: **Angelique A. Ciliberti, Ashley Brook Burkett, Jeffrey Hutton Horowitz, Robert M. Grass** and **Andrew Burns Johnson.**

_**s/ Richard D. Anderson**_
Richard D. Anderson
_Assistant Attorney General_

ADDRESS OF COUNSEL:

Office of the Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL 36130
Office (334) 353-2021
Fax (334) 353-8400
Richard.Anderson@AlabamaAG.gov