**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| KENNETH EUGENE SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:23-cv-00656-RAH |
| v. | ) | |
| | ) | CAPITAL CASE |
| JOHN Q. HAMM, in his official | ) | |
| Capacity as Commissioner, Alabama | ) | **EXECUTION SCHEDULED FOR** |
| Department of Corrections, and | ) | **JANUARY 25, 2024** |
| | ) | |
| TERRY RAYBON, in his official | ) | |
| Capacity as Warden, Holman | ) | |
| Correctional Facility, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF KENNETH EUGENE SMITH'S RESPONSE TO
DEFENDANTS' MOTION TO DISMISS AND REPLY IN FURTHER
SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY
INJUNCTION**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................1

MR. SMITH'S SECOND AMENDED COMPLAINT ...............................4

I.   THE COURT SHOULD DENY DEFENDANTS' MOTION TO
     DISMISS THE SAC .....................................................................5

     A.   Mr. Smith's First and Second Claims are Not Barred by Judicial
          Estoppel ...............................................................................5

     B.   Res Judicata and Collateral Estoppel Do Not Bar Mr. Smith's
          First Claim ...........................................................................12

     C.   Each of Mr. Smith's Claims Contains Sufficient Factual
          Allegations to State a Plausible Claim to Relief .................15

          1.   Mr. Smith has Alleged a Plausible Claim to Relief for
               Violation of His Equal Protection Rights Under the
               Fourteenth Amendment ............................................16

          2.   Mr. Smith Has Alleged a Plausible Claim to Relief for
               Violation of His Right to be Free from Cruel and
               Unusual Punishment Under the Eighth Amendment...............23

               a.   Mr. Smith Has Plausibly Alleged that Execution
                    Under the Protocol Would Expose Him to a Risk of
                    Superadded Pain ............................................24

                    i.    Mr. Smith's Allegations of Superadded Pain.......24
                    ii.   Defendants' Contentions are Meritless ...............28

               b.   Mr. Smith Has Plausibly Alleged that There are
                    Feasible and Available Alternatives to Execution
                    Under the Protocol.........................................31

          3.   Mr. Smith Has Alleged a Plausible Claim to Relief for
               Violation of RLUIPA.................................................32

          4.   Mr. Smith Has Alleged a Plausible Claim to Relief for
               Violation of ARFA ..................................................34

i

5.      Mr. Smith Has Alleged a Plausible Claim to Relief for Violation of His Free Speech and Free Exercise Rights Under the First Amendment........................................................36

II.    THE COURT SHOULD GRANT A PRELIMINARY INJUNCTION TO ENJOIN MR. SMITH'S SCHEDULED EXECUTION BY NITROGEN HYPOXIA USING THE PROTOCOL ..................................37

A.     Mr. Smith is Likely to Succeed on the Merits of His Claims.............38

1.      Mr. Smith is Likely to Succeed on the Merits of His Claim that His Execution Would Violate His Right to Equal Protection Under the Fourteenth Amendment................38

2.      Mr. Smith is Likely to Succeed on His Claim that His Execution by Nitrogen Hypoxia Would Violate His Right to be Free from Cruel and Unusual Punishment Under the Eighth Amendment ..................................................................43

a.      The Evidence Will Demonstrate that the Protocol Exposes Mr. Smith to a Substantial Risk of Superadded Pain ..........................................................43

i.      Risks Associated With Oxygen Leakage Into a "One-Size-Fits-All Mask......................................43

ii.     Risks Associated With Carbon Dioxide Entrapment ...........................................................48

iii.    Risks Associated With Vomiting.........................48

iv.     Risks Associated With Impure Nitrogen..............51

v.      Risks Associated With the Failure to Monitor Oxygen Levels After Administration of Nitrogen................................................................51

b.      The Evidence Will Demonstrate that There are Feasible and Readily Available Alternatives ................52

i.      Amendments to the Protocol.................................53

ii.     Utah's Protocol for Executions by Firing Squad .55

c.      Defendants' Comparison of Execution by Nitrogen Hypoxia Under the Protocol to Hanging Does Not Help Them .....................................................................58

ii

       d.     The Court Should Not Adopt a Novel Standard for
             Eighth Amendment Execution Claims ...........................60

    3.     Mr. Smith is Likely to Succeed on His Claim that His
         Execution by Nitrogen Hypoxia Under the Protocol
         Would Violate RLUIPA ...........................................61

    4.     Mr. Smith is Likely to Succeed on His Claim that His
         Execution by Nitrogen Hypoxia Under the Protocol
         Would Violate ARFA ..............................................64

  B.    Mr. Smith Will Be Irreparably Harmed Without an Injunction..........64

  C.    The Balance of Equities Weighs in Favor of Mr. Smith....................65

CONCLUSION ........................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Arthur v. State*,
   71 So.3d 733 (Ala. Crim. App. 2010)..................................................19

*Arthur v. Thomas*,
   674 F.3d 1257 (11th Cir. 2012) (per curiam) .......................................16, 18, 37

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................15

*Barber v. Gov. of Ala.*,
   73 F.4th 1306 (11th Cir. 2023) ...................................................23, 39

*Barber v. Ivey*,
   143 S. Ct. 2545 (2023)................................................................23

*Battle v. Allstate Indemn. Co.*,
   No. 2:20-cv-901, 2023 WL 1483151 (M.D. Ala. Feb. 2, 2023) ........................6

*Baze v. Rees*,
   553 U.S. 35 (2008)....................................................................40

*Bouton v. Ocean Props., Ltd.*,
   223 F. Supp. 3d 1248 (2016) .........................................................29

*Broom v. Shoop*,
   963 F.3d 500 (6th Cir. 2020) .........................................................40

*Bucklew v. Precythe*,
   139 S. Ct. 1112 (2019)..........................................................*passim*

*Burwell v. Hobby Lobby Stores*,
   573 U.S. 682 (2014)..................................................................32

*Commodity Investment Res. Co. II, Inc. v. JPMorgan Chase Bank, N.A.*,
   No. 1:19-CV-1296, 2019 WL 2566749 (N.D. Ga. Jun. 21, 2019) ....................14

iv

*Criswell v. City of Naples*,
  No. 2:19-cv-305, 2020 WL 2745818 (M.D. Fla. May 27, 2020).......................21

*Disser v. City of Tampa*,
  No. 8:13-cv-885, 2013 WL 3975759 (M.D. Fla. Jul. 31, 2013).........................21

*Engquist v. Oregon Dep't of Agri.*,
  553 U.S. 591 (2007)...................................................................................16

*Ferguson v. Warden, Fla. State Prison*,
  493 F. App'x 22 (11th Cir. 2022) ...........................................................27

*Fletcher v. CoverWallet of Cal.*,
  No. 2:21-cv-671, 2022 WL 980838 (N.D. Ala. Mar. 30, 2022).........................14

*Glossip v. Gross*,
  576 U.S. 863 (2015)...................................................................................59

*Grider v. City of Auburn*,
  618 F.3d 1240 (11th Cir. 2010) ...............................................................21

*Hakim v. Hicks*,
  223 F.3d 1244 (11th Cir. 2000) ...............................................................36

*Hamm v. Smith*,
  143 S. Ct. 1188 (2023)..............................................................................9

*Hill v. McDonough*,
  547 U.S. 573 (2006)...................................................................................52

*Hoefling v. City of Miami*,
  811 F.3d 1271 (11th Cir. 2016) ...............................................................6

*Holt v. Hobbs*,
  574 U.S. 352 (2015)...................................................................................32

*Hubbard v. Campbell*,
  379 F.3d 1245 (11th Cir. 2004) ...............................................................19

*In re Holladay*,
  331 F.3d 1169 (11th Cir. 2003) ...............................................................62

v

*In re Hutcherson*,
    468 F.3d 747 (11th Cir. 2006) ............................................................19

*In re Piper Aircraft Corp.*,
    244 F.3d 1289 (11th Cir. 2001) ...................................................3, 14

*Jackson v. Danberg*,
    594 F.3d 210 (3d Cir. 2010) .............................................................27

*Johnson-Price v. Ala. Dep't of Human Res.*,
    No. 2:07cv568, 2010 WL 1268095 (M.D. Ala. Mar. 30, 2010) ........14

*Jones v. Mississippi*,
    141 S. Ct. 1307 (2021) .......................................................................41

*Kennedy v. Louisiana*,
    554 U.S. 407 (2008) ...........................................................................57

*Lipscomb v. Cronic*,
    No. 2:11-CV-78, 2011 WL 6755198 (N.D. Ga. Dec. 22, 2011) .......29

*McWaters v. Houston*,
    No. 2:21-cv-57, 2022 WL 395309 (M.D. Ala. Feb. 8, 2022) ...........15

*Nance v. Comm'r, Ga. Dep't of Corrs*,
    59 F.4th 1149 (11th Cir. 2023) .........................................................31

*Nance v. Ward*,
    142 S. Ct. 2214 (2022) .......................................................................52

*Nelson v. Campbell*,
    541 U.S. 637 (2004) ...........................................................................52

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ............................................................2, 3, 6, 10

*Overton v. Wells Fargo Bank, N.A.*,
    No. 4:11CV1957, 2012 WL 401065 (E.D. Mo. Feb. 3, 2012) .........29

*Pardo v. Palmer*,
    500 F. App'x 901 (11th Cir. 2012) ...................................................27

*Precision Air Parts, Inc. v. Avco Corp.*,
   736 F.2d 1499 (11th Cir. 1984) ..........................................................14

*Ramirez v. Collier*,
   595 U.S. 411 (2022)..............................................................32, 59

*Slater v. U.S. Steel Corp.*
   871 F.3d 1174 (11th Cir. 2017) ............................................................2

*Smith v. Comm'r, Ala. Dep't of Corr.*,
   No. 22-13781, 2022 WL 17069492 (11th Cir. Nov. 17, 2022) ...........................9

*Smith v. Dunn*,
   516 F. Supp. 3d 1310 (M.D. Ala. 2021) ...............................................34

*Smith v. Hamm*,
   142 S. Ct. 1108 (2022).........................................................................41

*Smith v. Hamm*,
   No. 2:22-cv-497, 2023 WL 4353143 (M.D. Ala. Jul. 5, 2023).................*passim*

*State v. Broom*,
   146 Ohio St.3d 60, 51 N.E.3d 620 (2016) ...................................40, 41

*Thai Mediation Ass'n of Ala., Inc. v. City of Mobile, Ala.*,
   980 F.3d 821 (11th Cir. 2020) ...................................................33, 34

*Thai Mediation Ass'n of Ala. Inc. v. City of Mobile, Ala.*,
   83 F.4th 922 (11th Cir. 2023) .............................................................31

*Turner v. Safley*,
   482 U.S. 78 (1987)...............................................................................35

*Vill. of Westbrook v. Olech*,
   528 U.S. 562 (2000)..............................................................................16

*Wackerly v. Jones*,
   398 F. App'x 360 (10th Cir. 2010) .....................................................27

*Wellons v. Comm'r, Ga. Dep't of Corr.*,
   754 F.3d 1260 (11th Cir. 2014) ...........................................................27

*Wilson v. Seiter*,
    501 U.S. 294 (1991) ................................................................................. 40

*Woods v. Comm'r, Ala. Dep't of Corr.*,
    951 F.3d 1288 (11th Cir. 2020) .................................................... *passim*

## <u>Statutes</u>

28 U.S.C. § 2283 ......................................................................................... 35

42 U.S.C. § 2000cc-1(a) ............................................................................. 31

42 U.S.C. § 2000cc-5(7)(A) ........................................................................ 32

## <u>Other Authorities</u>

Ala. Const. art. I, § 3.01(V) ........................................................................ 33

Ala. R. Crim. P. 32 .............................................................................. *passim*

Death Penalty Information Center, State-by-State Execution
    Protocols, https://deathpenaltyinfo.org/executions/methods-of-
    execution/state-by-state-execution-protocols ...................................... 58

Fed. R. Civ. P. 12(b)(6) .......................................................................... 4, 28

U.S. Const. amend. I .......................................................................... *passim*

U.S. Const. amend. VIII ..................................................................... *passim*

U.S. Const. amend. XIV ..................................................................... *passim*

Plaintiff Kenneth Eugene Smith responds to Defendants' motion to dismiss the Second Amended Complaint ("SAC") and replies in further support of his motion for a preliminary injunction to prohibit Defendants from executing him by nitrogen hypoxia using the Protocol[1] on January 25, 2024, as currently scheduled.

## PRELIMINARY STATEMENT

The Court should deny Defendants' motion to dismiss.  Defendants offer two primary arguments for dismissal, neither of which has merit.

First, Defendants contend that Mr. Smith's First and Second Claims for violation of his Fourteenth Amendment right to equal protection and his Eighth Amendment right to be free from cruel and unusual punishment, respectively, are barred by the doctrines of judicial estoppel and claim preclusion.

