## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| KENNETH EUGENE SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:23-cv-00656-RAH |
| v. | ) | |
| | ) | CAPITAL CASE |
| JOHN Q. HAMM, in his official | ) | |
| Capacity as Commissioner, Alabama | ) | **EXECUTION SCHEDULED FOR** |
| Department of Corrections, and | ) | **JANUARY 25, 2024** |
| | ) | |
| TERRY RAYBON, in his official | ) | |
| Capacity as Warden, Holman | ) | |
| Correctional Facility, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF KENNETH EUGENE SMITH'S SUPPLEMENTAL BRIEF IN SUPPORT OF HIS MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................1

ARGUMENT ..........................................................................................................2

I.     THE EVIDENCE SHOWS THAT MR. SMITH IS LIKELY TO
SUCCEED ON THE MERITS OF EACH OF HIS CLAIMS .......................3

     A.     Mr. Smith is Likely to Succeed on His Claim that Attempting to
Execute Him by Nitrogen Hypoxia on January 25, 2024 Would
Violate His Right to Equal Protection.....................................................3

          1.     Defendants Have Intentionally Treated Mr. Smith
Differently from Similarly Situated Condemned People ...........4

          2.     Defendants' Disparate Treatment of Mr. Smith is Not
Rationally Related to a Legitimate Government Interest ........10

          3.     Defendants' Legal Arguments in Opposition to
Mr. Smith's Equal Protection Claim are Meritless..................14

     B.     Mr. Smith is Likely to Succeed on His Claim that Attempting to
Execute Him by Nitrogen Hypoxia Under the Procedures in the
Protocol Would Violate His Right to be Free from Cruel and
Unusual Punishment.............................................................................16

          1.     Executing Mr. Smith by Nitrogen Hypoxia Using the
Protocol Would Subject Him to a Substantial Risk of
Superadded Pain......................................................................17

               a.     Execution by Nitrogen Hypoxia Under the Protocol
Would Subject Mr. Smith to a Substantial Risk of
Being Left in a Persistent Vegetative State,
Experiencing a Stroke, or Other Serious Harm..............18

                    i.     ADOC's Use of a Mask to Deliver Nitrogen Gas
Subjects Mr. Smith to a Substantial Risk of
Oxygen Infiltration...............................................19

i

        ii.     There is a Substantial Risk that the Mask ADOC Intends to Use to Deliver Nitrogen Gas to Mr. Smith Will Permit the Entrainment of Room Air 24

        iii.   Execution by Nitrogen Hypoxia Under the Protocol Would Subject Mr. Smith to a Substantial Risk of a Lingering Death ....................................28

        iv.   Defendants' Evidence is Unavailing ...................30

            (1)    Dr. Antognini ..............................................30

            (2)    Ms. Stewart-Riley ......................................34

            (3)    Assistant Attorneys General ......................35

    b.    Execution by Nitrogen Hypoxia Under the Protocol Would Subject Mr. Smith to a Substantial Risk of Asphyxiation on His Own Vomit ..................................37

        i.      Oxygen Deficient Environments Cause Nausea and Vomiting .........................................................38

        ii.     Mr. Smith is at Heightened Risk for Nausea and Vomiting Due to PTSD ........................................40

        iii.   ADOC Lacks Adequate Procedures to Prevent Asphyxiation from Vomiting ...............................45

  2.    There are Feasible and Readily Available Alternatives that Would Significantly Reduce the Substantial Risk of Superadded Pain to Mr. Smith from ADOC's Plan to Deliver Nitrogen Through a Mask .............................................49

C.    Mr. Smith is Likely to Succeed on His Claim that Attempting to Execute Him by Nitrogen Hypoxia Using the Procedures in the Protocol Would Violate His Rights Under RLUIPA .........................52

  1.    Executing Mr. Smith by Nitrogen Hypoxia Using the Procedures in the Protocol Would Substantially Burden His Religious Exercise ...............................................................52

ii

2.    Defendants Have Not Shown that the Procedures in the Protocol are the Least Restrictive Means to Further a Compelling Governmental Interest ............................................ 54

D.    Mr. Smith is Likely to Succeed on His Claim that Attempting to Execute Him by Nitrogen Hypoxia Using the Procedures in the Protocol Would Violate His Rights Under ARFA .............................. 56

II.    MR. SMITH WILL BE IRREPARABLY HARMED WITHOUT AN INJUNCTION ................................................................................. 58

III.    THE THREATENED INJURY TO MR. SMITH OUTWEIGHS THE HARM AN INJUNCTION WOULD CAUSE DEFENDANTS .................. 59

CONCLUSION ..................................................................................... 61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arthur v. Thomas*,
  674 F.3d 1257 (11th Cir. 2012) ........................................................................10

*Baze v. Rees*,
  553 U.S. 35 (2008).............................................................................17, 28, 58

*Behr v. Campbell*,
  8 F.4th 1206 (11th Cir. 2021) ....................................................................14, 15

*Bucklew v. Precythe*,
  139 S. Ct. 1112 (2019)....................................................................1, 16, 18, 58

*Daubert v. Merrell Dow Pharms, Inc.*,
  509 U.S. 579 ...................................................................................................32

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
  544 U.S. 280 (2005).........................................................................................15

*Glossip v. Gross*,
  576 U.S. 863 (2015).................................................................................17, 58

*Gomez v. U.S. Dist. Ct. for N. Dist. of California*,
  966 F.2d 460 (9th Cir. 1992) ...........................................................................60

*Hill v. Martin*,
  296 U.S. 393 (1935).........................................................................................57

*Hill v. McDonough*,
  547 U.S. 573 (2006).........................................................................................60

*In re Holladay*,
  331 F.3d 1169 (11th Cir. 2003) .......................................................................58

*Holt v. Hobbs*,
  574 U.S. 352 (2015).........................................................................................52

*Ke-Sun Oil Co. v. Hamilton,*
    61 F.2d 215 (9th Cir. 1932) ................................................................57

*In re Kemmler,*
    136 U.S. 436 (1890)............................................................................28

*Leathe v. Thomas,*
    97 F. 136 (7th Cir. 1899) ...................................................................58

*Melendez v. Sec'y, Fla. Dep't of Corr.,*
    No. 21-13455, 2022 WL 1124753 (11th Cir. Apr. 15, 2022)............................59

*Miller v. Hamm,*
    No. 2:22-cv-506, 2022 WL 4348724 (M.D. Ala. Sept. 19, 2022),
    *vacated sub nom.*, *Hamm v. Miller*, 143 S. Ct. 50 (2022) .........................2, 3, 58

*Nance v. Ward,*
    597 U.S. 159 (2022)..............................................................17, 49, 58

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville,*
    896 F.2d 1283 (11th Cir. 1990) ..........................................................59

*Powell v. Thomas,*
    784 F. Supp. 2d 1270 (M.D. Ala. 2011).......................................15, 16

*Price v. Comm'r, Ala. Dep't of Corr.,*
    920 F.3d 1317 (11th Cir. 2019) .............................................................6

*Ramirez v. Collier,*
    595 U.S. 411 (2022)..........................................................................53, 54

*Smith v. Comm'r, Ala. Dep't of Corr.,*
    No. 21-13581, 2021 WL 4916001 (11th Cir. Oct. 21, 2021) ............................58

*Smith v. Dunn,*
    516 F. Supp. 3d 1310 (M.D. Ala. 2021)..............................................58

*Smith v. Hamm,*
    142 S. Ct. 1108 (2022).......................................................................10

*Smith v. Hamm,*
    No. 2:22-cv-497, 2023 WL 4353143 (M.D. Ala. Jul. 5, 2023)..................*passim*

v

*Stewart v. U.S.*,
  646 F.3d 856 (11th Cir. 2011) ................................................................8

*Thai Meditation Ass'n of Ala., Inc. v. City of Mobile, Ala.*,
  83 F.4th 922 (11th Cir. 2023) ...............................................................53

*Thai Meditation Ass'n of Ala., Inc. v. City of Mobile, Ala.*,
  980 F.3d 821 (11th Cir. 2020) ...............................................................57

*Vill. of Willowbrook v. Olech*,
  528 U.S. 562 (2000).................................................................................4

*Woods v. Comm'r, Ala. Dep't of Corr.*,
  951 F.3d 1288 (11th Cir. 2020) .....................................................4, 5, 7

**Constitutional Provisions**

Ala. Const. art. I, § 3.01(V) ......................................................................3, 56

U.S. Const. amend. VIII...............................................................3, 16, 17, 29

U.S. Const. amend. XIV ......................................................................................3

**Statutes**

28 U.S.C. § 2283...............................................................................................57

42 U.S.C. § 2000cc, *et seq.* ..............................................................................3

42 U.S.C. § 2000cc-1(a)...................................................................................52

Ala. Code § 15-18-82.1(b)(2) ...........................................................................4

**Other Authorities**

Ala. R. Crim. P. 32.......................................................................................7, 8

Fed. R. Civ. P. 12(b)(1)....................................................................................13

Fed. R. Evid. 702 ..............................................................................................26

Plaintiff Kenneth Eugene Smith submits this supplemental brief in support of his preliminary injunction motion "in light of the evidence and arguments presented at the December 20, 2023 hearing." (DE 61.[1])

## PRELIMINARY STATEMENT

Last November, the Alabama Department of Corrections ("ADOC") attempted, but failed, to execute Mr. Smith by lethal injection. ADOC subjected Mr. Smith to "cruel superadded pain as part of the execution [attempt], as multiple needle insertions over the course of one-to-two hours into muscle and into the collarbone in a manner emulating being stabbed in the chest, in combination with being strapped to the gurney for up to four hours and at one point being placed in a stress position for an extended period of time, goes 'so far beyond what [is] needed to carry out a death sentence that [it] could only be explained as reflecting the infliction of pain for pain's sake.'" *Smith v. Hamm*, No. 2:22-cv-497, 2023 WL 4353143, at *7 (M.D. Ala. Jul. 5, 2023) (quoting *Bucklew v. Precythe*, 139 S. Ct. 1112, 1126–27 (2019)).[2]

---

[1] "DE __" refers to entries on the Court's docket. "PX __" and "DX __" refer to exhibits submitted by Plaintiff and Defendants, respectively, at the hearing on December 20, 2023. (*See* DE 62.) "Tr. __" refers to pages of the transcript of the December 20 hearing.

[2] In denying the defendants' motion to dismiss, this Court assumed the truth of Mr. Smith's allegations in his Second Amended Complaint challenging the constitutionality of ADOC's then-intention to attempt to execute him a second time by lethal injection (the "Lethal Injection Action"). *Id.* On the record in this case, those allegations are now sworn and unrebutted evidence. (*See* PX B5 at ¶ 4; PX A23 ¶¶ 138–235.)

A little more than one year later, on January 25, 2024, ADOC plans to make Mr. Smith the test subject in the first attempt anywhere to execute a condemned person by the novel method of nitrogen hypoxia using the untested procedures in ADOC's Execution Procedures as of August 2023 ("Protocol"). (*See* PX A1.) The evidence amply demonstrates that, if ADOC is permitted to proceed, it will violate Mr. Smith's right to equal protection and that the procedures in the Protocol will subject Mr. Smith again to the substantial risk of "cruel superadded pain." *Smith*, 2023 WL 4353143, at *7.[3] As explained in greater detail below, based on the evidence, the Court should grant Mr. Smith's motion for a preliminary injunction.

