# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | | |
|---|---|---|
| KENNETH EUGENE SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  2:23-cv-00656-RAH |
| | ) | |
| JOHN Q. HAMM, | ) | |
| Commissioner of the Alabama | ) | |
| Department of Corrections, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TERRY RAYBON, Warden, | ) | |
| Holman Correctional Facility, | ) | |
| | ) | |
| Defendants. | ) | |

## Defendants' Post-Hearing Brief in Opposition to Plaintiff Smith's Motion for a Preliminary Injunction

Steve Marshall
*Attorney General*

Richard D. Anderson
*Assistant Attorney General*
Counsel of Record *

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
Tel: (334) 353-2021
Richard.Anderson@AlabamaAG.gov

December 29, 2023

# TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………ii

TABLE OF AUTHORITIES…………………………………………………...iv

I. Legal Standard ........................................................................................ 1

II. Argument ................................................................................................ 3

    COUNT ONE: FOURTEENTH AMENDMENT (EQUAL
    PROTECTION) ....................................................................................... 3

    COUNT TWO: EIGHTH AMENDMENT ........................................... 7

       1.   Smith Did Not Establish a Substantial Risk of Harm
           Associated with ADOC's Mask or Oxygen Infiltrating the
           Mask. ....................................................................................... 10

       2.   Smith Did Not Establish A Substantial Likelihood that He
           Would Vomit in the Mask and Thereby Suffer Severe Pain. ............... 17

       3.   Smith Did Not Establish Any Feasible, Readily Available
           Alternative That Would Substantially Reduce the Risks of
           Harm He Attributes to ADOC's Mask. ................................... 21

         A.   The "Custom Fit" Mask ................................................. 21

         B.   The "Hood" as an Alternative Method. ............................. 24

         C.   Smith's "a Chamber" Alternative Method......................... 27

         D.   The PLRA's Narrowness-Necessity-and-Non-
            Intrusiveness Requirements ................................................. 29

         E.   The Firing Squad............................................................. 30

         F.   Abandoned Alternatives.................................................... 31

       4.   The Limitations on Smith's Expert Testimony..................... 31

COUNTS THREE AND FOUR: FIRST AMENDMENT/RLUIPA ................. 36

COUNT FIVE: ARFA……………………………………… ................... 38

POTENTIAL MODIFICATIONS TO ADDRESS SMITH'S
RELIGIOUS FREEDOM CLAIMS………………………… ................... 39

CONCLUSION………………………………………………………...40

CERTIFICATE OF SERVICE……………………………………………41

# TABLE OF AUTHORITIES

**Cases**

*Atl. Coast Line R. Co. v. Brotherhood of Locomotive Eng'rs*,
398 U.S. 281 (1970) ................................................................5

*Baze v. Rees*,
553 U.S. (2008) ......................................................... 18, 37

*Bottoson v. Moore*,
234 F.3d 526 (11th Cir. 2000) ..............................................32

*Bowles v. DeSantis*,
934 F.3d 1230 (11th Cir. 2019) ..............................................3

*Bucklew v. Precythe*,
139 S. Ct. 1112 (2019)........................... 9, 11, 17, 20, 28, 36

*City of St. Louis v. Praprotnik*,
485 U.S. 112 (1988) ................................................................4

*Estelle v. Gamble*,
429 U.S. 97 (1976) ..............................................................36

*Exxon Mobil Corp. v. Saudi Basic Industr. Corp.*,
544 U.S. 280 (2005). ...............................................................5

*General Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ..............................................................33

*Glossip v. Gross*,
576 U.S. 863 (2015) ..............................................................16

*Griffin Indus., Inc. v. Irvin*,
496 F.3d 1189 (11th Cir. 2007).............................................7

*Hoffer v. Sec'y, Fla. Dep't of Corr.*,
973 F.3d 1263 (11th Cir. 2020)........................................3, 29

*Hughes v. Kia Motors Corp.*,
  766 F.3d 1317 (11th Cir. 2014) ........................................................................34

*Keeton v. Anderson-Wiley*,
  664 F.3d 865 (11th Cir. 2011) ...........................................................................2

*Knight v. Thompson*,
  797 F.3d 834 (11th Cir. 2015) ..........................................................................31

*McCorvey v. Baxter Healthcare Corp.*,
  298 F.3d 1253 (11th Cir. 2002) .................................................................. 32, 34

*Nken v. Holder*,
  556 U.S. 418 (2009) ...........................................................................................2

*Parsons Steel, Inc. v. First Ala. Bank*,
  474 U.S. 518 (1986) .........................................................................................38

*Powell v. Powell*,
  80 F.3d 464 (11th Cir. 1996) ..............................................................................6

*Powell v. Thomas*,
  784 F. Supp. 2d 1270 (M.D. Ala. 2011) ............................................................6

*Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*,
  320 F.3d 1213 (11th Cir. 2003) ........................................................................12

*United States v. Frazier*,
  387 F.3d 1244 (11th Cir. 2004) ........................................................................33

*United States v. Myers*,
  972 F.2d 1566 (11th Cir. 1992) ........................................................................12

*United States v. Tinoco*,
  304 F.3d 1088 (11th Cir. 2002) ........................................................................12

*Vendo Co. v. Lektro-Vend Corp.*,
  433 U.S. 623 (1977) .........................................................................................38

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ......................................................................................... 1, 2, 16


**Statutes**
18 U.S.C. § 3626(a)(2) ............................................................................................2
42 C.F.R. § 84.135(a) ............................................................................................10
Ala. Code § 36-15-1(b ..........................................................................................4


**Rules**
Alabama Rules of Appellate Procedure
Rule 8(d) ................................................................................................................6

Federal Rules of Evidence
Rule 702 ........................................................................................................ 32, 33

Federal Rules of Civil Procedure
Rule 8 ...................................................................................................................21

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| KENNETH EUGENE SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No.  2:23-cv-00656-RAH |
| | ) |
| JOHN Q. HAMM, | ) |
| Commissioner of the Alabama | ) |
| Department of Corrections, | ) |
| | ) |
| and | ) |
| | ) |
| TERRY RAYBON, Warden, | ) |
| Holman Correctional Facility, | ) |
| | ) |
| Defendants. | ) |

### Defendants' Post-Hearing Brief in Opposition to Plaintiff Smith's Motion for a Preliminary Injunction

Plaintiff Kenneth Smith failed to present evidence establishing an entitlement to preliminary injunctive relief as to any of his causes of action. Accordingly, for the reasons set forth below, this Court should deny the motion for a preliminary injunction.

## I.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain preliminary injunctive relief, Smith was required to demonstrate "(1) a substantial

likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest." *Keeton v. Anderson-Wiley*, 664 F.3d 865, 868 (11th Cir. 2011). Because a governmental entity is the true party-in-interest opposing the motion, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* Because preliminary injunctive relief may only be awarded upon a plaintiff's clear showing of entitlement to relief, evidence of a mere *possibility* of irreparable harm is insufficient. *Winter*, 555 U.S. at 22. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 24. To the extent that Smith's motion for preliminary injunction seeks the drastic, broad remedy of a "preliminary injunction to enjoin Defendants from executing him using the nitrogen hypoxia protocol on January 25, 2024" (Doc. 19 at 36), the Prison Litigation Reform Act ("PLRA") requires this Court to give "substantial weight" to the adverse impact on the operation of Alabama's criminal justice system that would be caused by such relief, effectively countermanding an order of the Alabama Supreme Court. *See* 18 U.S.C. § 3626(a)(2). It is that

2

"substantial weight" that Smith must overcome when the Court balances the third and fourth factors for issuance of a traditional stay. And Smith does not contest the supreme public interest in carrying out his sentence for murdering Liz Sennett. *Compare* Doc. 39 at 80-82 *with* Doc. 44 at 65; *see also Bowles v. DeSantis,* 934 F.3d 1230, 1248 (11th Cir. 2019).

