IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| KENNETH EUGENE SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:23-cv-656-RAH |
| | ) | [WO] |
| JOHN Q. HAMM, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

Kenneth Eugene Smith was convicted of capital murder and sentenced to death in 1996.  He is now scheduled for execution via a new method—nitrogen hypoxia—on January 25, 2024.  This is the State of Alabama's second attempt to execute Smith, the first attempt at execution by lethal injection having failed.  Both before and after the failed first attempt, Smith voiced his preference that any execution be conducted by nitrogen hypoxia.  After the failed first attempt, the State of Alabama honored Smith's request and notified him of its intent to execute him by nitrogen hypoxia.  Now, and unsurprisingly, Smith objects to that method too, at least under Alabama's current protocol.  He also offers up amendments to the current protocol and Utah's firing squad execution protocol as feasible and readily implemented alternative methods.  He challenges his current execution method pursuant to 42 U.S.C. § 1983 under the First, Eighth, and Fourteenth Amendments to the United States Constitution, the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.*, and the Alabama Constitution's Religious Freedom Amendment (ARFA), Ala. Const. amend. 622.

Smith has moved for a preliminary injunction to enjoin Defendants John Q. Hamm (Commissioner of the Alabama Department of Corrections) and Terry Raybon (Warden at the William C. Holman Correctional Facility), in their official capacities, from executing him under Alabama's current nitrogen hypoxia protocol (Protocol).  The Defendants have moved to dismiss Smith's Second Amended Complaint (SAC), the operative one.  The motions are ripe for review.  For the reasons that follow, the court will grant in part and deny in part the Defendants' motion to dismiss and will deny Smith's motion for preliminary injunction.

## II. BACKGROUND

Sometime in mid-August 2023, Hamm formally approved a nitrogen hypoxia execution protocol, the first protocol of its kind in the United States.  On August 25, 2023, the State of Alabama, through the Office of the Attorney General, moved for an order from the Alabama Supreme Court authorizing the Alabama Department of Corrections (ADOC) to carry out Smith's death sentence by means of nitrogen hypoxia within a time frame set by the Governor of Alabama.  Over Smith's opposition, the Alabama Supreme Court granted the Attorney General's motion and ordered Hamm to carry out Smith's death sentence within the time frame set by the Governor.  The Governor then set Smith's execution for a thirty-hour time frame between January 25, 2024, and January 26, 2024.  Smith then filed the instant lawsuit.

### A. Smith's Capital Litigation History

In 1988, Elizabeth Dorlene Sennett was found dead in her home.  *Smith v. State,* 908 So. 2d 273, 279 (Ala. Crim. App. 2000), *cert. denied*, 546 U.S. 928 (2005), *denying stay of execution*, 143 S. Ct. 440 (2022).  She was stabbed eight times in the chest and once on each side of her neck.  In 1996, an Alabama jury convicted Smith of murdering Sennett for $1,000 and recommended a sentence of life imprisonment without the possibility of parole by an 11-to-1 vote.  The trial judge however

2

overrode the jury's recommendation and sentenced Smith to death.   After pursuing conventional post-trial and post-conviction relief in state court, including a direct appeal of his conviction and sentence and his first Rule 32 action, Smith filed for federal habeas relief pursuant to 28 U.S.C. § 2254, seeking to reverse his conviction and sentence, which the United States District Court for the Northern District of Alabama denied.  *Smith v. Dunn*, No. 2:15-cv-0384-AKK, 2019 WL 4338349 (N.D. Ala. Sept. 12, 2019), *aff'd*, 850 F. App'x 726 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 1108 (2022).

On August 18, 2022, and after the Attorney General sought an execution date, Smith filed his first method-of-execution action challenging Alabama's lethal injection protocol.  *Smith v. Hamm*, No. 2:22-cv-497-RAH, 2022 WL 10198154 (M.D. Ala. Oct. 16, 2022).  In that action, Smith asserted that execution by lethal injection violated his Eighth Amendment rights, and he further asserted that nitrogen hypoxia was his preferred method of execution because it was an available and feasible alternative method.  Smith also sought a preliminary and permanent injunction against the ADOC's plan to execute him by lethal injection.  On September 30, 2022, the Alabama Supreme Court authorized Smith's execution and the Governor thereafter set his execution for November 17, 2022.

After the defendant (Hamm) moved to dismiss that action, Smith's complaint was dismissed and his later attempt to alter or amend the dismissal ruling with an amended complaint was denied.  *Smith v. Hamm*, No. 2:22-cv-497-RAH, 2022 WL 16842050 (M.D. Ala. Nov. 9, 2022).  On appeal, the Eleventh Circuit reversed, holding that Smith's proposed amended complaint stated a plausible Eighth Amendment claim.  *Smith v. Comm'r, Ala. Dep't of Corr.,* No. 22-13781, 2022 WL 17069492 (11th Cir. 2022) (per curiam), *cert. denied*, No. 22-580, 143 S. Ct. 1188 (2023).

The same day the Eleventh Circuit ruled, and the day of his execution, Smith moved for a preliminary injunction seeking an order enjoining the defendants from executing him by lethal injection.  He also sought an emergency stay of execution. Both requests were denied.  *Smith v. Hamm*, No. 2:22-cv-497-RAH, 2022 WL 17067498 (M.D. Ala. Nov. 17, 2022).  Smith appealed again that day.  The Eleventh Circuit then granted a temporary stay of execution, *Smith v. Comm'r, Ala. Dep't of Corr.,* No. 22-13846-P, 2022 WL 19831029 (11th Cir. 2022), which the United States Supreme Court vacated several hours later, *Hamm v. Smith*, No. 22A441, 143 S. Ct. 440 (2022).

With the green light to proceed, at approximately 8:00 p.m. that evening, ADOC officials attempted to execute Smith via lethal injection.  The ADOC was unsuccessful with its efforts despite trying to access Smith's veins for over 90 minutes.  *Smith v. Hamm*, No. 2:22-cv-497-RAH, 2023 WL 4353143, at *3 (M.D. Ala. July 5, 2023).  The execution was terminated just before midnight.

After the failed execution attempt, Smith's lethal injection litigation continued, this time with another amended complaint that also included the Alabama Attorney General as a defendant.  During that litigation, Smith, through counsel, continued to represent in court proceedings that nitrogen hypoxia was his preferred method of execution.  On August 25, 2023, the defendants moved to dismiss the case, stating that Smith's challenge to lethal injection was now moot because the defendants had agreed never to attempt to execute Smith by lethal injection again and that the Attorney General had moved to reset Smith's execution, this time by nitrogen hypoxia.  On September 20, 2023, Smith's lethal injection case was dismissed for lack of a live case or controversy and the defendants were enjoined from conducting any future execution of Smith by lethal injection.  *Smith v. Hamm,* No. 2:22-cv-497-RAH, *Final Judgment & Order* (M.D. Ala. Sept. 20, 2023).

On May 12, 2023, Smith filed a second Rule 32 petition in state court (the Circuit Court of Jefferson County, Alabama) related to the failed execution attempt by lethal injection, seeking to prevent the State of Alabama from attempting to execute him a second time by any means; that is, relieve him of his death sentence (Doc. 58-1 at 30.)  The state trial court dismissed Smith's petition, and the Alabama Court of Criminal Appeals affirmed that dismissal on December 8, 2023.  (*Id.* at 39.)  On December 18, 2023, Smith petitioned for a Writ of Certiorari in the Alabama Supreme Court.   (*Id.* at 2.)  As the court writes, that petition remains pending.

### B. Alabama's Novel Nitrogen Hypoxia Execution Protocol

In June 2018, Alabama's statutory amendment allowing execution by nitrogen hypoxia as an approved method of execution went into effect.  Ala. Code § 15-18-82.1(b).   Although condemned inmates have offered nitrogen hypoxia as the preferred feasible and readily implemented alternative method of execution in their capital § 1983 litigation challenging lethal injection, *Smith*, No. 2:22-cv-497-RAH, 2023 WL 4353143, at *5; *Bucklew v. Precythe*, 139 S. Ct. 1112, 1129–30  (2019); *Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1328 (11th Cir. 2019); *Miller v. Hamm*, No. 2:22-cv-506-RAH, 2022 WL 4348724, at *3 (M.D. Ala. Sept. 19, 2022), the Attorney General's office and the ADOC maintained, until just a few months ago, that nitrogen hypoxia was not a feasible and available method because the ADOC had not yet formalized and approved an execution protocol for it.  Then, in August 2023, with no warning that it was coming, the Attorney General's office announced the finalization of the Protocol.

Maintaining the ADOC's familiar veil of secrecy over its capital punishment procedures, the public version of the Protocol is heavily redacted.  But its 40 pages contain provisions and instructions for ADOC officials to follow from the time the ADOC receives word that an execution directive has been issued by the Alabama Supreme Court and Governor to the time of the inmate's interment after execution,

including detailed procedures for carrying out the State of Alabama's three approved methods of execution: electrocution, lethal injection, and nitrogen hypoxia.

The present action concerns the Protocol's nitrogen-hypoxia-specific provisions. These provisions contain detailed directives and warnings about gas usage in an enclosed space; training; and inspections, testing, calibration, and use of atmospheric monitors, gas measurement devices, pulse oximeters, tubing, masks, and other devices. (Doc. 31-1.) The Protocol also contemplates the attendance of the condemned inmate's spiritual advisor in the execution chamber and securing and checking the mask.

### C. The Present Action

The SAC is the governing pleading. In it, Smith pleads five causes of action against two defendants, John Q. Hamm, in his official capacity as the ADOC Commissioner, and Terry Raybon, in his official capacity as Warden of the William C. Holman Correctional Facility. Smith seeks declaratory and injunctive relief.

#### 1. Fourteenth Amendment Claim

In Count One, Smith asserts a claim under the Fourteenth Amendment.[1] He asserts that the State of Alabama's custom is to wait to move for an inmate's execution until after the inmate has exhausted his conventional appeals, and that here, Smith "has not exhausted his appeals." (Doc. 31 at 29.) He alleges that his appeal from his *Second Petition for Relief from Death Sentence Under Alabama Rule of Criminal Procedure 32*, filed on May 12, 2023, seeking an order altogether relieving him of his death sentence, remains pending. He further alleges that "[o]ther condemned people in Alabama who elected to be executed by nitrogen hypoxia five years ago have exhausted their appeals" and therefore the "Defendants' actions

---

[1] For ease of reference, Smith's claims for relief will be referred to as Counts One, Two, Three, Four and Five, instead of his First Claim for Relief, Second Claim for Relief, etc. as used in the SAC.

toward Mr. Smith are arbitrary and capricious and violate its own stated custom regarding selecting condemned people for execution." (Doc. 31 at 29.) This, according to Smith, is not rationally related to a legitimate government purpose and therefore violates his Fourteenth Amendment rights.

