# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| KENNETH EUGENE SMITH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:23-cv-00656-RAH |
| ) | |
| JOHN Q. HAMM, ) | |
| Commissioner of the Alabama ) | |
| Department of Corrections, ) | |
| ) | |
| and ) | |
| ) | |
| TERRY RAYBON, Warden, ) | |
| Holman Correctional Facility, ) | |
| ) | |
| Defendants. ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFF SMITH'S
## EMERGENCY MOTION TO SUPPLEMENT THE RECORD

Defendants oppose Smith's irregular and unwarranted attempt to introduce new evidence to the record on his denied preliminary-injunction motion, which is now up on appeal. Defendants offer the following arguments:

1. Under bedrock principles of appellate procedure, this Court lacks jurisdiction to act upon matters before the Eleventh Circuit until the appeal is resolved and the mandate issues. This Court may have limited jurisdiction if Smith's motion is construed as a motion under Rule 10(e) of the Federal Rules of Appellate Procedure, but that rule is designed to correct mistakes in the record, not to build a new record

while an appeal is pending.

2. Beyond Rule 10(e), the Eleventh Circuit has equitable authority to supplement the record that district courts do not possess. But even if this Court had such authority, Smith's request would fail. Under binding precedent, the key equitable factor is whether the proffered evidence would be outcome-determinative, and Smith hasn't attempted to reach that high standard. If the Court considers Smith's new evidence, it would not affect the ultimate findings of fact and conclusions of law in this Court's order denying preliminary injunctive relief. Smith's speculative claim still relies on "a cascade of unlikely events," DE69:42 & n.13, even if he has now vomited. And his new evidence does nothing to address his failure to prove that his "alternative methods would in fact significantly reduce that risk if used instead." DE69:44.

## BACKGROUND

Smith alleges that he has had chronic nausea since the November 17, 2022, execution attempt. Though his expert Dr. Porterfield provided an exhaustive analysis of his condition, she did not report that Smith ever vomited. Indeed, she testified at the preliminary-injunction hearing that Smith had never reported any vomiting whatsoever. *See* DE67:143:16-20, 144:12-14; *see also* DE66:23; DE69:39 (confirming that Smith "did not report…vomiting from PTSD-induced nausea"). Nonetheless, the claim that Smith will vomit at a critical moment became one of the

cornerstones of Smith's case at the hearing, *see* DE69:36, and on appeal.

On January 10, 2024, the Court denied Smith's motion for a preliminary injunction. The Court determined that Smith's Eighth Amendment claim rested on a "theoretical possibility," DE69:39, which did not show a risk "sure or very likely" to happen, *Glossip v. Gross*, 576 U.S. 863, 877 (2015). In fact, Smith's fears will materialize "only if a cascade of unlikely events occurs":

> For example, Smith eating a sufficiently large meal at a time sufficiently close to the execution which, together with his anxiety and/or PTSD, results in him vomiting a sufficient volume of stomach contents into the mask after nitrogen has been introduced that in turn clogs his airways or impacts the performance of the mask and requires the execution team to intervene and interrupt the flow of nitrogen.

DE69:42 & n.13. The Court denied Smith's motion, finding that "no one could state with any certainty the likelihood that Smith will vomit," "when, where, or how much he might vomit," or any "foundation upon which any such likelihood of vomiting would be based." *Id.*

The Eleventh Circuit Court of Appeals held oral argument in this case on January 19, 2024, at 3:30pm Eastern. After over an hour of argument—and after the State's time expired—Smith's counsel revealed to the Court in rebuttal that Smith "has been vomiting for about a week." Oral Arg. at 1:17:25, *Smith v. Comm'r, Ala. Dep't of Corr.*, No. 24-10095 (11th Cir. Jan. 19, 2024). By email to the State's trial counsel that day, Smith's counsel also stated that Smith "has been experiencing symptoms *over the past two weeks* that have resulted in and include vomiting."

3

Ex. B. to DE77-2 (emphasis added). Smith's counsel states that he learned of these symptoms on January 18, 2024, after Smith's Eleventh Circuit reply brief was filed. *See* DE77-2:1 & Ex. A to DE77-2.

Smith now moves this Court for leave to supplement the record with (1) his attorney's declaration reporting Smith's out-of-court statement about his recent vomiting, (2) his attorney's supplemental declaration reporting Smith's wife's out-of-court statement about Smith's recent vomiting, and (3) medical records from January 9 and January 18, 2024. The motion should be denied.