Defendants' contention is based on the false premise that Mr. Smith's position has changed his position taken in a prior litigation (the "Lethal Injection Action") that nitrogen hypoxia is a feasible and available method of execution.  He has not. Defendants' Response is inaccurate in its first paragraph when it claims that Mr. "Smith now seeks this Court's intervention to prohibit Alabama from employing nitrogen hypoxia."  (DE 39 at 1.)  He does not.

---

[1] Capitalized terms have the same meanings given to them in Plaintiff's Motion for Preliminary Injunction to Enjoin Defendants from Executing Mr. Smith by Nitrogen Hypoxia Using Their Protocol (DE 19).

1

Mr. Smith challenges the *Protocol* that Defendants intend to use to conduct his execution by nitrogen hypoxia, which Mr. Smith had never seen before the State moved for authority to execute him by that means and simultaneously moved to dismiss the Lethal Injection Action as moot on August 25.  Mr. Smith alleges that "[t]he *Protocol*, if used to execute [him] by nitrogen hypoxia, exposes him to a severe risk of superadded pain during the execution process . . . ."  (DE 31 at ¶ 11 (emphasis added).)   And he specifically alleges that "[t]here are feasible and available alternatives, including amendments to the Protocol to cure its inadequacies." *Id.* at ¶ 17.  In other words, Defendants can carry out Mr. Smith's execution by nitrogen hypoxia consistent with Constitutional requirements by amending the Protocol.   Thus, Mr. Smith's position here is not "'clearly inconsistent' with [his] earlier position" in the Lethal Injection Action, which is a necessary prerequisite for applying judicial estoppel. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (citation omitted); and neither position gives any indication that Mr. Smith "intended to make a mockery to the judicial system." *Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017).

There is simply no basis to conclude that judicial acceptance of Mr. Smith's position in this action "would create 'the perception that [this] court was misled'" by Mr. Smith's position in the Lethal Injection Action or that Mr. Smith "would derive an unfair advantage or impose an unfair detriment on [Defendants] if not

estopped." *New Hampshire*, 532 U.S. at 750–51 (citation omitted).  Mr. Smith made no secret of his position.  *After* the State moved for authority to execute Mr. Smith by nitrogen hypoxia and simultaneously moved to dismiss the Lethal Injection Action as moot, Mr. Smith's counsel informed the Court that "we are doing our due diligence on that protocol" and "[w]e have some other issues with the selection of Mr. Smith as the first person to be subject to the protocol, and so *we reserve our rights to assert those claims as appropriate*, in an appropriate forum at an appropriate time." *Smith v. Hamm*, No. 2:22-cv-497, Transcript (DE 111) at 3:6–24 (M.D. Ala.) (Ex. 1) (emphasis added).  Indeed, the State expected a challenge to the protocol—it expressly noted the right of inmates to make such a challenge in its nitrogen-hypoxia-election form. *See infra* at 11–12.

Defendants' contention that Mr. Smith's First Claim for violation of his equal protection rights is barred by claim preclusion or res judicata is equally meritless. Mr. Smith's equal protection claim did not arise until the State moved for authority to execute him by nitrogen hypoxia well *after* he filed the Lethal Injection Action and on the eve of its dismissal.  Claim preclusion does not apply under those circumstances because "for res judicata purposes, claims that 'could have been brought' are claims *in existence at the time the original complaint is filed* or claims actually asserted . . . in the earlier action." *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1298 (11th Cir. 2001) (citation omitted, emphasis in original).

3

Defendants' second primary contention in support of their motion to dismiss is that Mr. Smith's allegations are "speculative" and insufficiently detailed. The detail that Defendants demand would be impossible to meet in a pleading based solely on the Protocol that is silent or incomprehensibly vague about those details even in its unredacted form and which are in the Defendants' sole possession. And Defendants' position is contrary to the Rule 12(b)(6) standard, which "does not require detailed factual allegations." *Smith v. Hamm*, No. 2:22-cv-497, 2023 WL 4353143, at *2 (M.D. Ala. Jul. 5, 2023) (citations and internal quotation marks omitted). Dismissing the SAC under those circumstances would create a perverse incentive for ADOC to hide the details of its execution protocols from the condemned people that are subject to them. As demonstrated below, as to each of his claims, Mr. Smith has alleged "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at *2.

## MR. SMITH'S SECOND AMENDED COMPLAINT

On November 8, 2023, Mr. Smith filed his complaint in this action one week after the Alabama Supreme Court authorized ADOC to make a second attempt to execute him over the dissent of two justices. (*See* DE 1; DE 31 at ¶ 73.) On the same day, Governor Ivey scheduled Mr. Smith's execution for January 25, 2024. DE 19-5. On November 16, Mr. Smith amended his complaint (DE 16) and moved for a preliminary injunction to enjoin his planned execution (DE 19). On November

4

28, Mr. Smith filed the SAC in which he asserts that his execution on January 25, 2024 using the Protocol would (1) violate his rights under the equal protection clause of the Fourteenth Amendment (First Claim);[2] (2) violate his right to be free from cruel and unusual punishment under the Eighth Amendment (Second Claim); (3) violate his rights to freedom of speech and free exercise of his religion under the First Amendment (Third Claim); (4) substantially burden his right to exercise his religion under RLUIPA; and (5) burden his right to exercise his religion under ARFA.[3]

## I.   THE COURT SHOULD DENY DEFENDANTS' MOTION TO DISMISS THE SAC

### A.   Mr. Smith's First and Second Claims are Not Barred by Judicial Estoppel

Defendants contend that Mr. Smith's First and Second Claims are judicially estopped.  According to Defendants, those claims are barred because: (1) Mr. Smith previously alleged in the Lethal Injection Action that nitrogen hypoxia was a feasible and available alternative to lethal injection; and (2) that prior position is fundamentally inconsistent with Mr. Smith's current challenge to ADOC's current

---

[2] Mr. Smith withdraws his First Claim only to the extent that it asserted a violation of the due process clause of the Fourteenth Amendment.

[3] After the Court ordered Defendants to produce an unredacted copy of the Protocol and granted Mr. Smith limited discovery (*see* DE 23, 28) Mr. Smith dropped his claim for violation of his right of access to the courts.  Mr. Smith's Third Claim for violation of his First Amendment rights is not at issue on his preliminary injunction motion.

execution Protocol. (*See* DE 39 at 17–20, 21–26.)  Defendants' contention is baseless.

"At a minimum, judicial estoppel requires a party's later position to be contradictory or 'clearly inconsistent' from an earlier one." *Hoefling v. City of Miami*, 811 F.3d 1271, 1278 (11th Cir. 2016) (quoting *New Hampshire,* 532 U.S. at 750); *see also Battle v. Allstate Indemn. Co.*, No. 2:20-cv-901, 2023 WL 1483151, at *5 (M.D. Ala. Feb. 2, 2023) ("Here, the judicial estoppel analysis begins and ends with whether Battle has taken a position that is 'clearly inconsistent' to that taken in her 2014 bankruptcy case." (applying Alabama law)).  Defendants' contention fails at that first step.

When Defendants' counsel raised judicial estoppel at a recent hearing, the Court inquired: "So does the State have the right to perform a nitrogen hypoxia execution in an otherwise unconstitutional manner because this was the mechanism that he chose last year without really knowing what the protocol was?"  (DE 37 at 14:4–7.)  The indisputable answer to that question is "no."

It follows that Mr. Smith's allegation and consistent position in the Lethal Injection Action—that "nitrogen hypoxia is an available and feasible method of execution" (DE 39-1 at ¶ 54; DE 39-7 at ¶¶ 250–51)—*before* he had ever seen the Protocol was not and could not have been an endorsement of the procedures in the Protocol for carrying out such an execution.  Nothing in Mr. Smith's allegations and

6

consistently maintained position in the Lethal Injection Action is inconsistent with his position here that *the Protocol* subjects him to a substantial risk of superadded pain and that amending the Protocol to reduce those risks is a feasible and available alternative means of executing him by nitrogen hypoxia.[4]

Defendants have submitted twelve exhibits in support of their contention that Mr. Smith consistently maintained his position that nitrogen hypoxia was an available and feasible alternative to lethal injection. (*See* DE 39-1–39-12.) But Defendants do not identify anything in them that constitutes an endorsement of the then-undisclosed Protocol or that includes any representation that is inconsistent with Mr. Smith's position in this action.

One of those exhibits—a declaration submitted in the Lethal Injection Action and signed by Dr. Joel Zivot—is particularly illustrative. In his declaration, Dr. Zivot explained how inhaling nitrogen gas theoretically would cause death and reduce the risks posed to Mr. Smith by lethal injection. (*See* DE 39-4 at ¶¶ 22–28.) Characteristic of their approach, Defendants fail to disclose that Dr. Zivot did not

---

[4] Defendants mischaracterize the SAC when they say that Mr. Smith "now seeks to prohibit Alabama from employing nitrogen hypoxia; his latest proposed method is the firing squad." (De 39 at 22; *see also id.* at 25 (incorrectly describing the firing squad as Mr. Smith's purported "preferred method"); *id.* at 81 (incorrectly referring to Mr. Smith's purported "newfound desire for a firing squad")). Mr. Smith "neither seeks to prohibit Alabama from employing nitrogen" nor desires the firing squad as his "preferred method." Rather, he has offered the firing squad as an alternative only "if Defendants are unwilling or unable to amend the Protocol so that it complies with constitutional requirements." (DE 31 at ¶ 103.)

purport to opine on a protocol that was not yet public even in redacted form.  To the contrary, Dr. Zivot stated:  "To date, ADOC has released no protocol for accomplishing that [execution by nitrogen hypoxia].  How it will be done remains unknown."  (*Id.* at ¶ 21.)  And he clearly stated that he was not offering procedures for accomplishing that because "I am duty bound as a physician not to guide or advise ADOC or any other prison system on how nitrogen may be used for execution," but "I am qualified to explain how inhaling nitrogen gas would cause death."  (*Id.* at ¶ 22.)

The defendants in the Lethal Injection Action, including Commissioner Hamm and Warden Raybon, well understood those limitations in Dr. Zivot's declaration.  Indeed, after Mr. Smith submitted Dr. Zivot's declaration, they moved to dismiss Mr. Smith's Second Amended Complaint in the Lethal Injection Action, including on the ground that Mr. Smith had failed to supply them with "a proposal that is sufficiently detailed" for carrying out a nitrogen hypoxia execution.  *See Smith v. Hamm*, No. 2:22-cv-497, Defendants' Motion to Dismiss (DE 78) at 25 (M.D. Ala.) (citation omitted) (Ex. 2).

What is more, contrary to Defendants contention, Mr. Smith did *not* have a "burden" at the pleading stage "to specify a blueprint" for nitrogen hypoxia executions in the Lethal Injection Action.  (DE 39 at 26; *see also id.* at 25 (referring to a purported "requirement—to plead a 'virtual blueprint' in his prior lawsuit").)

That issue was litigated exhaustively in the Lethal Injection Action and the Eleventh Circuit held that Mr. Smith "plausibly plead[ed] that there is an available alternative method [nitrogen hypoxia] that will reduce the risk of severe pain." *Smith v. Comm'r, Ala. Dep't of Corr.*, No. 22-13781, 2022 WL 17069492, at *5 (11th Cir. Nov. 17, 2022); *see also Smith*, 2023 WL 4353143, at *9 (same). And the U.S. Supreme Court denied Commissioner Hamm's petition for certiorari challenging the Eleventh Circuit's holding that Mr. Smith's pleading was sufficient. *See Hamm v. Smith*, 143 S. Ct. 1188 (2023).

The Lethal Injection Action never got past the pleading stage. But Defendants are not in a position to complain about that. It was Defendants' serial motion practice directed at Mr. Smith's pleadings—practice that resulted in a year of litigation in this Court, the Court of Appeals, and the Supreme Court—and Defendants' objection to engaging in any discovery while their motions were pending that prevented the Lethal Injection Action from proceeding past the pleading stage. (*See* DE 31 at ¶ 66.) Then, when their motions ultimately were decided adversely to them and discovery was imminent, Defendant Hamm suddenly decided that lethal injection was not an available method of execution for Mr. Smith and the State moved to execute him by nitrogen hypoxia, thereby rendering the Lethal Injection Action moot before discovery could begin. (*See id.* at ¶¶ 67–72.)