## ARGUMENT

Mr. Smith "is entitled to a preliminary injunction if he demonstrates (1) a substantial likelihood of success on the merits; (2) a likelihood of suffering irreparable injury without the injunction; (3) that the threatened injury to him outweighs the harm the injunction would cause the Defendants; and (4) that the injunction would not be adverse to the public interest." *Miller v. Hamm*, No. 2:22-cv-506, 2022 WL 4348724, at *8 (M.D. Ala. Sept. 19, 2022), *vacated sub nom.*,

---

[3] In discovery, Defendants withheld information from Mr. Smith pre-dating the adoption of the Protocol on August 25, 2023, despite providing that information to their own expert who relied on it to form his opinions in this case. Mr. Smith's motion to compel Defendants to produce that information is pending. *See* DE 41. Mr. Smith reserves his right to submit additional evidence in support of his preliminary injunction motion if the Court grants his motion and he gains access to the information that Defendants improperly have withheld from him.

*Hamm v. Miller*, 143 S. Ct. 50 (2022). "Where, as here, 'the [State] is the party opposing the preliminary injunction, its interest and harm merge with the public interest,' and thus the third and fourth elements are the same." *Id.* (citation omitted). As demonstrated below, Mr. Smith has satisfied all the elements for preliminary injunctive relief.

## I.  THE EVIDENCE SHOWS THAT MR. SMITH IS LIKELY TO SUCCEED ON THE MERITS OF EACH OF HIS CLAIMS

Mr. Smith asserts that attempting to execute him by nitrogen hypoxia under the procedures in the Protocol on January 25, 2024 would (1) violate his right to equal protection under the Fourteenth Amendment; (2) violate his right to be free from cruel and unusual punishment under the Eighth Amendment; (3) substantially burden his right to exercise his religion under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, *et seq.*; and (4) burden his right to exercise his religion under the Alabama Religious Freedom Amendment ("ARFA"), Ala. Const. art. I, § 3.01(V). Mr. Smith is likely to succeed on each of those claims.

### A.  Mr. Smith is Likely to Succeed on His Claim that Attempting to Execute Him by Nitrogen Hypoxia on January 25, 2024 Would Violate His Right to Equal Protection

As this Court previously has explained, "[a] plaintiff may successfully allege a violation of his equal protection rights as a 'class of one' by showing 'that [he] has been intentionally treated differently from others similarly situated and that there is

no rational basis for the difference in treatment.'" *Smith*, 2023 WL 4353143, at *12 (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  The evidence establishes that Mr. Smith is likely to satisfy each of the elements necessary to prove his equal protection claim.

### 1.    Defendants Have Intentionally Treated Mr. Smith Differently from Similarly Situated Condemned People

Defendants plan to execute Mr. Smith by nitrogen hypoxia despite his pending appeal from the dismissal of a state postconviction petition.  That violates the State's custom and practice to wait until condemned people have exhausted their appeals before seeking to execute them.   In doing so, Defendants also are intentionally treating Mr. Smith differently than twenty-one condemned people subject to execution by nitrogen hypoxia who have exhausted their appeals—some more than a decade ago.

In 2018, the Alabama legislature authorized ADOC to execute condemned people by nitrogen hypoxia and gave condemned people then on death row a 30-day window to elect that method instead of lethal injection.  *See* Ala. Code § 15-18-82.1(b)(2).  "Nearly 50" condemned people elected to be executed by nitrogen hypoxia then.  *Woods v. Comm'r, Ala. Dep't of Corr.*, 951 F.3d 1288, 1291 (11th Cir. 2020).

However, ADOC did not approve a protocol for executing condemned people by nitrogen hypoxia until August 2023 (PX A30 at 45:18–20), which "affected the

order in which the State . . . moved for executions." *Woods*, 951 F.3d at 1291–92.

Before adoption of the Protocol in August 2023, the State did not move to execute

condemned people by nitrogen hypoxia even if they had exhausted their appeals,

although the State continued to move to execute condemned people by lethal

injection if they had not elected to be executed by nitrogen hypoxia and had

exhausted their appeals. *See id.* at 1292. By acting in that way, the State, by its own

description in litigation with condemned people subject to execution by lethal

injection, created two distinct "classes" of condemned people:

> Woods neglects to recognize that there are now *two classes of
> death-row inmates* who have exhausted their conventional appeals:
> those who made a timely election of nitrogen hypoxia in June 2018, and
> those who declined to do so. The Code of Alabama provides that
> execution shall be by lethal injection "unless the person sentenced to
> death affirmatively elects to be executed by electrocution or nitrogen
> hypoxia," and so the ADOC cannot execute those inmate[s] who
> affirmatively elected hypoxia until a protocol is finalized. There is no
> such impediment, however, to the execution of those inmates . . . who
> did not so elect.

(DE 44-4 at 38–39 (emphasis added, citation and footnote omitted).)

Mr. Smith did not elect to be executed by nitrogen hypoxia in 2018. (*See* PX

A31 at 237:14–16.) Consequently, when the State moved to execute him in June

2022, he was in the lethal injection line and there was no impediment to his

execution. At that time, he was not similarly situated to the condemned people who

elected to be executed by nitrogen hypoxia and who had exhausted their appeals.

*See Woods*, 951 F.3d at 1295; *Price v. Comm'r, Ala. Dep't of Corr.*, 920 F.3d 1317, 1325 (11th Cir. 2019) (per curiam).

On August 25, Commissioner Hamm determined that Mr. Smith would be executed by nitrogen hypoxia instead of lethal injection.  (*See* PX A40 at ¶ 3.)  In making that determination, Defendants moved Mr. Smith not only from the lethal injection line to the nitrogen hypoxia line but also to *the front of that line*.  Since then, Mr. Smith has been similarly situated in all material respects to all other condemned people in Alabama who are subject to execution by nitrogen hypoxia. Cynthia Stewart-Riley, who was the warden at Holman Correctional Facility in 2018 when the State permitted condemned people to elect execution by nitrogen hypoxia, admitted as much:

> Q.    And you'd agree with me that Kenny Smith shouldn't be treated differently than others who elected nitrogen hypoxia, right?
>
> MR, ANDERSON:  Object to the form.  Calls for a legal conclusion.  Calls for speculation also.
>
> Q.    You can answer.
>
> A.    Yes.
>
> Q.    Yes, meaning that Kenny should not be treated any differently than any other inmate who elected to be executed by nitrogen hypoxia, right?
>
> A.    Correct.

(PX A31 at 61:21–62:10; *see also* Tr. at 118:12–15.)

6

Despite Ms. Stewart-Riley's testimony, by moving Mr. Smith to the front of the nitrogen hypoxia line, Defendants are treating Mr. Smith differently from all other condemned people who elected to be executed by nitrogen hypoxia. As Commissioner Hamm testified, based on his experience, "an inmate wouldn't be up for execution until their appeals had been exhausted." (PX A30 at 114:2–8; *see also* Tr. at 119:3–12.) The State has acknowledged that custom in a pleading in another case: "As a matter of custom, the State waits to move for an inmate's execution until he has exhausted his conventional appeals: direct appeal, state postconviction, and federal habeas." (DE 44-4 at 4 (quoted in *Woods*, 951 F.3d at 1291).)

The State violated that custom when it moved in the Alabama Supreme Court for authority to execute Mr. Smith by nitrogen hypoxia in August even though he had an appeal pending from the dismissal of a state postconviction petition and even though 21 condemned people in the nitrogen hypoxia line already had exhausted their appeals. Thus, on May 12, 2023, more than three months *before* the State moved to execute him by nitrogen hypoxia, Mr. Smith filed a second petition for relief from his death sentence under Alabama Rule of Criminal Procedure 32 in the Circuit Court of Jefferson County. (*See* PX A44.)[4] Mr. Smith asserted a claim based on ADOC's failed attempt to execute him by lethal injection in November 2022,

---

[4] Mr. Smith's petition stands in stark contrast to the examples of successive Rule 32 petitions that Defendants cited, which involve petitions filed by condemned people *after* their executions had been scheduled and only days or weeks before the scheduled execution. (*See* DE 44 at 19–20.)

which the State conceded Mr. Smith "could not have raised . . . in his first Rule 32 petition." (DE 44-6 at 18.)  *Cf. Stewart v. U.S.*, 646 F.3d 856, 863 (11th Cir. 2011) ("[C]laims based on a *factual* predicate not previously discoverable are successive, but if the purported defect did not arise, or the claim did not ripen until after the conclusion of the previous petition, the later petition based on that defect may be non-successive." (emphasis and alteration in original, citation and internal quotation marks omitted)).[5]

On August 11, the circuit court dismissed Mr. Smith's petition and Mr. Smith filed a notice of appeal to the Alabama Court of Criminal Appeals.[6]  Three months later, the State moved for authority to execute Mr. Smith despite his pending appeal and even though twenty-one (21) other condemned people who are subject to execution by nitrogen hypoxia had exhausted their appeals between October 2011 and May 2023, including six who exhausted their appeals more than a decade ago.

---

[5] Contrary to Defendants' contention (DE 39 at 20–21), Mr. Smith could not have raised his equal protection claim in the Lethal Injection Action.  When the State moved for a date to execute Mr. Smith by lethal injection, he did not have any pending appeals.  The claim Mr. Smith asserted in his state court petition did not arise until ADOC's failed attempt to execute him by lethal injection in November 2022 and the equal protection claim Mr. Smith asserts in this action did not arise until August 2023 when the State moved in the Alabama Supreme Court to execute him by nitrogen hypoxia and simultaneously sought to dismiss the Lethal Injection Action as moot.  (*See* PX A25; PX A40.)

[6] The Alabama Court of Criminal Appeals has since affirmed the dismissal of Mr. Smith's petition and denied his application for rehearing.  Mr. Smith's petition for certiorari is now pending in the Alabama Supreme Court.

**CONFIDENTIAL**

List of Alabama Death Row Inmates who have elected nitrogen hypoxia and whose conventional appeals are exhausted.

| Inmate | Date Appeals Exhausted |
|---|---|
| ████████████ | 10/3/2011 |
| | 6/18/2012 |
| | 11/6/2012 |
| | 1/14/2013 |
| | 3/25/2013 |
| | 10/7/2013 |
| | 3/24/2014 |
| | 1/23/2017 |
| | 3/19/2018 |
| | 10/1/2018 |
| | 10/1/2018 |
| | 5/13/2019 |
| | 2/24/2020 |
| | 12/16/2020 |
| | 5/17/2021 |
| | 6/15/2021 |
| | 10/4/2021 |
| | 10/4/2021 |
| | 2/22/2022 |
| | 3/21/2022 |
| | 5/1/2023 |

(PX A29; *see also* PX A30 at 119:3–10; Tr. at 116:10–21.)[7]

In addition, the State provided one of those condemned people with a six-month grace period to review the Protocol after its release during which it agreed not to move for authority to execute him.  The State did not provide Mr. Smith with such a grace period.  The State sought authority to execute Mr. Smith on the same day it published the Protocol.  (*See* PX A25; PX A40.)

### 2. Defendants' Disparate Treatment of Mr. Smith is Not Rationally Related to a Legitimate Government Interest

The State's decision to seek Mr. Smith's execution by nitrogen hypoxia despite his pending appeal and despite the existence of 21 other condemned people who elected to be executed by nitrogen hypoxia and who had exhausted their appeals was not "rationally related to a legitimate government interest." *Arthur v. Thomas*, 674 F.3d 1257, 1262 (11th Cir. 2012) (per curiam).  Instead, it was an arbitrary decision made to forestall discovery in the Lethal Injection Action into ADOC's failed attempt to execute Mr. Smith in November 2022.