The PLRA also requires that any grant of injunctive relief be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means to correct that harm." *Id*. A district court is required to perform an analysis of narrowness, necessity, non-intrusiveness as to each separate form or basis of injunctive relief. *See Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1279 (11th Cir. 2020) ("Rather, our precedent makes clear that if a district court's injunction grants 15 separate forms of relief, the court must make—and explain—15 separate PLRA-related findings.").

## II.   Argument

### COUNT ONE: FOURTEENTH AMENDMENT (EQUAL PROTECTION)

Smith's request for preliminary injunctive relief as to Count I is premised on his allegation that "ADOC has moved Mr. Smith to the front of the line for execution by nitrogen hypoxia despite that there are other condemned people who elected to be executed by nitrogen hypoxia five years ago that have exhausted their appeals." (Doc. 19 at 17–18.) But Alabama law places the responsibility for determining *when*

it is the "appropriate time" for executing an inmate's sentence in the Alabama Supreme Court. ALA. R. APP. P. 8(d). It is undisputed that that court has found that it is the appropriate time for Smith's sentence to be executed and has issued an order to that effect. That order gave the Governor authority to set the execution date, and Defendants are now legally required to execute Smith's sentence.

Defendants seek dismissal of this claim on the basis that they have no role in determining Smith's "place in line" and no power to alter it. Indeed, Defendants are not the state officials responsible for litigating criminal cases in the Alabama Supreme Court. State law clearly identifies the state official with that legal responsibility as someone other than either defendant. ALA. CODE § 36-15-1(b) (noting the Attorney General "shall attend, on the part of the state, to all criminal cases pending in the Supreme Court"). This Court may not find that the relevant authority "lies somewhere other than where the applicable law purports to put it." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988). Because Defendants are not responsible for the alleged violation, Smith cannot establish that he is entitled to an injunction limiting their ability to carry out their mandatory duties to execute a lawful order of the Alabama Supreme Court at a lawful time as directed by the Governor.

Further, Smith's direct challenge to the Alabama Supreme Court's determination that he should be at the "front of the line"—a determination made

4

prior to the filing of this lawsuit—is barred by the *Rooker-Feldman* doctrine. *See Exxon Mobil Corp. v. Saudi Basic Industr. Corp.*, 544 U.S. 280, 284 (2005). If the Alabama Supreme Court erroneously failed to realize that Smith has been wrongfully moved in the "formal queue," then federal review of that Court's decision lies with the United States Supreme Court. *Id*. at 285 (discussing *Dist. of Columbia Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983)). Even if, as Smith alleges, the Alabama Supreme Court should not have determined it the appropriate time for execution of his sentence, "lower federal courts possess no power whatsoever to sit in direct review of state court decisions." *Atl. Coast Line R. Co. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 296 (1970).

This Court should resolve Defendants' motion to dismiss Count One before it rules on the question of injunctive relief. On appeals from the entry of preliminary injunctive relief, adjudication of a case on the merits is "most appropriate if the injunction rests on a question of law and it is plain the plaintiff cannot prevail." *Munaf*, 553 U.S. at 691–92 (citing *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 287 (1940); *N.C. R. Co. v. Story*, 268 U.S. 288, 292 (1925); *City & Cnty. of Denver v. N.Y. Trust Co.*, 229 U.S. 123, 136 (1913)). Application of the *Rooker-Feldman* doctrine and identification of the state executive- and judicial-branch officials responsible for determining the appropriate time for Smith's execution to be carried out are matters established by state law. Adjudication of this claim on the

5

merits, on the basis of Defendants' motion to dismiss, is "most appropriate" rather than merely the denial of injunctive relief.

At the hearing on this motion, Smith cited *Powell v. Thomas*, 784 F. Supp. 2d 1270, 1276 n.1 (M.D. Ala. 2011), to suggest that the *Rooker-Feldman* doctrine is inapplicable to Count One. But in *Powell*, the plaintiff did not "identify or complain of an injury caused by the Alabama Supreme Court's decision"; rather, he complained about the future conduct of the defendants as to how they would carry out that decision. *Id.* Here, Smith's first cause of action is plainly challenging the Alabama Supreme Court's decision that it is the "appropriate time" for Smith's execution, not the method that will be used to carry out that order at some future time. Thus, *Powell v. Powell*, 80 F.3d 464 (11th Cir. 1996), is the controlling precedent. Because Smith's claim that it is not the appropriate time for his sentence to be executed is "inextricably intertwined" with the Alabama Supreme Court's determination under Rule 8(d) that it *is* the appropriate time, the "result would be that the state court's judgment, insofar as it pertains to [the appropriate time for Smith's sentence to be executed], would be collaterally reviewed and reversed in federal court, which is precisely what the *Rooker-Feldman* doctrine exists to prevent." *Id.* at 467.

Finally, Smith's claim fails on the merits. He has not "demonstrate[d] that [he was] treated differently than someone who is *prima facie identical in all relevant*

6

*respects.*" *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205 (11th Cir. 2007). The State has executed inmates like Smith who still had second or successive state habeas proceedings pending; a contrary rule would allow inmates to delay their sentence in perpetuity through endless state habeas petitions. And Smith is not identical to inmates who elected nitrogen hypoxia because he did not elect nitrogen hypoxia.

For these reasons, Smith is not likely to succeed and is not entitled to preliminary injunctive relief based on his first cause of action.

## COUNT TWO: EIGHTH AMENDMENT

Smith asks this Court to prevent the Defendants from carrying out their statutory duties on January 25, 2024,[1] but he has wholly failed to establish that he is entitled to preliminary injunctive relief on Eighth Amendment grounds. Here, Smith originally identified and alleged six risks of harm in support of his request for preliminary injunctive relief. (Doc. 19 at 24–28.) Prior to the start of the hearing on his motion, however, Smith abandoned his second alleged risk: that because the Protocol does not specify that ADOC's mask contains a carbon dioxide removal mechanism, he "could breathe exhaled carbon dioxide and experience hypercarbia,

---

[1]As argued elsewhere (*e.g.*, Doc. 48), Defendants' internal deliberations about *how* to implement the Alabama Legislature's enactment of nitrogen hypoxia as a method of execution are inapposite. The Eighth Amendment does not protect prisoners from allegedly inadequate deliberations but from cruel and unusual *punishments*. Smith's desire to delve into how Alabama *developed* its method instead of how it will be carried out would improperly turn this Court into a "board of inquiry charged with determining 'best practices' for executions.'" *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019) (quoting *Baze v. Rees*, 553 U.S. 35, 51–52 (2008)).

asphyxiation, and the painful sensation of suffocation." (Doc. 19 at 26.) Smith also abandoned his fourth alleged risk: that because the Protocol does not specify the purity of the nitrogen gas to be used, he "may transition to a persistent vegetative state, have a stroke, or experience the painful sensation of suffocation." (*Id.*)

Having abandoned these allegations, Smith's alleged risks are that (1) that ADOC's mask will not properly fit or be correctly placed onto his face and head, "thereby increasing the risk of persistent vegetative state, stroke, or the painful sensation of suffocation" (*id.* at 24–25), because "[i]f nitrogen can escape outside the mask, it follows that oxygen can infiltrate inside the mask" (*id.* at 25); (2) that the failure of the Protocol to provide for procedures for responding to an inmate vomiting while wearing the mask means he might "choke and asphyxiate" (*id.* at 26); (3) that the Protocol's provision for pulse oximetry monitoring for the first two minutes the inmate wears the mask means that "Defendants would be ignorant of oxygen infiltrating the mask thereby increasing the risk of dire consequences short of death" (*id.* at 27); and (4) that because the Protocol fails to include procedures for dealing with inmates with PTSD, Smith's symptoms may become exacerbated, risking "intense psychological distress, extreme panic, or sleep disruption" (*id.*).