### 2. Eighth Amendment Claim

In Count Two, Smith asserts that the Defendants' intention to execute him by nitrogen hypoxia under this Protocol would expose him to a "severe risk of a persistent vegetative state, a stroke, or the painful sensation of suffocation, i.e., superadded pain" and that there are feasible and readily implemented alternatives that would reduce the risk to him either by amending the Protocol or executing him by firing squad using Utah's protocol. (*Id.* at 31.) He alleges, "[i]t is clear that the consequences of attempting an execution by nitrogen hypoxia using ADOC's deficient Protocol will be dire. If not performed correctly, execution by nitrogen hypoxia can result in another failed execution that risks leaving Mr. Smith with permanent injuries." (*Id.* at 4.) Smith asserts that death by nitrogen hypoxia exposes him to a severe risk of superadded pain, including hypoxemia and hypoxia short of death.

In particular, he alleges that the Protocol does not contain guidance on the type of mask to be used; how, when, and by whom it will be placed, adjusted, and inspected; how variations in the physical characteristics of the inmate, such as facial hair and obesity, can increase the mask's ventilation through breach of the mask's seal; what training the ADOC execution team will receive; how the ADOC will conduct a final inspection to determine if the mask has been properly placed; and what will happen if the mask becomes displaced or dislodged during the execution process. All, Smith alleges, could result in the infiltration of oxygen inside the mask, thereby increasing time to unconsciousness and increasing the risk of dire consequences such as a vegetative state, a stroke, or the painful sensation of

suffocation.  He also alleges that allowing an inmate to speak with the mask on will increase the possibility that the mask could dislodge and break the seal.  He further alleges that the Protocol does not provide for the removal of exhaled carbon dioxide, does not specify the purity of nitrogen gas to be used, and does not require monitoring of the pulse oximeters after nitrogen is introduced.  Smith also claims the Protocol fails to account for the possibility that he could vomit inside the mask thereby causing him to choke, a possibility due to his diagnosed post-traumatic stress disorder (PTSD), depression, and anxiety attributable to the circumstances surrounding his current situation and the previously failed execution attempt.  He claims that procedures should be implemented to account for these issues, including: the use of a custom fit mask; allowing him to speak, including his prayers and final statement, before placement of the mask; adding a mechanism to remove carbon dioxide from the mask; use of 100% pure nitrogen; disclosure of the source of the nitrogen and testing of it; inclusion of procedures to test the nitrogen; monitoring of the pulse oximeter; halting the execution if vomiting occurs; accounting for Smith's PTSD and depression; and having a licensed medical provider present. Alternatively, Smith alleges the Defendants should execute him by firing squad consistent with the protocol used by the State of Utah.

### 3. First Amendment, RLUIPA, and ARFA Claims

In Counts Three, Four, and Five, Smith alleges that his First Amendment and religious freedom rights under RLUIPA and ARFA will be violated because "[m]asking will interfere with Mr. Smith's right to make an audible statement and to pray audibly" and "any statement or prayer may not be audible and may risk consequences associated with dislodging the mask and/or building the level of carbon dioxide under the mask."  (Doc. 31 at 31.)  He also alleges that the Protocol burdens his exercise of religion because it forces Smith to "choose between abstaining from his religious practice of audible prayer at the end of his life or face

the dangerous consequences of dislodging the mask while praying." (Doc. 31 at 32–33.)[2]

**D. Evidence Presented at the December 20, 2023, Hearing**

On December 20, 2023, the court held a hearing on Smith's preliminary injunction request.  The court admitted 58 exhibits from Smith and 53 exhibits from the Defendants.  Among other things, the evidence included: declarations from expert witnesses, Smith, and other party and non-party witnesses; case reports and articles discussing hypoxia in the context of industrial accidents and assisted suicides; medical articles concerning the respiratory system and anesthesiology; and several videos of individuals donning the mask the Defendants intend to use for Smith's execution.  The Defendants also presented the court with the mask apparatus, which the court examined in detail.[3]  Smith called five witnesses: Dr.

---

[2] Smith also claims that he has been placed on "single walk" status, "which means that he cannot share the same space with other" inmates, "some of whom he has developed familial relationships with over decades." (Doc. 31 at 26.)  Smith alleges the Protocol is further deficient because it is silent on "single walk" status even though "Defendants intend to maintain Mr. Smith isolated from his brothers on that status for 78 days through his planned execution." (*Id.*)  By his account, "single walk" status "deprives Mr. Smith of the fellowship of his brother inmates when he needs their friendship most. . . [and] deprives him of the companionship of his family during this critical period." (*Id.*)  While he is on "single walk" status, "Smith's family cannot schedule a visit with him when any other Holman inmate has a scheduled visit[,]" and the status "interferes with his relationship with his counsel when he needs their advice most because their visits are constrained for the same reason." (*Id.*)  "And while Defendants recently permitted Mr. Smith to select one religious service that he will be permitted to attend each week accompanied by two corrections officers, his 'single walk' status also burdens the exercise of his religion." (*Id.*)  Although he generally makes these allegations, he does not raise them in Counts Three, Four and Five.

[3] The court's examination of the mask apparatus revealed it to be a NIOSH-approved, industrial grade, continuous flow supplied-air respirator mask with an adjustable five point harness system and a pliable, double flange rubber seal that would tightly fit and hold the mask over the entirety of the wearer's face—including eyes, nose, mouth, and chin—that also contained a one-way valve near the mouth and nose allowing for the exit of exhaled gases, including carbon dioxide.  Such masks are often used in industrial settings involving confined spaces and chemical processes where external air conditions are or can be dangerous.  The mask is very different from those encountered in a medical or hospital setting or used to deliver continuous air pressure to individuals diagnosed with sleep apnea, i.e., CPAP machines.

9

Robert Jason Yong, Defendant John Q. Hamm, Dr. Philip Nitschke, Smith, and Dr. Katherine Porterfield.   The Defendants called, and made available for cross-examination, nine witnesses: Dr. Joseph Antognini, Cynthia Stewart-Riley, James Houts, and six assistant attorneys general who were videoed wearing the mask in the execution chamber while also breathing and speaking.

The court need not repeat or summarize all the testimony and declarations here but will summarize relevant portions of the testimony several witnesses provided during the hearing.

During the hearing, Dr. Yong, an anesthesiologist and pain doctor with expertise in the respiratory system and ventilation, testified about nitrogen hypoxia and the use of masks to deliver gas.  In his declaration, he testified that "[b]reathing in 100% nitrogen gas would result in hypoxemia, eventual end-organ damage, and ultimately death."  (Doc. 19-1 at 6.)  But he also voiced concerns about the use of anything less than 100% pure nitrogen and a mask delivery system in general.[4]  His concerns about the mask included that the mask may not properly fit due to variations in the physical characteristics of wearers, such as nose structure and facial hair; dislodgment of the mask if a wearer resists or is noncompliant, turns his head, speaks, or suffers a seizure; the failure of the mask to allow for the removal of exhaled carbon dioxide; and vomiting inside of the mask—all of which could result in the condemned inmate experiencing a persistent vegetative state, stroke, suffocation, choking, or other complications short of death.  At the hearing, Dr. Yong testified that there is "not an abundant body of literature" or case reports to allow for concrete scientific conclusions about what will happen to a person subject to the current Protocol.  And concerning whether nitrogen hypoxia could leave a person in a persistent vegetative state, he said there are a very small number of OSHA reports

---

[4] No testimony was provided that Dr. Yong has seen, viewed, or examined the mask that the Defendants intend to use.  As such, his opinions were largely theoretical.

in total and no report states such a vegetative state has or would actually occur.  He further testified that there is no data to conclude with certainty the time to unconsciousness under conditions with no or minimal oxygenation because the science is experimental and that any conclusions he has made in his declaration concerning the time to unconsciousness under the Protocol amount to extrapolations from industrial disasters or assisted suicides.  Dr. Yong also testified that the Protocol lacks a "nothing by mouth" order by which a condemned inmate would be prohibited from consuming food for an amount of time prior to the execution to avoid, or minimize the risk of, vomiting during the execution process.

Defendant Hamm testified that he alone, pursuant to his duty as Commissioner of the ADOC, approved and adopted the Protocol.  He did not recall whether he had considered an alternative to the mask, such as a hood, to deliver nitrogen to the condemned inmate.  He testified it is and will be his responsibility to determine whether an execution fails and at what moment to call off an execution attempt.

Dr. Nitschke, a medical doctor with expertise in assisted suicides and a PhD in Physics, opined that the risks he gleaned from the Protocol could subject Smith "to incomplete cerebral hypoxia. A resultant vegetative state with permanent brain damage cannot be excluded." (Doc. 19-2 at 8.)  He inspected the nitrogen delivery system, and mask (including the mask user manual) the Defendants intend to use during Smith's execution as well as the declaration of Dr. Antognini, the Defendants' expert witness.  At the hearing, Dr. Nitschke testified to the use of a bag delivery system, as opposed to a mask, during assisted suicides to reduce the risk of outside air infiltration during nitrogen delivery.  He also testified it is possible for a person exposed to nitrogen via a bag delivery system to experience nausea.

Smith testified that he was put on "single-walk" status after a prison official informed him that the Governor had set his execution date.  He testified that "single-

walk" status deprived him of the close relationships he developed with his fellow inmates and that his status limits his availability for visitation because he cannot have a visitor at the same time any other inmate has a visitor.  He also testified that he and his spiritual advisor have agreed to a plan on the day of his execution, which includes praying audibly, communion, reading of scripture, and the spiritual advisor anointing Smith with oil.