### I. The Court Should Deny the Motion on Jurisdictional and Procedural Grounds.

It is axiomatic that "a notice of appeal is an event of jurisdictional significance." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (per curiam). The notice "confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Id.* Smith acknowledged as much in his Rule 28(j) letter to the Eleventh Circuit: "[T]he district court no longer has jurisdiction while this appeal is pending." DE77-2:1. Generally, the district court lacks jurisdiction until the appeal is resolved by the court of appeals and the mandate has issued. *See Zaklama v. Mount Sinai Med. Ctr.*, 906 F.2d 645, 649 (11th Cir. 1990). This rule serves "two important interests: judicial economy…and considerations of fairness." *Shewchun v. United States*, 797 F.2d 941, 943 (11th Cir. 1986).

4

Because this Court lacks jurisdiction over matters involved in the appeal from the Court's denial of the preliminary injunction, Smith first sought relief from the Eleventh Circuit. Smith invoked Rule 28(j) of the Federal Rules of Appellate Procedure, which permits a party to provide notice of supplemental authorities. But a motion to alter the record on appeal is properly brought under Rule 10(e) titled "Correction or Modification of the Record." *See, e.g.*, *Lester v. Portfolio Recovery Assocs., LLC*, 324 F. Supp. 3d 1227, 1231 n.1 (N.D. Ala. 2018) ("PRA never identifies what rule it relies upon in bringing its Amended Motion for Leave.…However, the appropriate rule for analysis is Federal Rule of Appellate Procedure 10."). The Eleventh Circuit thus construed Smith's notice as a motion to supplement, which the panel denied. *See* DE42 (11th Cir.). At the same time, the Court stated that it "would permit Smith to refile his motion after he first seeks relief in the district court." *Id.*

The Eleventh Circuit's invitation for Smith to refile after seeking relief from this Court did not imbue this Court with broad jurisdiction to rule upon matters implicated in Smith's appeal. And Smith's motion cites no authority that would permit him to supplement the record in this Court to benefit his appeal while his appeal is pending. The only rule that grants this Court authority to act regarding the record is Federal Rule of Appellate Procedure 10(e). But Smith does not invoke that rule, and his proposed new evidence is not covered by it, because Rule 10(e) permits

supplementation only if something material was omitted or misstated by "error or accident."

In light of Rule 10(e)'s limited scope, the Eleventh Circuit and courts within it have emphatically rejected attempts to use the rule "as an end-run play to introduce new evidence to the record for the appellate court." *Edwards v. Tift Reg'l Health Sys., Inc.*, No. 7:20-CV-3 (WLS), 2022 WL 1608558, at *3 (M.D. Ga. May 20, 2022). "Rule 10(e) exists to allow the district court to conform the record to what happened, not to what did not." *United States v. Smith*, 493 F.2d 906, 907 (5th Cir. 1974). *Accord United States v. Page*, 661 F.2d 1080, 1082 (5th Cir. 1981) ("New proceedings of a substantive nature, designed to supply what might have been done but was not, are beyond the reach of the rule."); *Anthony v. United States*, 667 F.2d 870, 875 (10th Cir. 1981) (The Rule "does not grant a license to build a new record."); *Thomas v. Lodge No. 2461 of Dist. Lodge 74 of Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 348 F. Supp. 2d 708, 712-13 (E.D. Va. 2004) ("The defendants have not cited, nor has the Court found, a decision supplementing the record" with evidence "that was not available to the district court because it did not exist.").

Smith's motion is not designed to correct the record but to add additional evidence in support of his claims, DE77:2-3, which are admittedly the same "claims on appeal," DE77:5. There is no basis in Rule 10(e) for granting such a motion.

## II. The Court Should Not Exercise Any Equitable Discretion to Grant the Motion Because It Would Not Change the Outcome.