9

Even if Defendants could show, contrary to the record, that Mr. Smith's position here is inconsistent with his position in the Lethal Injection Action, the record does not support a finding that Mr. Smith misled this Court or imposed any purported "unfair detriment" on Defendants. *New Hampshire*, 532 U.S. at 750–51. When the defendants in the Lethal Injection Action announced, on the eve of discovery, that lethal injection was not an available method of execution for Mr. Smith and sought to dismiss that Action as moot, Mr. Smith's counsel represented to the Court that Mr. Smith was doing his due diligence on the then-recently released and redacted protocol and reserving his rights:

> THE COURT:  And Mr. Grass, I think there was a discussion I had with you the last time we had a status hearing.  I did ask the question of you whether your client's chosen method of execution was nitrogen hypoxia, and your response was yes.  Is that still your client's position.
>
> MR. GRASS:  Yes, Your Honor.  We did allege, as you know, that nitrogen hypoxia is available as a useful alternative; however, I want to be clear on the record that through no fault of Mr. Smith, the case never proceeded to discovery.  We never came forward with a blueprint for doing that and we just received the Department of Corrections' protocol for accomplishing nitrogen hypoxia execution a few weeks ago.  The protocol is heavily redacted.  And as we indicated in our opposition to the motion to dismiss, *we are doing our due diligence on that protocol.  We have some other issues with the selection of Mr. Smith as the first person to be subject to that protocol, and so we reserve our rights to assert those claims as appropriate*, in an appropriate forum at the appropriate time.

10

Ex. 1 at 3:6–24 (emphasis added); *see also id.* at 4:10–13 ("[W]e reserved our rights with respect to additional claims that might arise in the future and depending on our due diligence concerning the department's newly issued protocol for executions by nitrogen hypoxia . . . .").[5]

Finally, with respect to Mr. Smith's First Claim, it is ironic that Defendants accuse Mr. Smith of seeking more favorable treatment than condemned people who elected to be executed by nitrogen hypoxia in 2018 when it is Defendants who are seeking to treat Mr. Smith less favorably than those condemned people.  (*See* DE 39 at 17–18.)  In the form for condemned people to elect nitrogen hypoxia that *ADOC adopted* and claims to have distributed to all death row inmates in June 2018, condemned people who elected nitrogen hypoxia expressly reserved the right to challenge the constitutionality of any nitrogen hypoxia protocol that ADOC might adopt: "This election is not intended to . . . waive my right to challenge the constitutionality of any protocol adopted for carrying out execution by nitrogen hypoxia."  *Woods v. Comm'r, Ala. Dep't of Corr.*, 951 F.3d 1288, 1291 (11th Cir. 2020) (quoting election form); *see also Miller v. Hamm*, No. 2:22-cv-506, Reply in Support of Motion for Preliminary Injunction to Enjoin Defendants from Executing

---

[5] We note that Defendants failed to include this transcript in their litany of exhibits concerning representations about nitrogen hypoxia.

Mr. Miller Via Lethal Injection Ex. 7 (DE 48-7) (M.D. Ala.) (Ex. 3).  Defendants now seek to deprive Mr. Smith of that right reserved with ADOC's acquiescence by all other condemned people who elected nitrogen hypoxia.

In short, Defendants' contention that Mr. Smith's First and Second Claims are barred by judicial estoppel is meritless and their invective about Mr. Smith's motives and purported "abuse" and "gamesmanship" is unjustified.

## B.    Res Judicata and Collateral Estoppel Do Not Bar Mr. Smith's First Claim

Defendants also contend that Mr. Smith's First Claim is barred by res judicata. (*See* DE 39 at 20–21.)  Defendants concede that the equal protection claim that Mr. Smith asserted in the Lethal Injection Action is "different than the [equal protection claim] presented here."  (*Id.* at 20.)  They nevertheless contend that Mr. "Smith could have asserted his equal protection claim in" the Lethal Injection Action because there were "individuals on death row whose appeals have been concluded longer than Smith's . . . when the State first moved for his execution" in June 2022.  (*Id.* at 21.)  The Court should reject Defendants' contention because Mr. Smith did not suffer the equal protection harm at issue here until the State's motion for authority to execute him, which it did not file until months after the original complaint in the Lethal Injection Action.

12

Mr. Smith notes at the outset that Defendants have mischaracterized the nature of his Equal Protection Claim.  That Claim does not turn on the fact that there are others on death row whose appeals were concluded before Mr. Smith's but will be executed after him.[6]  It instead turns on the fact that, unlike those others on Alabama's death row who ADOC intends to execute by nitrogen hypoxia, Mr. Smith's appeals are still pending and were pending when the State sought authority to execute him.[7]  (DE 31 at ¶¶ 58, 107–08.)[8]  And even assuming that his appeals had been exhausted, ADOC has brought Mr. Smith to the front of the line.  *See infra* at 40–43.  Mr. Smith is not, in other words, arguing that he has a constitutional right to a particular spot in the formal execution queue; his argument is that equal protection demands that he be excluded entirely from the formal queue until he is allowed, as others on Alabama's death row were allowed, to fully complete his conventional appeals, and even then, not be moved ahead of those inmates who

---

[6] That is not to diminish the significance of the fact that there are others on Alabama's death row whose appeals have been final for several years but who are scheduled to be executed after Mr. Smith.  As noted, the only thing that distinguishes Mr. Smith from others on death row is that he was pursuing federal litigation, which imposed discovery obligations on Defendants. By prioritizing Mr. Smith's execution, Defendants were able to moot that federal litigation just in time to avoid their discovery obligations.

[7] As Mr. Smith noted in his motion for a preliminary injunction, the State's request for authority to execute was a departure from its established practice of "wait[ing] to move for an inmate's execution until he has exhausted his conventional appeals." (DE 19 at 13 (quoting *Woods*, 951 F.3d at 1292).)

[8] On December 8, 2023, the Alabama Court of Criminal Appeals affirmed the denial of Mr. Smith's second Rule 32 petition.  *See* DE 43-1.  Mr. Smith will be pursuing his appellate remedies expeditiously, and earlier today filed a petition for rehearing in that court.  *See* Ex. 11.

exhausted their appeals much earlier and ADOC intends to execute by nitrogen hypoxia.

It was only after the State's request for authority to execute that Mr. Smith suffered the equal protection harm alleged in his first claim.  And the State did not seek authority to execute Mr. Smith until months after Mr. Smith filed his original complaint in the Lethal Injection Action.

That the request for authority to execute post-dates Mr. Smith's original complaint in the Lethal Injection Action forecloses Defendants' claim preclusion arguments.  Res judicata bars a plaintiff from asserting in a later action claims that it could have asserted in an earlier one. And in the Eleventh Circuit, "for res judicata purposes, claims that 'could have been brought' are claims *in existence at the time the original complaint is filed* or claims actually asserted . . . in the earlier action." *In re Piper Aircraft Corp.*, 244 F.3d at 1298 (emphasis in original) (quotations and citation omitted); *see also Fletcher v. CoverWallet of Cal.*, No. 2:21-cv-671, 2022 WL 980838, at *6 (N.D. Ala. Mar. 30, 2022) (same); *Johnson-Price v. Ala. Dep't of Human Res.*, No. 2:07cv568, 2010 WL 1268095, at *5 (M.D. Ala. Mar. 30, 2010) (same).  Defendants concede that Mr. Smith did not actually assert in the Lethal Injection Action the equal protection claim at issue here.  (*See* DE 39 at 32 ("[Mr.] Smith's previous lawsuit alleged an equal protection claim against Defendants different than the [one] presented here.").)  And, as just explained, Mr. Smith's Equal

14

Protection Claim in this case could not have been filed in the Lethal Injection Action because it only came into existence months after the original complaint in the Lethal Injection Action was filed.

Along those same lines, issue preclusion would not apply because Mr. Smith "did not have a full and fair opportunity to litigate" in the Lethal Injection Action the issues underlying his Equal Protection Claim in this case. *Precision Air Parts, Inc. v. Avco Corp.*, 736 F.2d 1499, 1504 (11th Cir. 1984); *see also Commodity Investment Res. Co. II, Inc. v. JPMorgan Chase Bank, N.A.*, No. 1:19-CV-1296, 2019 WL 2566749, at *6 (N.D. Ga. Jun. 21, 2019) (same). When that claim arose, Defendants' motion to dismiss the Lethal Injection Action as moot was pending. Mr. Smith would have required leave to amend his complaint in the Lethal Injection Action to add an equal protection claim. Defendants surely would have opposed any such motion.

## C.    Each of Mr. Smith's Claims Contains Sufficient Factual Allegations to State a Plausible Claim to Relief

Defendants fail to adhere to the well-settled standard that governs their motion to dismiss. It therefore bears repeating. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Smith*, 2023 WL 4353143, at *2 (citations and internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In making that determination, "the court must accept well-pled facts as true, but the court is not required to accept a plaintiff's legal conclusions." *Smith*, 2023 WL 4353143, at *2; *see also McWaters v. Houston*, No. 2:21-cv-57, 2022 WL 395309, at *1 (M.D. Ala. Feb. 8, 2022) (Huffaker, J.) (the Court "must take 'the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff'"). Mr. Smith has alleged sufficient facts to support a plausible claim to relief on each of his claims.

### 1. Mr. Smith has Alleged a Plausible Claim to Relief for Violation of His Equal Protection Rights Under the Fourteenth Amendment

Mr. Smith's Equal Protection Claim requires him to establish that Defendants are treating him "disparately from other similarly situated persons," and that the disparate treatment is not "rationally related to a legitimate government interest." *Arthur v. Thomas*, 674 F.3d 1257, 1262 (11th Cir. 2012) (per curiam) (citation and internal quotation marks omitted). "[A]n equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that [he] has been irrationally singled out as a so-called 'class of one.'" *Engquist v. Oregon Dep't of Agri.*, 553 U.S. 591, 601 (2007). That is because "[w]hen those who appear similarly situated are nevertheless treated

16

differently, the Equal Protection Clause requires at least a rational reason for the difference." *Id.* at 602. Thus, "[a] plaintiff may successfully allege a violation of his equal protection rights as a 'class of one' by showing 'that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Smith*, 2023 WL 4353143, at \*12 (quoting *Vill. of Westbrook v. Olech*, 528 U.S. 562, 564 (2000)).

In support of his Equal Protection Claim, Mr. Smith alleges the following facts:

- Mr. Smith is similarly situated to all other condemned people in Alabama who are subject to execution by nitrogen hypoxia. (DE 31 at ¶¶ 59, 61.)

- He has an appeal pending in the Alabama Court of Criminal Appeals from the dismissal of his second Rule 32 petition, which he filed before the State moved for authority to execute him by nitrogen hypoxia. (*Id.* at ¶¶ 54–57.)

- The State has a "custom [to] wait[] to move for an inmate's execution until he has exhausted his conventional appeals: direct appeal, state postconviction, and federal habeas." (*Id.* at ¶ 58 (quoting *Woods*, 951 F.3d at 1292).)

17

- "There are other condemned people in Alabama whose appeals have exhausted and who elected to be executed by nitrogen hypoxia" in 2018 and still are awaiting execution. (*Id.* at ¶¶ 59–61.)

- On information and belief, "ADOC gave at least one condemned person who it intends to execute by nitrogen hypoxia a grace period so that the condemned inmate and his counsel could review the Protocol *before* the State moved for authority to execute him under its procedures." (*Id.* at ¶ 62 (emphasis in original).)

- But "ADOC did not provide Mr. Smith with any comparable grace period" and "[e]ven though [he] has an appeal pending in the Alabama Court of Criminal Appeals and other condemned people who elected to be executed by nitrogen hypoxia five years ago have exhausted their appeals, the State chose Mr. Smith to be the first condemned person to be subject to execution pursuant to its experimental nitrogen hypoxia Protocol." (*Id.* at ¶¶ 63–64.)

- Defendants chose Mr. Smith to avoid discovery into their failed lethal injection procedures in the Lethal Injection Action. *Id.* at ¶¶ 65–72.

Those facts, if proven, establish that Defendants are treating Mr. Smith "disparately from other similarly situated persons," *Arthur*, 674 F.3d at 1262, by seeking his execution despite his pending appeal and in violation of the State's

18

custom while there are other condemned people who are subject to execution by nitrogen hypoxia and whose appeals have exhausted.  In addition, Defendants have no legitimate basis for doing so.

Despite those alleged facts, Defendants contend that Mr. Smith's Equal Protection Claim fails as a matter of law because "Alabama has executed or sought to execute other inmates with second or successive postconviction petitions pending."  (DE 39 at 15.)  Those facts are not alleged in the SAC.[9]  In any event, Defendants' examples are easily distinguishable.   Not one of those examples involves the State moving for authority to execute a condemned person, as here, *after* a condemned person filed a successive postconviction petition and while pending appeal.  Unlike here, in each case, the State had scheduled an execution date *before* the condemned person sought to file a successive postconviction petition, which in two cases, was patently meritless.