For nine months after ADOC's failed attempt to execute Mr. Smith by lethal injection, Defendants maintained consistently that they would attempt to execute him by lethal injection again.  (*See* DE 31 at ¶ 66.)  Defendants simultaneously

---

[7] And even if, contrary to fact, Mr. Smith had exhausted his appeals on February 22, 2022 when the U.S. Supreme Court denied his petition for certiorari in his federal habeas proceeding, *see Smith v. Hamm*, 142 S. Ct. 1108 (2022), there are still eighteen (18) condemned people who elected to be executed by nitrogen hypoxia and whose appeals exhausted before then and a nineteenth whose appeals exhausted on the same day.  (*See* PX A29; Tr. at 116:22–25.)

objected to and refused to respond to any written discovery in the Lethal Injection Action for this nine-month period.   In late August, after Defendants' efforts to dismiss the Lethal Injection Action failed and discovery was imminent (*id.* at ¶ 67), Defendants changed their position and simultaneously moved in the Alabama Supreme Court for authority to execute Mr. Smith by nitrogen hypoxia, moved in this Court to dismiss the Lethal Injection Action as moot, and released a heavily redacted version of the Protocol.  (*See* PX A25; PX A40.)

Defendants represented that those activities were based on Commissioner Hamm's determination about the availability of methods of execution for Mr. Smith:

> Defendant Hamm has determined that nitrogen hypoxia is an available method of execution and will be used in the execution of Plaintiff. Further, under the unique circumstances of this case, Defendant Hamm has determined that lethal injection is not available as to Plaintiff and will not be used in any future execution attempt of Plaintiff.

(PX A40 at ¶ 3.)  But Commissioner Hamm testified that he *did not* make that determination:

> Q.    With respect to Mr. Smith's case, who made the determination that lethal injection was unavailable for him?
>
> A.    I'm not aware who made that decision.
>
> Q.    Was it you?
>
> A.    No, sir.
>
> Q.    Do you know when that decision was made that lethal injection was unavailable for Mr. Smith?

11

A.    No, sir, I do not.

(PX A30 at 28:20–29:7; *see also* Tr. at 108:17–109:2.)

According to Commissioner Hamm, the determination that lethal injection was not an available method of execution for Mr. Smith was not based on any medical examination or ADOC's failed attempt to execute Mr. Smith by lethal injection in November 2022, but instead was based on the advice of counsel (although he declined to disclose that advice).  (Tr. at 110:20–111:5; PX A30 at 108:8–109:14, 111:8–13.)   And Commissioner Hamm could not explain why Mr. Smith was selected as the first condemned person to be executed by nitrogen hypoxia even though other condemned people subject to execution by that method had exhausted their appeals years earlier:

> Q.    Do you know why if someone exhausted their appeals in 2011 and had previously elected nitrogen hypoxia as their method of execution, why Mr. Smith would be taken as the first nitrogen hypoxia attempt of execution in the State of Alabama?

> A.    I do not know, sir.

> Q.    Do you know why Mr. Smith would be in front of any of these people on the list who had their appeals exhausted prior to his?

> A.    I have no knowledge.

(PX A30 at 119:11–23; *see also* Tr. at 118:16–119:2.)

12

The reason that Defendants selected Mr. Smith as the first person who would be subject to the novel and untested method of execution by nitrogen hypoxia is apparent from the circumstances.  Mr. Smith was the only person in the nitrogen hypoxia line who had pending litigation—the Lethal Injection Action.  Defendants' initial disclosures in the Lethal Injection Action were due on August 29 and their responses to Mr. Smith's discovery requests—some of which had been outstanding for nine months—were due the following week.  (*See* Tr. at 112:13–22; PX A35 at ¶ 1; *Smith v. Hamm*, No. 2:22-cv-497, Plaintiff Kenneth Eugene Smith's Opposition to Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure and to Defendants' Motion to Stay Discovery (DE 108) at 10 (M.D. Ala.).)   Engaging in discovery would have required Defendants to disclose information about ADOC's failed attempt to execute Mr. Smith by lethal injection in November 2022, which they had assiduously avoided disclosing to that point in the Lethal Injection Action.  (*See id.* at 7–11.)

Treating Mr. Smith differently by seeking to execute him despite his pending appeal and despite that 21 other condemned people who are subject to execution by nitrogen hypoxia have exhausted their appeals was not rationally related to a legitimate government interest.  Instead, it was a litigation tactic to avoid disclosure of information that Defendants want to shield from public scrutiny—that is not, and cannot be, a legitimate government interest.

13

Accordingly, Mr. Smith is likely to succeed on his equal protection claim and the Court should grant a preliminary injunction to prevent his execution by nitrogen hypoxia on January 25, 2024.

### 3. Defendants' Legal Arguments in Opposition to Mr. Smith's Equal Protection Claim are Meritless

The foregoing facts are undisputed. Defendants have not submitted any contradictory evidence. In previous briefing, Defendants have contended that Mr. Smith's equal protection claim is barred by judicial estoppel and claim preclusion and that Mr. Smith's state postconviction Petition is not "conventional" within the contemplation of the State's custom to wait until conventional appeals have been exhausted before seeking execution dates. Mr. Smith has responded to Defendants' contentions in previous briefing and incorporates those responses by reference here. (*See* DE 44 at 5–15, 38–42.)

In their reply in support of their motion to dismiss, Defendants contended for the first time that Mr. Smith's equal protection claim is precluded by the *Rooker-Feldman* doctrine. (*See* DE 50 at 3.)[8] Defendants' contention is unavailing.

As the Eleventh Circuit has cautioned, "district courts should keep one thing in mind when *Rooker-Feldman* is raised: it will almost never apply." *Behr v.*

---

[8] In their opening papers in support of their motion to dismiss, Defendants raised the *Rooker-Feldman* doctrine only in connection with a due process claim that Mr. Smith has since withdrawn. (*See* DE 39 at 11; DE 44 at 5 n.2.)

*Campbell*, 8 F.4th 1206, 1212 (11th Cir. 2021).   The Court explained that the *Rooker-Feldman* doctrine "occupies 'narrow ground' and is 'confined to cases of the kind from which the doctrine acquired its name.'"   *Id.* at 1209 (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)).   "Only when a losing state court litigant calls on a district court to modify or 'overturn an injurious state-court judgment' should a claim be dismissed under *Rooker-Feldman*; district courts do not lose subject matter jurisdiction over a claim 'simply because a party attempts to litigate in federal court a matter previously litigated in state court.'"   *Id.* at 1210 (quoting *Exxon Mobil Corp.*, 544 U.S. at 292–93); *see also id.* at 1212 (*Rooker-Feldman* "is merely a way of ensuring that [federal] courts do not exercise jurisdiction over the appeal of a state court judgment simply because the claimant does not call it an appeal of a state court judgment").   In other words, *Rooker-Feldman* applies only when "the plaintiff's claim directly challenge[s] a state court loss." *Id.* at 1211.   Mr. Smith's equal protection claim does not.

The court's decision in *Powell v. Thomas*, 784 F. Supp. 2d 1270 (M.D. Ala. 2011) is instructive.   There, the plaintiff brought a method-of-execution challenge to Alabama's lethal injection protocol in federal court after he unsuccessfully sought a stay of his scheduled execution on the same grounds in the Alabama Supreme Court.   The court "decline[d] to apply the narrow *Rooker-Feldman* doctrine because Williams does not identify or complain of any injury caused by the Alabama

Supreme Court's decision, but rather complains of the future conduct of the ADOC officials in implementing the lethal injection procedure." *Id.* at 1276 n.1.

Here, as in *Powell*, Mr. Smith's equal protection claim does not complain of any injury caused by the Alabama Supreme Court, but rather complains about the determination that Defendants represented Commissioner Hamm made to seek Mr. Smith's execution by nitrogen hypoxia despite his pending appeal and despite the existence of 21 other condemned people who elected to be executed by nitrogen hypoxia and who had exhausted their appeals. Accordingly, the *Rooker-Feldman* doctrine does not apply.

B.   **Mr. Smith is Likely to Succeed on His Claim that Attempting to Execute Him by Nitrogen Hypoxia Under the Procedures in the Protocol Would Violate His Right to be Free from Cruel and Unusual Punishment**

This Court previously has explained that "the relevant Eighth Amendment inquiry is whether the State's chosen method of execution superadds pain well beyond what's needed to effectuate a death sentence" and "whether the State had some other feasible and readily available method to carry out its lawful sentence that would have significantly reduced a substantial risk of pain." *Smith*, 2023 WL 4353143, at *6 (quoting *Bucklew*, 139 S. Ct. at 1126–27) (internal quotation marks omitted)). The evidence establishes that executing Mr. Smith by nitrogen hypoxia using the procedures in the Protocol would subject him to a substantial risk of

superadded pain and that there are feasible and readily available alternatives that would significantly reduce that substantial risk.

> **1.    Executing Mr. Smith by Nitrogen Hypoxia Using the Protocol Would Subject Him to a Substantial Risk of Superadded Pain**

To establish that execution by nitrogen hypoxia under the Protocol would subject him to superadded pain, Mr. Smith must show "a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment." *Baze v. Rees*, 553 U.S. 35, 50 (2008) (plurality op.); *see also Nance v. Ward*, 597 U.S. 159, 164 (2022) (holding that a plaintiff asserting a method-of-execution claim must prove "that the State's method of execution presents a 'substantial risk of serious harm'—severe pain over and above death itself" (quoting *Glossip v. Gross*, 576 U.S. 863, 877 (2015)).   The evidence establishes that executing Mr. Smith by nitrogen hypoxia using the Protocol would subject him to a substantial risk of serious harm.  Specifically, ADOC's plan to deliver nitrogen gas to Mr. Smith through a mask that is placed over his face subjects him to a substantial risk that (1) oxygen will infiltrate the mask, which could leave Mr. Smith in a persistent vegetative stroke, cause him to have a stroke, or to experience the sensation of suffocation, and (2) he will asphyxiate on his own vomit.

a.  **Execution by Nitrogen Hypoxia Under the Protocol Would Subject Mr. Smith to a Substantial Risk of Being Left in a Persistent Vegetative State, Experiencing a Stroke, or Other Serious Harm**

In 2019, the U.S. Supreme Court acknowledged that nitrogen has "never been used to carry out an execution and ha[s] no track record of successful use." *Bucklew*, 139 S. Ct. at 1130 (citation and internal quotation marks omitted). That remains the case. No state or the federal government has ever attempted to execute a condemned person by nitrogen hypoxia. (*See* Tr. at 92:21–93:16; PX A30 at 40:4–13; PX A33 at 54:22–55:3, 56:3–6.) Nor has the use of nitrogen hypoxia generally or the Protocol specifically to execute condemned people ever been tested on any living being. (*See* Tr. at 65:21–66:20, 73:22–74:17, 77:20–78:11, 161:10–13, 175:21–176:16; PX A33 at 53:15–54:2; *see also* PX B1 at 5 ("[T]here is a lack of data regarding exactly how long a person must be exposed to 100% nitrogen to lead to death, or what happens at exposures to slightly less than 100% nitrogen for prolonged periods of time."); DX 2 at ¶ 8 ("Obviously, there are no carefully controlled studies on what happens to humans when they breathe 100% nitrogen for a prolonged period, up to the point of death.").) ADOC's attempt to execute Mr. Smith would be the first anywhere by the novel method of nitrogen hypoxia using the untested procedures in the Protocol.