As Smith concedes, he must identify "an 'alternative' method of execution that is 'feasible, readily implemented, and in fact *significantly* reduces the *substantial* risk of [*severe*] pain posed by the state's planned method of execution."

8

(*Id.* at 23 (insertion to track the standard set forth in *Bucklew*, 139 S. Ct. at 1130)). Smith's proposed alternatives include the use of a "custom fit mask to reduce the risk that oxygen leaks under the mask or, alternatively, use a closed space or hood" (*id.* at 28), the "opportunity to speak and to audibly pray without being masked" (*id.*), disclosure of the training that execution team members will receive in placing and adjusting the mask on the condemned[2] (*id.* at 29), the addition of "procedures to monitor the pulse oximeter throughout the process" (*id.*), the addition of "procedures to halt the execution if the condemned person vomits into the mask" (*id.*), the addition of "procedures for attempting to execute condemned people who have survived a previous attempt and are experiencing PTSD as a result" (*id.*), and the employment of "a third-party licensed medical provider" to observe and participate in the execution and have the authority to call off or postpone the execution (*id.*).[3]

As set forth below, Smith has failed to establish a likelihood of success on the merits of his Eighth Amendment claim. Smith has failed to prove the existence of a

---

[2] Through this Court's grant of expedited discovery, Smith has now learned that the members of the execution team have practiced fitting the mask to multiple persons of varying body and face types during their bi-weekly practice sessions. (Pl. Ex. A31, pp. 252:2-16, 114-115.)

[3] Smith's request for preliminary injunctive relief also provided alternatives pertaining to the alleged risk of carbon dioxide rebreathing, but as noted above, Smith dropped that claim at the start of the evidentiary hearing. Additionally, he asserted two alternatives pertaining to alleged risks associated with impure nitrogen gas, but that claim was also dropped. Because Smith withdrew the alleged risks of harm these alternatives were intended to address, they would not be grounds for a preliminary injunction.

substantial risk of harm associated with ADOC's Protocol, and he has failed to prove that any of his proffered alternatives would reduce the risks of harm he has alleged.

1. **Smith Did Not Establish a Substantial Risk of Harm Associated with ADOC's Mask or Oxygen Infiltrating the Mask.**

*a. The Quality of the Mask and Its Fit.* The Protocol employs a Type-C supplied-air respirator mask having a five-point rubberized head harness and a full facepiece with double-sealing flange. (Pl's. Exs. A26, A36.)[4] The mask is approved for use as a Type-C supplied air respirator by the United States Department of Health and Human Services, the Centers for Disease Control and Prevention, and the National Institute for Occupational Safety and Health ("NIOSH"). (Pl's. Exs. A26, A36, A42; Defs.' Ex. 12 ¶ 7.)[5] The mask has been worn under conditions supplying Grade-D breathing air at execution flow rate conditions for long periods by individuals of various sizes, shapes, ages, genders, and degrees of beardedness.

Smith's second amended complaint alleges that "[v]ariations in nose structure, facial hair, obesity, and other anatomic characteristics can increase the difficulty of mask ventilation" and that "[m]any variables affect proper placement and securing of a mask." (Doc. 31 at 22.) But NIOSH approval of Type-C supplied air respirators is governed by federal law, including 42 C.F.R. § 84.135(a), which

---

[4] Both exhibits have been designated "Highly Confidential—Attorneys' Eyes Only."

[5] The identified Plaintiff's exhibits have been designated "Highly Confidential—Attorneys' Eyes Only." The identified Defendants' exhibit contains a single paragraph that has been designated "Highly Confidential—Attorneys' Eyes Only" (paragraph 4), but the cited paragraph is not designated under the Court's protective order.

10

sets forth the minimum requirements for approval and certification of "full facepiece" supplied air respirators. That regulation provides that "full facepieces shall be designed and constructed to fit persons with various facial shapes and sizes either (1) by providing more than one facepiece size; or (2) by providing one facepiece size which will fit varying facial shapes and sizes." It is reasonable for ADOC officials to rely on NIOSH approval of its mask, and "the Constitution affords a 'measure of deference to a State's choice of execution procedures,'" *Bucklew*, 139 S. Ct. at 1125 (quoting *Baze*, 553 U.S. at 51–52).

Critically, Smith has not even attempted to prove that *he* has facial features or anatomic characteristics that would pose a substantial risk of improper mask placement. Dr. Nitschke—the only one of Smith's experts who has both met Smith *and* is familiar with ADOC's mask—admits that Smith has no "facial deformities" that might interfere with mask fit and that if Smith were truly worried about potential issues caused by his facial hair he has a simple solution: shave. (Nitschke Depo. pp. 44:14-17, 45:2-8.) Dr. Nitschke also agreed that the mask—again, one NIOSH-approved to "fit varying facial shapes and sizes"—is "a design which would fit most people effectively," (Def. Exhibit 53, p. 40:15-16.) Further, Dr. Nitschke, who himself sports facial hair, found that the mask was "a fair fit" on him and that he could detect no entrainment of room air even when he breathed deeply. *Id.* at 42:16-17, 44:1-3. Defendants' expert, Dr. Antognini, also wore the mask and obtained an

effective seal. (Def. Ex. 1, p. 12-13.) Another defense witness, James Houts, testified to obtaining an effective seal with the mask.[6] Paragraph 12 of the Houts declaration references Defendants' Exhibit 20, a video depicting the termination of air flow to the mask while Houts was wearing it, capturing visual evidence of a negative pressure seal.

> **b. The Risk of Severe Pain Associated with Stroke or a Permanent Vegetative State, Rather than Death.** ADOC's nitrogen hypoxia protocol will rapidly reduce oxygen inside the mask, cause unconsciousness within seconds, and cause death within minutes. ADOC's mask has a volume of approximately 1.3–1.4 liters and an execution flow rate that ensures that nitrogen gas will displace the breathing air inside the mask within 2–3 seconds of activation (Def. Ex. 1, p. 19, ¶34.). Video evidence was introduced showing that this rapidly reduces the available oxygen inside the mask to approximately 1%. (Def. Exs. 21-23.).

---

[6] Plaintiff has objected to Houts's declaration, but he misapprehends the purpose of the factual details provided in that declaration pertaining to Houts's experience. Under Rule 701 of the Federal Rules of Evidence, Houts's assertion that he obtained an effective seal of the ADOC mask was "rationally based on the perception of the witness" and "is helpful to a clear understanding of [his] testimony or the determination of a fact in issue." That Houts's military training provided an informed basis to determine whether he achieved an effective seal is no different than the admission of police testimony that burn marks were consistent with those that would be left by a stun gun, *United States v. Myers*, 972 F.2d 1566, 1577 (11th Cir. 1992), a police officer's characterization of a vessel as a "go fast" boat based on his personal observation and past experiences, *United States v. Tinoco*, 304 F.3d 1088, 1119 (11th Cir. 2002), or other lay testimony based on particularized knowledge garnered from years of experience in a field, *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1223 (11th Cir. 2003). Houts's perceptions were also confirmed by multiple expert witnesses during the hearing.