Dr. Porterfield, a clinical psychologist from New York with expertise in treating survivors of torture and war trauma, examined Smith after the previous failed execution attempt.  Dr. Porterfield opined that, due in large part to the failed execution, Smith suffers from PTSD and depression, and that the experience from the upcoming execution "will likely create a panic reaction that is totally destabilizing to his mind and nervous system" and "will most certainly cause him severe suffering, destabilization and psychological deterioration." (Doc. 19-3 at 35.) At the hearing, Dr. Porterfield acknowledged that Smith did not report to her that he has vomited as a result of PTSD or depression, and that he did not report nausea during his previous failed execution attempt.  She also testified that it is possible but not certain that Smith may experience nausea during the next execution attempt.

Dr. Antognini, an anesthesiologist, submitted a declaration and supplemental declaration.  He stated that, in his professional opinion, the Protocol will result in a likely 35 to 40 second time to unconsciousness, death in 10 to 15 minutes after nitrogen begins flowing, and will not cause carbon dioxide rebreathing, significant leakage that will allow outside air to enter the mask, significant suffering or pain, or result in brain damage, persistent vegetative state, or stroke short of death.  (Docs. 62-60; 62-61.)  At the hearing, Dr. Antognini testified that he has never induced nitrogen hypoxia in a person or published articles related to administering nitrogen to a person.  But he has inspected the subject mask and has arrived at his conclusions based upon his own research, relying in part on internet searches, his credentials,

and his scientific background.  He testified that although no human data exists for the time to unconsciousness by nitrogen hypoxia, death will occur when the oxygen level in a person's breathing environment reaches less than six percent.

Stewart-Riley, the ADOC Regional Director, submitted a declaration and two affidavits, stating among other things that the ADOC has not found and is not aware of any study or scientific literature evidencing that the selected mask would increase the risk of harm to Smith were he to vomit during the execution.  At the hearing, she testified to her knowledge of the Protocol.

The court also reviewed the declarations of Thomas R. Govan, Jr., Audrey Jordan, Alana K. Cammack, Lauren Simpson, Jasper B. Roberts, Jr., and Cameron Ball, all of whom were videoed wearing the mask in the execution chamber and audibly speaking while wearing the mask.  At the hearing, Simpson, Ball, and Roberts testified to their experience wearing the mask.

Houts, an attorney and retired military officer, submitted a declaration opining favorably on the Protocol.  At the hearing, he testified that he is not an expert on the development of nitrogen hypoxia execution protocols and is unsure whether such an expert exists.

### III. JURISDICTION AND VENUE

The court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  Personal jurisdiction and venue are uncontested, and the court concludes that venue properly lies in the Middle District of Alabama.  *See* 28 U.S.C. § 1391.

### IV. DISCUSSION

The court will first consider the Defendants' motion to dismiss and then dispose of Smith's motion for preliminary injunction on the remaining claims.

#### A. The Defendants' Motion to Dismiss

The Defendants have moved to dismiss each of Smith's claims under Federal Rule of Civil Procedure 12(b)(6).  In ruling upon a Rule 12(b)(6) motion, a court

considers only the allegations contained in the complaint and any attached exhibits. *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016). A Rule 12(b)(6) motion tests the sufficiency of the complaint against the legal standard set forth in Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The court must take "the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. But if the facts in the complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief,'" and the complaint must be dismissed. *Id.* (alteration adopted) (citing Fed. R. Civ. P. 8(a)(2)).

### 1. The Eighth Amendment Claim

For clarity, the constitutionality of capital punishment is *not* before the court. The death penalty is constitutional, *see Baze v. Rees*, 553 U.S. 35, 47 (2008) (citing *Gregg v. Georgia*, 428 U.S. 153, 177 (1976)), and it is in force in Alabama. The State of Alabama elected not to join 23 of its sister states in abolishing the death penalty, so the unenviable task falls to this court to decide whether Alabama's newest method of execution, one Smith himself previously declared was his

14

preferred method of execution, inflicts cruel and unusual punishment in violation of the Eighth Amendment.  *See* U.S. Const. amend. VIII.

Smith contends the Protocol, in its current form, exposes him to a substantial risk of severe and superadded pain although feasible, readily implemented alternative methods of execution exist—like an amended Protocol or death by firing squad—that would significantly reduce that risk.

The Defendants raise several arguments in support of dismissing the claim as set forth in Count Two, with particular emphasis on the doctrine of estoppel and, to a much lesser extent, issue preclusion.  They claim Smith is estopped from bringing an Eighth Amendment challenge to nitrogen hypoxia because, in his previous lawsuit, he successfully argued that nitrogen hypoxia was a feasible, readily implemented alternative method of execution.  They also note that Smith repeatedly stated that nitrogen hypoxia was his preferred method of execution even though he knew it was untested and that no protocol existed.  *See generally*, *Smith*, No. 2:22-cv-497-RAH, 2023 WL 4353143.  By repeatedly pointing to nitrogen hypoxia as his preferred method, Smith even achieved an injunction enjoining the Defendants from ever again attempting to execute him by lethal injection.  (Doc. 39-11.)  Thus, according to the Defendants, Smith is taking a "new and contradictory position" in this action by now opposing his execution by nitrogen hypoxia "simply because his interests have changed," (Doc. 39 at 34–35 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001))), and he now seeks to delay his execution by "attempting to manipulate the judicial process to his benefit,"[5] (*id.* at 37).

---

[5] The Defendants cite one judge's statement, 22 F.4th 621 (Mem.), concerning the Sixth Circuit's recent denial of rehearing en banc in *Middlebrooks v. Parker*, 15 F.4th 784 (6th Cir. 2021), a § 1983 method-of-execution case in which the Sixth Circuit reversed the district court's dismissal of a facial challenge to Tennessee's three-drug lethal injection protocol because it concluded the challenge was barred by the doctrine of res judicata.  That judge suggested, "[i]n future cases, states might consider arguing that judicial estoppel bars inmates from making inconsistent claims in order to delay proceedings."  22 F.4th at 628.  So, the Defendants did.  That judge may well be

The equitable doctrine of estoppel is intended to "prevent the perversion of the judicial process" and "protect [its] integrity . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017) (en banc) (alterations in original) (quoting *New Hampshire*, 532 U.S. at 749–50). When a party does so, the doctrine of estoppel allows a court to exercise its discretion to dismiss the party's claims. *Id.* To determine its application, courts look to "whether (1) the party took an inconsistent position under oath in a separate proceeding, and (2) these inconsistent positions were 'calculated to make a mockery of the judicial system.'" *Id.* (quoting *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002)). The court must consider Smith's actions and motive and determine whether his current claim is the result of "cold manipulation" and not "inadvertence or mistake." *Id.* at 1881 (brackets omitted) (quoting *Johnson Serv. Co. v. Transamerica Ins. Co.*, 485 F.2d 164, 175 (5th Cir. 1973)).

It is not lost on the court that Smith vehemently argued for execution by nitrogen hypoxia in his previous litigation only several months ago when he was scheduled for execution by lethal injection. He likely did so under the belief that the ADOC was nowhere near finalizing and issuing a final nitrogen hypoxia protocol, thereby placing Smith, like any condemned inmate subject to a nitrogen hypoxia execution, in an indefinite holding pattern while other lethal injection executions went forward. Now that Alabama is prepared to carry out his sentence using the method of execution he has consistently declared he prefers, the circumstances have changed. And what was once highly unlikely is now a certainty. With that change,

---

right, but such gatekeeping is outweighed where, such as here, a condemned inmate properly brings a plausible challenge when he "becomes subject to a new or substantially changed execution protocol." *Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853, 873 (11th Cir. 2017) (citations omitted).

Smith now seeks to enjoin the Defendants from carrying out his death sentence using the Protocol, arguing it unconstitutionally superadds pain such that the court should order the Defendants to amend it or execute him by firing squad, a "relatively uncommon and archaic" method. *Nance v. Comm'r, Ga. Dep't Corr.*, 59 F.4th 1149, 1155 (11th Cir. 2023) (*Nance III*) (quoting the State's brief).  On that basis, the Defendants assert estoppel.  But the details here compel rejecting the application of estoppel, or issue preclusion to the extent the Defendants invoke it.

Eighth Amendment jurisprudence holds that a condemned inmate has a new "method of execution claim [that] accrues on the later of the date on which state review [of his conviction and sentence] is complete, or the date on which the capital litigant becomes subject to a new or substantially changed execution protocol." *Boyd*, 856 F.3d at 873 (citations omitted).

In this case, Smith does not challenge nitrogen hypoxia as a method of execution per se.  Rather, he challenges the current procedure by which it will be carried out.  The novelty of the Protocol and that Smith is to be the first condemned inmate executed under it are undisputed facts.  The Protocol did not exist or, at least, was not approved for use and made publicly known until after the Attorney General's office moved for dismissal of Smith's prior lethal injection litigation last August and September.  Smith's claim here did not accrue until the Attorney General moved for, and the Alabama Supreme Court authorized, his execution under the novel Protocol.

It goes without saying that many capital cases come to the federal court system with the primary or sole aim of delaying execution indefinitely.  And inherent in many if not every capital case is the condemned inmate's goal to altogether avoid his death sentence.  It is human.  But in Smith's previous lawsuit, the Protocol was not yet approved or fully made known, and he was not yet subject to it.  So, he was unable to fully and fairly litigate the Eighth Amendment claim that he now brings in this case.  Applying estoppel or issue preclusion here would work a mockery of the

17

Eleventh Circuit's recognition that condemned inmates must be allowed a vehicle to challenge new and substantially changed execution protocols. The court refuses to apply either doctrine here.

The Defendants next argue that Smith's Eighth Amendment claim is far too speculative to state a claim because he has failed to plead plausible facts showing an actual risk that he will suffer superadded pain under the Protocol and that "ADOC officials are aware of, but are disregarding, known substantial risks" of severe pain. (Doc. 39 at 38, 47–48.) Notably, the Defendants do not argue at this stage that Smith's identification of Utah's execution protocol for the firing squad fails to identify a "feasible, readily implemented" alternative, but the Defendants do argue that Smith's proposed amendments to the Protocol fail as a satisfactory alternative under *Bucklew* and *Nance III*.