Beyond Rule 10(e), courts of appeals "have the inherent equitable power to allow supplementation of the appellate record." *CSX Transp., Inc. v. City of Garden City*, 235 F.3d 1325, 1330 (11th Cir. 2000). They "rarely" invoke that power—in part because "the district court…has labored without the benefit of the proffered material." *Id.* at 1329-30. And, more importantly here, "[d]istrict courts do not have the same inherent equitable powers as circuit courts have to supplement a record on appeal." *Lester*, 324 F. Supp. 3d at 1233. Otherwise, "[i]f a trial court were to reopen the record with every post-decision development that might have impacted its original judgment, there would be no end to litigation and appellate courts would face a constantly shifting target for review." *Freedman, Levy, Kroll & Simonds v. Mendelson*, 197 F.R.D. 276, 280 (E.D. Va. 2000).[1]

If this Court determines it has equitable authority to expand the appellate record, the Court should not exercise it. The "primary factor" is whether the proffered evidence would "establish beyond any doubt the proper resolution of the pending issues." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206,

---

[1] Additionally, an order granting such relief would be cited as persuasive authority in support of future eleventh-hour attempts to add "newly discovered" evidence while cases are pending in the Eleventh Circuit or the Supreme Court. Respectfully, the Court should not encourage the inevitable chaos and unfairness that would accompany such tactics.

7

1221 n.9 (11th Cir. 2015); *see also Young v. City of Augusta*, 59 F.3d 1160, 1168 (11th Cir. 1995). In extraordinary circumstances, a party may discover a proverbial smoking gun that warrants consideration "in the interests of justice." *CSX Transp.*, 235 F.3d at 1329-30. But Smith has not attempted to make such an extraordinary showing. Instead, he merely suggests that his new evidence would cast doubt on one of this Court's findings, which was not central to its holding.

Far from dispositive beyond doubt, Smith's new evidence does not move the needle. Even if the new evidence is admitted and assumed to be true, it does not overcome or disturb this Court's findings supporting the denial of preliminary injunctive relief. Importantly, this Court found that Smith's claim rests on a "cascade of unlikely events," only one of which was the likelihood that he would vomit at all. DE69:42.

***First***, although revealed in dramatic fashion, the new evidence is unsurprising. When it denied Smith's motion, the Court already had evidence about Smith's nausea. And, as detailed in Smith's motion, DE77:3, the Court already had Dr. Porterfield's opinion that as the second execution date approaches, Smith will face "triggering" reminders of the prior attempt. The Court also had the State's response that if certain personnel and places trigger Smith, then he is much more likely to experience symptoms well before the mask is placed and the nitrogen begins to flow. *See* DE66:24. In sum, the new evidence is not different in kind from the old

evidence, which the Court considered, weighed, and found wanting.

***Second***, even if Smith is likely to vomit at some point, his far-fetched vomiting scenario requires that he vomits during a small window—after the nitrogen begins to flow but before he reaches unconsciousness. Thus, the critical fact here is the time to unconsciousness. As Smith's expert Dr. Nitschke stated, a slower onset of hypoxia means "a greater possibility that the user could vomit during the procedure." DE62-53:§6.1. But, as Dr. Nitschke also stated, rapidly lowering the oxygen level "ensure[s] an almost-immediate loss of consciousness with death following soon after." DE62-53 §14.1. The State's method *will* rapidly lower the oxygen level in the mask, ensuring unconsciousness in seconds.[2]

Because Smith will be unconscious in under one minute (and probably much sooner) and the execution team could ameliorate any vomit at an earlier time,[3] the risk of severely painful asphyxiation is present only if he vomits within a very

---

[2] Dr. Antognini testified that Alabama's system will reduce oxygen levels to 2% in under 45 seconds. *See* DE62-35:266; DE62-60:¶24. With a supplied air respirator, the risk of death is so high that OSHA reports contain some fifty cases of workplace fatalities due to accidental hypoxia. *See* DE62-60:¶29; *see, e.g.*, DE62-95; DE-62-96; DE62-97; DE62-98; DE62-99; DE62-100. OSHA produced a notice to employers using inert gases and warned that "unconsciousness can occur in about 12 seconds." DE62-83:2. In the Ogden (2010) study, a woman committing suicide without assistance, using a cheap mask with visible gaps, became unconscious in 55 seconds. DE62-95:177.

[3] Ms. Stewart-Riley testified that the execution team has practiced procedures for dealing with vomit before nitrogen begins to flow and even simulated vomiting, removing the mask, using a bite guard to perform a finger sweep, and continuing the execution protocol. DE62-33:172, 179-80.

narrow window. And Smith has not shown a likelihood that he will vomit at that precise time. If Dr. Porterfield's trigger theory is correct and Smith vomits at all, it will be much more likely to happen leading up to his execution than right as nitrogen begins to flow.