Thus, in *In re Hutcherson*, 468 F.3d 747, 749 (11th Cir. 2006), the Eleventh Circuit denied a condemned person's motion filed one week before his scheduled

---

[9] *See Lomanack v. City of Ozark*, No. 1:15-CV-122-MHT-PWG, 2016 WL 1136935, at *7 (M.D. Ala. Feb. 16, 2016), report and recommendation adopted sub nom. *Lomanack v. Boutwell*, No. 1:15CV122-MHT, 2016 WL 1125508 (M.D. Ala. Mar. 22, 2016), judgment entered, No. 1:15CV122-MHT, 2016 WL 1122673 (M.D. Ala. Mar. 22, 2016) ("Plaintiff argues that whether the Board is a governmental entity entitled to limitations on damages is an issue that interjects facts not pleaded in the Complaint. . . . For the purpose of addressing the Board's present motion, this court excludes the additional facts interjected by the Board, and the Board's motion to dismiss Plaintiff's claims for punitive damages or damages in excess of $100,000.00 is due to be denied."); *see also Scottsdale Ins. Co. v. ULGM, Inc.*, No. 14-21084-CIV, 2014 WL 11906638, at *2 (S.D. Fla. July 14, 2014) ("Inherent in that argument is the flawed premise that the District Court would consider Defendants' purported new facts in considering the motion to dismiss. But at the motion to dismiss stage, all of the allegations in the complaint are taken as true.").

execution for permission to file a successive habeas corpus petition.  Similarly, in *Hubbard v. Campbell*, 379 F.3d 1245, 1246 (11th Cir. 2004), the Eleventh Circuit affirmed dismissal of a successive habeas corpus petition filed less than two weeks before the condemned person's scheduled execution.  And, in *Arthur v. State*, 71 So.3d 733, 738–39 (Ala. Crim. App. 2010), the Alabama Supreme Court stayed an execution to permit the circuit court to consider a successive Rule 32 petition filed two days before the condemned person's scheduled execution.

Defendants also contend that Mr. Smith "was already scheduled to be executed in 2022" and "imagines there is a distinct 'line for execution by nitrogen' but identifies no factual basis for his speculation."  (DE 39 at 15.)  But the facts alleged support the reasonable inference that there has been a "distinct 'line for execution by nitrogen hypoxia'" that the *State* created when it permitted condemned people in Alabama to elect to be executed by nitrogen hypoxia in 2018 even though "it did not . . . have a protocol in place for nitrogen-hypoxia executions."  *Woods*, 951 F.3d at 1291.  As a result, "some of the inmates who [had] exhausted their conventional appeals elected to be executed by nitrogen hypoxia and . . . could not be executed" until ADOC completed its Protocol while the State continued to move for execution dates "[f]or those inmates . . . who did not elect nitrogen hypoxia." *Id.* at 1292; *see also Woods v. Dunn*, No. 2:20-cv-00058, Defendants' Motion to Dismiss and, in the Alternative, Motion for Summary Judgment at 4 (DE 19) (M.D.

20

Ala.) (Ex. 4) ("Admittedly Woods is not the only death-row inmate to have completed his habeas litigation. But Woods, unlike some of his fellow inmates, did not elect to be executed by hypoxia, and so there is no impediment to preventing him from being executed now."); (DE 31 at ¶ 61).

Next, Defendants contend that Mr. Smith's Equal Protection Claim should be dismissed because he purportedly "fails to identify any specific comparators or the facts alleged to make" them "'identical in all relevant aspects.'" (DE 39 at 16 (citation omitted).) But it is plain from a fair reading of the SAC in the light most favorable to Mr. Smith that he is comparing himself with other condemned people who ADOC intends to execute by nitrogen hypoxia. (DE 31 at ¶¶ 59, 62.)

Defendants also contend that Mr. Smith has not alleged sufficient facts to show that he is similarly situated to his comparators because he has described his position as "unique" given his status as an execution survivor. (DE 39 at 16; *see also* DE 31 at ¶ 95 (referring to the "unique circumstances of Mr. Smith who survived an execution, has PTSD, and may experience nausea if he is re-exposed to the traumatizing experience").) That does not help Defendants. Comparators are "similarly situated" if they are "'prima facie identical in all *relevant* respects.'" *Grider v. City of Auburn*, 618 F.3d 1240, 1264 (11th Cir. 2010) (citation omitted, emphasis added); *see also Criswell v. City of Naples*, No. 2:19-cv-305, 2020 WL 2745818, at *3 (M.D. Fla. May 27, 2020) ("While Plaintiffs did not detail all the

21

ways [the comparators] are identical, at this stage of the proceedings, the allegation of 19 comparators is plausible and therefore sufficient to state a claim."); *Disser v. City of Tampa*, No. 8:13-cv-885, 2013 WL 3975759, at *10 (M.D. Fla. Jul. 31, 2013) ("A valid comparator must be similarly situated with respect to all factors that an objectively reasonable governmental decision maker would have found *relevant* in making the challenged decision." (emphasis added)).  Mr. Smith's status as an execution survivor with PTSD is not relevant to the decision to select him for the first such attempted execution while he has an appeal pending and other condemned people have exhausted theirs.  If anything, it makes the decision even more suspect.

Finally, Defendants contend that Mr. Smith has not sufficiently pleaded that they acted with a discriminatory intent because he "does not allege that the State was improperly motivated by discriminatory intent" when it "sought to carry out his sentence last year."  (DE 39 at 16.)  Defendants ignore Mr. Smith's allegations that they were motivated to choose him for the first attempted nitrogen hypoxia execution in advance of others who ADOC intends to execute by nitrogen hypoxia whose appeals exhausted long ago to forestall discovery into their prior failed attempt to execute him by lethal injection.  (*See* DE 31 at ¶¶ 67–72.)  Indeed, the very fact that ADOC scheduled Mr. Smith for execution by nitrogen hypoxia *first*—even though he has appeals pending and other similarly situated inmates have long had their

22

appeals exhausted—itself is evidence of a discriminatory intent, and is arbitrary and capricious on its face.

> **2.    Mr. Smith Has Alleged a Plausible Claim to Relief for Violation of His Right to be Free from Cruel and Unusual Punishment Under the Eighth Amendment**

Defendants accuse Mr. Smith of describing execution by nitrogen hypoxia under the Protocol as "'novel and experimental' and an 'untested' method." (DE 39 at 24 (citation omitted).)  It indisputably is all those things; it has "never been used [anywhere] to carry out an execution and ha[s] no track record of successful use." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1130 (2019) (citation and internal quotation marks omitted).  Mr. Smith will be the first condemned person subject to this novel, experimental, and untested method under the Protocol, which he alleges "exacerbates the risks" of "dire consequences, including a persistent vegetative state, a stroke, or the painful sensation of suffocation." (DE 31 at ¶¶ 81, 79.)  Defendants' attack on Mr. Smith's Eighth Amendment Claim is divorced from the factual allegations in the SAC and instead consists of their assurances that Mr. Smith has nothing to worry about.  Mr. Smith has been down this road before:

> Mr. Smith asked a panel of this Court—including myself—to stay his execution because he feared he would be subject to superadded pain and terror as the State carried out his death sentence.  The State called his claim speculative and asked us to trust that ADOC was prepared to perform the execution without incident.  We now know that Mr. Smith was right.

*Barber v. Gov. of Ala.*, 73 F.4th 1306, 1324 (11th Cir. 2023) (J. Pryor, J., dissenting); *see also Barber v. Ivey*, 143 S. Ct. 2545. 2549 (2023) (Sotomayor, J., dissenting from denial of application for a stay) ("Both Miller and Smith argued that Alabama would likely botch their execution just as it had botched preceding executions.  They were both right.").  He should not be made to travel it again.

>    **a.    Mr. Smith Has Plausibly Alleged that Execution Under the Protocol Would Expose Him to a Risk of Superadded Pain**

As this Court has held, "the relevant Eighth Amendment inquiry is whether the State's chosen method of execution superadds pain well beyond what's needed to effectuate a death sentence." *Smith*, 2023 WL 4353143, at *6 (quoting *Bucklew*, 139 S. Ct. at 1126–27, internal quotation marks omitted).  In making that determination, "the Court must ask 'whether the State had some other feasible and readily available method to carry out its lawful sentence that would have significantly reduced a substantial risk of pain.'"  *Id.* (quoting *Bucklew*, 139 S. Ct. at 1127).  Mr. Smith has plausibly alleged both elements.

>    **i.    Mr. Smith's Allegations of Superadded Pain**

Mr. Smith alleges that "nitrogen hypoxemia can cause dire consequences, including a persistent vegetative state, a stroke, or the painful sensation of suffocation" and that "the Protocol fails to account for and instead exacerbates the

risks of those dire consequences." (DE 31 at ¶¶ 79–82.) In addition, Mr. Smith alleges five ways in which the Protocol does so.

First, the Protocol contemplates that nitrogen will "be delivered through tubing into a mask and placed over the condemned person's face by a member of the execution team." (*Id.* at ¶ 83.) ADOC's decision to use a mask to deliver nitrogen requires "critical[ly] that the mask be properly secured and sealed throughout the process" because if oxygen can infiltrate the mask, "the time to unconsciousness will increase, posing a severe risk of dire consequences to the condemned inmate, including being left in a persistent vegetative state, experiencing a stroke, or experiencing the painful sensation of suffocation." (*Id.* at ¶ 85.)

Fitting a mask to ensure an airtight seal is complicated by "[v]ariations in nose structure, facial hair, obesity, and other anatomic characteristics [that] can increase the difficulty of mask ventilation." (*Id.* at ¶ 86.) "In addition, movement of the face or head can dislodge a mask and break the seal, which is more likely in an execution setting than, for example, in a medical setting." (*Id.* at ¶ 87.) The Protocol exacerbates that likelihood "because it affords the condemned person an opportunity to speak *after* the mask is placed over his face" and "[s]peaking or attempting to speak may dislodge or otherwise alter the placement of the mask, which may result in an imperfect seal and leaking." (*Id.* at ¶ 87–88 (emphasis in original).)

25

The Protocol does not account for the difficulty of maintaining an airtight seal (or even acknowledge that is critical) except for indicating that unidentified execution team members with no identified qualifications and no identified training are responsible for "plac[ing] and adjust[ing]" an unidentified mask "on the condemned inmate's face."  (*Id.* at ¶ 83; *see also id.* at ¶¶ 84, 86, 88–89.)  There is nothing in the Protocol to indicate that there are any criteria to determine whether the mask is sealed or that any member of the execution team is trained to determine whether the seal has been broken and what to do in that event.  Mr. Smith has alleged that the Protocol's deficiencies can be addressed by using "a custom fit mask to reduce the risk that oxygen leaks under the mask or, alternatively, us[ing] a closed space or hood" and by "[p]rovid[ing] a condemned person an opportunity to speak and to audibly pray without being masked."  (*Id.* at ¶ 102.)

Second, it also is critical to have a mechanism to vent exhaled carbon dioxide from the mask because "[i]f carbon dioxide that the condemned person exhales is trapped under the mask for the condemned person to inhale, carbon dioxide will build up in the condemned person's body, causing him to experience the sensation and pain of suffocation."  (*Id.* at ¶ 92.)  There is nothing in the Protocol that indicates that there is any mechanism to vent carbon dioxide from the mask and avoid those consequences.  (*See id.*)

26

Third, there is nothing in the Protocol to ensure that ADOC will deliver 100% pure nitrogen to a condemned person.  (*See id.* at ¶ 93.)  "If ADOC uses less than 100% nitrogen for a prolonged period of time, that entails a severe risk of the dire consequences from nitrogen hypoxia."  (*Id.*)

Fourth, although the Protocol indicates that "a 'pulse oximeter will be placed and secured on the condemned inmate'" when the mask is placed on a condemned person's face and monitored for two minutes thereafter, there are no procedures for monitoring the pulse oximeter *after* nitrogen flows into the mask.  (*Id.* at ¶ 94.) Monitoring the pulse oximeter *after* nitrogen is flowing into it "could reveal that the execution should be halted because oxygen is infiltrating the mask and raising the risk of dire consequences short of death."  (*Id.*)

Fifth, "[t]he Protocol fails to provide procedures for a condemned person who vomits inside the mask, which might cause the condemned person to choke."  (*Id.* at ¶ 95.)  Mr. Smith is particularly susceptible to nausea because he has post-traumatic stress disorder ("PTSD") from ADOC's previous attempt to execute him.  (*Id.*)  And his PTSD is exacerbated as he re-experiences the lead up to another attempt to execute him and because Defendants have placed him on "single walk" status, which isolates him from his brother inmates and complicates visits with his family, depriving him of their companionship when he needs it most.  (*Id.* at ¶¶ 97–98.)

Accepting those facts as true and drawing all reasonable inferences in Mr. Smith's favor, as the Court must on a motion to dismiss, Mr. Smith has alleged sufficient facts to state a plausible claim to relief that execution by nitrogen hypoxia using the Protocol will "'superadd[] pain well beyond what's needed to effectuate a death sentence.'" *Smith*, 2023 WL 4353143, at *6 (quoting *Bucklew*, 139 S. Ct. at 1126–27, internal quotation marks omitted).