18

> i. *ADOC's Use of a Mask to Deliver Nitrogen Gas Subjects Mr. Smith to a Substantial Risk of Oxygen Infiltration*

ADOC intends to deliver nitrogen through tubing into a "mask [that] will be placed and adjusted" on Mr. Smith's face after he is strapped to the gurney in the execution chamber. (PX A1 at § X.A.v.) Immediately after the mask is placed on Mr. Smith's face, ADOC intends to supply breathing air into the mask. (*See id.* at § X.A.ii–vi.) At that point (*i.e.*, with the mask on Mr. Smith's face), after Warden Raybon "read[s] the execution warrant" to Mr. Smith, provides him "with an opportunity to make a final statement," and the Defendants "verify that there has been no last-minute stay of execution," the "Warden will activate the nitrogen hypoxia system" and nitrogen gas will flow into the mask. (*Id.* at § X.A.ix–xv.)

To be sure, depriving a human of oxygen, including by causing that human to "breath[e] in 100% nitrogen gas would result in hypoxemia, eventual end-organ damage, and ultimately death." (PX B1 at 5.) But it is undisputed that depriving a human of sufficient oxygen (below normal levels but above fatal levels) can cause dire consequences short of death. As Dr. Robert Jason Yong[9] explained, "if a person is exposed to less than 100% nitrogen, there is a risk that the person could transition

---

[9] Dr. Yong is an anesthesiologist with substantial knowledge, training, and experience in the physiology and pathophysiology of the respiratory system and in monitoring and maintaining oxygen levels. (*See id.* at 2.) He is Chief of Pain Medicine and the Medical Director of the Pain Management Center at Brigham and Women's Hospital in Boston and an Assistant Professor of Anesthesia at Harvard Medical School. (*See id.* at 1.)

to a persistent vegetative state, have a stroke or experience the painful sensation of suffocation instead of dying." (PX B1 at 5.) Defendants' expert anesthesiologist Dr. Joseph F. Antognini agreed:

> Q. For example, if someone is oxygen deprived, there could be irreversible brain damage but that does not lead to death, right?
>
> A. That is correct.
>
> Q. If someone is deprived of oxygen but doesn't die, they could potentially have a stroke?
>
> A. That's correct, yes.
>
> Q. If someone is in a situation where they are oxygen deprived but don't die, they could end up in a persistent vegetative state, correct?
>
> A. Yes.

PX A33 at 81:14–82:5; *see also* Tr. at 161:14–162:5; PX B2 at ¶ 13.2 ("There is a significant risk that Mr. Smith will be subject to incomplete cerebral hypoxia. A resultant vegetative state with permanent brain damage cannot be excluded.").

To avoid those consequences, it is critical that a mask used for the purpose of executing a condemned person by nitrogen hypoxia has an airtight seal. (*See* PX B1 at 9; PX B2 at ¶¶ 5.1, 5.2; *see also* PX B7 at ¶ 4 ("[T]he establishment of a good gas seal between the face and the mask is essential.").) Otherwise "entrainment of room air can occur allowing for some oxygen to be inspired," thereby extending the time to unconsciousness and death and risking the dire consequences described above.

(PX B1 at 10; *see also* PX A33 at 80:5–81:6; PX A31 at 74:14–23, 75:9–18; PX B2 at ¶ 5.2.)

Protocols designed for delivery of gases assume "patient compliance and minimal movement."  (PX B1 at 9.)  In the context of executing condemned people, "[w]ithout patient compliance and minimal movement, it is difficult to ensure that a mask will remain sealed and in the correct position."  *Id.*  It is undisputed that each of the following can make it difficult to establish an airtight seal or dislodge or loosen a previously established airtight seal after a mask is placed on a condemned person's face:

- facial structure (PX A33 at 106:21–107:1; PX B1 at 6; PX B2 at ¶ 5.1; *see also* PX B7 at ¶ 4 (ADOC's mask is "a 'one size fits all' design with no particular provision for various face shapes and sizes that could be encountered"));

- facial hair (PX A33 at 107:3–4; PX B1 at 6; *see also* PX B2 at ¶ 5.1; PX B7 at ¶ 15 ("Mr. Smith has significant facial hair that would make the successful fitting of the planned mask difficult."));

- obesity (PX A33 at 107:5–8; PX B1 at 6; *see also Smith v. Hamm*, No. 2:22-cv-497, Declaration of Joel B. Zivot, MD, FRCP(C), MA (DE 48-1) at ¶ 19 (M.D. Ala.) ("[A]ccording to information on ADOC's website, KE Smith is 5'10" tall and weighs 207 pounds.  This height

and weight combination corresponds to a BMI that is borderline obese));

- talking, including audible prayer (PX A33 at 108:2–8; PX B1 at 9; *see also* Tr. at 133:7–16 (Mr. Smith's plan with his spiritual advisor includes audible prayer));

- voluntary or involuntary head or facial movements, which can occur even when a condemned person is unconscious (PX A33 at 110:5–10, 110:20–23, 320:16–321:3; PX B1 at 9; PX B7 at ¶ 8);[10] and

- changes to facial muscles when a condemned person loses consciousness (PX A33 at 108:9–15; PX B1 at 9; PX B2 at ¶ 5.1).[11]

As Dr. Philip Nitschke explained, "[t]he use of a sealing facemask has been abandoned" by people willingly using nitrogen or other inert gases to end their lives "because of the significant problems associated with maintaining an air-tight seal,"

---

[10] Indeed, when Dr. Antognini gives patients anesthesia, he sometimes provides them with opiates, muscle relaxants, or paralytics to prevent involuntary movements that can loosen or dislodge the airtight seal on a mask over the patient's face. (PX A33 at 111:2–7.) There are no procedures in the Protocol for what to do if a condemned person convulses or otherwise moves involuntarily. (*See* PX A31 at 79:16–20, 87:4–8.)

[11] Dr. Antognini contends that "industrial accidents in which workers died while wearing a supplied air mask indicate that loss of consciousness (and any subsequent change in facial structure) does not significantly alter the mask fit." (DX 2 at ¶ 6.) Dr. Antognini's logic is flawed. He does not report on industrial accidents where workers survived and whether that might have been due to entrainment of outside air. He does not indicate whether those accidents involved the mask that ADOC intends to use in its planned execution of Mr. Smith. And he admits that there can be variation among individuals in mask fit, which make it difficult to extrapolate from one person's experience to another person's experience. (*See* PX A33 at 106:10–20.)

which were deemed "unsolvable."  (PX B2 at ¶ 5.1; *see also* PX B7 at ¶ 16 ("The problems identified above were the reason the right to die movement abandoned all use of face masks over a decade ago.").)  A paper from ADOC's files ("Oklahoma White Paper"), which was prepared for an Oklahoma legislator when that state was considering authorizing nitrogen as a means of execution, confirms that even in the context of assisted suicide using masks to deliver inert gases has been problematic:

> However, it should be noted that deviations from the above protocols have not always been as successful. When masks were placed over the face (instead of using bags of helium over the head) it has been reported some problems have occurred. This is typically a result of the mask not sealing tightly to the face, resulting in a small amount of oxygen being inhaled by the individual. This extends the time to become unconscious and extends the time to death. This may result in purposeless movements by the decedent (Ogden et al, 2010. p 174-179). Further study will be necessary to determine the best delivery system for the state of Oklahoma.

(PX A32 at 7 (emphasis added).)[12]

---

[12] The Oklahoma White Paper was prepared in 2015—predating the adoption of the Protocol by 8 years.  (*See Price v. Dunn*, No. 1:19-cv-57, Affidavit of Christine Pappas, J.D., Ph.D.. (DE 45-3) at ¶ 2 (S.D. Ala.).)  Defendants produced the Oklahoma White Paper even though it plainly played some role in the development of the Protocol, although Ms. Stewart-Riley was instructed not to answer questions about that.  (*See* PX A31 at 66:22–67:4.)  Defendants' selective production of the Oklahoma White Paper is another example that supports this Court granting Mr. Smith's motion to compel.  (*See* DE 41.)

In addition, scientific literature published in the Journal of Medical Ethics, on which both Dr. Nitschke and Dr. Antognini relied, recommends against the use of masks to deliver inert gases as a means of assisted suicide:

Nevertheless, we believe a mask breathing apparatus is problematic because it is very difficult to achieve and maintain a gas tight seal between the face and the mask. Even if the initial mask fit is gas tight, subsequent involuntary movements of the head, neck, and facial muscles are likely to spoil the fit. In anesthesia, it is well known that achieving a continual airtight fit is technically difficult. Even tiny leaks may substantially allow ingress of oxygen into the breathing environment.[12] By enhancing the video images, gaps are visible around the nose bridge and

(PX A16 at *16–17 (emphasis added).)

And, if masks have been abandoned as problematic to deliver inert gases like nitrogen to willing participants in assisted suicides who have been trained on the procedures, "[i]t is difficult to see how an effective air-seal could be initially established, let alone maintained, without Mr. Smith's participation and cooperation." (PX B2 at ¶ 8.2.) It cannot.

> ii.  *There is a Substantial Risk that the Mask ADOC Intends to Use to Deliver Nitrogen Gas to Mr. Smith Will Permit the Entrainment of Room Air*

ADOC intends to use an off-the-rack, one-size-fits-all mask that is designed for industrial use to supply workers with oxygen and protect them from environmental hazards—not for use in executions to expose condemned people to environmental hazards and deprive them of oxygen—in its planned execution of

24

Mr. Smith.  (*See* PX A26; PX A36; PX B7 at ¶ 4; Tr. at 168:6–20.)  That mask will not solve the problems associated with ensuring that masks maintain an airtight seal throughout the process when used for the purpose of delivering inert gases like nitrogen to end life.  In fact, according to Ms. Stewart-Riley, who Defendants designated as the person with the most knowledge about the procedures in the Protocol for executing condemned people by nitrogen hypoxia, ADOC has no intention of doing anything to ensure that:

> Q.    And you understand that if there is not an airtight seal, that that allows for oxygen to get into the mask even when nitrogen is flowing, right?
>
> A.    It doesn't call for an airtight seal.
>
> Q.    What doesn't call for an airtight seal?  What doesn't?
>
> A.    *We do not have to have an airtight seal.*  We have to [e]nsure that the mask is properly seated on the condemned's face by [e]nsuring that his chin is in the chin cuff, [e]nsuring that the mask is centered, [e]nsuring that the straps, the five strapping mechanisms are tightened, and we listen and visually inspect.

(PX A31 at 131:8–23 (emphasis added).)[13]  Commissioner Hamm likewise testified that "I'm not aware of it [the mask] having to be airtight."  (PX A30 at 85:21–86:2.)

---

[13] The use of straps to secure the mask does not cure the difficulties with maintaining an airtight seal.  As Dr. Yong testified, "even in the compliant patient, the mask can move and dislodge and bend and become – the seal become broken . . . ."  (Tr. at 56:23–24; *see also* PX B1 at 7 ("Straps can be used if the patient is cooperative and has normal anatomy.  However, if a patient resists or turns their head the mask can be dislodged or the seal broken.").)  Indeed, Dr. Nitschke was able to loosen the straps when he wore the mask that ADOC intends to use in the planned execution of Mr. Smith.  (*See* PX B7 at ¶ 6.)

The User's Manual accompanying the mask contradicts Ms. Stewart-Riley's and Commissioner Hamm's testimony. ████████████████████████

████████████████████████

████████████████████████████████████

(PX A26 at 4 (emphasis added).)

According to Dr. Antognini, there are two methods for testing whether a mask has an airtight seal—a negative pressure test and use of a mask fit test kit.  (*See* PX A33 at 117:17–33; *see also* Tr. at 77:15–19.)  But Dr. Antognini did not perform either test when he was permitted access to ADOC's mask.  (*Id.* at 117:23–118:20.)