Wearing a supplied air respirator connected to an inert gas supply *will* result in fatality absent outside intervention. Supplied air respirators connected to inert gas supplies are so deadly that the United States Department of Labor's Occupational Safety and Health Administration published a safety and health information bulletin on the subject. (Defs.' Ex. 24.) In addition, nitrogen gas has been shown to cause death when delivered through a full-face SCUBA mask similar to the headgear and flange of ADOC's mask. (Defs.' Ex. 26.) OSHA inspection detail reports document multiple fatalities caused by individuals donning supplied air respirators connected to inert gas supplies, with loss of consciousness and death occurring without any attempt at self-rescue (i.e., removal of the mask). (Defs.' Exs. 37–41.) ADOC is aware of only one case report discussing a survivor of exposure to inert gas while wearing a supplied air respirator, in which a worker was rescued after collapsing unconscious while wearing the respirator. (Defs.' Ex. 25.)

Within seconds, Smith will have no available oxygen to breathe inside the mask. That will render him unconscious and cause death. Even if Smith had shown a substantial probability of oxygen becoming entrained in the mask, his experts were either unwilling or unable to offer an opinion or point to scientific literature explaining what degree of oxygen would fail to ensure death or rapid loss of consciousness.[7] Dr. Antognini explained that an atmosphere of less than 6% oxygen

---

[7] Smith also refused to answer an interrogatory seeking to clarify his view on the matter.

would "lead to cardiac arrest in the range of 8-14 minutes" and that an atmosphere of "nearly 100% nitrogen resulted in cardiac arrest and death within 5 minutes." (Def. Ex. 2, pp. 1-2.) An article in ADOC's possession indicates that an "oxygen concentration from: 6-8% would cause fainting within a few minutes," and an "oxygen concentration below 6% would lead to fainting within a few seconds, with possible severe brain damage or even death if unattended." (Defs.' Ex. 25.) Another article in ADOC's possession indicates that oxygen concentrations below 8% can be fatal, with loss of consciousness occurring at concentrations between 8–10%. (Defs.' Ex. 35.) Thus, even if the State did not have evidence that the Protocol will reduce oxygen in the mask to approximately 1% or lower, even if Smith had shown a substantial likelihood of higher levels of oxygen, he has not shown a substantial likelihood of levels high enough to prevent unconsciousness and death.

The only uncertainty—for any individual inmate—is how long it will take before the effects of nitrogen hypoxia are felt. But Smith has not alleged any reason that he faces a unique risk of prolonged onset of hypoxia. And he cannot show a substantial likelihood of such pain because the onset of hypoxia can vary person-to-person and day-to-day. (Defs.' Ex. 12 ¶ 11.) Predicting the precise level of oxygen concentration sufficiently low to cause unconsciousness and the length of time in an oxygen-deficient environment before loss of consciousness or impairment of mental functioning depends on variables like sleep, weight, hydration, and the presence of

14

minor illnesses. (*Id.*) Dr. Yong and Dr. Antognini both confirmed that reactions to hypoxia vary widely. There is no scientific basis for Smith's fear that he will face any kind of prolonged suffering on January 25, 2024.

In all likelihood, hypoxia will cause unconsciousness in a matter of seconds, rendering Smith unable to feel pain. The Houts declaration includes excerpts from an FAA advisory circular providing training and information pertaining to hypoxia intended for pilots and aircrew members. It notes that at extreme altitudes, a person's time of useful consciousness "is reduced to the time it takes for the blood to circulate from the lungs to the brain, plus any reserve oxygen stored in the brain," (Defs.' Ex. 12 (Ex. 1 at 24)), which is consistent with what occurred in a study where volunteers lost consciousness *seventeen seconds* after breathing pure nitrogen gas (Defs.' Ex. 27). OSHA's safety bulletin warns that when respirators are connected to inert gas lines, unconsciousness can occur "in about 12 seconds" and "death in a matter of minutes." (Defs.' Ex. 24.) Importantly, during his testimony at the preliminary injunction hearing, Dr. Antognini confirmed that once a person reaches unconsciousness, he or she no longer feels pain. (PI Tr. at 164:18-20.) Consequently, Smith has not shown (and is not likely to show) any risks of severe pain associated with "a stroke or the sensation of suffocation." (Doc. 19 at 26.).

Smith has not shown a substantial likelihood that he will be left in a permanent vegetative state or somehow survive yet suffer a stroke. Not one of the articles, case

studies, or reports in ADOC's possession (Defs.' Ex. 24 through 41) documents a case where a survivor of exposure to extremely hypoxic conditions suffered a stroke or permanent vegetative state. Dr. Yong was not able to identify any such case reports or medical literature. (PI Tr. at 65-67.) The Houts declaration notes that pilots are *encouraged* to undergo hypoxia training—using nitrogen gas or hyperbaric chambers—under conditions that may lead to some participants losing consciousness. (Def. Ex. 12, pp. 7-9.) There are no warnings that participation and exposure to hypoxic conditions sufficient to cause loss of consciousness creates a substantial risk of causing a permanent vegetative state or stroke. *Id.* at 9. The fact that this training is encouraged strongly implies that such outcomes are not deemed "likely" to occur. At most, such an outcome would be "possible," a standard "too lenient" and "inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citing *Mazurek*, 520 U.S. at 972).

Given this evidence, Smith has not shown facts that would "prevent[] prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Glossip v. Gross*, 576 U.S. 863, 877 (2015) (quoting *Baze*, 553 U.S. at 50). Nor has he shown that he is "sure or very likely" to suffer a stroke or be left in a persistent vegetative state rather than result in his death. *Id.* Nothing

16

but mere speculation supports a belief that this outcome is even possible. The Court can reject his Eighth Amendment claim on the ground that there is no "substantial risk" of "severe pain" without even addressing his alternatives that purport to reduce "significantly" the risk of these harms. *Bucklew*, 139 S. Ct. at 1130.

### 2.      Smith Did Not Establish A Substantial Likelihood that He Would Vomit in the Mask and Thereby Suffer Severe Pain.

Smith's vomiting scenario rests on a series of speculations that cannot amount to a substantial likelihood of severe pain. He has not shown that he is likely to vomit in the mask, that he is likely to vomit precisely after the nitrogen begins flowing but before losing consciousness, that his vomit would cause him severe pain, or that his alternatives would significantly reduce the risk. The possibility that he could vomit is nothing more than the chance of "accident, with no suggestion of malevolence" that would not give rise to an Eighth Amendment violation.  *Baze*, 533 U.S. at 50.

*a. Likelihood of Vomiting.* Smith did offer evidence that he suffers from PTSD and that PTSD can lead to nausea. But Smith failed to offer any evidence that PTSD episodes have ever *caused Smith to vomit*. Indeed, Dr. Porterfield opined about Smith's diagnosis and symptoms without mentioning any instance of him vomiting. (Pl. Ex. B6.) And when asked on cross whether Smith had *ever* mentioned vomiting to her, she said that he had not. (PI Tr. at 143:16-20.) Thus, Smith has failed to show any reasonable likelihood that his PTSD will cause him to vomit.

17

Moreover, to the extent that his PTSD could cause him to vomit, that risk would be present even with a custom mask and even with a hood—it has nothing to do with ADOC's Protocol. To the extent that Smith claims that he will suffer nausea upon seeing certain places or personnel, that would suggest that he is much more likely to vomit before to the nitrogen ever begins to flow. Further, Smith has not shown an alternative that would significantly reduce the minuscule risk that he vomits in the seconds between nitrogen flowing and unconsciousness. If he vomits *before* nitrogen begins flowing, the execution team will remove the mask, remove the vomit, use a device to help clear the airway, clean the mask, and continue the Protocol. (Pl. Ex. A31, pp. 172:4-19, 179:12-180:2.) The execution team has practiced this scenario. *Id.*; (Def. Ex. 12, p. 10.)