To state a plausible method-of-execution claim, Smith must (1) show that the challenged method "presents a risk that is '*sure or very likely* to cause serious illness and needless suffering,' and gives rise to 'sufficiently *imminent* dangers'"; and (2) identify "an alternative that is feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain and that the state has refused to adopt without a legitimate penological reason." *Price*, 920 F.3d at 1325–26 (quoting *Glossip v. Gross*, 576 U.S. 863, 877 (2015), *Baze*, 553 U.S. at 50–51, and *Bucklew*, 139 S. Ct. at 1129). Deciding "whether the State has cruelly 'superadded' pain to the punishment of death isn't something that can be accomplished by examining the State's proposed method in a vacuum, but only by 'compar[ing]' that method with a viable alternative." *Bucklew*, 139 S. Ct. at 1126 (alterations in original). The comparison "'provides the needed metric' to measure whether the State is lawfully carrying out an execution or inflicting 'gratuitous' pain." *Id.* (citation omitted).

Smith's burden under this legal test can be "overstated," so the Supreme Court has clarified that a condemned person "seeking to identify an alternative method of

execution is not limited to choosing among those presently authorized by a particular State's law." *Id.* at 1128. Nonetheless, Smith "faces an exceedingly high bar" because the Supreme Court "has yet to hold that a State's method of execution qualifies as cruel and unusual, and perhaps understandably so. Far from seeking to superadd terror, pain, or disgrace to their executions, the States have often sought more nearly the opposite[,]" *id.* at 1124, that is, "more humane way[s] to carry out death sentences," *Glossip*, 576 U.S. at 868.

In support of their contention that Smith's allegations are too speculative to state a claim, the Defendants primarily rely upon six decisions—*Baze*; *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260 (11th Cir. 2014); *Ferguson v. Warden, Fla. State Prison*, 493 F. App'x 22 (11th Cir. 2012); *Pardo v. Palmer*, 500 F. App'x 901 (11th Cir. 2012); *Jackson v. Danberg*, 594 F.3d 210 (3d Cir. 2010); *Wackerly v. Jones*, 398 F. App'x 360 (10th Cir. 2010). But none of those decisions were before courts on a motion to dismiss where, as here, the allegations are assumed true. Each of those cases, except *Baze,* reviewed the condemned inmate's Eighth Amendment claim under preliminary injunction or summary judgment standards. Although informative to the court's later preliminary injunction analysis, the Defendants' cited authority offers little in support of their argument that Smith has failed to state a plausible Eighth Amendment claim under a Rule 12(b)(6) attack.

Here, Smith has alleged several imminent dangers—improper fit of the mask; the potential for the mask to dislodge from its sealed position for a variety of reasons such as speaking, praying, or vomiting; vomiting; the introduction of oxygen into the mask; and the lack of monitoring of the pulse oximeters during the execution— that he also alleges present risks that are sure or very likely to increase the time for Smith to reach a state of unconsciousness and "would expose [him] to a severe risk of a persistent vegetative state, a stroke, or the painful sensation of suffocation, i.e., superadded pain." (Doc. 31 at 22, 31.) Smith has further alleged two alternative

methods that he says would in fact reduce the risk of severe or superadded pain and needless suffering he avers the current Protocol is sure or very likely to cause: (1) amending the Protocol to incorporate several changes he identifies in Paragraph 102 of the SAC or (2) carrying out his execution by firing squad using Utah's protocol. (*Id.* at 27–28.)

Taking Smith's allegations as true at this stage of the litigation, as the court must, Smith has alleged facts beyond "a formulaic recitation of the elements of a cause of action," and his allegations have a sufficient basis in fact "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Smith has pled that the Protocol could and will increase the time to unconsciousness and will present imminent dangers and superadd pain in the form of a persistent vegetative state, stroke, or the sensation of suffocation. He has alleged two feasible, readily implemented alternative methods that he says will reduce the risk of that harm. Together, those dangers—as compared to Smith's allegations about his proposed alternative methods—amount to "a 'substantial risk of serious harm'—severe pain over and above death itself[.]" *Nance v. Ward*, 597 U.S. 159, 164 (2022) (*Nance II*). He has therefore pled a plausible Eighth Amendment claim, *cf. Smith,* No. 22-13781, 2022 WL 17069492, and the Defendants' motion to dismiss Smith's Eighth Amendment claim in Count Two is thus due to be denied.[6]

### 2. The Fourteenth Amendment Claim

In Count One, Smith alleges that the Defendants have acted in an "arbitrary and capricious" manner in violation of his equal protection rights by seeking to execute him by nitrogen hypoxia even though "[o]ther condemned people in

---

[6] Concluding Smith has stated a plausible Eighth Amendment claim does not mean his request for a preliminary injunction is due to be granted because his request for a preliminary injunction is subject to an altogether different standard.

Alabama who elected to be executed by nitrogen hypoxia five years ago have exhausted their appeals." [7]  (Doc. 31 at 29.)  Smith also alleges "that attempting to execute [him] by nitrogen hypoxia before he has exhausted his pending appeals would violate his right to equal protection under the laws under the Fourteenth Amendment."  (*Id.* at 34.)

Smith argues that he has stated a plausible equal protection claim because (1) he is similarly situated to all other condemned inmates who are subject to execution by nitrogen hypoxia; (2) he has an appeal pending with the Alabama Supreme Court; (3) the State of Alabama has a custom to wait to seek an execution date until after the inmate has exhausted his conventional appeals: direct appeal, state post-conviction, and federal habeas; (4) there are other condemned inmates in Alabama whose appeals have been exhausted and who elected to be executed by nitrogen hypoxia in 2018 and are still awaiting execution; (5) the ADOC has given at least one condemned inmate who it intends to execute by nitrogen hypoxia a grace period for the inmate and his legal counsel to review the Protocol before the Attorney General seeks an execution date; (6) Smith was not given a similar grace period; and (7) the Defendants chose Smith to avoid discovery into their "failed lethal injection procedures" in his previous lawsuit before this court.

The Defendants argue that dismissal is appropriate because state law does not assign either of the named defendants the responsibility of seeking an order to carry out Smith's execution, let alone any death sentence.  The Defendants also argue that they did not violate any custom of their own; because any custom involving who is selected next for execution is that of the Attorney General, who is not a party in this litigation.  Additionally, Defendants contend Smith's pending Rule 32 litigation is meritless and he has failed to adequately plead comparators.  Finally, Defendants

---

[7] Smith voluntarily withdrew his due process claim.  (*See, e.g.*, Doc. 44 at 14.)

argue that dismissal is required on estoppel and res judicata grounds, primarily pointing to the fact that Smith voiced no concern or objection to the order of his selection as next in line for execution in his previous litigation.

It is not necessary to address whether Smith's second Rule 32 petition is meritless, barred by estoppel, or by any of the Defendants' other grounds because Smith's claim fails for lack of standing. Article III of the Constitution limits the subject matter jurisdiction of federal courts to "cases and controversies." U.S. Const. art. III, § 2. "To have a case or controversy, a [plaintiff] must establish that he has standing, which requires proof of three elements." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (quoting *United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019) (internal quotation marks omitted). To show standing, a plaintiff must prove (1) an injury in fact that (2) is fairly traceable to the defendant's actions and is (3) likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "[F]ederal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of the jurisdictional doctrines.'" *United States v. Hays*, 515 U.S. 737 (1995) (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230–31 (1990) (alterations adopted). "[E]ach element of standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'" *Bischoff v. Osceola Cnty., Fla.*, 222 F.3d 874, 878 (11th Cir. 2000) (quoting *Lujan*, 504 U.S. at 561). "Therefore, when standing becomes an issue on a motion to dismiss, general factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing." *Id.*

To have standing, a plaintiff's injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (alterations adopted).

22

Smith contends that he is injured because he has been selected for execution before his second state postconviction appeal has been exhausted and before the executions of other inmates who have selected nitrogen hypoxia long before he selected it.  So, for Smith to have standing, his selection for execution over other condemned inmates and during the pendency of other litigation must be traceable to the actions of Defendants Hamm and Raybon in their capacities as the Commissioner of the ADOC and the Warden of Holman Prison, respectively.  Smith's problem is that Alabama law tasks the Attorney General with seeking and moving for an execution date with the Alabama Supreme Court.  *See* Ala. R. App. P. 8(d)(1); Ala. Code § 36-15-1(2) (noting the Attorney General of Alabama "shall attend, on the part of the state, to all criminal cases pending in the Supreme Court"); State of Alabama's Motion to Set an Execution Date, *Ex parte Kenneth Eugene Smith*, No. 1000976 (Ala. Aug. 25, 2023).[8]  Then, the Alabama Supreme Court decides whether this is an "appropriate time" to execute a condemned inmate and, if so, authorizes the execution.  Finally, the Governor sets an execution date.  The Commissioner of the ADOC and the Warden at Holman play no role in selecting which condemned inmate comes next in carrying out a death sentence.  In fact, Alabama law merely requires the Defendants to carry out an execution that has been authorized by the Alabama Supreme Court and set by the Governor.  Ala. Code § 15-18-82(b), (c) ("It shall be

---

[8] The court takes judicial notice of the Attorney General's motion to set Smith's execution date in the Alabama Supreme Court pursuant to Fed. R. Evid. 201(b). This judicial act is not in dispute. The Eleventh Circuit has explained that "[j]udicial notice of court records is ordinarily confined to determining what happened in the course of a proceeding—when a plaintiff filed a complaint, what claims were argued and adjudicated on, and so on." *Kerruish v. Essex Holdings, Inc.*, 777 F. App'x 285, 293 (11th Cir. 2019). Moreover, "the Eleventh Circuit has distinguished between taking judicial notice of the fact that court records or court rulings *exist* versus taking judicial notice of the *truth* of the matter stated within those court records or court rulings." *Auto Owners Ins. Co. v. Morris*, 191 F. Supp. 3d 1302, 1304 (N.D. Ala. 2016) (emphasis in original).  Here, the court references this document to show that the Attorney General, as the State of Alabama's representative to the Alabama Supreme Court, is the official who sought Smith's execution before others.

the duty of the Department of Corrections of this state to provide the necessary facilities, instruments, and accommodations to carry out the execution.  The Warden of the William C. Holman unit of the prison system . . . shall be the executioner.").  And nowhere in Smith's SAC does he state how either Defendant played a role in his selection over other inmates for execution.