***Third***, even if Smith vomits, and even if he vomits at the critical time, his claim requires that he will vomit in a way that "completely fill[s] up the airway." DE62-35:308. But Smith has not shown any evidence about the characteristics of the vomit he anticipates, nor about his inability to expel vomit. He argued on appeal that vomit would have nowhere "to go other than back into Mr. Smith's mouth and *potentially* down his airway." Smith Reply Br. at 19 (11th Cir.) (emphasis added). But he cited nothing in the record for that assertion, and it is false. Evidence showed that the volume of the mask is sizable—1.4 liters, DE62-35:160. And video evidence showed that individuals strapped to the gurney are lying at an incline, not completely prone, and that they can lift their heads and move their heads from side to side, *see, e.g.*, DE62-73; DE62-79; DE62-106, such that vomit would have other places "to go" and would not cause severe pain by clogging the inmate's throat.

***Fourth***, as the Court noted at the hearing, "obviously, the more time passes between the meal and the event, the less risk of vomiting." DE67:198. The Court's observation was supported by the testimony of Smith's expert Dr. Yong, who stated that an instruction not to eat solid foods can reduce the risks of vomiting. DE67:69,

78-79. According to Dr. Yong, a person scheduled for a medical procedure that involved anesthesia would be directed not to eat any solid foods in the eight hours before the procedure. *Id.* Dr. Antognini agreed that a nothing-by-mouth order would reduce a patient's risk of vomiting. DE62-35:307. The State does not require Smith to eat anything the day of his execution. There is, therefore, still no evidence about whether Smith will "eat[] a sufficiently large meal at a time sufficiently close to the execution which, together with his anxiety and/or PTSD, results in him vomiting a sufficient volume of stomach contents into the mask after nitrogen has been introduced that in turn clogs his airways or impacts the performance of the mask." DE69:42 n.13. Smith has not shown that Alabama's method of execution is "*sure or very likely* to cause serious illness and needless suffering." *Glossip*, 576 U.S. at 877.

***Fifth***, Smith's claim still fails for want of an alternative that would significantly reduce risk. *See Nance v. Ward*, 597 U.S. 159, 169 (2022) (requiring a "veritable blueprint"). He has no method that would reduce his baseline risk of vomiting. As Dr. Yong testified, DE67:77, and the court found, DE69:38, nausea is a symptom of hypoxia regardless of the method. Defending a hood method, Smith says that "the vomit can leave the hood," Oral Arg. at 1:18:40, *Smith v. Comm'r*. But he has no evidence. Because Smith has not described the method with any particularity—how big, how tight, how secure the hood would be—there is no factual basis for his comparison. His argument that vomit would just "leave"

11

contradicts his position (*see, e.g.*, *id.* at 1:18:55) that the inmate's position on the gurney is part of the reason he would choke.[4] And, of course, Smith's own expert averred that even if Smith's proposed alternative of "a capsule, hood or container" were adopted, "vomiting would still be a possibility." DE62-53:8-9. Thus, Smith's proposed new evidence does nothing to cure his failure to show that "his alternative methods would in fact significantly reduce that risk if used instead." DE69:44.

* * *

Even with his new evidence, Smith has not shown the kind of substantial risk of severe pain sufficient for an Eighth Amendment claim. *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1124 (2019) ("[T]he Eighth Amendment does not guarantee a prisoner a painless death[.]"); *Baze v. Rees*, 553 U.S. 35, 50 (2008) ("Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual.").

---

[4] If the hood has holes large enough to allow vomited material (itself large enough to block the airway) to pass through, then it can't be "sealed," which has been Smith's complaint about the mask from the beginning. *See* DE31:¶85 ("If nitrogen can escape outside the mask, it follows that oxygen can infiltrate inside the mask."). Smith's claim makes no sense. He demands a method that would somehow seal in gas but let out vomit.

## CONCLUSION

Smith's motion should be denied.

        Respectfully submitted,

        Steve Marshall
        *Attorney General*

        **s/ Richard D. Anderson**
        Richard D. Anderson
        *Assistant Attorney General*

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will notify Angelique Ciliberti, Ashley Brook Burkett, Jeffrey Horowitz, Robert Grass, and Andrew Johnson.

**s/ Richard D. Anderson**
Richard D. Anderson
*Assistant Attorney General*

ADDRESS OF COUNSEL:

Office of the Attorney General
Capital Litigation Division
501 Washington Ave.
Montgomery, AL 36130
O: (334) 353-2021
F: (334) 353-8400
Richard.Anderson@AlabamaAG.gov