### ii.      Defendants' Contentions are Meritless

Defendants contend that Mr. "Smith's allegations are slim and speculative" and not sufficiently detailed to state a plausible claim for relief.  (DE 39 at 27.)  But Defendants ignore the details that have been alleged and further demand detail that is not required in a complaint.  Indeed, Defendants' authorities in support of their challenges to Mr. Smith's allegations supporting his Eighth Amendment Claim involve summary judgment or preliminary injunction motions resolved after evidentiary submissions.  *See Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1267 (11th Cir. 2014) (preliminary injunction); *Pardo v. Palmer*, 500 F. App'x 901, 904 (11th Cir. 2012) (same); *Ferguson v. Warden, Fla. State Prison*, 493 F. App'x 22, 25 (11th Cir. 2022) (same); *Wackerly v. Jones*, 398 F. App'x 360, 363 (10th Cir. 2010) (same); *Jackson v. Danberg*, 594 F.3d 210, 227 (3d Cir. 2010) (summary judgment).  Those cases do not bear on the standard for dismissal based on the pleadings under Rule 12(b)(6).

28

Contrary to Defendants' contention, Mr. Smith has not alleged that the Protocol must "specify every detail of the execution process." (DE 39 at 28.) But in the absence of critical details about how the process described in the Protocol will work, Mr. Smith's factual allegations raise a reasonable inference that he will incur a risk of superadded pain if he is subject to execution by nitrogen hypoxia using the Protocol.

In their Response, Defendants speculate about facts that are not alleged in the SAC, but might contradict Mr. Smith's factual allegations if they ultimately are supported by evidence. That is not a basis to dismiss Mr. Smith's Eighth Amendment Claim.[10] And, in any event, the underlying evidence (if it exists) is in Defendants' sole possession. For example, Defendants contend that:

- "The invited inferences that ADOC personnel *might* be insufficiently trained in mask placement and that *could* result in an improperly fit mask are likewise speculative." (DE 39 at 30 (emphasis in original).)

- Mr. Smith's allegation that the Protocol does not contain any mechanism for venting carbon dioxide from the mask "is *not* an allegation that carbon dioxide *will* be trapped under the mask, or that

---

[10] *See United States v. Focia*, 2015 WL 3672382, at *3 (M.D. Ala. June 12, 2015), *aff'd*, 869 F.3d 1269 (11th Cir. 2017) ("Perhaps Defendant is correct both in his interpretation of the statute and in his speculation about whether the Government will be able to prove all of the requisite elements of a violation under the statute, and perhaps he is not. But, *in resolving Defendant's pretrial motion to dismiss based on the facial sufficiency of Count Four, the court cannot speculate about what will be the content of the Government's evidence at trial*. Rather, the court must look to the face of the indictment, and, on its face, Count Four plainly alleges an offense under the statute . . . .").

the mask actually *does not* have a mechanism for coping with the inmate's exhalation of carbon dioxide." (*Id.* at 31 (emphasis in original).)

- Mr. Smith "does not allege that ADOC personnel will *not* monitor the pulse oximeter after nitrogen has begun to flow." (*Id.* at 32 (emphasis in original).)

There is nothing in the Protocol that suggests that ADOC personnel are trained or qualified to place the mask so that it is airtight and sealed or to notice if the seal becomes broken, that there is any mechanism to vent carbon dioxide from the mask, or that ADOC personnel will monitor the pulse oximeter *after* nitrogen flows into the mask. And Mr. Smith is entitled to the reasonable inferences that flow from those facts, including the risks to which he is exposed as a result. He plainly cannot be criticized for not alleging facts about the mask or ADOC personnel that are in the exclusive possession of the Defendants (if those facts exist). *See*, *e.g.*, *Bouton v. Ocean Props., Ltd.*, 223 F. Supp. 3d 1248, 1256 (2016) ("Courts should not dismiss complaints because plaintiffs are unable to plead facts 'which tend systemically to be in the sole possession of defendants." (quoting *Overton v. Wells Fargo Bank, N.A.*, No. 4:11CV1957, 2012 WL 401065, at *2 n.2 (E.D. Mo. Feb. 3, 2012)); *Lipscomb v. Cronic*, No. 2:11-CV-78, 2011 WL 6755198, at *11 (N.D. Ga. Dec. 22, 2011) ("at the motion to dismiss stage, each well-pleaded allegation is taken as true,

and, in pleading the *mens rea* of the Defendants, it is unclear what else the Plaintiff could plead as those facts are within Defendants' sole possession").

Elsewhere, Defendants confuse speculation with well-pleaded fact when they contend that Mr. "Smith speculates that 'movement of the face or head *can* dislodge a mask." (DE 39 at 30 (emphasis in original).)  That is not speculation; it is a well-pleaded fact,  (DE 31 at ¶ 87), accepted as true for purposes of Defendants' motion.

That there is sparse research on the human exposure to nitrogen, (DE 39 at 35), and Defendants' contention that Mr. "Smith makes no allegations at all about how much oxygen would have to 'infiltrate' the mask to cause him to suffer physical injury short of death," (*id.* at 28), highlights the experimental nature of the procedure under the Protocol.   That detail cannot be alleged with precision because an execution by nitrogen hypoxia has not been attempted anywhere before.

> **b.** **Mr. Smith Has Plausibly Alleged that There are Feasible and Available Alternatives to Execution Under the Protocol**

Defendants do not contend that Mr. Smith has failed to plausibly allege that there are feasible and readily available alternatives to execution by nitrogen hypoxia using the procedures in the Protocol.  Nor could they.  Mr. Smith has alleged that "ADOC can amend the Protocol to cure its deficiencies by including provisions" that Mr. Smith identifies.  (DE 31 at ¶ 102.)  "Alternatively, if Defendants are unwilling or unable to amend the Protocol so that it complies with constitutional

requirements," Mr. Smith has identified the firing squad as another feasible and readily available alternative method of execution. (*Id.* at ¶ 103.) And Mr. Smith identified Utah's protocol for executing condemned people by firing squad, "which is 'sufficiently detailed to permit a finding that the State could carry it out relatively easily and reasonably quickly.'" (*Id.* (quoting *Nance v. Comm'r, Ga. Dep't of Corrs*, 59 F.4th 1149, 1155 (11th Cir. 2023)).)

### 3.   Mr. Smith Has Alleged a Plausible Claim to Relief for Violation of RLUIPA

RLUIPA provides: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that governmental interest." 42 U.S.C. § 2000cc-1(a). A "substantial burden" on religious exercise "is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly." *Thai Meditation Ass'n of Ala. Inc. v. City of Mobile, Ala.*, 83 F.4th 922, 927 (11th Cir. 2023) (citation and internal quotation marks omitted).

"In RLUIPA, in an obvious effort to effect a complete separation from the First Amendment case law, Congress deleted reference to the First Amendment and

defined the 'exercise of religion' to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 696 (2014) (quoting 42 U.S.C. § 2000cc-5(7)(A)).  RLUIPA thus provides more "expansive protection" for religious liberty than the United States Supreme Court case law construing the First Amendment. *Holt v. Hobbs*, 574 U.S. 352, 358 (2015).

Mr. Smith alleges that the Protocol substantially burdens the exercise of his religion because it forces him into the untenable choice of praying audibly, which risks dislodging the mask with dire consequences, or abstaining from audible prayer. (DE 31 at ¶¶ 99, 136.)  As the Supreme Court has acknowledged, "there is a rich history" of audible prayer at the time of a condemned person's execution "dating back well before the founding of the nation." *Ramirez v. Collier*, 595 U.S. 411, 427 (2022).  That is all that is required for Mr. Smith to carry his initial burden. *See Holt*, 574 U.S. at 358 ("Under RLUIPA, petitioner bore the initial burden of proving that the Department's grooming policy implicates his religious exercise . . . grounded in a sincerely held religious belief, . . . [and] also bore the burden of proving that the Department's  grooming policy substantially burdened that exercise of religion.").

As they do repeatedly, Defendants ignore the facts that Mr. Smith has alleged. Instead, they offer an alternative version of the facts in which "[i]f Smith were to move his mouth so violently while praying or otherwise making his final statement

that the mask were to become unseated, this would be corrected, per the protocol, prior to the introduction of nitrogen gas." (DE 39 at 49.) But that is not alleged in the SAC. Nor are there allegations in the SAC about "exhalation ports" or "one-way valves" for venting carbon dioxide to which Defendants refer, (*id.*), because the Protocol does not say anything about carbon dioxide, ports, valves, or what type of mask will be used.

### 4. Mr. Smith Has Alleged a Plausible Claim to Relief for Violation of ARFA

ARFA provides: "Government shall not burden a person's freedom of religion even if the burden results from a rule of general applicability, except . . . if it demonstrates that application of the burden to the person (1) Is in furtherance of a compelling governmental interest; and (2) Is the least restrictive means of furthering that compelling governmental interest." Ala. Const. art. I, § 3.01(V). It differs from RLUIPA only in that ARFA does not require proof that the government "substantially" burdened religious exercise, only that it "burden[ed]" it. Under ARFA, "*any* burden—even an incidental or insubstantial one—suffices to trigger strict scrutiny." *Thai Mediation Ass'n of Ala., Inc. v. City of Mobile, Ala.*, 980 F.3d 821, 840 (11th Cir. 2020) (emphasis in original). While ARFA imposes a lesser burden on Mr. Smith than RLUIPA, the same allegations that support Mr. Smith's RLUIPA Claim support his ARFA Claim.

Even though Mr. Smith's ARFA Claim shares an identity of facts with Mr. Smith's RLUIPA Claim, Defendants contend that the "Court should decline to exercise supplemental jurisdiction" over it because "there is minimal guiding state authority."  (DE 39 at 53.)  The Court should reject that advice.

As noted, the only material difference between RLUIPA and ARFA is that the former requires a plaintiff to show a "substantial burden" on religious exercise while the latter requires a plaintiff to show only a "burden."  And, although the Eleventh Circuit expressed a "preference" for certifying the question to the Alabama Supreme Court, 980 F.3d at 837–38, it concluded, based on the plain language of ARFA, that it provides that "*any* burden—even an incidental or insubstantial one—suffices to trigger strict scrutiny."  *Id.* at 839–40.  Defendants do not offer any analysis to suggest that an Alabama state court would reach a different conclusion.

What is more, if the Court declines supplemental jurisdiction, Mr. Smith would be forced to pursue his ARFA Claim in an Alabama state court.  That would lead to parallel proceedings in federal and state court over the identical set of facts on an expedited basis given the January 25, 2024 execution date.  There is no reason to invite that waste of judicial and party resources.  This Court should consider Mr. Smith's federal RLUIPA Claim and his parallel ARFA Claim in this proceeding as the Court previously has done in litigation raising similar religious exercise issues

35

involving a condemned person during his planned execution.  *See Smith v. Dunn*, 516 F. Supp. 3d 1310 (M.D. Ala. 2021).

Defendants' contention that the Anti-Injunction Act precludes Mr. Smith from injunctive relief on his ARFA Claim misses the mark.  (DE 39 at 54.)  The Anti-Injunction Act provides that a federal court "may not grant an injunction to stay proceedings *in a State court* except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgment." 28 U.S.C. § 2283 (emphasis added).  The Anti-Injunction Act does not apply because Mr. Smith is not seeking an injunction "to stay proceedings in a State court."

> ### 5.   Mr. Smith Has Alleged a Plausible Claim to Relief for Violation of His Free Speech and Free Exercise Rights Under the First Amendment

It is well-settled "that federal courts must take cognizance of the valid constitutional claims of prison inmates." *Turner v. Safley*, 482 U.S. 78, 84 (1987). The standard for assessing such claims is that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89.  To make that determination, courts consider the following factors derived from *Turner*:

> (1)   whether there is a "valid, rational connection" between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to inmates; (3) whether and the

36

> extent to which accommodation of the asserted right will
> have an impact on prison staff, inmates, and the allocation
> of prison resources generally; and (4) whether the
> regulation represents an "exaggerated response" to prison
> concerns.

*Hakim v. Hicks*, 223 F.3d 1244, 1247 (11th Cir. 2000).

Mr. Smith's First Amendment Claim is based on the same factual allegations about the untenable choice he faces between praying audibly and exposing himself to increased risk or refraining from prayer. Application of the *Turner* factors requires factual development about Defendants' interest, other alternative means, if any, available to Mr. Smith, the impact on staff and prison resources, and the extent to which the procedures in the Protocol are an "exaggerated response" to the Defendants' concerns. The Court should await that factual development before ruling on Mr. Smith's First Amendment Claim.

## II.   THE COURT SHOULD GRANT A PRELIMINARY INJUNCTION TO ENJOIN MR. SMITH'S SCHEDULED EXECUTION BY NITROGEN HYPOXIA USING THE PROTOCOL

Defendants have failed to rebut Mr. Smith's showing that he satisfies the standard for entry of preliminary injunctive relief. They largely ignore Mr. Smith's evidence and fail to controvert it with their own evidence. Moreover, the limited discovery that the Court ordered, (DE 28), is ongoing at the time of this submission. Mr. Smith reserves his right to supplement the record with additional evidence before or at the hearing scheduled for December 20.