████████████████████████████████

████████████████████████████████

████████████████████████████

████████████████████████████████████

(PX A26 at 7, 8 (emphasis added).)[14]

Ms. Stewart-Riley confirmed that ADOC has no intention of performing either test when the mask is placed on Mr. Smith:

> Q.    . . . So it's my understanding then that the State of Alabama has no intention of doing a negative pressure user seal check on the mask when it attempts to execute Kenny Smith for the second time using nitrogen hypoxia in January of 2024?
>
> A.    Correct.
>
> Q.    And you have no intention of using any sort of fit test kit, right?
>
> A.    Correct.

(PX A31 at 150:11–21.)

Instead, Ms. Stewart testified that ADOC intends to rely on the positive pressure caused by the flow rate of nitrogen into the mask to prevent any oxygen from infiltrating into the mask.  (*Id.* at 149:7–21.)  ███████████████

████████████████████████████████████████████████████████████

████████████████

████████████████████████████████████████████████████████████

(PX A26 at 4.)

---

[14] Dr. Antognini dismisses the manufacturer's warnings because "[i]t is common (if not universal) for manufacturers to place statements about proper use so as to limit or eliminate liability in the case of an accident involving a product that was not used properly."  (DX 2 at ¶ 2.)  There is nothing in Dr. Antognini's "knowledge, skill, experience, training, or education" that qualifies him to opine on industrial mask manufacturer's practices.  Fed. R. Evid. 702.

In short, there is a substantial risk that oxygen will infiltrate the mask that ADOC intends to place over Mr. Smith's face, which will expose him to the substantial risk of being left in a persistent vegetative state, experiencing a stroke, or the sensation of suffocation.

> iii.   *Execution by Nitrogen Hypoxia Under the Protocol Would Subject Mr. Smith to a Substantial Risk of a Lingering Death*

"'Punishments are cruel when they involve torture or a *lingering death*.'" *Baze*, 553 U.S. at 49 (quoting *In re Kemmler*, 136 U.S. 436, 447 (1890) (emphasis added)). Given the likelihood of infiltration of oxygen into the mask, at a minimum, there is a substantial risk that would increase the time to unconsciousness or death. Even "[t]he smallest air leak greatly increases the time to loss of consciousness and uncertainty regarding the outcome." (PX B2 at ¶ 5.2; PX A16 at *17 ("Even tiny leaks may substantially allow ingress of oxygen into the breathing environment.").)

Under the Protocol, ADOC will not discontinue delivering nitrogen gas to Mr. Smith until the longer of fifteen minutes or five minutes after a flatline indication on an EKG:

> After the nitrogen gas is introduced, it will be administered for (1) fifteen minutes or (2) five minutes following a flatline indication on the EKG, whichever is longer.

(PX A1 at § X.A.xv.)

As Ms. Stewart-Riley confirmed, ADOC will deliver nitrogen gas to Mr. Smith for an indefinite time depending on whether and, if so, when his heart stops beating:

> Q.    So as written, the protocol does not put a hard stop on this, there is no time limit, right?
>
> A.    As written, it states 15 minutes or five minutes flat line.
>
> Q.    Right, but we agree that if there is no flat line on the EKG in 30 minutes, it's discretionary, it's up to the commissioner as to whether or not to continue, right?
>
> A.    Correct.
>
> Q.    So in other words, the protocol does not – it's not written in such a way that says you got to stop by a certain time, right?
>
> A.    Correct.

(PX A31 at 47:1–16.)  For his part, Commissioner Hamm agreed that the Protocol does not impose a time limit for delivering nitrogen unless Mr. Smith's heart stops beating and, in that event, Commissioner Hamm would decide whether to stop delivering nitrogen to Mr. Smith, although he could not articulate any criteria he would use to make that decision.  (*See* Tr. at 101:1–102:17; PX A30 at 90:4–19, 92:2–93:16, 95:23–96:16, 98:23–99:6, 99:17–23.)

The Governor has scheduled Mr. Smith's execution for a thirty-hour window beginning at 12:00 a.m. on January 25.  (*See* PX A39.)  Even if ADOC begins the execution at 6 p.m. that day as it generally does, there is nothing to stop ADOC from delivering nitrogen gas to Mr. Smith for hours while Mr. Smith is strapped to the

29

gurney and while he and the witnesses wait for him to flatline.   The Eighth Amendment does not permit that gruesome spectacle.

### iv.    Defendants' Evidence is Unavailing

Defendants offer evidence from (1) Dr. Antognini, (2) Ms. Stewart-Riley, and (3) seven different Assistant Attorneys General in support of their contention that there is not a material risk of oxygen infiltrating the mask.   None of Defendants' evidence overcomes Mr. Smith's showing.   At most, Defendants' evidence amounts to empty reassurances that Mr. Smith is not required to accept at face value especially given ADOC's mistreatment of him last November.

### (1)    Dr. Antognini

As a threshold matter, the Court should strike Dr. Antognini's opinions. Dr. Antognini was first contacted by Defendants in 2021 and retained by them in August 2022—one year before ADOC finalized the Protocol and informed Mr. Smith that he was subject to execution by nitrogen hypoxia.  (*See* PX A33 at 12:22–13:19.)  Before the Protocol was finalized, he reviewed drafts of the Protocol that Defendants have refused to provide to Mr. Smith, inspected aspects of the nitrogen delivery system to which Defendants were denied access, received results from unspecified tests that Defendants have not shared with Mr. Smith, and observed and reported on demonstrations to which Mr. Smith was not invited.  (*Id.* at 12:22– 13:19, 21:4–21, 29:23–33:19, 221:1–222:15, 271:16–273:8, 295:5–296:19.)   The

Court should not consider Dr. Antognini's opinions for those reasons as explained in more detail in Mr. Smith's pending motion to strike his opinions.  (*See* DE 54.)

But even if the Court considers them, Dr. Antognini's opinions do not help Defendants.  Dr. Antognini opines on the results of "[a] demonstration by the ADOC on August 16th, 2023" of the mask placed on the gurney surrounded by sheets and a towel with an oxygen monitor placed under the mask purportedly "document[ing] how quickly the oxygen decreased in the mask after the introduction of nitrogen." (DX 1 at ¶ 24.)   Dr. Antognini's evidence regarding ADOC's demonstration is unreliable for several reasons.

First, "[t]he static sheet cannot mimic the dynamic effect of a gasping individual attached to a leaking face mask."  (PX B7 at ¶ 10; PX A33 at 176:8–14.) Indeed, Dr. Antognini admitted that he has not seen any testing or materials that pertain to whether the mask will maintain an airtight seal on Mr. Smith.  (PX A33 at 109:20–110:4).

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████    (*See* PX A31 at 154:23–156:12, PX A33 at 167:6–12, 254:18–22.)   And Dr. Antognini admitted that he did not do any testing to determine how the results of the

demonstration would have been impacted if the nitrogen gas had been flowing at a slower rate.  (PX A33 at 167:10–16.)

Third, Dr. Antognini only observed the demonstration once so he cannot calculate the error rate for the test and, thus, he did not assess the extent of variability in results had the test been performed multiple times.  (*See id.* at 269:6–13.) Dr. Antognini admitted that the results of the demonstration would change if the mask were leaking after it had been placed on a condemned person.  (*See id.* at 176:8–14.)

Fourth, the results Dr. Antognini reported have not been subject to peer review to assess their reliability as a means to determine how quickly oxygen will decrease in the mask after nitrogen is introduced when a condemned person is wearing it.  (*See id.* at 270:18–20.)  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594 (1993) (in assessing the reliability of proffered scientific testimony, courts should consider "whether the theory or technique has been subjected to peer review" and "the known or potential rate of error").  And there is no evidence that this method has ever been used outside this litigation to make that determination.

Furthermore, Mr. Smith was not privy to that demonstration; he did not even know that he was subject to execution by nitrogen hypoxia when that demonstration occurred.  Defendants also have not produced video of that demonstration or any

underlying documents that supposedly confirm the results that Dr. Antognini reports.

Dr. Antognini also purports to have "evaluated the nitrogen system at W.C. Holman Correctional Facility" and reports that he "did not find any issues related to how the air and nitrogen will be delivered." (DX 1 at ¶ 18.)  Aside from the mask itself in the execution chamber, Mr. Smith was not provided access to the equipment and locations that Dr. Antognini claims to have inspected. (*See* PX B7 at ¶ 19.)  And because Mr. Smith was denied the ability to make his own inspection and Dr. Antognini does not provide anything more than his *ipse dixit* that he did not find any issues with how the oxygen and nitrogen will be delivered the Court should not credit his opinion.  In any event, it has nothing to do with whether the mask will maintain an airtight seal throughout the process or the risk of asphyxiation from vomit that the Protocol poses.

Finally, Dr. Antognini's observations after wearing the mask and observing others wear it (DX 1 at ¶ 20) also lack probative value, as he lacks the qualifications necessary to render such opinions.  Dr. Antognini testified that he has limited experience administering gases through a mask (PX A33 at 46:9–18), has no experience with masks designed to completely seal out oxygen (Tr. at 158:17–21), and has never used a mask to induce hypoxia (*id.* at 157:23–24).  Dr. Antognini also admitted that, before this litigation, he had never: used a mask for the purpose that

ADOC intends to use it (*id.* at 48:6–13), researched or published articles about using nitrogen to end life (Tr. at 158:6–8, 158:24–159:3; PX A33 at 53:10–15), and never had any experience with the model mask that ADOC intends to use in its planned execution of Mr. Smith (Tr. at 159:4–9).  In short, Dr. Antognini is not qualified to opine on delivering nitrogen gas through a mask as a means of executing a condemned person.

### (2)   Ms. Stewart-Riley

Ms. Stewart-Riley testified that the Execution Team captain or other members of the Execution Team would "reseat[]" the mask if it "become[s] unseated or knocked askew during the execution" even if it required them to come within three feet of Mr. Smith while nitrogen was flowing into the mask on his face.  (PX A33 at 261:23–262:17.)   That seems unlikely given that ADOC's Spiritual Advisor Acknowledgment Form warns spiritual advisors to stay at least three feet clear of the mask for their own safety.  (*See* PX A45).

More importantly, Ms. Stewart-Riley's testimony on this score is beside the point.  As noted above, she admits that ADOC does not intend to do anything to ensure that the mask has an airtight seal throughout the execution process because "[w]e do not have to have an airtight seal."  (PX A33 at 131:16–17.)  Ms. Stewart-Riley distinguishes between ensuring that the mask maintains an airtight seal and ensuring that it is properly "placed" or "seated," which means that condemned

person's "chin is in the chin cuff," "the mask is centered" on the condemned person's face, "the five strapping mechanisms are tightened, and we listen and visually inspect."  *Id.* at 131:17–23.)

Even as to that task, the unidentified "security personnel" that are assigned to ensure that the mask is properly "placed" or "seated" do not undergo any testing to show that they can accomplish that task competently.  (*Id.* at 132:19–133:13.) Instead, those unidentified security personnel have undisclosed experience "with the mask or they have worn a respirator mask before, some type" so the "[p]eople that are responsible for placing a mask, they are familiar with it."  *Id.*

As for visual inspections, Defendants' own expert Dr. Antognini could not say to a reasonable degree of medical certainty that a visual inspection would be sufficient to ensure that the mask maintains an airtight seal.  (*See* PX A33 at 129:3–9.)  But that is not ADOC's goal in the first place.