Smith also alleges that exposure to nitrogen could cause him to vomit—a risk that is also present in all of his alternatives. ADOC is in possession of one article that detailed an inert gas suicide in which the deceased vomited while wearing a bag over his head and aspirated vomit. (Def. Ex. 32, pp. 1-2.) By contrast, *none* of the many government reports regarding hypoxic deaths associated with mask usage listed vomiting as a complication. But, more to the point, there is no evidence as to how commonly vomiting (as opposed to nausea) is associated with hypoxic conditions. This is important because at the hearing, Smith's own expert conceded

that one could be nauseated without vomiting. (PI Tr. at 69.) Nor did Smith offer evidence regarding the time of onset for nausea after exposure to hypoxic conditions.

True, Smith identified reports that indicate that nausea is a possible symptom of hypoxia, but without information about time of onset, this Court has no way of determining whether there is *any* possibility that Smith will become nauseated *to the point of vomiting* during the brief period in between when nitrogen begins to flow and Smith loses consciousness. As Dr. Nitschke opined in his declaration, in an atmosphere of less than 1% oxygen, unconsciousness would occur "almost immediate[ly]." (Pl. Ex. B2, p. 8.) Similarly, Dr. Antognini has opined that the system the Defendants will employ on January 25th will render Mr. Smith unconscious "within 30-40 seconds after starting the nitrogen[.]" (Def. Ex. 1, p. 5.) Further, at the evidentiary hearing, this Court heard testimony from Dr. Yong that not all nausea leads to vomiting and that symptomology and time of onset would vary from person to person. (PI Tr. at 69:9-11; 73:9-21.) Given that Smith has offered this Court no evidence as to whether nausea to the point of vomiting *could* occur during his brief period in which he is both conscious and in a hypoxic environment, he has failed to show that he is likely to prevail on the merits of this claim.

**b. Likelihood of Severe Pain.** Once Smith is unconscious, he will no longer feel pain. (PI Tr. at 164:18-20.) Thus, any vomiting would have to cause

19

unconstitutionally severe pain in the seconds prior to unconsciousness. Smith has not shown any evidence that vomiting will cause him severe pain in those few seconds, which would require not just a likelihood of vomit but also a likelihood of choking/asphyxiating on his own vomit, and some associated pain. He has not adduced such evidence. It is noteworthy that Dr. Nitschke has also opined that in the dozens of inert gas suicides he has observed, he never "observed physical pain." (Def. Ex. 53, pp. 22:22- 23:2.)

Even if Smith had shown a likelihood of his precisely timed vomiting scenario, it would not rise to the level of unconstitutional pain. *See* Doc. 39 at 76- 78. Other permissible methods of execution, such as hanging, involve greater risks of pain than nitrogen hypoxia. *See Bucklew*, 139 S. Ct. at 1124 (describing pain of prolonged death commonly resulting from hanging). In response to this argument, Smith simply states that it is "cold comfort" and "should give pause to others" that Defendants would compare other constitutionally permissible methods of execution to nitrogen hypoxia. Doc. 44 at 68-69. That's not a constitutional argument. That nitrogen hypoxia "can be compared" to "more modern methods" does not mean comparison to other constitutional methods is inapt. Moreover, Smith has suggested a firing squad; the idea that tearing his organs apart with bullets lies on one side of the constitutional line, but the minute risk of choking on vomit lies on the other is not supported by evidence or argument.

### 3. Smith Did Not Establish Any Feasible, Readily Available Alternative That Would Substantially Reduce the Risks of Harm He Attributes to ADOC's Mask.

At the preliminary injunction hearing, Smith's counsel assured this Court that it had provided the Defendants with "a way forward." (PI Tr. at 50.) But if they did so, it was a path to nowhere. Smith's second amended complaint and motion for preliminary injunctive relief make abstract references to a "custom fit" mask, a hood, or a chamber as alternative methods of performing an execution by nitrogen hypoxia. Defendants seek dismissal of Smith's Eighth Amendment claim on the basis that he has failed to plead the requisite detail necessary to satisfy Rule 8 of the Federal Rules of Civil Procedure, including as to whether there are facts pleaded that would show that any of these generic alternatives are feasible and readily available to ADOC. Although Defendants maintain they are entitled to dismissal of this claim under Rule 12(b)(6), Smith's evidentiary failings at the hearing make denial of preliminary injunctive relief straightforward. At this stage of the proceedings, Smith was required to show that he is likely to establish that such alternative methods are feasible and readily available to ADOC, and he did not do so.

#### A. The "Custom Fit" Mask

Smith alleges that a "custom fit" mask is a feasible, readily available alternative method of exposing him to fatal concentrations of nitrogen gas. But this Court heard no testimony about such a "custom fit" mask at the hearing. Inasmuch

as Dr. Yong clearly indicated that he would not provide testimony or assistance to ADOC or testimony that would enable ADOC to execute Smith by nitrogen hypoxia, it is clear that Dr. Yong's testimony was not offered for the purpose of establishing the existence of such an alternative method, and his testimony should be ignored on the issue of the existence of an alternative method. (PI Tr. at 63:25-64:9.)

The only "custom fit" mask Smith identified in this litigation is the Mojo 2 by Sleepnet, a CPAP mask.[8] Sleepnet publishes a chart of "Intentional Leak Rates" for its masks, including the Mojo 2. (Defs.' Ex. 44.) The user manual for the Mojo 2 reveals that it comes equipped with vent holes and an "air entrainment valve" (Defs.' Ex. 43 at 3, 6), with the vent holes *designed* to "allow a continuous flow of air out of the mask" (*id*. at 6). Inasmuch as Smith's request for preliminary injunctive relief is based on the fallacy that "[i]f nitrogen can escape outside [ADOC's] mask, it follows that oxygen can infiltrate inside the mask" (Doc. 19 at 25), his identification of a mask with vent holes designed to permit breathing gas to flow continuously out of the mask does not address that risk. Indeed, Smith's expert Dr. Yong was utterly unfamiliar with the Mojo 2 and that it was designed to allow air to be entrained. (PI Tr. at 62-63.) Dr. Yong does not use "custom-fit" masks, because he generally uses a "standard adult sized mask[.]" *Id.* at 56:16-18.

---

[8] "Continuous Positive Airway Pressure."

The Mojo 2 mask would not significantly reduce the purported risk of vomiting. The user manual contains the following "Contraindications" statement:

> This product should not be used if the patient is experiencing nausea, *vomiting*, taking a prescription drug *that may cause vomiting*, or if they are unable to remove the mask on their own.

(Defs.' Ex. 43 at 6 (emphasis added).) Putting aside the fact that Smith will be restrained to a gurney and unable to remove the mask on his own, he has repeatedly pleaded that he is at risk of vomiting into ADOC's mask due to PTSD. His identification of an alternative "custom fit" mask that warns against its use if vomiting is likely does not reduce the (already minimal) risks of harm that he has alleged in support of his Eighth Amendment claim. In short, Smith cannot obtain injunctive relief based on the Mojo 2, the only "custom fit" mask he has alleged to be feasible or readily available to ADOC.[9]

Finally, ADOC's mask was worn by Plaintiff's expert and Defendants' expert while breathing air was flowing, and it was produced to the Court for inspection. The Court has access to the previously referenced videos of volunteers wearing the mask while breathing air is flowing, including the video showing the mask negatively seal to a person's face when the flow of air was terminated. On the other

---

[9] In addition, the Mojo 2 is secured to a person's face by magnetic clips. ADOC has a valid security interest in not using a mask that would be held in place only by magnetic clips. Smith presented no evidence as to how the Mojo 2's clips would be more resistant to the head and facial movements identified in his motion (Doc. 19 at 25, 31) than the five-point rubber headgear and double-flanged seal of ADOC's mask.

hand, no expert witness has seen or worn the Mojo 2. This Court has not been given an opportunity to inspect the Mojo 2 mask in the same manner it inspected ADOC's mask. There are no videos showing how the Mojo 2 would perform on a number of different body types and sizes at execution flow rates, and in fact, there is no testimony or evidence about what the proper execution flow rate would be for a nitrogen hypoxia execution using the Mojo 2. In short, Smith has done nothing to show that the Mojo 2 is feasible and readily available, much less that would address any alleged risk of harm more effectively than ADOC's current mask does.