Despite his allegation that the ADOC maintains a "custom" of waiting to move for an execution until a condemned inmate has exhausted his conventional appeals, Smith mischaracterizes *whose* custom it actually is.  Smith cites to the custom mentioned in *Woods v. Comm'r, Ala. Dep't of Corrs.*, 951 F.3d 1288, 1292 (11th Cir. 2020), to support his equal protection claim.  However, it is not the ADOC as an institution, nor the Defendants in their official capacities, that maintain this custom; instead, it is the Attorney General's office.  Since the Attorney General is the state official who "attends to the criminal cases pending in the Supreme Court," a violation of this custom is fairly traceable back to the Attorney General, not the Commissioner of the ADOC or the Warden of Holman.  Ala. Code § 36-15-1(b); *see Lujan*, 504 U.S. at 560.  Therefore, Smith has failed to show an injury that is fairly traceable to any defendant in this case.  *Lujan*, 504 U.S. at 560.

Smith's SAC is also devoid of any allegation that one or both of these two Defendants acted outside of their statutory authority or improperly influenced the Attorney General to move for Smith's execution.  This court, absent allegations of such conduct, will assume that a state official's authority lies where the "applicable law purports to put it."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988).  Since Smith is unable to show that his injury is fairly traceable to the Defendants, he lacks the required standing to bring his equal protection claim against them.  *See Jacobson*, 974 F.3d at 1245 ("To have a case or controversy, a [plaintiff] must establish that he has standing, which requires proof of [all] three elements.").

The court is aware of prior capital punishment litigation in Alabama federal courts involving equal protection claims where the Attorney General was a defendant, yet the choice to include the Attorney General was not made here even though Smith sued the Attorney General in his previous litigation.  *See generally*, *Woods v. Dunn*, No. 2:20-cv-58-ECM, 2020 WL 1015763 (M.D. Ala. Mar. 2, 2020); *Smith*, No. 2:22-cv-497-RAH, 2023 WL 4353143.

Standing aside, Smith's equal protection claim also fails on the merits for a different but related reason: the lack of a causal connection.[9]  Without a causal connection between a defendant's actions and a plaintiff's alleged constitutional violation, a § 1983 claim fails.  *See Spencer v. Benison*, 5 F.4th 1222, 1232 (11th Cir. 2021) (quoting *Troupe v. Sarasota Cnty.*, 419 F.3d 1160, 1165 (11th Cir. 2005)).  Smith's equal protection claim is premised upon an alleged custom by the ADOC in how it determines whose execution date will be set next.  As Smith defines the claim in the SAC, his claim focuses on whether or not the Defendants violated their "custom [to] wait[] to move for an inmate's execution until he has exhausted his conventional appeals: direct appeal, state postconviction, and federal habeas." (Doc. 31 at 2–3, 29 (quoting *Woods*, 951 F.3d at 1292)).  But again, the Defendants are not involved in the selection of condemned inmates for execution, moving for an execution date, or authorizing an execution.  Their duties are statutory and are merely to carry out an execution once authorized by the Alabama Supreme Court and set by

---

[9] Defendants also argue that Smith's claim is due to be dismissed under the *Rooker-Feldman* doctrine, arguing that success on this claim would effectively nullify the Alabama Supreme Court's authorization of Smith's execution.  The court declines to apply the narrow *Rooker-Feldman* doctrine because Smith does not identify or complain of an injury caused by the Alabama Supreme Court but rather complains about the conduct of the Defendants in "selecting" him for execution despite having an appeal outstanding.  *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (holding that the *Rooker-Feldman* doctrine is limited and confined to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments").

the Governor. *Compare* Ala. Code § 15-18-82 *with* Ala. Code § 36-15-1(2). There is no discretion in the Defendants' responsibilities or duties here. And nowhere in the SAC or in his responsive briefing does Smith allege that these two Defendants— Hamm or Raybon—were involved in the process of selecting Smith, or any other condemned inmate, for execution, or were involved in moving the Alabama Supreme Court to authorize Smith's execution. Alabama law provides no ability for either of these Defendants to involve themselves in this process. As such, there is simply no causal connection between the Defendants' actions, Smith's alleged equal protection violations, and Smith's injury, other than the Defendants' mandatory and statutory obligations to carry out the death sentence.

In short, Count One must be dismissed for several reasons. Despite Smith's allegations, Defendants Hamm and Raybon do not have the statutory power to select, move for, or authorize his execution—those actions lie with the Attorney General and the Alabama Supreme Court. As a result, Count One suffers from traceability and causation infirmities that require its dismissal.

### 3. *The First Amendment Free Speech Claim*

In Count Three, Smith alleges that the Protocol violates his First Amendment rights because it "will interfere with [his] right to make an audible statement and to pray audibly" and "[a]ny statement or prayer . . . may risk consequences associated with dislodging the mask and/or building the level of carbon dioxide under the mask." (Doc. 31 at 31.) Thus, two parts comprise Smith's claim: (1) a free exercise claim and (2) a free speech claim. Because RLUIPA claims "embed[] a heightened standard for government restrictions on the free exercise of religion" than do First Amendment free exercise claims, the court reserves its analysis of Smith's free exercise claims for its discussion of Smith's RLUIPA claim. *Dorman v. Aronofsky*, 36 F.4th 1306, 1313 (11th Cir. 2022). And because, as discussed below, Smith pled

facts sufficient to state a claim that the Protocol violates his First Amendment right to free speech, the Defendants' motion to dismiss that claim is due to be denied.[10]

In the context of the execution chamber, it is not obvious or recognized that Smith has a First Amendment "right to make an audible statement" that the SAC alleges he has. (Doc. 31 at 31.)  *See In re Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2017 WL 2964901, at *26 (S.D. Ohio 2017) ("While last statements have traditionally been a part of executions in the Anglo-American tradition, nothing in the Constitution compels honoring that tradition.  In the contemporary Ohio context, the means of communication between the inmate in the death chamber and witnesses in the witness room is by way of a microphone provided by the State. Even if the Constitution protects—on free speech or free exercise grounds—the right of an inmate to speak, it does not compel the State to furnish him with a means to ensure that speech is heard by certain people.").  Although "federal courts must take cognizance of the valid constitutional claims of prison inmates," *Turner v. Safley*, 482 U.S. 78, 84 (1987), "a lesser standard of scrutiny is appropriate in determining the constitutionality of [] prison rules" than in determining the validity of laws impacting constitutional rights outside the prison context, *id.* at 81.  Specifically, a prison regulation or protocol impacting prisoners' constitutional rights is valid if "the regulation is . . . reasonably related to legitimate penological interests."  *Id.* at 89 (alterations in original) (citations omitted).  And there are four factors used to

---

[10] In the SAC, Smith also states that his single-walk status "burdens the exercise of his religion," although he does not state exactly how his exercise of religion is burdened.  (Doc. 31 at 26.)  Moreover, Smith did not include a single-walk status allegation in his First Amendment claim (Count Three), RLUIPA claim (Count Four), or ARFA claim (Count Five), and he did not respond to the Defendants' arguments about Smith's single-walk status in their motion to dismiss.  (Doc. 39 at 59, 62, 64–65, 68.)  Accordingly, the court considers Smith's allegations that his single-walk status interferes with his religious exercise abandoned.

determine whether a regulation is reasonably related to legitimate penological interests:

> (1) whether there is a "valid, rational connection" between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether the regulation represents an "exaggerated response" to prison concerns.

*Hakim v. Hicks*, 223 F.3d 1244, 1247–48 (11th Cir. 2000). Thus, to state a First Amendment claim, Smith must state facts alleging that the prison regulation is unreasonable, and facts supporting the *Hakim* factors would help him do so.

Taking everything Smith alleges in the SAC as true, the court concludes the SAC sufficiently alleges that the Protocol's burden on his speech is not reasonably related to a legitimate penological interest. Smith offers an alternative that would resolve his free speech concerns (allowing him to speak without a mask on) (Doc. 31 at 27), and he states that there is no "compelling governmental interest that justifies" masking Smith for his final statement, (Doc. 31 at 6). And crucially, "evaluating whether there is a legitimate penological interest that permits a restriction on the constitutional rights of incarcerated individuals is not normally an exercise that can be undertaken in the context of a motion to dismiss brought under Rule 12(b)(6)." *Mayberry v. Humphreys Cnty.*, No. 3:11-0855, 2012 WL 4506027, at *9 (M.D. Tenn. Sept. 4, 2012) (citations omitted), *report and recommendation adopted*, No. CIV. 3:11-0855, 2012 WL 4490809 (M.D. Tenn. Sept. 28, 2012). Smith's response to Defendants' assertion that he has not stated a First Amendment free speech claim is that he needs further factual development so that he can address the *Hakim* factors. (Doc. 44 at 46.) Moreover, the Defendants fail to identify binding law on this court that states that any of their asserted interests (*see* Doc. 39

at 50–51) are, as a matter of law, reasonably related to the need to mask Smith at the time of his final words.  And so, "[w]hile Defendants may develop evidence consistent with *Turner* that [they] could rely on at the summary judgment stage, there is no such evidence before the Court at this juncture."  *Garber v. Conway*, No. 1:16-CV-137-AT, 2016 WL 11545540, at *2 n.2 (N.D. Ga. Dec. 6, 2016).  And even if there was, the court cannot consider it for purposes of the Defendants' motion to dismiss.

Although it is entirely possible that the Protocol's regulation of Smith's speech rights is reasonable, that fact-centered determination is not before the court at this stage of the litigation.  Instead, the court must determine whether Smith has alleged enough to state a plausible claim that the Protocol imposes an unreasonable restriction on his First Amendment free speech rights.  Because the court concludes he did, although barely, the Defendants' motion to dismiss Smith's free speech claim in Count Three will be denied.

### 4. *The RLUIPA Claim*

Count Four alleges that the Protocol violates RLUIPA because it (1) "substantially burdens Mr. Smith's religious exercise to pray audibly" during his last statement and because it (2) "substantially burdens Mr. Smith's religious exercise to pray audibly by forcing Mr. Smith to choose between abstaining from his religious practice of audible prayer at the end of his life or face the dangerous consequences of dislodging the mask while praying."  (Doc. 31 at 32.)  Because Smith has sufficiently pled that the Protocol substantially burdens an exercise of his sincere religious beliefs, the Defendants' dismissal motion as to Smith's RLUIPA claim will be denied.