**A.      Mr. Smith is Likely to Succeed on the Merits of His Claims**

      **1.      Mr. Smith is Likely to Succeed on the Merits of His Claim that His Execution Would Violate His Right to Equal Protection Under the Fourteenth Amendment**

Defendants do not address Mr. Smith's showing that he is likely to succeed on the merits of his Equal Protection Claim. *See* DE 19 at 12–15. The facts are unrebutted.

The State previously has represented: "As a matter of custom: the State waits to move for an inmate's execution until he has exhausted his conventional appeals: direct appeal, state postconviction, and federal habeas." Ex. 4 at 4 (quoted in *Woods*, 951 F.3d at 1292). But the State seeks to execute Mr. Smith even though he has an appeal pending from denial of a state postconviction petition. *See* DE 19-6.

██████████████████

██████████████████

█████████. *See* Ex. 5. And Defendants have not submitted any evidence, much less evidence that remotely suggests that the decision to seek Mr. Smith's execution despite the pendency of his state postconviction appeal is "rationally related to a legitimate government interest." *Arthur*, 674 F.3d at 1262.

Defendants do not and cannot deny those facts. Instead, in a footnote, they contend that "[w]hile a Rule 32 petition is considered a conventional postconviction proceeding in an Alabama capital case, a *successive* Rule 32 petition is not." (DE

39 at 2 n.2 (emphasis in original).)  Defendants' *ipse dixit* is not supported with any evidence.  More importantly, Defendants fail to address *Mr. Smith's* successive Rule 32 petition—which is, on its face, of a different kind—in any meaningful way.

Mr. Smith's successive Rule 32 petition is nothing like the examples on which Defendants rely, which were filed by condemned people *after* their executions were scheduled.  *See supra* at 19.  Nor is Mr. Smith's successive Rule 32 petition like others that involve allegations about newly discovered facts concerning events that happened at trial years or decades ago.  Mr. Smith's second Rule 32 petition and his appeal from the dismissal of that claim indisputably *arose from* ADOC's failed attempt to execute him in November 2022.  There is no dispute that Mr. "Smith could not have raised this claim in his first Rule 32 petition," as the State conceded on appeal in state court—because it turns on factual developments that occurred in November 2022.  *Smith v. State*, CR-2023-0594, Brief of Appellee at 18 (Ala. Ct. Crim. App.) (Ex. 6).

Moreover, contrary to Defendants' mischaracterization of the claim Mr. Smith asserted in his successive Rule 32 petition, (DE 39at 2 n.2), Mr. Smith's claim is based on his allegations that (i) Mr. Smith's was ADOC's third consecutive botched or failed execution caused by its failure to establish intravenous lines (DE 19-6 ¶¶ 22, 25–27); (2) ADOC did no investigation after the first two and before it attempted to execute Mr. Smith (*id.* at ¶¶ 22, 27); (3) given that ADOC "knew or

should have known . . . that the IV team would have great difficulty establishing IV access, resulting in severe physical and psychological pain to Mr. Smith" (*id.* at ¶ 28); (4) ADOC nevertheless "recklessly and knowingly charged ahead with deliberate indifference to Mr. Smith's rights and with the same results" (*id.* at ¶ 30); (5) causing Mr. Smith "severe physical and psychological pain that has had ongoing effects," including "severe post-traumatic stress disorder" (*id.* at ¶¶ 13, 35); and (6) "ADOC's attempt to make a second attempt to execute Mr. Smith exacerbates his symptoms and further destabilizes him" (*id.* at ¶ 36).  Those allegations parallel Mr. Smith's allegations in the Lethal Injection Action that this Court found "support a plausible claim of cruel superadded pain as part of the execution" that "goes 'so far beyond what [is] needed to carry out a death sentence that [it] could only be explained as reflecting the infliction of pain for pain's sake.'"  *Smith*, 2023 WL 4353143, at *7 (citation omitted).[11]

Legally, those allegations differentiate Mr. Smith's experience from a failed execution that follows from an "unforeseeable accident," *La. ex rel. Resweber*, 329 U.S. 459, 464 (1947) (plurality op.), which does not prohibit a second attempt, from one like Mr. Smith's that follows from a "series of abortive attempts . . . or a single,

---

[11] *See also Barber*, 73 F.4th at 1324 (J. Pryor, J., dissenting) ("Mr. Smith's horrifying experience was not a singular event; it was just the latest incident in an uninterrupted pattern of executions by Alabama's Department of Corrections ('ADOC') that involved protracted, severely painful, and grisly efforts to establish the intravenous lines necessary to carry the lethal injection drugs into his body.").

cruelly willful attempt," *id.* at 471 (Frankfurter, J., concurring), which does.  *See also Baze v. Rees*, 553 U.S. 35, 50 (2008) (plurality op.) ("'a series of abortive attempts at [execution] . . . unlike an 'innocent misadventure'—would demonstrate an 'objectively intolerable risk of harm' that officials may not ignore" because it "prevents [them] from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment'" (citations omitted)); *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) ("Because the first attempt [in *Resweber*] had been thwarted by an 'unforeseeable accident,' the officials lacked the culpable state of mind necessary for the punishment to be regarded as 'cruel,' regardless of the actual suffering inflicted.").

Notwithstanding the Alabama Court of Criminal Appeals' recent decision (on which, today, Mr. Smith has sought rehearing as required by the Alabama Rules of Appellate Procedure, mere days after the Court of Criminal Appeals issued its decision), the U.S. Supreme Court and the Ohio Supreme Court (the only state court of last resort to consider the implications of a failed execution attempt on a successive attempt) have rendered closely divided decisions when condemned people have challenged the constitutionality of multiple execution attempts.  *See Resweber*, 329 U.S. at 471 (Frankfurter, J. concurring); *State v. Broom*, 146 Ohio St.3d 60, 51 N.E.3d 620 (2016).  And, in *Resweber*, "Justice Frankfurter's fifth vote hinged on an outdated understanding of constitutional procedure, . . . and Justice

Frankfurter himself suggested that, but-for that understanding, he might have voted with the dissenters." *Broom v. Shoop*, 963 F.3d 500, 511 (6th Cir. 2020); *see also id.* at 511 ("Broom makes a compelling case on the merits, one that some members of the panel might be tempted to accept were this case before us on direct review."); *Broom*, 146 Ohio St.3d at 84, 51 N.E.3d at 641 (O'Neill, J., dissenting) (In *Resweber*, "five of the justices were able to recognize the second execution attempt for what it was: torture.").[12]   Mr. Smith's Rule 32 petition raises a serious constitutional question.  He should be entitled to pursue his appeal through the ordinary channels *before* Defendants attempt to execute him again.

In any event, even accepting contrary to fact, that Mr. Smith exhausted his conventional appeals on February 22, 2022 when the U.S. Supreme Court denied his petition for certiorari in his federal habeas proceeding, *see Smith v. Hamm*, 142 S. Ct. 1108 (2022), he still is being treated disparately from similarly situated condemned people who Defendants intend to execute by nitrogen hypoxia. ███

████████████████████████████████████████

████████████████████████████████████████

---

[12] Justice Frankfurter's fifth vote upholding as constitutional the second execution attempt in *Resweber* was based on his view that the Eighth Amendment did *not* apply to the states through incorporation into the Fourteenth Amendment's due process clause, although he stated that he was "[s]trongly drawn . . . to some of the sentiments expressed by my [dissenting] brother Burton." *Resweber*, 329 U.S. at 471 (Frankfurter, J., concurring).  It is now well-settled that "the Fourteenth Amendment incorporates the Cruel and Unusual Punishments Clause against the States." *Jones v. Mississippi*, 141 S. Ct. 1307, 1314 (2021).

████████████████████████████████████████

████████████████ . *See* Ex. 5. ████████████████████████

████████████████████ *See id.*

### 2. Mr. Smith is Likely to Succeed on His Claim that His Execution by Nitrogen Hypoxia Would Violate His Right to be Free from Cruel and Unusual Punishment Under the Eighth Amendment

Mr. Smith is likely to succeed on both elements of his Eighth Amendment Claim—that the Protocol exposes him to a substantial risk of superadded pain and that there are feasible and available alternatives to reduce that risk.  Defendants' evidence does not alter that conclusion.

### a. The Evidence Will Demonstrate that the Protocol Exposes Mr. Smith to a Substantial Risk of Superadded Pain

In his opening papers, Mr. Smith identified substantial risks associated with Defendants plan to execute him by nitrogen hypoxia using the Protocol.  (DE 19 at 18–22.)  Each of them "could result in the condemned person being transitioned to a persistent vegetative state, having a stroke, experiencing the painful sensation of suffocation, choking on aspirated vomit, or other complications if not properly rectified."  (DE 19-1 at 9.)

### i. Risks Associated With Oxygen Leakage Into a "One-Size-Fits-All Mask

Defendants do not dispute that "execution by nitrogen hypoxia requires a 'tightly sealed mask.'" (DE 39 at 58; DE 19-1 at 9 ("Delivery of nitrogen gas would require a closed chamber or a tightly sealed mask."); DE 19-2 at ¶ 5.1.) That is because "in the execution by nitrogen hypoxia setting, breathing oxygen would likely prolong the time to reach unconsciousness which could lead to a persistent vegetative state or other complications." (DE 19-1 at 10; *see also* DE 19-2 at ¶ 5.2 ("The smallest air leak greatly increases the time to loss of consciousness and uncertainty regarding the outcome.").)[13]

Maintaining an airtight seal with a mask is complicated by "[v]ariations in nose structure, facial hair, obesity, and other anatomic variability can increase the difficulty of mask ventilation." (De 19-1 at 6.) In addition, "the movement of the condemned person while speaking or otherwise moving their head, including small mouth movements such as quiet but audible prayer, along with changes to the facial muscles when they lose consciousness, may result in an imperfect seal resulting in leaking." (*Id.* at 9; *see also id.* at 7 (the loss of consciousness "causes changes to the face as the facial muscles relax," which "can cause the mask to dislodge or the seal to be broken"); DE 19-2 at ¶ 2.3 ("there were ongoing problems associated with

---

[13] Defendants incorrectly claim that the "primary result" Mr. Smith contends would result from leakage of oxygen into the mask "would be to 'prolong the time to reach unconsciousness.'" (DE 39 at 61). Defendants ignore the dire consequences that could follow.

maintaining a tight air-seal between the device and the user's face, especially once consciousness is lost"); *id.* at ¶ 9.1 (referring to "an involuntary (or voluntary) movement that could lead to the dislodgment of the mask" like "muscle spasms which can occur in the course of a person developing cerebral hypoxia").)

ADOC knew about the difficulties of using a mask to deliver nitrogen as a means of execution when it prepared the Protocol.  A report in ADOC's files about nitrogen hypoxia as a means of execution makes this clear.  *See* Ex. 7 ("Oklahoma Report").[14]  The authors reported that the trend in using nitrogen (or helium) as a "method of human euthanasia" was "toward using an 'exit bag' filled with an inert gas such as nitrogen or helium."  *Id.* at 6.  However, the authors cautioned "that deviations from the above protocols have not always been as successful."  *Id.* at 7.  In particular:

> When masks were placed over the face (instead of using bags of helium over the head) it has been reported some problems have occurred.  This is typically the result of the mask not sealing tightly to the face, resulting in a small amount of oxygen being inhaled by the individual.  This extends the time to become unconscious and extends the time to death.

*Id.*

---

[14] The authors prepared the Oklahoma Report for an Oklahoma legislator to consider "whether hypoxia via nitrogen gas inhalation would be an effective and humane alternative to the current methods of capital punishment practiced in Oklahoma per the eighth amendment."  (*Id.* at 2.)

Indeed, as a result of "significant problems associated with maintaining an air-tight seal," which "have been found to be unsolvable," delivery of nitrogen through a mask was abandoned as a means of human euthanasia in 2002. (DE 19-2 at ¶¶ 5.1, 2.3.)   Thus, "[i]t is difficult to see how an effective air-seal could be initially established, let alone maintained, without Mr. Smith's participation and cooperation." (DE 19-2 at ¶ 8.2.)  As a result, "[t]here is a significant possibility that Mr. Smith will be subject to incomplete cerebral hypoxia.  A resultant vegetative state with permanent brain damage cannot be excluded." (*Id.* at ¶ 13.2); *see also* Ex. 7 at 5 ("If the supply of oxygen in the blood is reduced below a critical level it will result in a rapid loss of consciousness and irreversible brain damage.").  And that significant possibility "intensifie[s] the sentence of death with a (cruel) superaddition of terror, pain, or disgrace." *Bucklew*, 139 S. Ct. at 1124 (citation and internal quotation marks omitted).