### (3)   *Assistant Attorneys General*

Defendants also have submitted evidence from seven Assistant Attorneys General who wore the mask for between 15 to 30 minutes while breathing air was supplied into it and who report that they did not have difficulty breathing, hearing, or speaking and did not experience any pain or discomfort.  (*See* DX 6–12.)  None of the Assistant Attorneys  General's experiences simulate the experience that Mr. Smith will have if Defendants are permitted to go forward with his execution on

January 25.  Each of the Assistant Attorneys General was a willing volunteer.  None are under a sentence of death.  None had any reason to believe that nitrogen would be supplied into the mask for the purpose of killing him or her.  And none have PTSD from a prior failed execution attempt.  (*See* Tr. at 181:14–182:7, 186:11–23, 187:18–188:10.)  Although someone in that position might find "the sound of the flowing air to be soothing" (DX 11 at ¶ 6; Tr. at 186:8–10), it seems unlikely that a condemned person who knows that nitrogen will be flowing into the mask imminently for the purpose of killing him will have that same experience while wearing the mask.

Moreover, there is no way to assess self-serving representations of some that the mask fit "snug" (DX 6 at ¶ 4; DX 10 at ¶ 3; DX 11 at ¶ 5; .) or that they "did not feel any exterior air coming into the mask."  (DX 10 at ¶ 3; *see also* DX 6 at ¶ 4 ("there were no gaps where air could escape from the mask while I was wearing it"); DX 9 at ¶ 8 ("If there was any air leakage at the edges of the mask, I was unaware of such, and I did not feel air coming in from the room.").)  In the circumstances of these demonstrations, there was no difference between the breathing air being supplied into the mask and the breathing air outside the mask and no way to determine whether the breathing air from outside the mask was infiltrating inside the mask absent a negative pressure or other test.  None of the witnesses reporting these things purports to have performed such a test.

36

* * *

Defendants' evidence amounts to nothing more than their assurances that nothing will go wrong.  Mr. Smith received those assurances once to no effect.  He should not be made to rely on them again.  That is especially true given ADOC's poor track record in carrying out executions and the novelty and untested nature of the procedures in the Protocol for executing condemned people by nitrogen hypoxia, leading one of the Assistant Attorneys General to candidly admit: "I don't know whether an expert [in developing nitrogen hypoxia protocols] exists."  (Tr. at 192:24.)

> **b.    Execution by Nitrogen Hypoxia Under the Protocol Would Subject Mr. Smith to a Substantial Risk of Asphyxiation on His Own Vomit**

Defendants' plan to deliver nitrogen gas to Mr. Smith through a mask placed over his face also entails a substantial risk of asphyxiation and the painful sensation of suffocation if Mr. Smith vomits into the mask.  Deficient oxygen levels can cause nausea.  Mr. Smith is at heightened risk for nausea and vomiting because he has post-traumatic stress disorder ("PTSD") from ADOC's failed attempt to execute him last year.  The evidence regarding Mr. Smith's condition and symptoms is overwhelming and unrefuted.  Defendants' plans in the event Mr. Smith vomits into the mask are inadequate to reduce the risk of asphyxiation.  In particular, once nitrogen gas begins to flow into the mask, Defendants will not remove the mask to

clear Mr. Smith's airway if he vomits, resulting in almost certain asphyxiation even if Mr. Smith is unconscious.

> i. *Oxygen Deficient Environments Cause Nausea and Vomiting*

It is undisputed, as Dr. Yong explained, that "[e]nvironments deficient in oxygen can result in nausea [and] vomiting," among other things.  (PX B1 at 5.) Dr. Antognini agreed that nausea is a symptom of oxygen deprivation.  (PX A33 at 203:3–10.)  An article published in a scientific journal, on which Drs. Nitschke and Antognini relied, also documents that nausea is a symptom of oxygen deprivation.

**Table 2 Progressive Human Response to Oxygen Deficient Atmosphere**

| Oxygen Concentration (%) | Symptoms |
|---|---|
| 12 – 16 | Increase breathing/heart rate; slightly disturbed muscular coordination |
| 10 – 14 | Emotional upset; fatigue on exertion; breathing is disturbed; consciousness is not lost |
| 6 - 10 | Nausea; loss of free movement; possible collapse; may be aware but unable to move or speak; may lose consciousness |
| > 6 | Convulsive movement; gasping breaths; cessation of respiration and heart rate |

Adapted from Clayton & Clayton.[11]

(PX A17 at 6 (emphasis added).)

████████████████████████████████████████

████████████████████████████████████████

███████████████████████



(PX A34 at ADOC_Hypoxia_000756 (emphasis added); *see also* PX A31 at 103:4–104:4.)

ADOC intends to place Mr. Smith into an oxygen deficient environment by delivering pure nitrogen to him instead of breathing air that consists of approximately 20% oxygen.  In their medical practices, Drs. Yong and Antognini give nothing-by-mouth orders that advise patients not to eat a full meal for eight hours before receiving anesthesia to reduce the risks of vomiting.  (*See* Tr. at 69:12–19, 78:15–79:2;162:6–13.)  But the Protocol provides that Mr. Smith is entitled to a "last meal."  (PX A1 at ¶ IX.B.)  When ADOC attempted to execute Mr. Smith in November 2022, his last meal was delivered to him at about 4:00 p.m.—only two

hours before his scheduled 6:00 p.m. execution.  (*See* PX B5 at ¶ 4; PX A23 at ¶ 138.)

Accordingly, execution by nitrogen hypoxia entails an inherent risk of nausea and vomiting.

      *ii.*     *Mr. Smith is at Heightened Risk for Nausea and Vomiting Due to PTSD*

The risk to Mr. Smith of nausea and vomiting is exacerbated by his PTSD. Based on her evaluation of Mr. Smith over more than thirty-five (35) hours of in-person and telephonic interviews, review of medical records, and data from psychological standardized measures, Dr. Katherine Porterfield[15] concluded that Mr. Smith has PTSD from ADOC's failed attempt to execute him last year.  (PX B3 at 3.)  According to Dr. Porterfield, Mr. Smith's "experience on November 17, 2022 of living through an almost four-hour execution process (preceded by weeks of isolation and visits in which he said his final goodbyes to his family) subjected him to severe trauma, the intensity of which I have rarely seen in twenty-five years of practice as a trauma psychologist."  (*Id.*; *see also id.* at 29 ("What Kenny Smith experienced weas one of the most severely debilitating traumas a person can

---

[15] Dr. Porterfield is a clinical psychologist at Bellevue Hospital and New York University School of Medicine at the Bellevue/NYU Program for Survivors of Torture.  (*See id.* at 2.)  She has experience evaluating and treating children, adolescents, and adults who have experienced war trauma or torture.  (*See id.*)

endure—that of being purposely brought almost to the point of death—and he suffers marked and profound psychological damage from the experience.").)

His "symptoms include hyperarousal and anxiety, intrusive reexperiencing of the attempted execution, dissociation from his environment, avoidance of reminders of the events, social disconnection, and profoundly negative mood and thoughts." (*Id.*)  Mr. Smith also "demonstrated and reported across time several fairly common . . . gastrointestinal symptoms, that can accompany posttraumatic stress," including nausea.  (Tr. at 153:6–22; *see also* PX B3 at 29.)  In particular, he reported "that he is frequently nauseated especially if he has a reminder of the attempted execution." (PX B3 at 21, *see also id.* at 28, 30; Tr. at 143:24–25 ("Mr. Smith reported chronic nausea very frequently, coming on all the time, as – as I recall, throughout the year.").)

Mr. Smith's medical records confirm Dr. Porterfield's conclusion that Mr. Smith has PTSD and depression and that the onset of his conditions was in November 2022 after ADOC's failed attempt to execute him.  (PX B6 at ¶¶ 9–10.) The medical records further confirm that Mr. Smith experienced several hours of "intense pain and fear" during the failed execution and has continuing symptoms of anxiety, tearfulness, intrusive thinking, and nightmares.  (*Id.* at ¶ 11; *see also* PX A31 at 35:3–11.)

Mr. Smith's PTSD and its symptoms are exacerbated as he experiences the same procedures leading up to ADOC's planned second attempt to execute him that he experienced last November, including being housed in the same holding cell, saying goodbye to his family in the same visiting room, and receiving another last meal, and contemplates that second attempt with ten of the twelve same Execution Team members, on the same gurney in the same execution chamber.  (*See* Tr. at 95:5–98:14; PX A31 at 51:19–52:9.)  As Dr. Porterfield explained:

> The new execution date set for Mr. Smith will begin a process of reexperiencing of reminders and details that are sure to be highly triggering for Mr. Smith.  Procedures, such as moving him into lock-down status, examining him pre-execution, setting up visit protocols with his family to say goodbye to him again, managing his last meal and his personal effects will be highly distressing, as these events will flood him with memories and involuntary fear reactions from his experiences in November 2022.  Additionally, the actual procedures of the execution, such as holding him in the death watch cell, having multiple guards bring him into the chamber, strapping him to the gurney, and beginning physical procedures that will bring about his suffocation through nitrogen hypoxia will likely create a panic reaction that is completely destabilizing to his mind and nervous system.

(PX B3 at 29–30; *see also id.* at 3 ("It is my clinical opinion that the current plan of execution and the possibility of having to again face these procedures is completely terrifying for Mr. Smith and leading to ongoing deterioration.").)

Mr. Smith's PTSD and his symptoms are further exacerbated because he has been on "single walk" status since the Governor set his execution date on November 8.  (*See* Tr. at 129:18–23, 153:2–5.)  On single walk status, Mr. Smith is not

permitted in the same space as his fellow inmates. (*See id.*) That isolates Mr. Smith from long-time friends who he considers brothers and complicates visits with his family and his counsel while he is preparing for another execution attempt and needs their fellowship and counsel most. (*See id.* at 129:24–131:12.)

Although Warden Raybon did not respond to Mr. Smith's letter to him requesting that he be removed from single walk status, Mr. Smith had an opportunity to speak with the Warden several weeks later about it. (*See id.* at 131:20–132:11.) The Warden told Mr. Smith that it was "my policy" to put condemned people on single walk status when their executions are scheduled through the execution to address "[a] security risk." (*Id.* at 131:25–132:17.)[16]  There is no basis to believe that Mr. Smith is a security risk to inmates or staff or that any inmate or staff is a security risk to him:

> Q.    Since you've been incarcerated, have you been – ever had any disciplinary infraction involving violence?
>
> A.    No, sir.  Never.
>
> Q.    Has anyone ever informed you that you're a security risk to other inmates?
>
> A.    No, sir.  Never.
>
> Q.    How about to prison staff?
>
> A.    No, sir.  Never.

---

[16] Based on his thirty-plus year confinement at Holman, Mr. Smith testified that the policy is of recent vintage. (*See id.* at 135:4–10.)

Q.     Are you aware of anyone else at Holman who's a security risk to you?

A.     No, sir.  No one.

(*Id.* at 132:18–133:3.)

Despite that Mr. Smith remains on single walk status.  According to Ms. Stewart-Riley, single-walk status usually lasts around 30 days.  *See* PX A31 at 185:2–9.  But in Mr. Smith's case it will continue for 78 days, including Thanksgiving, Christmas, and New Years, and deprive Mr. Smith of companionship and fellowship during those times and contribute to his deteriorating condition and exacerbate his symptoms.  (*See* Tr. at 153:2–5.)

Dr. Nitschke's observations during a visit with Mr. Smith on December 13 are consistent with Dr. Porterfield's conclusions: "In my conversation with Mr. Smith, I noticed he was tense and anxious and he openly discussed the traumatic effects of the previous failed attempted execution.  This anxiety along with nausea, a recognised symptom of nitrogen inhalation, could significantly increase the chance of vomiting."  (PX B7 at ¶ 14.)

Dr. Antognini testified that, in a clinical setting, it would be important for him to know if a patient had severe anxiety or fear going into the procedure.  (PX A33 at 305:3–8; *see also id.* at 305:20–306:6.)  But Defendants are unconcerned with Mr. Smith's PTSD or, at least, as shown below, have no plans for the heightened risk of nausea and vomiting to which he is subject.