### B.    The "Hood" as an Alternative Method.

The totality of Smith's allegations about a hood in his motion for preliminary injunctive relief is a single sentence alleging that ADOC could amend its Protocol to "measure each condemned person subject to execution by nitrogen hypoxia for a custom fit mask…or, alternatively, *use a closed space or hood*." (Doc. 19 at 28.) The second amended complaint contains the same solitary sentence referencing "a hood," but does not specify what sort of hood could one use to carry out an execution, what it would be made of, how it would be secured, how it would reduce the risk Smith fears that oxygen would enter, how it would reduce the risks of vomiting, etc.

One could conceivably connect Smith's claim regarding a "hood" to evidence regarding the use of a "suicide bag" or "exit bag" presented through Dr. Nitschke.

But Smith himself never draws this analogy. If he attempts to do so in post-hearing briefing, his failure to explicitly state this in his second amended complaint, in his motion for preliminary injunctive relief, or at the evidentiary hearing should weigh heavily against his claim.

Smith has not shown that an exit bag would address and reduce the alleged risks of harm that he has identified as to ADOC's mask. For example, Smith worries that he will be harmed by ADOC's mask if he vomits while wearing it. But Defendants introduced a scholarly article in the possession of ADOC reflecting that the cause of death in at least one death attributable to use of an exit bag and helium gas "was suffocation due to a plastic bag over the head *and aspiration of gastric contents*." (Defs.' Ex. 32 at 2 (emphasis added).) And that individual was not strapped to a gurney in an execution chamber. Thus, use of a plastic exit bag would not significantly reduce the risk of harm associated with vomiting that Smith has alleged. Smith certainly offered no testimony that the use of a bag would reduce the risk of vomiting or the risk of harm if vomiting were to occur.

Additionally, Dr. Nitschke agreed that the method of causing death using an exit bag requires the wearer to take several actions, including pulling the bag around the top of his head, waiting for it to inflate, exhaling deeply, pulling the bag down over his head, cinching the elastic collar, and inhaling deeply. (Def. Ex. 53, p. 30:9-14.) Neither Smith nor Dr. Nitschke has offered any explanation as to how that

procedure could be adapted for an execution-or, indeed, whether it *could* be used for an execution. *Id.* p. 32. It also is worth noting that, as Dr. Nitschke testified on the stand, exit bags rely *exclusively* on positive air pressure supplied by the flow of gas to prevent the entrainment of room air. And as Dr. Nitschke explained during his deposition, the exit bag system uses a 15-liter-per-minute flow rate. (Def. Ex. 53, p. 31:6-7.) Considering that the ADOC system uses a tight-fitting mask, much higher flow rates, and one-way exhalation valves, it is difficult to see how an exit bag would reduce the risk of entraining room air cited by Smith. *See* (Pl. Ex. A33, pp. 59-60.)

Additionally, Defendants have introduced multiple journal articles and case reports in the possession of ADOC showing that exit bags would be more likely to fail to produce death than ADOC's mask. While it is true that Defendants introduced several articles and case reports demonstrating that exit bags can produce fatal results, this would not require Defendants to ignore evidence showing that they do not always bring about death. Defendants' Exhibit 28 contains a case report where a thirty-year-old man attempted suicide "by inhaling nitrogen gas through a plastic bag" and "lost consciousness for a while," but a "few hours later, he recovered consciousness." Defendants' Exhibits 29 and 31 contain case reports of failed suicide attempts using an exit bag with helium as the inert gas. Defendants' Exhibit 30 is a case report involving a failed suicide attempt with an exit bag using argon as the inert gas. Defendants have no reason to believe that exit bags are foolproof, and

26

Smith certainly did not provide Defendants (or this Court) with one at the evidentiary hearing. Considering that the only known case of a survivor of inert-gas exposure while wearing a supplied air respirator was rescued by outside actors, Smith's alternative of "a hood" with its many failures does not appear to reduce the risks "of dire consequences short of death" Smith generically alleges. (Doc. 19 at 27.)

### C.    Smith's "a Chamber" Alternative Method

Like Smith's "hood" alternative, the suggestion that ADOC could feasibly use "a chamber" is supported by a single sentence in Smith's motion for preliminary injunctive relief, and it does not appear at all in the second amended complaint. There, Smith only alleges ADOC could use "a closed space."

This Court heard expert testimony that ADOC does use a closed space for conducting executions by nitrogen hypoxia. As noted in the declaration of Dr. Antognini, ADOC uses a mask that creates a closed space of approximately 1.4 liters in volume. (Defs.' Ex. 1 ¶ 34.) On the other hand, this Court received no testimony regarding what volume of "a closed space" or "a chamber" Smith is referencing.

Drs. Yong and Nitschke discussed enclosures or chambers in the abstract, but not in sufficient detail to prove that they are feasible and readily available to ADOC or that they would substantially reduce the risks of harm Smith alleges as to ADOC's mask. For example, Smith has not presented *any* evidence as to how restraining him

and placing him inside a sealed enclosure would make it *easier* for ADOC officials to respond and render aid if he were to vomit (or suffer any other complication requiring intervention). Similarly, Smith has failed to show that placing him inside a sealed enclosure would resolve his concerns about not being able to be heard if he chooses to pray.

Smith freely concedes that a condemned inmate's proposed alternative should be rejected if it fails to address "'essential questions' including but not limited to 'what concentration' of nitrogen should be administered or how the State might protect 'against the risk of gas leaks.'" (Doc. 19 at 28 (quoting *Bucklew*, 139 S. Ct. at 1129).) Here, Smith has not told the Court how large a chamber would need to be to conduct a nitrogen hypoxia execution. Given that chambers are not used for anesthesia, Dr. Yong had no idea what such a chamber would be like and refused to hypothesize. (PI Tr. at 70-71.) This is critical because that volume of nitrogen gas would have to be vented into the environment after the execution, *inside a maximum-security correctional facility*. How can this Court determine the feasibility of venting a large volume of nitrogen gas inside a prison without knowing that volume? How can this Court determine whether staff and other inmates would be protected without knowing that volume? Smith has not informed the Court of what flow rate would be required to displace the air inside of this "chamber" in a manner that would not prolong life or would reduce the risks "of dire consequences short of death" that

Smith generically alleges. (Doc. 19 at 27.) At bottom, Smith's vague proposal of a chamber, like his proposals of an ill-defined "hood" are more "rabbit trail" than "pathway forward," and they fall far short of the Supreme Court's requirements for alternative means of execution.