RLUIPA states that

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if

29

> the burden results from a rule of general applicability, unless the
> government demonstrates that imposition of the burden on that
> person—(1) is in furtherance of a compelling governmental interest;
> and (2) is the least restrictive means of furthering that compelling
> governmental interest.

42 U.S.C. § 2000cc–1(a).  The Supreme Court has summarized the RLUIPA test as
follows:

> A plaintiff bears the initial burden of proving that a prison policy
> implicates his religious exercise. Although RLUIPA protects any
> exercise of religion, whether or not compelled by, or central to, a system
> of religious belief, a prisoner's requested accommodation must be
> sincerely based on a religious belief and not some other motivation.
> The burden on the prisoner's religious exercise must also be substantial.
> Once a plaintiff makes such a showing, the burden flips and the
> government must demonstrate that the imposition of the burden on that
> person is the least restrictive means of furthering a compelling
> governmental interest.

*Ramirez v. Collier*, 595 U.S. 411, 425 (2022) (cleaned up).  Thus, to survive a motion
to dismiss a claim that a prison policy violates RLUIPA, Smith must plead that
audible prayer is an exercise of his sincere religious beliefs and that the Protocol
substantially burdens his ability to audibly pray.  *See, e.g.*, *Holt v. Hobbs*, 574 U.S.
352, 360–61 (2015) (stating that "of course, a prisoner's request for an
accommodation must be sincerely based on a religious belief and not some other
motivation"); *Williams v. Wilkinson*, 645 F. App'x 692, 699 (10th Cir. 2016) ("To
survive a motion to dismiss . . . [the prisoner] was required to allege only that his
request to eat a kosher diet was motivated by a sincerely held religious belief and
that his exercise of that belief has been substantially burdened by the government.").

As to religious exercise, the SAC alleges that Smith is a "man of faith." (Doc.
31 at 11.)  Audible prayer is an exercise of that religious faith. The Supreme Court
has found that "traditional forms of religious exercise" satisfy the religious exercise

30

prong of RLUIPA, and that "there is a rich history of clerical prayer at the time of a prisoner's execution, dating back well before the founding of our Nation[.]" *Ramirez*, 595 U.S. at 425, 427.  Moreover, the court struggles to conceive of a practice more central to religious exercise than audible prayer.  Accordingly, the court finds that Smith has pled sufficient facts to state a plausible claim under the first prong of the RLUIPA analysis.

> And as to RLUIPA's substantial burden analysis, the
>
> inquiry . . . asks whether the government has substantially burdened religious exercise . . . not whether the RLUIPA claimant is able to engage in other form of religious exercise. We have held that a substantial burden is more than an inconvenience and is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly.  We said in *Midrash Sephardi* that a substantial burden can tend to force adherents to forego religious precepts or mandate religious conduct.

*Dorman*, 36 F.4th at 1314 (cleaned up).  Smith alleges that being masked "may prevent [his] prayers from being audible," and that during his execution he will face the untenable choice of either praying audibly or risking the consequences of dislodging the mask.  (Doc. 31 at 32.)  Taking these allegations as true, Smith has stated a plausible claim that the Protocol substantially burdens his religious exercise under RLUIPA.  Accordingly, because Smith has plausibly pled that the Protocol imposes a substantial burden on his religious exercise, the Defendants' motion to dismiss Smith's RLUIPA claim (Count Four) will be denied.

### 5. *The First Amendment Free Exercise Claim*

As previously stated, "[i]f a prison's regulation passes muster under RLUIPA . . . it will perforce satisfy the requirements of the First Amendment, since RLUIPA offers greater protection to religious exercise than the First Amendment offers." *Smith v. Allen*, 502 F.3d 1255, 1264 n.5 (11th Cir. 2007).  And "[i]f a claim fails under the RLUIPA—which embeds a heightened standard for government

restrictions of the free exercise of religion—it necessarily fails under the First Amendment." *Dorman*, 36 F.4th at 1313 (citing *Allen*, 502 F.3d at 1264 n.5). Because Smith has plausibly pled a RLUIPA claim, Smith has also necessarily pled a plausible First Amendment free exercise claim, and therefore the Defendants' motion to dismiss Smith's free exercise claim in Count Three will be denied.

### 6. *The ARFA Claim*

Section V of the ARFA states:

(a) Government shall not burden a person's freedom of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

(b) Government may burden a person's freedom of religion only if it demonstrates that application of the burden to the person:

(1) Is in furtherance of a compelling governmental interest; and

(2) Is the least restrictive means of furthering that compelling governmental interest.

Ala. Const. amend. 622 § V.   "Thus, ARFA, like RLUIPA, requires the government's action to satisfy strict scrutiny to survive review." *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 83 F.4th 922, 929 (11th Cir. 2023) (*TMAA II*). But there is an important difference between RLUIPA and ARFA: rather than requiring a "substantial" burden on religious exercise as RLUIPA does, *any* burden on "freedom of religion" triggers ARFA.  *See Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 980 F.3d 821, 840 (11th Cir. 2021) (*TMAA I*) ("Under Alabama law, our job (giving it our best *Erie* guess) is to interpret [ARFA's] language to mean exactly what it says. And what ARFA says is that *any* burden—even an incidental or insubstantial one—suffices to trigger strict scrutiny." (internal quotations and citations omitted)).

Were the court to have found that Smith's RLUIPA claim failed to state a claim because Smith did not plead a "substantial burden," the critical difference between RLUIPA and ARFA would be relevant here: while Smith might not have pled a *substantial* burden, he could have still survived the Defendants' motion to dismiss his ARFA claim having merely pled a burden. *See TMAA I*, 980 F.3d at 839 ("ARFA repeatedly states that, except in extraordinary circumstances, the government may not 'burden' religious exercise.  In its 'findings' section, ARFA provides that '[g]overnments should not *burden* religious exercise without compelling justification.'" (emphasis in original) (quoting Ala. Const. amend. 622)). But because Smith has successfully pled that the Protocol substantially burdens his sincere religious beliefs, the critical difference between RLUIPA and ARFA does not matter here.  As such, Smith has sufficiently pled that the Protocol merely *burdens* Smith's religious exercise, and therefore the Defendants' motion to dismiss Smith's ARFA claim will be denied.

## B. Smith's Preliminary Injunction Motion

Smith's motion for preliminary injunction proceeds only as to those claims that survive the Defendants' motion to dismiss and only on those claims for which he has sought a preliminary injunction against his execution under the Protocol—his Eighth Amendment, RLUIPA, and ARFA claims.[11]

"When ruling on a preliminary injunction, 'all of the well-pleaded allegations [in a movant's] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true.'" *Alabama v. U.S. Dep't of Com.*, 546 F. Supp. 3d 1057, 1063 (M.D. Ala. 2021) (quoting *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976)).  "At the preliminary injunction stage, a district court may

---

[11] Although his First Amendment claims (Count Three) survived the Defendants' motion to dismiss, Smith did not seek a preliminary injunction based on them.  Accordingly, the court will not consider Smith's First Amendment claims in his request for a preliminary injunction.

rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (quoting *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).

And crucially, "where facts are *bitterly* contested and credibility determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312 (11th Cir. 1998) (emphasis added). At an evidentiary hearing, the district court sits as both factfinder and credibility assessor. *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1211 (11th Cir. 2003). Highly disputed factual issues may cast doubt on the plaintiff's substantial likelihood of success. Ultimately, "[t]he grant or denial of a preliminary injunction is a decision within the sound discretion of the district court." *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Smith is entitled to a preliminary injunction if he demonstrates (1) a substantial likelihood of success on the merits; (2) a likelihood of suffering irreparable injury without the injunction; (3) that the threatened injury to him outweighs the harm the injunction would cause the State; and (4) that the injunction would not be adverse to the public interest. *Barber*, 73 F.4th at 1317. A preliminary injunction is "'not to be granted unless the movant clearly established the "burden of persuasion"' for each prong of the analysis." *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014) (citation omitted). Smith, as the movant, must satisfy his burden on all four elements "by a clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

Substantial likelihood of success on the merits is "the most critical" factor in the preliminary injunction analysis, and because the court concludes that Smith has failed to meet his burden on this factor, "'it is unnecessary' for the court to determine whether [Smith] 'satisfied the second, third, or fourth factors.'"  *Barber*, 73 F.4th at 1317 (quoting *Grayson v. Warden, Comm'r, Ala.*, 869 F.3d 1204, 1238 n.89 (11th Cir. 2017)).  Although Smith has plausibly alleged claims such that they survive dismissal at the motion to dismiss stage, he has failed to show a substantial likelihood of success on their merits.  Accordingly, Smith's motion for preliminary injunction will be denied.

### *1. The Eighth Amendment Claim*

Execution by nitrogen hypoxia is unusual because it is novel.  But Smith has the burden to "establish a likelihood" that the Protocol is unconstitutionally cruel because it will inflict an "unacceptable risk of severe pain" that is "substantial when compared to known and available alternatives." *Glossip*, 576 U.S. at 878.  The Eleventh Circuit has applied the Supreme Court's Eighth Amendment method-of-execution framework and held that a condemned inmate must show that the challenged method of execution creates "a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment," and additionally must point to "an alternative that is feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Price*, 920 F.3d at 1326 (quoting *Glossip*, 576 U.S. at 877).  In other words, Smith must again satisfy the *Baze-Glossip* test, as interpreted in *Price*, but now he must bolster his allegations, which are highly contested by the Defendants, with evidence to meet his heavy burden.