Defendants contend that that even if a mask becomes dislodged and an airtight seal is broken, Execution Team members can adjust or apply pressure to the mask to reseal it, as Dr. Nitschke and Dr. Yong suggest.  (DE 39 at 58.)  But it is critical that the mask remain sealed when the *nitrogen* is flowing into it because even involuntary movements like changes in facial muscles caused by loss of consciousness or seizures can cause the mask to become dislodged.  (*See* DE 19-1 at 7, 9; DE 19-2 at ¶ 2.3.)

46

███████████████████████████████████████████   Ex. 8 at ADOC

Hypoxia_000770.

Even assuming Execution Team members are trained to "monitor the situation" (and Defendants have not submitted any evidence of that), there is no reason to believe that they will be in a position to adjust or apply pressure to a dislodged mask once nitrogen is flowing into it. Given the potential risks to third parties, Defendants intend to make a spiritual advisor who enters the execution chamber sign an acknowledgment form to confirm that "I understand and agree to remain at least (3) feet away from the mask or any outflow of breathing gases discharging from the system." (DE 19-7.) Presumably, Defendants have provided the same instruction to the Execution Team members.

Defendants also contend that Mr. Smith is not likely to succeed on the merits because he "does not allege that the State will use or is likely to use a loosely sealed mask." (DE 39 at 58.) Defendants' contention misses the point. It is difficult to maintain the necessary airtight seal using *any* mask given the complications associated with variations in face structure and voluntary and involuntary movements.

Next, relying on an affidavit from Cynthia Stewart, one of ADOC's Regional Directors, Defendants provide assurances that they "will use a mask tightly sealed by five separate straps." (DE 39 at 58.) Based on Ms. Stewart's observations, the

mask purportedly "demonstrates no substantial risk of becoming loose or dislodged." (*Id.*; *see* Doc. 39-13 at ¶¶ 3–5.)[15] But Ms. Stewart's observations fail to account for the difference between fitting a mask to a willing volunteer with nothing to fear and fitting it to a condemned person who knows that gasses will be supplied through it to cause his death. (*See* DE 19-1 at 9 ("Without patient compliance and minimal movement, it is difficult to ensure that a mask will remain sealed and in the correct position."); DE 19-2 at ¶¶ 2.3, 5.1, 9.1.)

### ii.   Risks Associated With Carbon Dioxide Entrapment

It also is important that "a mask system . . . include a scrubber to remove carbon dioxide from the air the condemned person exhales." (DE 19-1 at 10.) In the absence of such a scrubber, "the condemned person could re-breathe carbon dioxide and experience hypercarbia, asphyxiation, and the painful sensation of suffocation." (*Id.*) Although the Protocol is silent on any system to vent carbon dioxide, Defendants contend that they "intend[] to use a mask featuring 'exhalation valves for venting carbon dioxide.'" (DE 39 at 61.) Subject to confirmation, Mr. Smith reserves any further comment.

### iii.   Risks Associated With Vomiting

---

[15] At the time of submission of this brief, Mr. Smith had not had an opportunity to depose Ms. Stewart. Mr. Smith reserves his right to submit additional evidence before or during the hearing scheduled for December 20.

Among other things, hypoxemia (low blood oxygen) can cause nausea or vomiting.  (*See* DE 19-1 at 5.)  ████████████████████████████████████

*See* Ex. 8 at ADOC Hypoxia_000770.  But the Protocol does nothing to address a condemned person who vomits into the mask.

Mr. Smith is particularly susceptible to nausea because, as Dr. Katherine Porterfield has explained, he has post-traumatic stress disorder ("PTSD") from his failed execution attempt last November, which can and has caused Mr. Smith to become nauseous.  (*See* DE 19-3 at 3, 30 *see also id.* at 21 (reporting that Mr. Smith "noted that he is frequently nauseated especially if he has a reminder of the attempted execution"); *id.* at 28 (reported physical symptoms after the failed execution included "waxing and waning nausea").)

Moreover, Mr. Smith's PTSD is exacerbated by ADOC's planned second attempt to execute him because "each step of the execution will be a repeat of the steps taken in 2022 during the lead-up to his first execution attempt." (*Id.* at 4.)  And "[e]xperiencing these traumatic events again—step by step—will severely trigger his [PTSD], likely thrusting him into states of disabling panic, fight or flight and dissociation that can only be characterized as devastating to the human body and mind." (*Id.*)  Mr. Smith's PTSD is further exacerbated by his placement on "single walk" status until his planned execution, which prohibits him from sharing the same space with other inmates.  (DE 31 at ¶ 97.)  That isolates him from his brother

inmates, complicates visits with his family and counsel, and restricts his religious exercise (he recently has been permitted to attend religious services one day a week accompanied by two corrections officers) when he needs companionship most. (*Id.* at ¶ 98.)

The Protocol does not address what will happen if a condemned person vomits into the mask. (DE 19-1 at 10.) "If vomit is not cleared from the mask, the condemned person could inhale the vomit and asphyxiate, resulting in painful physical sensations of choking and suffocation." (*Id.*) Defendants dismiss these issues because Mr. Smith has not reported to Dr. Porterfield "that he has vomited as a result of his PTSD." (DE 39 at 62.) They fail to consider that hypoxia itself can cause nausea in addition to Mr. Smith's PTSD and Mr. Smith's deteriorating condition.

Although Mr. Smith has alleged that a feasible and available alternative to address this issue is to amend the Protocol to "include procedures to halt the execution if the condemned person vomits into the mask," (DE 31 at ¶ 102), Defendants contend that is insufficient "to give the State a pathway forward." (DE 39 at 63.) A pathway forward is to adopt the procedures used during the administration of anesthesia: "If a patient vomits into a mask during the administration of anesthesia, anesthesiologists use suction to remove any vomit from inside the mask. Often this requires removing the mask in order to properly suction

50

out all material, to ensure the patient does not inhale and choke on their own vomit. The mask would then be cleaned or exchanged for a new mask."  (DE 19-1 at 8.)

### iv.    Risks Associated With Impure Nitrogen

The Protocol does not provide for any testing or other procedures to ensure that the nitrogen Defendants intend to use is pure.  Using anything less than pure nitrogen would expose the condemned person to the risk of transitioning to a persistent vegetative state, having a stroke, or experiencing the painful sensation of suffocation.  (*See* DE 19-1 at 11.)  Defendants contend that a Certificate of Conformance verifies the purity of the nitrogen it intends to use.  (DE 39 at 63.)  But nitrogen gas generally comes with manufacturer instructions for safe storage, including to "[s]tore away from direct sunlight in a dry, cool and well-ventilated area, away from incompatible materials."  *See* Ex. 9 at § 7.  There is no record evidence that ADOC complies with those instructions.

### v.    Risks Associated With the Failure to Monitor Oxygen Levels After Administration of Nitrogen

"The Protocol states that a pulse oximeter, which reads blood oxygen levels, will be affixed to the condemned person before administration of nitrogen and will be monitored for two minutes."  (DE 19-1 at 11.)  But there is no provision for continuing to monitor the pulse oximeter *after* administration of nitrogen, which would allow Defendants to halt the execution if the blood oxygen level falls to

51

perilous but not fatal levels, which would pose a risk to the condemned person "of entering a permanent vegetative or experiencing other physiological damage short of death." (*Id.*)

According to Defendants, "[t]hat the protocol does not specify continuous monitoring does not make it likely that ADOC personnel will not continue to monitor the pulse oximeter." (DE 39 at 64.)  Significantly, Defendants have not submitted any evidence that any Execution Team member *will* monitor the pulse oximeter while nitrogen is flowing into the mask.

Defendants' remaining argument is circular.  Defendants contend that there is no need to monitor the oxygen levels after the administration of nitrogen because Mr. Smith is "not likely to show that oxygen will infiltrate the mask to a degree that could produce a substantial risk of 'dire consequences.'" (*Id.* at 63.)  But Mr. Smith has made that showing. *See supra* at 42–47.

### b. The Evidence Will Demonstrate that There are Feasible and Readily Available Alternatives

A feasible, available, and readily implemented alternative method of execution need not be available on Defendants' schedule.  That ADOC needs to amend its Protocol—or, alternatively, the State needs to change its law to authorize a new method of execution—to satisfy Constitutional requirements does not make the proposed alternatives infeasible or unavailable.  Despite "the 'incidental delay'

involved in changing a procedure—which even when uncodified may take some work—" neither action "'*necessarily* prevents' the State from carrying out its execution." *Nance v. Ward*, 142 S. Ct. 2214, 2223 (2022) (emphasis in original) (quoting *Hill v. McDonough*, 547 U.S. 573, 583 (2006); *Nelson v. Campbell*, 541 U.S. 637, 647 (2004) (emphasis in original)); *see also Bucklew*, 139 S. Ct. at 1128 ("An inmate seeking to identify an alternative method of execution is not limited to choosing among those presently authorized by a particular State's law.")

Mr. Smith has identified two feasible and available alternative methods to execution by nitrogen hypoxia under the Protocol. Defendants can amend the Protocol to cure its deficiencies or, alternatively, the State can authorize executions by firing squad and adopt Utah's protocol.

### i.      Amendments to the Protocol

Mr. Smith has proposed amendments to the Protocol that would cure its deficiencies and significantly reduce the substantial risk of severe pain that its current incarnation entails. (*See* DE 19 at 22–23.) Despite that, Defendants complain that Mr. Smith has not provided a "veritable blueprint for the State to execute him by nitrogen hypoxia." (DE 39 at 67.)

For example, Defendants contend that Mr. Smith has not shown that "a custom fit mask" and "a mechanism to remove carbon dioxide" are "available and feasible." (*Id.* at 67.) There are custom fit continuous positive airway pressure

("CPAP") masks commercially available, which can be used by Defendants to supply nitrogen to condemned persons. *See*, *e.g.*, Ex. 10. As for mechanisms to remove carbon dioxide, Defendants claim that the mask they will use already has one. They cannot at the same time contend that one is unavailable.

Notably, Defendants fail to address Mr. Smith's proposed feasible and available alternative of using "a closed space or a hood," (DE 31 at ¶ 102), instead of a mask, which would eliminate the risks associated with mask use entirely:

> If an execution subject is uncooperative, any procedure that relies on a facemask will be at risk of significant failure. *One way to bypass the inherent problems of a facemask is to use a capsule, hood or container.* The restraining gurney could then be placed within the contained environment. To effect a peaceful death the oxygen level within the container would need to be rapidly lowered from an ambient 21% to less than one percent. This would ensure an almost immediate loss of consciousness with death following soon after.

(DE 19-2 at ¶ 14.1 (emphasis added); *see also* DE 19-1 at 9 ("Delivery of nitrogen gas would require a *closed chamber* or a tightly sealed mask." (emphasis added).) Indeed, the Oklahoma Report found that "[t]he process itself, as demonstrated by those who seek euthanasia, requires little more than a *hood* sufficiently attached to the subject's head and a tank of inert gas to create a hypoxic atmosphere." Ex. 7 at 10 (emphasis added).

### ii.     Utah's Protocol for Executions by Firing Squad

In the alternative, Mr. Smith has proposed Utah's firing squad protocol as a feasible and available alternative to the Protocol.  Under that procedure, upon impact of the bullets, a condemned person would experience immediate "loss of the pumping function of the heart," which, in turn would "cause blood flow to the brain to cease immediately," and loss of consciousness and sensation seconds later.  (DE 19-8 at ¶¶ 6–9.)

Purporting to place themselves in Mr. Smith's shoes, Defendants speculate that "[b]y Smith's own lights, his firing-squad proposal is insufficiently detailed and would not reduce his alleged risks."  (DE 39 at 71.)  Mr. Smith has not identified any of the imagined concerns that Defendants attribute to him.  In any event, Defendants apparently have not reviewed the Utah protocol, which addresses the imagined concerns Defendants have raised.

For example, Defendants imagine that Mr. Smith would complain because "Utah apparently places a hood over the inmate," which would interfere with him speaking and praying audibly.  *Id.*  But, unlike the Protocol, which provides for Mr. Smith to be masked as soon as he enters the execution chamber and before he is permitted to speak or pray with his spiritual adviser, the Utah protocol provides for a hood to be placed over the condemned person's head "at the conclusion of the condemned inmate's last words."  (DE 19-8 at 145.)

55

Defendants also contend that Mr. Smith would complain because the Utah protocol does not disclose the training the execution team members will receive and their level of experience.   (DE 39 at 71.)   But, unlike ADOC's Protocol for executions by nitrogen hypoxia, Utah's protocol for firing squad executions answers those questions.   For example, the Utah firing squad protocol discloses the qualifications of the five execution team members and the criteria by which they will be selected:

B.    Selection of Executioners

GRAMA Classifie
Public

1.    A five-person execution team, plus
      twoalternates and a team leader shall be
      chosen for the firing squad.

2.    The alternate(s) shall be selected to
      replace any member(s) of the firing
      squad who are unable to discharge their
      required functions.