44

> iii.    *ADOC Lacks Adequate Procedures to Prevent Asphyxiation from Vomiting*

It is undisputed that a person who vomits into a mask covering their face while laying prone on a gurney is at risk of "chok[ing] on his own vomit."  (PX B1 at 8.) As Dr. Antognini testified:

> Q.    And why is that [aspiration of stomach contents] a problem?
>
> A.    Well, that aspirate, the stomach contents can get into the lungs and, of course, cause lung damage and can cause blockage of the airways.
>
> Q.    What happens if that happens?
>
> A.    Well, they can get pneumonia, they can get blockage of part – maybe one lung or the other and that's going to cause breathing problems and it's possible they could completely fill up the airway which means they can't breathe and *they would choke to death*.

 (PX A33 at 307:16–308:6 (emphasis added.)  Dr. Yong testified about the same risk:

> Q.    You were asked about vomiting into the mask.  If Mr. Smith vomits into the mask before he is deceased and the nitrogen is flowing, what can happen to Mr. Smith?
>
> A.    That was one of my main concerns, is that without protocols or mitigation, my worry is that the subject would breathe in their own vomit and asphyxiate or choke on – on their own vomit.
>
> Q.    Choke to death on their own vomit, right?
>
> A.    That would be my concern.

(Tr. at 79:20–80:3.)

45

According to Defendants' own expert, to avoid that outcome, it is imperative to act "the moment you see it" to remove the mask and "turn the whole body and suction out the airway and the mouth to remove the vomit." (PX A33 at 308:10–19, 309:13–20; *see also* Tr. at 163:9–17; PX B1 at 8.)  It is standard of care to have suction available for that purpose. (*See* PX A33 at 311:5–17; Tr. at 69:25–70:7.) Indeed, Dr. Antognini agreed that when a patient of his vomits during general anesthesia, it is an emergency that he cannot just ignore because "[i]t's something that needs to be taken care of right away.  There could be complications if it's not taken care of right then and there." (Tr. at 163:2–8.)

But ADOC will not have suction available to address vomiting when breathing air is flowing into the mask and ADOC personnel will not do anything to address vomiting once nitrogen gas begins to flow into the mask.  According to Ms. Stewart-Riley, if a condemned person vomits while breathing air is flowing into the mask, the Execution Team Captain will remove the mask, place a bite plate in the condemned person's mouth, turn the condemned person's head to the side, and perform a finger sweep to remove vomit from the condemned person's airways. (PX A31 at 179:12–180:2.[17])  But "a finger sweep is insufficient to remove the vomit from a patient's airway and suction is required." (PX B8 at ¶ 5; *see also* PX B7 at

---

[17] As the condemned person will be strapped to a gurney, the preferred practice of turning his whole body to the side is not an option.

¶ 12 ("That [a finger sweep] would be considered insufficient and also dangerous in a non-compliant person.").)

Even worse, if Mr. Smith vomits into the mask once the nitrogen has begun to flow, Ms. Stewart-Riley testified that ADOC will not do anything:

> Q.     So did you address as you went through the simulation what to do about the nitrogen if the person vomits and the nitrogen is already turned on?
>
> A.     If the person vomits while the nitrogen is engaged, we know that we cannot remove that mask.
>
> Q.     So you just let them sit there with the vomit in the mask?
>
> A.     They won't know.  I mean, they won't know.  They will be unconscious and probably deceased.
>
> Q.     What if they're not deceased.  What if it happens before they're deceased, couldn't that asphyxiate them?
>
> MR. ANDERSON:  Objection.  Calls for speculation.
>
> Q.     You can answer.
>
> A.     If the nitrogen is engaged, we would not remove the mask.

(PX A31 at 180:11–181:7.)

Commissioner Hamm confirmed Ms. Stewart-Riley's testimony:

> Q.     And is it your understanding that the protocols currently drafted and the plan as articulated by the . . . 30(b)(6) witness for the Department of Corrections to be that if someone being executed vomits while the mask is on and nitrogen is being administered, nothing will be done in that situation but to let it happen?
>
> A.     That is correct.

47

Q.     Okay.  That's your understanding, as the commissioner, to be the protocol in that circumstance?

A.     Yes sir, that's what we've decided.

(Tr. 88:17–89:1.)  And even though he was aware of the risk of asphyxiation in that event, Commissioner Hamm did not seek available medical advice about how to mitigate it:

Q.     Did you consider that vomiting in the mask could cause asphyxiation? . . .

A.     Yes, sir.

Q.     Did you consult with any medical personnel about how to lessen that risk?

A.     No, sir.

Q.     Did you talk to the medical personnel about how to alleviate that risk?

A.     No, sir.

Q.     Did you talk to any medical personnel about what to do in that situation, as it's happening, to prevent asphyxiation?

A.     I did not.

Q.     Okay.  You certainly had medical personnel available to you to ask that question.

A.     I could have sought out medical advice, yes.

(Tr. at 89:13–90:3.)

"If a condemned person vomits once nitrogen is deployed and in a reclined position, he will likely inhale vomit and asphyxiate, resulting in painful sensations

48

of choking and suffocations or even death from asphyxiation."  (PX B8 at ¶ 6; *see also* PX B7 at ¶ 12 ("There is no such plan if vomiting occurs once the nitrogen flow is started.  In that event, the person will die by asphyxiation instead of hypoxia.").) In other words, if Mr. Smith vomits once the nitrogen begins to flow, ADOC will leave him to choke on his own vomit.

> 2.    **There are Feasible and Readily Available Alternatives that Would Significantly Reduce the Substantial Risk of Superadded Pain to Mr. Smith from ADOC's Plan to Deliver Nitrogen Through a Mask**

The evidence establishes that Defendants have a "pathway forward"— feasible and readily available alternatives—that would significantly reduce the substantial risk of superadded pain to which execution by nitrogen hypoxia using a mask under the Protocol would subject Mr. Smith.   *Nance*, 597 U.S. at 169. Although Defendants have compared execution by nitrogen hypoxia to other methods like hanging (DE 39 at 65), disemboweling, and burning at the stake, (Tr. at 29:9–11), they have made little effort to address the feasible and readily available alternatives that Mr. Smith has offered.

As Dr. Nitschke explained: "If an execution subject is uncooperative, any procedure that relies on a facemask will be at risk of significant failure.  One way to bypass the inherent problems of a facemask is to use a capsule, hood or container." (PX B2 at ¶ 14.1.)  Delivering nitrogen gas through a hood or in a closed chamber

"would address the risks associated with any ingress of oxygen from surrounding air and eliminate any concern over carbon dioxide accumulation." (*Id.* at ¶ 14.2.)

Dr. Antognini agreed that an airtight chamber would be the best method to reduce the risk of oxygen infiltrating into the mask. (*See* PX A33 at 65:3–7.) And the Oklahoma White Paper in ADOC's files also provides that the process for executing people by nitrogen "requires little more than *a hood* sufficiently attached to the subject's head and a tank of inert gas to create a hypoxic atmosphere." (PX A32 at 10 (emphasis added).)

Defendants have not produced any evidence that either of these alternatives are infeasible or unavailable. Commissioner Hamm was not aware of anyone at ADOC even considering the use a hood or a closed chamber instead of a mask to deliver the nitrogen gas to condemned people despite documents in its possession that recommend that. (*See* Tr. at 86:19–87:17, 88:6–11, 90:17–25.)

Defendants do not even attempt to rebut Mr. Smith's showing that a hood or a closed chamber would reduce the substantial risk of oxygen infiltration associated with the use of a mask to deliver nitrogen gas. Relying on a solitary case report suggesting that a person attempting suicide with "with a plastic bag over his head and two helium cylinders next to him connected to the bag with tubes," Ms. Stewart-Riley contends that "ADOC views the available literature as showing that an 'exit bag' or 'suicide bag' would not eliminate any risk of vomiting." (DX 3 at ¶ 3; *see*

50

*also* DX 32.)  But Defendants' own expert disagrees: Dr. Antognini testified that a hood would reduce the risk of aspirating on vomit.  (PX A33 at 65:11–66:4.)  In any event, Mr. Smith is not required to show that the use of a hood would "eliminate" the risk of asphyxiation from vomiting and one case report is an insufficient basis for Defendants to determine the relative risk of asphyxiation from vomiting using a hood to deliver nitrogen gas compared with the risk using a mask to do so.

Mr. Smith also has established the existence of another feasible and readily available alternative—firing squad—if Defendants are unable or unwilling to amend the Protocol.  Mr. Smith submitted evidence from Dr. Joseph Groner who is a pediatric and general surgeon with experience treating adult and pediatric patients with gunshot wounds.  (*See* PX B4 at ¶¶ 1–2.)  Based on his review of the Utah protocol for executing condemned people by firing squad, Dr. Groner has concluded that the "bullets will tear open the heart causing immediate loss of the pumping function of the heart," which "will cause the blood flow to the brain to cease immediately," and "[l]oss of consciousness . . . a few seconds" later.  (*Id.* at ¶¶ 6–8.)  The condemned person will "be clinically dead (absence of heart beat, breathing, or any reflexes) within a few minutes."  (*Id.* at ¶ 10.)  Execution by that method would not subject Mr. Smith to the substantial risk of being left in a persistent vegetative state, experiencing a stroke, or asphyxiating on his vomit.  Defendants have not submitted any evidence to rebut Dr. Groner.

51

### C.   Mr. Smith is Likely to Succeed on His Claim that Attempting to Execute Him by Nitrogen Hypoxia Using the Procedures in the Protocol Would Violate His Rights Under RLUIPA

RLUIPA provides: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that governmental interest."   42 U.S.C. § 2000cc-1(a).   The evidence shows that executing Mr. Smith by nitrogen hypoxia using the procedures in the Protocol would impose a substantial burden on Mr. Smith's religious exercise and Defendants have not carried their burden to show that those procedures are the least restrictive means of furthering a compelling governmental interest.

### 1.   Executing Mr. Smith by Nitrogen Hypoxia Using the Procedures in the Protocol Would Substantially Burden His Religious Exercise

Under RLUIPA, Mr. Smith bears "the initial burden of proving that the Department's . . . policy implicates his religious exercise . . . grounded in a sincerely held religious belief, . . . [and] also . . . that the Department's . . . policy substantially burden[s] that exercise of religion."   *Holt v. Hobbs*, 574 U.S. 352, 358 (2015).   A "substantial burden" on religious exercise is "akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly."

*Thai Meditation Ass'n of Ala., Inc. v. City of Mobile, Ala.*, 83 F.4th 922, 927 (11th Cir. 2023) (citation and internal quotation marks omitted).  The procedures in the Protocol would substantially burden Mr. Smith's religious exercise by placing significant pressure on Mr. Smith to abstain from audible prayer during his planned execution.

Mr. Smith has a plan with his spiritual advisor that includes reciting scripture, audible prayer, anointing Mr. Smith's head with oil, receiving communion, and hands-on ministering.  (*See* Tr. at 133:7–16.)  "[T]here is a rich history" of audible prayer at the time of a condemned person's execution "dating back well before the founding of the nation."  *Ramirez v. Collier*, 595 U.S. 411, 427 (2022).  Because the Protocol provides for Mr. Smith to be masked immediately upon entry into the execution chamber (PX A1 at § X.A.v), the Protocol substantially burdens Mr. Smith's religious exercise by forcing him to choose between audible prayer, which may loosen or dislodge the mask and lead to the dire consequences described above, or abstaining from audible prayer.  In that circumstance, Mr. Smith has no meaningful choice; he will be coerced to abstain from audible prayer in violation of his right under RLUIPA to exercise his religious beliefs.