### D.    The PLRA's Narrowness-Necessity-and-Non-Intrusiveness Requirements

It is telling that Smith does not ask for preliminary injunctive relief requiring ADOC to execute him using "a chamber," "a hood," or the Mojo 2 mask by Sleepnet. Instead, he seeks an injunction barring "Defendants from executing him using the current nitrogen hypoxia Protocol on January 25, 2024." (*Id.* at 36.) But there is no reasonable argument that an injunction prohibiting Defendants from executing Smith on January 25 is the most narrowly tailored and non-intrusive remedy available. In order to grant the broad injunctive relief Smith requests, this Court would have to provide an explanation as to why an absolute bar to executing his sentence meets the narrowness-necessity-and-non-intrusiveness standard required by the PLRA. *See Hoffer*, 973 F.3d at 1279.

Perhaps an order to execute Smith using the Mojo 2 mask could meet the PLRA's requirements under some set of facts, but it would not be the facts in this case. How does one "custom fit" the Mojo 2 mask? Why is use of the Mojo 2 mask necessary if its manufacturer warns against its use on those who may vomit? Is the Mojo 2 mask intrusive if the Court does not know how much nitrogen gas would be

continuously flowed into the execution chamber through the Mojo 2's vent holes? Is the Mojo 2 mask necessary if the presence of vent holes does not address Smith's concern that "[i]f nitrogen can escape outside [ADOC's] mask, it follows that oxygen can infiltrate inside the mask"? (Doc. 19 at 25.)

Similarly, Smith provided no evidence that would permit the Court to order Defendants to use "a hood" or "a chamber" under the PLRA. If the Court lacks the necessary evidence to perform the PLRA's narrowness-necessity-and-non-intrusiveness analysis, then that alone is a legitimate basis for the denial of the requested injunctive relief.

### E.    The Firing Squad

Smith's firing-squad proposal is a nonstarter because the allegations in his amended complaint do not amount to a veritable blueprint for the method. Nor did Smith develop evidence of its availability and feasibility at the hearing. He has effectively abandoned the proposal. Again, Smith points only to a law review article and another State's heavily redacted protocol. Smith argued at length in reply that the Utah protocol discloses some of the training its team members undergo (Doc. 44 at 65-67), but he ignored the other myriad hypothetical questions raised but unanswered by the public Utah protocol (Doc. 39 at 82-85). Because it has been Smith's position that the mere absence of some detail in a protocol violates the Eighth Amendment, so too the Utah protocol fails by Smith's own lights.

### F.    Abandoned Alternatives.

Finally, at the preliminary injunction hearing, Smith effectively abandoned two of his proposed alternative or additions to the Protocol: further monitoring of pulse oximetry and the employment of a "third-party licensed medical provider" to monitor the execution. (Doc. 31, pp. 27-28, ¶102.) As for the first of these, Smith presented no evidence to back up his speculation that monitoring of the pulse oximeters would cease after the flow of nitrogen began. Moreover, this speculation was dispelled by Ms. Stewart-Riley's testimony explaining that monitoring of the pulse oximeters would continue throughout the execution. (Pl. Ex. A31, pp. 217:2-10, 260:17-261:2.) It is also worth noting that, as Dr. Antognini explained, pulse oximetry would quickly become unreliable as Smith's heart began to fail. (Def. Ex. 1, p. 8, ¶ 14.) As for the second proposed change, Smith has neither identified any licensed medical provider who would be willing to assist in carrying out an execution, precisely what that person's role would be, or what standards they would employ to "call off or postpone" the execution. (Doc. 31, p. 28.)

### 4.    The Limitations on Smith's Expert Testimony

While it is true that a district court may not arbitrarily ignore expert testimony, such testimony should be ignored when a reason is objectively present for ignoring it. *Knight v. Thompson*, 797 F.3d 834, 942 (11th Cir. 2015) (quoting *United States v. Hall*, 583 F.2d 1288, 1294 (5th Cir. 1978)). "Where there is conflicting testimony

31

by expert witnesses, as here, discounting the testimony of one expert constitutes a credibility determination, a finding of fact." *Bottoson v. Moore*, 234 F.3d 526, 534 (11th Cir. 2000). "The burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002) (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999)).

First, Defendants dispute that Dr. Yong's expert testimony is relevant to the question of whether preliminary injunctive relief is warranted. To constitute admissible expert testimony, the expert's "scientific, technical, or other specialized knowledge" must "help the trier of fact to understand the evidence *or to determine a fact in issue.*" FED. R. EVID. 702 (emphasis added). Dr. Yong has clearly indicated that his testimony did not include information that would permit ADOC to develop an effective protocol, much less one employing any of the alternative methods Smith identifies. His testimony, then, was not offered to assist this Court in determining whether any of Smith's alternative methods feasibly could be employed by ADOC in a manner that would substantially reduce an alleged risk of significant harm.

Moreover, unlike Dr. Antognini, Dr. Yong did not wear ADOC's mask to inspect its fit. He has never even seen the mask in person, much less touched or inspected it. (PI Tr. at 53-56.) Nor has he used exit bags in the performance of his

work as an anesthesiologist. *Id.* at 59. Dr. Yong did not testify that he has specialized knowledge pertaining to Type-C supplied-air respirators or that his medical training included the use of such devices. *Id.* at 56. At best, he ventured that respirators are "similar" to masks used in anesthesiology. *Id.* at 56:1-8. That "similarity" quickly broke down, because anesthesiology masks are half-masks that are *held* to the face and have no straps. *Id.* at 56:9-24, 75:16-25. But "[t]he Committee Note to the 2000 Amendments of Rule 702 expressly says that, '[i]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (quoting FED. R. EVID. 702 advisory committee's note (2000 amends.)).

Nothing "in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citing *Turpin v. Merrell Dow Pharms., Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992)). "Something doesn't become scientific knowledge simply because it's uttered by a scientist, nor can an expert's self-serving assertion that his conclusions were derived by the scientific method be deemed conclusive." *Hughes*

33

*v. Kia Motors Corp.*, 766 F.3d 1317, 1331 (11th Cir. 2014) (quoting *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004)). Dr. Yong's testimony cannot be applied to the facts of this case when his medical training does not provide a valid basis of knowledge about the performance and capabilities of ADOC's Type-C supplied-air respirator mask, and when he has no experience with that mask. Additionally, his testimony is useless because he has no experience with the Mojo 2 mask put forth as Smith's alternative method, and there is no evidence that he has attempted to "custom fit" this mask to Smith's face. This latter criticism also applies to the testimony of Dr. Nitschke, who does not even purport to support Smith's "custom fit" mask alternative.

In *McCorvey*, the court found the methodology of an engineering expert scientifically unreliable and "based wholly on speculation" where the expert "did not test alternative designs," "did not talk to medical personnel," "was unable to cite scientific literature in support of his theories," and did not "consider or test possibilities for failure" unrelated to the product at issue. 298 F.3d at 1256–57. Dr. Yong's testimony is due to be treated the same. He did not test ADOC's mask, he did not test alternative methods of nitrogen gas delivery (including those Smith advocates), he admitted to a lack of scientific evidence or literature available to support his testimony, and he did not consider the extent to which the risks Smith

34

identifies are unrelated to ADOC's mask or not present in the proposed alternative methods. (PI Tr. at 54-56, 63, 65-67.)

Dr. Nitschke's testimony is similarly speculative. To the extent that he advocates for the use of an exit bag, he admits that these bags require a loosely drawn (i.e., not airtight) neck strap that will permit breathing gases and waste gases inside the bag to be flushed out of the opening. (PI Tr., p. 127:3-13.) Dr. Nitschke does not explain how this addresses any risk alleged to result from the use of ADOC's mask at execution flow rates. Smith's motion seeking preliminary injunctive relief alleges that "[i]f nitrogen can escape outside [ADOC's] mask, it follows that oxygen can infiltrate inside the mask" (Doc. 19 at 25), but Dr. Nitschke advocates for an alternative method that *requires* nitrogen to escape outside of the delivery vehicle. At best, Dr. Nitschke offers speculation that an exit bag would be safer than ADOC's mask—which, he admits was "a fair fit" on him and that he could detect no entrainment of room air even when he breathed deeply.  *Id.* at 42:16-17, 44:1-3.