The parties do not dispute that nitrogen hypoxia can and ultimately will result in death.  Smith contends the Protocol lacks the "proper controls" to alleviate the

risk of "torture or lingering death," (Doc. 19 at 24, 28 (quoting *Baze*, 553 U.S. at 49–50)), or the "'superadd[ing]' of 'terror, pain, or disgrace,'" (*id.* at 24 (quoting *Bucklew*, 139 S. Ct. at 1124).)   In other words, he argues that there are deficiencies with the Protocol that could unnecessarily prolong his death or result in complications short of death, such as a persistent vegetative state or experiencing a stroke, the sensation of suffocation, or choking.   In his SAC, Smith originally enumerated six purported deficiencies in the Protocol that will subject him to a substantial risk of serious harm.   However, since that time, Smith has been given a complete, unredacted copy of the Protocol and has engaged in limited expedited discovery, both of which appear to have allayed some of those concerns.   As such, at the evidentiary hearing and in his briefing, Smith has reduced those six initial deficiencies down to three: (1) use of an off-the-shelf mask, as opposed to some other device such as a hood, subjects Smith "to a substantial risk of oxygen infiltration"; (2) the specific mask the ADOC intends to use for Smith's execution "will permit the entertainment of room air" resulting in a substantial risk of superadded pain short of death; (3) the Protocol itself, and Smith's individual circumstances—now suffering from PTSD and depression as a result of the failed lethal injection execution attempt and his looming execution—subjects him to a "substantial risk of asphyxiation on his own vomit[.]" (Doc. 65 at 25–44.)   Smith's briefing and arguments at the hearing focus his superadded pain argument on his assertion that the Protocol *may* result in him vomiting while the mask is on which, according to Smith, could cause him to choke and/or could dislodge the seal of the mask, thereby allowing oxygen and outside air into the mask after the nitrogen begins to flow, which risk pain and physical complications short of death.

To reduce or alleviate the purported substantial risk of harm, Smith proposes two allegedly feasible and readily implemented alternative methods: (1) an amended

nitrogen hypoxia protocol that includes ten proposed changes,[12] or (2) death by firing squad using Utah's execution protocol.  (Doc. 31 at 27–28; Doc. 19 at 28–29.)  In support of the firing squad, Smith submitted Utah's execution protocol (*see* Doc. 19-8) and the declaration of Dr. Jonathan I. Groner, M.D., stating:

> The Utah firing squad protocol involves 4 skilled individuals firing 30 caliber bullets directly at the inmate's heart.  These bullets will tear open the heart causing immediate loss of pumping function to the heart.  The loss of pumping function of the heart will cause the blood flow to the brain to cease immediately.  Loss of consciousness occurs a few seconds after blood flow to the brain ceases.  The loss of consciousness that occurs when blood flow to the brain ceases is

---

[12] Smith did not draft a proposed amended nitrogen hypoxia protocol.  Instead, he submitted a bullet-point list of ten proposed amendments:

- Measure each condemned person subject to execution by nitrogen hypoxia for a custom fit mask to reduce the risk that oxygen leaks under the mask seal or, alternatively, use a closed space or a hood.
- Provide a condemned person an opportunity to speak and to audibly pray without being masked.
- Disclose the training that the execution team members will receive in placing and adjusting the mask over the condemned inmate's face, their level of experience with the masks being used, and the metrics that will be used to ensure the mask is "properly placed" and passes the "final inspection."
- Add a mechanism to remove carbon dioxide that the condemned inmate exhales from under the mask.
- Disclose the source of the nitrogen to be used, and information about its transportation and storage to avoid contamination.
- Require testing of the nitrogen gas before use to ensure purity of the nitrogen gas.
- Add procedures to monitor the pulse oximeter throughout the process.
- Add procedures to halt the execution if the condemned person vomits into the mask.
- Add procedures for attempting to execute condemned inmates who have survived a previous attempt and are experiencing PTSD as a result.
- Employ a third-party licensed medical provider who (1) will be permitted to observe the execution process from the time the condemned inmate is taken into the execution chamber until completed, and (2) has the authority to call off or postpone the execution if, in his or her judgment, the condemned inmate is at risk of serious injury short of death.

(Doc. 31 at 27–28 ¶102; Doc. 19 at 28–29.)

complete, meaning the individual cannot experience pain. The inmate will remain comatose and be clinically dead (absence of heart beath, breathing, or any reflexes) within a few minutes.

(Doc. 19-8.)

Smith submitted the declarations of Dr. Yong and Dr. Nitschke, both of whom opined that improper sealing of the face mask, movement of Smith's head or mouth during the execution process, improper gas pressure and flow, vomiting, and respiratory complications specific to an individual person *could* each complicate the execution process and *may* result in prolonged time to death or medical complications short of death—like the sensation of suffocation, panic, stroke, or a persistent vegetative state. Both Dr. Yong and Dr. Nitschke testified at the hearing on December 20, 2023. No evidence was presented showing either Dr. Yong or Dr. Nitschke had read the unredacted Protocol in its entirety, but both testified they had reviewed the redacted Protocol. Dr. Yong testified from his viewpoint as a medical doctor, whose goal is to minimize risks in medical settings to reduce complications and to preserve life and not to reduce complications in a penal setting for the purpose of quickly ending life, as is the case here. From Dr. Nitschke's perspective with a background in assisted suicide, although he stated those seeking assisted suicide now tend to use a hood system instead of a mask, he did not, nor could he, identify to a scientific certainty or likelihood that the ADOC's choice of this particular mask when combined with Smith's physical characteristics or with speaking or praying will in fact cause complications from air leakage or a dislodged seal, and he testified at the hearing that nausea is possible even in a hood system. What both doctors acknowledged, although from different viewpoints, was that nitrogen hypoxia would ultimately cause death.

As to the possibility of vomiting inside the mask during the execution, Stewart-Riley, the Regional Director of the ADOC, testified that the execution team

would remove and clean the mask and check and clean Smith's airway if Smith vomited *before* nitrogen was introduced into the mask. She also testified that the team would not halt the execution if Smith vomited *after* nitrogen was introduced into the mask. Both Dr. Yong and Dr. Nitschke stated, in their professional opinions, the Defendants' proposed procedure to handle vomit *could* lead to death by asphyxiation instead of hypoxia. Notably, neither expert stated, or could state to a scientific or medical certainty, the time to unconsciousness after nitrogen is introduced into the mask, the time to death, or what percentage of oxygen or other breathing air could cause pain if the mask dislodged.

Although Dr. Yong and Dr. Nitschke were largely silent on the possibility that Smith himself could vomit during the execution, Smith introduced the testimony of Dr. Porterfield. Dr. Porterfield testified Smith suffers from nausea resulting from PTSD and depression. She also opined that the Protocol does not account for Smith's individual mental circumstances and therefore may cause him to panic or experience "fight or flight dissociation" during the execution. (Doc. 19-3 at 8.)

Dr. Porterfield acknowledged under questioning by defense counsel that Smith told her that he did not experience nausea during the previous execution attempt and that he did not report to her vomiting from PTSD-induced nausea since that time. No one, including Dr. Porterfield, could state with any certainty whether Smith will feel nauseous during the execution. And no one could state with any certainty the likelihood Smith will vomit during the execution, with or without the mask on, before or during the administration of nitrogen; when, where, or how much he might vomit during the execution, or any other condition or risk. Nor did any witness provide a foundation upon which any such likelihood of vomiting would be based, such as the time of Smith's last meal, whether Smith would eat a last meal, and if so, the volume of stomach contents that would exist at the time of execution. Instead, witnesses merely opined to the theoretical possibility the Protocol may lead

a condemned inmate to vomit, and—by extrapolation—the complications from an episode of vomiting if the mask happened to become dislodged during the execution or was removed altogether.

In response, the Defendants argue that each of the purported deficiencies Smith has identified in the Protocol, although posing *some* theoretical risks, do not rise to the level of *substantial* risk of causing severe pain when compared to Smith's proposed alternatives.  And as to the alternatives, the Defendants argue that Smith's list of proposed amendments to the Protocol fails *Nance*'s "veritable blueprint" standard, *see Nance II*, 597 U.S. at 169 (stating that a condemned person proposing an alternative method of execution must provide "a veritable blueprint for carrying the death sentence out" and "persuade[] a court that the State could readily use his proposal to execute him"), but offer little argument against Utah's method of execution by firing squad except to attack the brevity of Dr. Groner's declaration.

In opposition to Smith's preliminary injunction request, the Defendants submitted the declaration of Stewart-Riley.  (Doc. 39-13.)  Stewart-Riley stated that she is familiar with the mask that is to be used and that the mask "is designed to fit and does fit a broad range of wearers."  (*Id.* at 2.)  She said the mask will be secured to Smith using a five-point harness or strapping system "that allows for a secure fit, even in instances where the wearer needs to be able to communicate with others" when masked.  (*Id.* at 2–3.)  Based on Stewart-Riley's observations, "the strapping system creates a tight seal" and Smith will be able to speak audibly without dislodging the mask.  (*Id.* at 3.)  Stewart-Riley also stated that she has worn the mask herself and she "was able to breathe comfortably and to make [her]self heard by those around [her], including persons in the witness rooms[.]"  (*Id.*)  Finally, she said she and others who wore the mask did not report problems breathing or complications arising from the entrapment of carbon dioxide because the "mask is

40

designed to be used with supplied air and features exhalation valves for venting carbon dioxide." (*Id.*)

As to the mask's design and fit, the court inspected it, including the harness system, the contours and size of the face shield, and the rubber seal. Given its design, the court finds it highly unlikely that the mask would dislodge or that the seal would be broken and outside air introduced if it is tightly secured on the condemned inmate's head in a positive pressure environment, even under the scenarios Smith alleges could break the seal—like audibly speaking or moving his mouth or head.

The Defendants also submitted the declaration of Dr. Antognini. In his declaration, Dr. Antognini opined the time to unconsciousness when nitrogen is introduced into a virtually air-tight mask is 35 to 40 seconds, and the time to death is 10 to 15 minutes. He arrived at his conclusion using case reports studying the lethality of inert gases during industrial accidents and assisted suicides. Dr. Antognini disagreed with Dr. Yong and Dr. Nitschke: it is his "expert medical and scientific opinion that the use of the mask, as proposed, and the delivery of nitrogen to the mask, would result in rapid unconsciousness, followed by cardiac arrest and death[,]" and that the condemned inmate would experience no pain as a result of the nitrogen hypoxia execution process. (Doc. 62-60 at 16–17.) But the court recalls defense counsel's cross-examination of Dr. Yong and, specifically, when Dr. Yong testified that, because so little data exists on the use of inert gases to cause death in humans, he could not give an opinion with any certainty concerning the time to unconsciousness or time to death based merely on extrapolations sourced from industrial accidents or assisted suicides.