3.    Persons selected for the firing squad
      shall be POST certified peace officers.

4.    Selected peace officers will be required
      to demonstrate proficiency with weapons
      designated to carry out the execution.

      a.    Under conditions substantially
            similar to those of the execution
            chamber, proficiency shall be
            exhibited by:

            1.    Firing each weapon.

            2.    At a minimum of 21 feet,
                  accurately hitting the target
                  of the same dimension as that
                  which will be attached to the
                  condemned.

      b.    During the proficiency test,
            failure to accurately hit the
            specified target with one round
            from each weapon fired shall
            disqualify the officer.

(DE 19-8 at 110.)

By contrast, ADOC's Protocol does not include any information about what,

if anything, qualifies execution team members to fit and secure the mask on a

57

condemned person so it is airtight and remains that way throughout the process.  Nor is there anything in the Protocol to explain the criteria by which those execution team members will determine whether the mask is securely fit and airtight.  And there is no evidence in the record to shed light on those issues.

Finally, Defendants contend that Mr. Smith's expert, "Dr. Groner does not compare the risks of a firing-squad protocol to the risks of nitrogen hypoxia."  (DE 39 at 72–73.)  But Dr. Groner need not do that.  A method of execution that causes near immediate loss of consciousness and ability to experience pain plainly reduces the substantial risks of a persistent vegetative state, stroke, or the sensation of suffocation associated with the Protocol.

### c.   Defendants' Comparison of Execution by Nitrogen Hypoxia Under the Protocol to Hanging Does Not Help Them

Defendants contend that even if Mr. Smith shows that the Protocol poses "a substantial risk of asphyxiation or the sensation of suffocation, the risks would not rise to the level of unconstitutionally severe or serious pain."  (*Id.* at 65.)  According to Defendants, relying on the Supreme Court's decision in *Bucklew*, that risk would be no worse than the risks posed by hanging, (*id.*), which was "the predominant method of execution in this country" "[a]t the time of [Eighth] Amendment's adoption."  *Bucklew*, 139 S. Ct. at 1124. The Court should reject this argument as an initial matter because executing Mr. Smith by nitrogen hypoxia under the Protocol

also exposes Mr. Smith to "being transitioned to a persistent vegetative state [or] having a stroke." (DE 19-1 at 9.) Defendants do not contend that those are among the grisly outcomes that were associated with hanging.

Defendants' argument is a telling statement about the low bar they have set for Mr. Smith's execution (and those of other condemned people in Alabama). According to the Supreme Court, "'[m]any and perhaps most hangings were evidently painful for the condemned person because they caused death slowly' and '[w]hether a hanging was painless or painful seems to have been largely a matter of chance.'" *Bucklew*, 139 S. Ct. at 1124. However, the "risk of pain involved was considered 'unfortunate but inevitable'" and it "was considered more humane than some of the punishments of the Old World . . . like burning and disemboweling." *Id.* (citations omitted) The standard to which Defendants hold themselves is cold comfort to Mr. Smith (and should give pause to others).

Putting aside the low standard to which Defendants aspire, their argument is meritless. Although Eighth Amendment claims involve a "comparative exercise," *id.* at 1126, it does not follow that the comparison is stuck at the Eighteenth Century as Defendants suggest. *See Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008) ("The [Eighth] Amendment 'draw[s] its meaning from the evolving standards or decency that mark the progress of a maturing society.'" (citation omitted)). As the Court stated in *Bucklew*, "by the time of the founding,, [certain] methods had long fallen

59

out of use and so had become 'unusual.'" 139 S. Ct. at 1123.  Execution by hanging fits that description today.  No state currently authorizes execution by hanging and none has done so in thirty years.  (*See* Death Penalty Information Center, State-by-State Execution Protocols, https://deathpenaltyinfo.org/executions/methods-of-execution/state-by-state-execution-protocols.)  There are more modern methods to which execution by nitrogen hypoxia under the Protocol can be compared, including those proposed by Mr. Smith.

Equally misplaced is Defendants' comparison of the risks to which Mr. Smith is exposed with the risks to which the condemned person in *Bucklew* was exposed as Justice Breyer described them in his dissent.  (DE 39 at 66 (quoting *Bucklew*, 139 S. Ct. at 1138–39 (Breyer, J., dissenting)).)  The *Bucklew* majority's holding did not turn on a finding about Mr. Bucklew's allegations about his exposure to serious risks.  Rather ironically, it turned on his failure to establish that nitrogen hypoxia was a feasible and available alternative that would reduce those risks because that was "an entirely new method—one that had 'never been used to carry out an execution' and had no track record of success." *Bucklew*, 139 S. Ct. at 1130 (citation omitted).

### d.   The Court Should Not Adopt a Novel Standard for Eighth Amendment Execution Claims

Defendants contend that Mr. "Smith is not likely to succeed on his Eighth Amendment Claim because the nitrogen hypoxia method is not deliberately designed to inflict unnecessary pain." (DE 39 at 69.)  They grudgingly acknowledge that the Supreme Court has not adopted that standard for evaluating method-of-execution claims.  (*Id.* at n.11.)  That standard derives from a concurring opinion joined by two Justices, one of whom no longer serves on the Court.  *See Glossip v. Gross*, 576 U.S. 863, 899 (2015) (Thomas, J., concurring) (joined by Scalia, J.).  The Court should decline Defendants' invitation to create new law.

### 3.      Mr. Smith is Likely to Succeed on His Claim that His Execution by Nitrogen Hypoxia Under the Protocol Would Violate RLUIPA

Defendants claim that Mr. Smith cannot succeed on his RLUIPA Claim because he purportedly "proposes no alternative" to praying while masked. (DE 39 at 74.)  That is legally irrelevant and factually incorrect.  It is legally irrelevant because Mr. Smith has no legal burden to propose alternatives under RLUIPA.  Once Mr. Smith demonstrates that the Protocol substantially burdens his religious exercise, the Defendants must prove that the burden is justified by a compelling governmental interest and is the least restrictive means to achieve it.  *Ramirez*, 595 U.S. at 426–27.

Defendants' contention also is factually incorrect.  While it is true that "*any* nitrogen hypoxia protocol involving a mask" is not desirable, (DE 39 at 74),

Defendants' contention that Mr. Smith has proposed no alternative is false.  As noted above, Defendants ignore that Mr. Smith did just that in the SAC and in his moving papers on his preliminary injunction motion when he proposed "use [of] a capsule, hood or container" as a "way to bypass the inherent problems of a facemask."  (DE 19-2 at ¶ 14.1.)

But, even if a mask is used to deliver nitrogen to a condemned person, Defendants have not shown that requiring a condemned person to wear it while he speaks and prays is the least restrictive alternative to accomplish a compelling governmental interest.  Mr. Smith proposed a less restrictive alternative and a relatively simple fix of "[p]rovid[ing] a condemned person an opportunity to speak and to audibly pray without being masked."  (DE 31 at ¶ 102.)

Defendants reject Mr. Smith's proposal because some Execution Team members will be dismissed to their secondary posts after the condemned person is strapped to the gurney and the mask is properly secured (if it is), which occurs before the inmate speaks.  (DE 39 at 75–76.)  And Defendants say that "[i]f the mask placement were saved until after the condemned's last words, there would be far fewer members of the Execution Team on hand to ensure that it was properly positioned" and "if the condemned were to resist, the Execution Team members would have a more difficult time seating the mask correctly without the assistance of the full team."  (*Id.* at 76.)  According to the Defendants, that is necessary to

further "a compelling governmental interest in the safety and security of the execution chamber, as well as a strong interest in maintaining the safety of their personnel, including during judicial executions." (*Id.*)

But Mr. Smith will be strapped to a gurney and immobilized as soon as he enters the execution chamber with the full contingent of corrections officers comprising the Execution Team present and before he is permitted to speak. (*See* DE 31-1 at § X.A.iii.) And Defendants ignore that the Protocol contemplates that the "Execution Team members responsible for secondary posts will be dismissed from the execution chamber" before "the team members inside the execution chamber will make a final inspection of the mask" and "proper placement is verified." (DE 31-1 at § X.A.v., xiii.) Defendants do not explain, why, if the team members inside the execution chamber can supposedly perform those responsibilities after other team members are dismissed to their secondary posts, they cannot also place the mask on Mr. Smith *after* he is permitted to pray audibly and speak.

Moreover, although the Protocol is silent (as it is on many matters) on the number of corrections officers who will comprise the Execution Team, Mr. Smith's experience when ADOC attempted to execute him in November 2022 may be informative. Then, the Execution Team was comprised of approximately ten corrections officers who escorted Mr. Smith to the execution chamber and strapped

him to the gurney, three of whom remained with Mr. Smith in the execution chamber throughout the entirety of his ordeal.  (*See* DE 39-7 at ¶¶ 141, 150–62.)  Assuming the Execution Team will be comprised of the same number of corrections officers when ADOC attempts to execute Mr. Smith again in January, Defendants do not explain why it will take more than three corrections officers to place the mask on Mr. Smith (assuming they are trained to do that in the first place).

> **4.    Mr. Smith is Likely to Succeed on His Claim that His Execution by Nitrogen Hypoxia Under the Protocol Would Violate ARFA**

As ARFA imposes a lesser standard on Mr. Smith than RLUIPA, he necessarily is likely to succeed on his ARFA Claim if he is likely to succeed on his RLUIPA Claim.  As shown above, he is likely to succeed on his RLUIPA Claim.  He is likely to succeed on his ARFA Claim for the same reasons.

> **B.    Mr. Smith Will Be Irreparably Harmed Without an Injunction**

Mr. Smith will suffer irreparable harm if he is subjected to an unconstitutional death under the Protocol.  DE 19 at 28; *see also In re Holladay*, 331 F.3d 1169, 1177 (11th Cir. 2003) ("We consider the irreparability of the injury that petitioner will suffer in the absence of a stay [of execution] to be self-evident.").

Defendants' contention—that Mr. Smith will not be irreparably harmed "[t]o the extent the alleged pain is intrinsic to the method of nitrogen hypoxia"—is beside the point.  (DE 39 at 79.)  That has no bearing here because Mr. Smith's Claims are

64

not based on pain intrinsic to the method of nitrogen hypoxia. Defendants' contention that Mr. Smith will not be irreparably harmed because he supposedly "has merely speculated about remote risks—not a substantial and imminent harm," (*id.*), fares no better for the reasons explained above. *See supra* at 42–51.

### C.   The Balance of Equities Weighs in Favor of Mr. Smith

Defendants acknowledge that the State and victims have an interest in timely enforcement of judgments. But the balance of equities weighs in Mr. Smith's favor for the reasons outlined in his opening memorandum. (*See* DE 19 at 29–30.) For their part, Defendants do not even acknowledge the public's interest in ensuring that executions are conducted consistent with constitutional requirements.

The invective that Defendants direct at Mr. Smith for alleged "last-minute claim[s]" and  "gamesmanship," (DE 39 at 81–82), do not apply here. Mr. Smith was not informed that the Defendants intended to execute him by nitrogen hypoxia until August 25. The Supreme Court of Alabama did not authorize that until November 1 and the Governor did not schedule his execution for January 25, 2024 until November 8. Mr. Smith filed this action on the same day the Governor scheduled his execution. The "last-minute" nature of this litigation is Defendants' doing—not Mr. Smith's.

### CONCLUSION

For the foregoing reasons and those in Mr. Smith's opening brief, the Court should deny Defendants' motion to dismiss and grant Mr. Smith's motion for a preliminary injunction to enjoin Defendants from executing him using the current nitrogen hypoxia Protocol on January 25, 2024.

DATED: December 11, 2023

       /s/ Andrew B. Johnson      
Andrew B. Johnson (ASB: 8504-r76j)
BRADLEY ARANT BOULT
  CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203
(205) 521-8000
ajohnson@bradley.com

Jeffrey H. Horowitz*
David A. Kerschner*
Robert M. Grass*
ARNOLD & PORTER KAYE
  SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
(212) 836-8000
jeffrey.horowitz@arnoldporter.com
david.kerschner@arnoldporter.com
robert.grass@arnoldporter.com

Ashley Burkett* (ASB: 2789-T79G)
Angelique Ciliberti (ASB: 1504-T44C)
ARNOLD & PORTER KAYE
  SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
(202) 942-5000
ashley.burkett@arnoldporter.com

66

angelique.ciliberti@arnoldporter.com

*Attorneys for Plaintiff Kenneth Eugene Smith*

*admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I certify that on December 11, 2023, I electronically filed the foregoing with the Clerk of the Court using the Pacer system, which will send notification to the following:

Richard D. Anderson
Richard.Anderson@AlabamaAG.gov

Polly Spencer Kenny
Polly.Kenny@AlabamaAG.gov

Beth Jackson Hughes
Beth.Hughes@AlabamaAG.gov

Henry Mitchell Johnson
Henry.Johnson@AlabamaAG.gov

Jordan Shay Shelton
Jordan.Shelton@AlabamaAG.gov

*Attorneys for Defendants*


                    */s/ Andrew B. Johnson*
                        Of Counsel