2. **Defendants Have Not Shown that the Procedures in the Protocol are the Least Restrictive Means to Further a Compelling Governmental Interest**

"Once a plaintiff has made out his initial case under RLUIPA, it is the government that must show its policy 'is the least restrictive means of furthering [a] compelling governmental interest.'" *Ramirez*, 595 U.S. at 432 (citation omitted). Defendants have not satisfied that burden.

Defendants can eliminate the substantial burden to Mr. Smith's religious exercise by using a hood or a closed chamber to deliver nitrogen gas to him instead of a mask. Neither of those methods of delivering nitrogen gas entail the substantial risk of oxygen infiltrating the mask and the consequent dire consequences.

But, even if a mask is used to deliver nitrogen to a condemned person, Defendants have not shown that requiring a condemned person to wear it while he speaks and prays is the least restrictive alternative to accomplish a compelling governmental interest. Mr. Smith proposed a less restrictive alternative and a relatively simple fix of "[p]rovid[ing] a condemned person an opportunity to speak and to audibly pray without being masked." (PX A23 at ¶ 102.)

Defendants reject Mr. Smith's proposal because some Execution Team members will be dismissed to their secondary posts after the condemned person is strapped to the gurney and the mask is properly secured (if it is), which occurs before the inmate speaks. (DE 39 at 75–76.) And Defendants say that "[i]f the mask

placement were saved until after the condemned's last words, there would be far fewer members of the Execution Team on hand to ensure that it was properly positioned" and "if the condemned were to resist, the Execution Team members would have a more difficult time seating the mask correctly without the assistance of the full team." (*Id.* at 76.)  According to the Defendants, that is necessary to further "a compelling governmental interest in the safety and security of the execution chamber, as well as a strong interest in maintaining the safety of their personnel, including during judicial executions." (*Id.*)

But Mr. Smith will be strapped to a gurney and immobilized as soon as he enters the execution chamber with the full contingent of corrections officers comprising the Execution Team present and before he is permitted to speak.  (*See* PX A1 at § X.A.iii.)  And the Protocol contemplates that the "Execution Team members responsible for secondary posts will be dismissed from the execution chamber" before "the team members inside the execution chamber will make a final inspection of the mask" and "proper placement is verified." (*Id.* at § X.A.v., xiii.) Defendants have not explained, why, if the Execution Team members inside the execution chamber can supposedly perform those responsibilities after other team members are dismissed to their secondary posts, they cannot also place the mask on Mr. Smith *after* he is permitted to pray audibly and speak.

Moreover, Mr. Smith's experience when ADOC attempted to execute him in November 2022 is informative.  Then, three of the Execution Team members remained with Mr. Smith in the execution chamber throughout the entirety of his ordeal after he had been strapped to the gurney and the other Execution Team members had been dismissed to their secondary posts.  (*See* PX B5 at ¶ 4; PX A23 at ¶¶ 141, 150–62.)  Assuming the Execution Team will be comprised of the same number of individuals when ADOC attempts to execute Mr. Smith again in January, Defendants do not explain why it will take more than three Execution Team members to place the mask on Mr. Smith (assuming they are trained to do that in the first place) while he is immobilized on the gurney.

### D.      Mr. Smith is Likely to Succeed on His Claim that Attempting to Execute Him by Nitrogen Hypoxia Using the Procedures in the Protocol Would Violate His Rights Under ARFA

ARFA provides: "Government shall not burden a person's freedom of religion even if the burden results from rule of general applicability, except . . . if it demonstrates that application of the burden to the person (1) Is in furtherance of a compelling governmental interest; and (2) Is the least restrictive means of furthering that compelling governmental interest."  Ala. Const. art. I, § 3.01(V).  It differs from RLUIPA only in that ARFA does not require proof that the government "substantially" burdened religious exercise, only that it "burden[ed]" it.  Under ARFA, "*any* burden—even an incidental or insubstantial one—suffices to trigger

56

strict scrutiny." *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile, Ala.*, 980 F.3d 821, 840 (11th Cir. 2020) (emphasis in original). Given that ARFA imposes a lesser burden on Mr. Smith than RLUIPA, the evidence that supports his RLUIPA claim necessarily supports his ARFA claim.

In support of their motion to dismiss, Defendants contended that the Court should decline to exercise supplemental jurisdiction over Mr. Smith's ARFA claim and that the Anti-Injunction Act prevented the Court from granting the relief that Mr. Smith is seeking. The Court should reject Defendants' contentions for the reasons explained in previous briefing, which Mr. Smith incorporates by reference. (*See* DE 44 at 33.)

In their reply in support of their motion to dismiss, even though the Anti-Injunction Act only prevents federal courts from issuing injunctions "to stay proceedings in a State court," 28 U.S.C. § 2283, Defendants nevertheless contend that the statute applies "to an execution issued upon a judgment." (DE 50 at 20 (quoting *Hill v. Martin*, 296 U.S. 393, 403 (1935)).) But *Hill* and the cases cited in it involve proceedings to execute on civil judgments. *See Hill*, 296 U.S. at 399–40 (federal court lacked jurisdiction to stay state court proceedings involving assessment of state inheritance tax); *Ke-Sun Oil Co. v. Hamilton*, 61 F.2d 215 (9th Cir. 1932) (federal court lacked jurisdiction to enjoin execution of liens to enforce

state court judgment); *Leathe v. Thomas*, 97 F. 136, 138–39 (7th Cir. 1899) (federal court lacked jurisdiction to enjoin sheriff from executing on state court judgment).

Following Defendants' contention to its logical conclusion, a federal court would never have jurisdiction to enjoin an execution arising from a judgment of conviction for capital murder in a state court. But Defendants have not cited any case so holding. Nor could they. The Supreme Court routinely has accepted jurisdiction over method-of-execution claims like Mr. Smith's arising from state court capital murder judgments. *See Nance v. Ward*, 597 U.S. 159 (2022); *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019); *Glossip v. Gross*, 576 U.S. 863 (2015); *Baze v. Rees*, 553 U.S. 35 (2008). And so has this Court. *See Smith*, 2023 WL 4353143; *Miller*, 2022 WL 4348724; *Smith v. Dunn*, 516 F. Supp. 3d 1310 (M.D. Ala. 2021).

## II.   MR. SMITH WILL BE IRREPARABLY HARMED WITHOUT AN INJUNCTION

There is nothing more final and irreversible than death. What Mr. Smith stands to suffer, however, would compound that. Without a preliminary injunction, Mr. Smith is scheduled for an unconstitutional death that will strip him of his "'final dignity.'" *Miller*, 2022 WL 4348724, at *21 (citing *Smith v. Comm'r, Ala. Dep't of Corr.*, No. 21-13581, 2021 WL 4916001, at *5 (11th Cir. Oct. 21, 2021) (Pryor, J., concurring)); *see also In re Holladay*, 331 F.3d 1169, 1177 (11th Cir. 2003) ("We consider the irreparability of the injury that petitioner will suffer in the absence of a stay [of execution] to be self-evident."). Under ADOC's Protocol, Mr. Smith will

suffer a needlessly painful execution attempt in violation of his constitutional rights. Moving forward with the execution under the Protocol would result in irreparable injury as it "cannot be undone through monetary remedies." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).

## III.   THE THREATENED INJURY TO MR. SMITH OUTWEIGHS THE HARM AN INJUNCTION WOULD CAUSE DEFENDANTS

The balance of equities weighs heavily in Mr. Smith's favor.  "The public interest is served when constitutional rights are protected." *Melendez v. Sec'y, Fla. Dep't of Corr.*, No. 21-13455, 2022 WL 1124753, at *17 (11th Cir. Apr. 15, 2022) (citation and internal quotation marks omitted).   This case involves serious constitutional violations.   The State has scheduled Mr. Smith for execution by nitrogen hypoxia despite the facts that (1) Mr. Smith has not exhausted his appeals; (2) the Protocol subjects Mr. Smith to a heightened risk of superadded pain including the painful sensation of suffocation, stroke, or a transition to a persistent vegetative state; (3) and the Protocol places a substantial burden on his religious exercise by inhibiting audible prayer.

There is little research regarding death by nitrogen hypoxia.  When the State is considering using a novel form of execution that has never been attempted anywhere, the public has an interest in ensuring the State has researched the method adequately and established procedures to minimize the pain and suffering of the

condemned person.  Thus, it is in the public's interest to ensure Defendants comply with the Constitutional protections afforded to Mr. Smith.

To be sure, the State and victims have an interest in carrying out timely executions.  *See Hill v. McDonough*, 547 U.S. 573, 584 (2006).  But, in this case, Mr. Smith does not seek an injunction to prevent the State from executing him forever—only from attempting an unconstitutional execution.   Any harm to Defendants is less consequential than the harm Mr. Smith stands to suffer.  After all, "[t]he state will get its man in the end.  In contrast, if persons are put to death in a manner that is determined to be cruel, they suffer injury that can never be undone, and the Constitution suffers an injury that can never be repaired."  *Gomez v. U.S. Dist. Ct. for N. Dist. of California*, 966 F.2d 460, 462 (9th Cir. 1992) (Noonan, J., dissenting).

Defendants' accusations that Mr. Smith has asserted "last-minute claim[s]" and engaged in "gamesmanship," (DE 39 at 81–82), do not apply here.  Mr. Smith was not informed that the Defendants intended to execute him by nitrogen hypoxia until August 25.  *See* PX A25; PX A40.  The Supreme Court of Alabama did not authorize Mr. Smith's execution by that method until November 1 and the Governor did not schedule his execution for January 25, 2024 until November 8.  *See* PX A39.  Mr. Smith filed this action on the same day the Governor scheduled his execution.  The "last-minute" nature of this litigation is Defendants' doing—not Mr. Smith's.

## CONCLUSION

For the foregoing reasons and those in Mr. Smith's previous submissions (DE 19; DE 44), the Court should grant Mr. Smith's motion for a preliminary injunction to enjoin Defendants from executing him by nitrogen hypoxia using the Protocol on January 25, 2024.

DATED: December 29, 2023

*/s/ Andrew B. Johnson*
Andrew B. Johnson (ASB: 8504-r76j)
BRADLEY ARANT BOULT
  CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203
(205) 521-8000
ajohnson@bradley,com

Jeffrey H. Horowitz*
David A. Kerschner*
Robert M. Grass*
ARNOLD & PORTER KAYE
  SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
(212) 836-8000
jeffrey.horowitz@arnoldporter.com
david.kerschner@arnoldporter.com
robert.grass@arnoldporter.com

Ashley Burkett* (ASB: 2789-T79G)
Angelique Ciliberti (ASB: 1504-T44C)
ARNOLD & PORTER KAYE
  SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743

(202) 942-5000
ashley.burkett@arnoldporter.com
angelique.ciliberti@arnoldporter.com

*Attorneys for Plaintiff Kenneth Eugene Smith*

*admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I certify that on December 29, 2023, I electronically filed the foregoing with the Clerk of the Court using the Pacer system, which will send notification to the following:

Richard D. Anderson
Richard.Anderson@AlabamaAG.gov

Polly Spencer Kenny
Polly.Kenny@AlabamaAG.gov

Beth Jackson Hughes
Beth.Hughes@AlabamaAG.gov

Henry Mitchell Johnson
Henry.Johnson@AlabamaAG.gov

Jordan Shay Shelton
Jordan.Shelton@AlabamaAG.gov

John Coleman Hensley, III
John.Hensley@AlabamaAG.gov

*Attorneys for Defendants*

                    __/s/ Andrew B. Johnson_
                         Of Counsel