As discussed above, individuals reactions to hypoxia can vary from person-to-person and from day-to-day. If a person's susceptibility to the onset of hypoxic conditions is unique and changeable, then there is no scientific basis for alleging that ADOC's Protocol poses a substantial risk to Smith unless it is explained how that risk would apply to all people, under all circumstances. Dr. Yong's testimony about permanent vegetative states and the risk of coma does not provide such an

explanation. To the extent that Dr. Yong opined that Smith could be exposed to conditions that would result in harm less than death, this is based on speculation. It is certainly speculative to say that it is likely that Smith will be exposed to a substantial risk of stroke, coma, or a permanent vegetative state, but not death. Preliminary injunctive relief cannot be awarded based on an expert's *ipse dixit* that such conditions will occur when the scientific and medical consensus is that each person's response to hypoxic conditions is unique and changes from day to day, especially when that expert witness cannot opine as to the oxygen-deficient level of breathing atmosphere required to induce unconsciousness or death.[10]

## COUNTS THREE AND FOUR: FIRST AMENDMENT/RLUIPA

Defendants have maintained that any decision by Smith not to audibly pray would be based on his own subjective fears, which cannot be reasonably attributed to their official actions. Defendants have done nothing to discourage Smith from engaging in audible prayer, and whatever fears Smith has about the consequences of praying were placed into his head by unknown third parties. The unreasonableness

---

[10] Defendants maintain and preserve the argument that the Eighth Amendment is concerned with "tortures and other barbarous methods of punishment," *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (cleaned up), that reflect a "deliberate infliction of pain for the sake of pain"—*i.e.*, a deliberate design to inflict unnecessary pain. *Baze*, 553 U.S. at 48. Smith argues that this is not the law, Doc. 44 at 69-70, but *Bucklew* applied a more forgiving standard only because it was not necessary to decide whether deliberate infliction of cruel pain is the proper standard. The Supreme Court has not foreclosed Defendants' argument and, in fact, *Bucklew*'s reference to a showing of an absence of "a legitimate penological reason," 139 S. Ct. at 1125, is support for the view that there must be some pain superadded by design to establish an Eighth Amendment claim.

of Smith's attempts to fault Defendants for his fears should be evident after the December 20 hearing.

No evidence has been presented that if Smith audibly prays, the mask used by ADOC will dislodge or become ineffective. Instead, videos have been presented to the Court showing people of various genders, sizes, and ages wearing the mask without difficulty. (Def. Exs. 13-20.) Smith's expert wore the mask and obtained an effective seal. (Def. Ex. 53 at 42:16-17, 44:1-3.) An anesthesiologist wore the mask and was able to obtain an effective seal that was not broken by facial movements. (Def. Ex. 1, pp. 12-13, 15.) An individual with military training noted that he obtained an effective seal, and video evidence exists showing the mask seal to his face under execution-type circumstances, but with the breathing air terminated. (Def. Ex. 12, p. 6.)

To the extent that Smith's fears were based on representations made by his own lawyers and experts, at the start of the evidentiary hearing, Smith personally witnessed them abandon the claim that ADOC's mask would cause him to rebreathe carbon dioxide. (PI Tr. at 13-14.) Potential exposure to carbon dioxide rebreathing was a basis underlying Smith's third claim for relief in the second amended complaint. (Doc. 31 ¶ 129.) If anything, having his lawyers and experts abandon this claim ought to have reassured Smith that he will be able to pray audibly while

wearing ADOC's mask without fear of rebreathing carbon dioxide. But it should also make him less concerned about the so-called dangers of head movement.

If Smith chooses not to pray audibly on January 25, 2024, while wearing ADOC's mask, it will not be because of any efforts by Defendants to discourage him. Smith can choose to do what he wishes, but he cannot transfer the responsibility for that choice onto Defendants. Smith's subjective and unfounded concerns are not an appropriate basis for the entry of injunctive relief, especially under the narrowness-necessity-and-non-intrusiveness standard required by the PLRA.

Similarly, Defendants have produced video evidence showing that individuals wearing the ADOC mask can be heard. (Def. Exs. 45-49.) This includes video evidence depicting the use of the microphone in the execution chamber as heard in the witness room used for the inmate's witnesses and media. *Id.* This evidence illustrates that injunctive relief is not necessary to ensure that Smith can be heard.

## COUNT FIVE: ARFA

Defendants continue to assert that the Anti-Injunction Act bars entry of injunctive relief as to Smith's cause of action based on Alabama law (ARFA). The Anti-Injunction Act bars federal courts from enjoining efforts to enforce a state-court *judgment* in the same way as it bans efforts to enjoin an ongoing state-court proceeding. *See, e.g.*, *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623 (1977); *see also Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 525 (1986) ("Even if the

38

state court mistakenly rejected respondents' claim of res judicata, this does not justify the highly intrusive remedy of a federal-court injunction against the enforcement of the state-court judgment."). Unlike the § 1983 claims, Smith's ARFA claim has not been exempted from the Anti-Injunction Act by Congress.

## POTENTIAL MODIFICATIONS TO ADDRESS SMITH'S RELIGIOUS FREEDOM CLAIMS

Further, in light of this Court's encouragement (Doc. 61) to consider alterations to minimize any burden on Smith's ability to consult with his spiritual advisor, Defendants have considered partially altering their procedures. Defendants do not concede that the Protocol's requirements that Smith be masked during the final consultation with his spiritual advisor and during his final statement violate the Constitution or any state or federal law. Further, Defendants content that Smith has not shown a substantial likelihood of success on the merits of his claims regarding masking. However, considering both this Court's encouragement and their legitimate penological interests in maintaining adequate security and a dignified proceeding, Defendants are willing to allow Smith's final consultation with his chosen spiritual advisor to take place prior to placing the mask. The spiritual advisor would be permitted into the chamber after Smith is secured to the gurney to anoint him with a drop of oil, and to pray with him for not more than ten minutes. The spiritual advisor would then be escorted from the chamber briefly while masking takes place. The spiritual advisor would then be returned to the chamber as provided

by the Protocol. These events would take place prior to the arrival of witnesses. As shown by the evidence discussed above, the placement of the mask will not impair Smith's ability to make his final statement in the presence of witnesses in any meaningful way. Further, at the preliminary injunction hearing, Smith asserted that he is not seeking a preliminary injunction on First Amendment grounds. (PI Tr. at 13:17-20.)

## CONCLUSION

For the above-stated reasons, Smith has failed to establish an entitlement to the extraordinary relief of a preliminary injunction under the PLRA, and such relief should be denied.

Respectfully submitted,

Steve Marshall
*Attorney General*


*s/ Richard D. Anderson*
Richard D. Anderson
*Assistant Attorney General*

40

## CERTIFICATE OF SERVICE

I hereby certify that on December 29, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system, which will send notification of such filing to the following: **Angelique A. Ciliberti, Ashley Brook Burkett, Jeffrey Hutton Horowitz, Robert M. Grass,** and **Andrew Burns Johnson.**

_s/ Richard D. Anderson_
Richard D. Anderson
_Assistant Attorney General_

ADDRESS OF COUNSEL:

Office of the Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL 36130
Office (334) 353-2021
Fax (334) 353-8400
Richard.Anderson@AlabamaAG.gov

41