What the testimony from the experts shows, if anything from an overall standpoint of consistency, is that the uninterrupted introduction of pure nitrogen will result in nitrogen hypoxia and that nitrogen hypoxia will ultimately lead to death. On this record, there is simply not enough evidence to find with any degree of

certainty or likelihood that execution by nitrogen hypoxia under the Protocol is substantially likely to cause Smith superadded pain short of death or a prolonged death. It could, in a highly theoretical sense, but only if a cascade of unlikely events occurs.[13] Or it may well be painless and quick. Execution by nitrogen hypoxia is novel, and it will remain novel even if the Defendants employ Smith's proposed amendments to the Protocol.

But novel methods of execution are not new to the federal courts, and the Supreme Court has examined them before. After all, although lethal injection is currently the most common form of execution in the present day in this country, it was once novel. So too were the introduction of various types of sedatives and drugs during the evolution of many states' lethal injection protocols over the years. For example, in *Glossip*, the Supreme Court considered the constitutionality of Oklahoma's amended three-drug lethal injection protocol which replaced pentobarbital with midazolam after Oklahoma was unable to source sodium thiopental and pentobarbital. 576 U.S. at 871. Faced with a dearth of evidence relating to the use and effects of midazolam during a lethal injection procedure in humans, the Supreme Court affirmed the district court's denial of a preliminary injunction because the district court had not clearly erred when it found the condemned petitioners failed to establish that a massive dose of midazolam during the lethal injection procedure would entail a substantial risk of severe pain. *Id.* at 883–84. The fact that little or no evidence and scientific proof on the topic existed did not relieve the condemned petitioners of their burden "of showing that the method creates an unacceptable risk of pain." *Id.* at 884.

---

[13] For example, Smith eating a sufficiently large meal at a time sufficiently close to the execution which, together with his anxiety and/or PTSD, results in him vomiting a sufficient volume of stomach contents into the mask after nitrogen has been introduced that in turn clogs his airways or impacts the performance of the mask and requires the execution team to intervene and interrupt the flow of nitrogen.

Again, preliminary injunctions are extraordinary remedies meant to preserve the status quo until the merits of a case are fully and fairly adjudicated. *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001). They are the exception, not the rule. *Barber*, 73 F.4th at 1317 (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)). So, it is Smith's burden to show a substantial likelihood that he will succeed on his Eighth Amendment claim before the court will enjoin his execution to allow him to litigate his challenge, and for good reason. The status quo here is that Smith will be executed by nitrogen hypoxia on January 25, 2024, using the ADOC's current Protocol. Courts presume, based upon the history and development of capital punishment in this country and the legislative process, that the Defendants do not "seek[] to superadd terror, pain, or disgrace to their executions" unless and until a condemned person can make the requisite showing under *Baze* and *Glossip*. *Bucklew*, 139 S. Ct. at 1124–25 (citing *Baze* and *Glossip*).

Considering all the evidence presented and the parties' arguments, Smith has not met that burden. His evidence and allegations amount to speculation, at best "scientific controvers[y,]" well short "of showing that the method creates an unacceptable risk of pain." *Glossip*, 576 U.S. at 882, 884. As in *Glossip*, Smith's own experts effectively conceded that they lacked evidence to prove Smith's case beyond dispute. *See id.* at 884. Proof of *some* theoretical risk does not clear Smith's high hurdle: "[s]imply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Baze*, 553 U.S. at 50. Smith has argued and provided some evidence that the Protocol could theoretically result in some risk of pain if many other events occur, like vomiting or the dislodging of the mask during the execution procedure but—far from providing a feasible, readily implemented alternative nitrogen hypoxia protocol with his list of proposed amendments to the Protocol or his cursory allegations and evidence about

43

the firing squad—he has not shown the current Protocol is sure or very likely to cause substantial risk of serious harm or superadded pain when compared to either of his alleged alternatives, nor that either of his alternative methods would in fact significantly reduce that risk if used instead.

Smith is not guaranteed a painless death. *Bucklew*, 139 S. Ct. at 1124. On this record, Smith has not shown, and the court cannot conclude, the Protocol inflicts both cruel and unusual punishment rendering it constitutionally infirm under the prevailing legal framework. Having failed to show a substantial likelihood of success on the merits, Smith is not entitled to injunctive relief on his Eighth Amendment claim.

### 2. The RLUIPA Claim

In his motion for preliminary injunction, Smith argues that the Protocol "substantially burdens [his] religious exercise by inhibiting audible prayer at the time of his execution." (Doc. 19 at 30.) For the court to issue a preliminary injunction on Smith's RLUIPA claim, Smith must, as a threshold matter, clearly establish a prima facie case—that is, that the Protocol substantially burdens his sincere religious beliefs. *See Hudgens*, 742 F.3d at 1329; *Ramirez*, 595 U.S. at 425. If Smith establishes a prima facie case, the burden then shifts to the Defendants to demonstrate that the Protocol is the least restrictive means of furthering a compelling government interest. *See, e.g.*, *Smith v. Comm'r, Ala. Dep't of Corr.*, 844 F. App'x 286, 291–93 (11th Cir. 2021).

The RLUIPA analysis for Smith's preliminary injunction request begins with RLUIPA's first prong: whether Smith can clearly establish that audible prayer is an exercise of his sincere religious beliefs. Smith's SAC states that he is a man of faith and that he prayed audibly during his previous attempted execution. And during the December 20, 2023 evidentiary hearing, Smith testified to the plans that he and his spiritual advisor have made for the day of his execution, and that those plans include

audibly praying.  Moreover, the Defendants do not appear to question this aspect of Smith's RLUIPA burden.  Accordingly, the court finds that Smith has carried his burden to show that audible prayer is an exercise of his sincere religious beliefs.  The preliminary injunction analysis thus moves to whether Smith has clearly established that the Protocol substantially burdens his ability to audibly pray.

The substantial burden prong of the RLUIPA analysis requires that, for the court to issue a preliminary injunction, Smith clearly establish that the Protocol will force him to "engage in conduct that seriously violates [his] religious beliefs."  *Holt*, 574 U.S. at 360 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720 (2014)).  The Eleventh Circuit has written that "'substantial burden' requires something more than an incidental effect on religious exercise." *Midrash Sephardi*, 366 F.3d at 1227.

> [A] "substantial burden" must place more than an inconvenience on religious exercise; a "substantial burden" is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly. Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct.

*Id.*

The evidence Smith presented that the mask will substantially burden his ability to audibly pray during his execution was, as described above in the court's analysis of Smith's Eighth Amendment claim, speculative.  Dr. Yong and Dr. Nitschke stated via their declarations that improper sealing of the face mask and movement of Smith's head or mouth *could* complicate the execution process and *may* result in prolonged time to death or medical complications short of death.  And Smith stated that this possibility could lead him to elect not to audibly pray while he

is being executed.[14]  So while this assertion could be true, it is speculative because it is not based on any evidence that Smith has presented and because it is untethered from the mask that will be used during Smith's execution.

In contrast to the limited evidence that Smith provided, the Defendants provided substantial evidence showing that the mask used during the execution will not dislodge if Smith elects to audibly pray.  The Defendants provided numerous videos showing multiple individuals on the execution gurney in the execution chamber speaking while wearing the mask without any problem associated with dislodging the mask.  (Docs. 62-72 to 62-77.)  And further, Stewart-Riley stated in her affidavit:

> 3.   The mask that ADOC intends to use is designed to fit and does fit a broad range of wearers. I understand that this type of mask is commonly used for industrial purposes. The mask features a five-point strapping system that allows for a secure fit, even in instances where the wearer needs to communicate with others while wearing the mask.
>
> 4.   I have observed the mask in use in conditions closely replicating those that will take place during the execution. … Based on my observations, the strapping system creates a tight seal. Individuals wearing the mask have been able to speak audibly without dislodging the mask. It would be highly unlikely and very difficult for the wearer to dislodge the mask without use of his or her hands.

(Doc. 39-13 at 2–3.)

In sum, the Defendants have provided substantial evidence that the mask will not dislodge if Smith audibly prays during his execution.  Smith, in contrast, provided little-to-no actual evidence, let alone compelling evidence, to the contrary.  So, while Smith's evidence does suggest that it is *possible* that his audible prayer

---

[14] The court notes that Smith did not plead and did not present evidence that he actually *would* elect not to audibly pray out of fear of dislodging the mask.  Smith's pleadings and evidence only indicate that he believes he would have to choose between the two.  (*See* Doc. 31 at 32–33.)

could dislodge the mask during his execution to some extent, Smith has failed to meet the requisite burden required for this court to issue a preliminary injunction. Having considered the evidence presented at the December 20, 2023 evidentiary hearing as well as the written and physical evidence submitted by the parties, the court concludes that Smith has not clearly established that his ability to audibly pray at the time of his execution will be substantially burdened by wearing the execution mask.[15]  Accordingly, Smith has not shown a substantial likelihood of success on the merits of his RLUIPA claim.

### 3. *The ARFA Claim*

Again, ARFA, unlike RLUIPA, only requires that Smith show that the Protocol will *burden* his religious exercise. *TMAA I*, 980 F.3d at 840.  But the difference between ARFA and RLUIPA is irrelevant here: Smith has not clearly shown that there is likely to be *any* burden on his ability to audibly pray during his execution.  The evidence presented strongly shows the opposite.  Smith will have to wear a mask during his execution, but Smith has not shown that wearing a mask in and of itself burdens the exercise of his religion.  Smith has therefore not shown a substantial likelihood of success on the merits of his ARFA claim.

## V.  CONCLUSION

For these reasons, it is **ORDERED** as follows:

1.	The Defendants' Motion to Dismiss (Doc. 39) is **GRANTED in part and DENIED in part**.  Count One of Plaintiff's Second Amended Complaint (Doc. 31) is **DISMISSED without prejudice**.  Counts Two, Three, Four, and Five remain.

---

[15] In their supplemental briefing, and at the court's suggestion, the Defendants state that they are *willing* to modify the Protocol to allow Smith to audibly pray with his spiritual advisor in the execution chamber with the mask off.  (*See* Doc. 66 at 45–46.)  But the Defendants did not say they *will* in fact modify the Protocol as such, so the court analyzes Smith's preliminary injunction request assuming they will not do so.

2.      Plaintiff's *Motion for Preliminary Injunction to Enjoin Defendants from Executing Mr. Smith by Nitrogen Hypoxia Using Their Protocol* (Doc. 19) is **DENIED**.

**DONE** on this the 10th day of January 2024.

R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE